**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**


APR 29 2014
U.S.D.C. S.D. N.Y.

| | |
|---|---|
| DEUTSCHE BANK NATIONAL TRUST COMPANY, solely in its capacity as Trustee for the MORGAN STANLEY STRUCTURED TRUST I 2007-1, |  |
| Plaintiff, | Civil Action No. |
| v. | |
| MORGAN STANLEY MORTGAGE CAPITAL HOLDINGS LLC, as Successor-by-Merger to MORGAN STANLEY MORTGAGE CAPITAL INC. | |
| Defendant. | |

Plaintiff Deutsche Bank National Trust Company, solely in its capacity as Trustee for the Morgan Stanley Structured Trust I 2007-1 (the "Trust"), brings this Complaint against Defendant Morgan Stanley Mortgage Capital Holdings LLC, as Successor-by-Merger to Morgan Stanley Mortgage Capital Inc. ("Morgan Stanley Capital"). The Trustee hereby alleges as follows:

### NATURE OF THE ACTION

1.    This action arises from Morgan Stanley Capital's failure to honor its contractual commitments arising out of its central role in a residential mortgage-backed securitization. Morgan Stanley Capital served as the Sponsor in that securitization, selling 4,374 mortgage loans (the "Loans" and each a "Loan") with an aggregate principal balance of $735,100,464 into a securitization trust. The Mortgage Loans were pooled and securitized in the Trust, which issued certificates (the "Certificates") that were sold to investors (the "Certificateholders"). Those

Loans were (and remain) the sole source of income from which the Trust makes payments to Certificateholders.

2. Morgan Stanley Capital, by the terms of the contract, assured the Trust and Certificateholders that the borrowers would be likely to repay the Loans. It did so in three ways: *First*, by making a series of representations and warranties regarding underwriting of the Loans, the creditworthiness of the borrowers, and the risk of repayment of the Loans; *second*, by promising to notify the Trustee of breaches of those representations and warranties; and *third*, by promising to cure or repurchase Loans that materially breached the representations and warranties.

3. A preliminary investigation has uncovered that at least 1,620 Loans are defective because the borrowers were not creditworthy or because the Loans did not conform to underwriting standards. And of the 553 Loans forensically reviewed by a re-underwriting firm, nearly *93%* of those Loans (513 thus far) materially breach Morgan Stanley Capital's representations and warranties. On information and belief, the remainder of the Loans, if reviewed, would exhibit a similar defect rate. Indeed, the breaches are so pervasive throughout the Trust that Morgan Stanley Capital knew or should have known of those breaches long before the Trustee provided notice.

4. Not only has Morgan Stanley Capital failed to notify the Trustee of any breaches, but it has failed to repurchase the vast majority of Loans that breach the representations and warranties it made. The Trust, and consequently Certificateholders, has suffered more than $306 million in losses to date, which is over 41% of the original loan balance.

5. Accordingly, the Trustee, on behalf of the Trust, brings this action to enforce the contract and receive the benefit of the parties' bargain.

## THE PARTIES

6.     Deutsche Bank National Trust Company, acting solely in its capacity as Trustee on behalf of the Trust in this action (the "Trustee"), serves as the Trustee for the Trust. The Trustee participates in this action solely in its capacity as Trustee of the Trust, and not in its individual capacity. The Trustee is a national banking association. The Trustee's principal place of business is in Los Angeles, California, and its principal place of trust administration is in Santa Ana, California.

7.     Defendant Morgan Stanley Capital is a limited liability company formed under the laws of New York with its principal place of business in New York. Morgan Stanley Capital's sole member is Morgan Stanley, which is incorporated in Delaware, with its principal place of business in New York.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

9.     Venue is proper in this district pursuant to 28 U.S.C. § 1391, because Morgan Stanley Capital resides within this district and because a substantial part of the events giving rise to the claims occurred within this district.

## FACTUAL ALLEGATIONS

### I.     THE 2007-1 MORTGAGE SECURITIZATION DEAL

10.     The Trust stands at the center of a mortgage-backed securitization, a process in which residential Loans are pooled and deposited into the Trust for the benefit of Certificateholders (the "2007-1 Deal"). These Loans serve as collateral for securities, called

"Certificates," issued by the Trust. The Certificates generate cash flow to Certificateholders when borrowers make principal and interest payments on the Loans in the Trust.

11. Because the Certificates generate cash to Certificateholders only when borrowers of the underlying mortgages actually repay their Loans, the value of the Certificates depends upon the quality of the individual Loans within the Loan pool. Accordingly, the Loans deposited into the Trust were subject to a specific set of representations and warranties regarding their kind, character, and quality, which were meant to ensure that borrowers were creditworthy and that the Loans would be repaid on time.

12. The 2007-1 Deal was created in 2007 through a transaction structure that is standard within the securitization industry.

13. *First*, Morgan Stanley Capital and EMC Mortgage Corporation ("EMC") (each a "Seller" and collectively the "Sellers") sold a pool of Loans to Bear Stearns Asset Backed Securities I LLC (the "Purchaser"), through a Mortgage Loan Purchase Agreement ("MLPA"); the MLPA is attached as Exhibit 1 to this Complaint.

14. *Second*, the Purchaser agreed to deposit the Loans into a trust fund and create the certificates.

15. *Third*, the Purchaser (as depositor of the Loans); Wells Fargo Bank, National Association (as master servicer and securities administrator); and Deutsche Bank National Trust Company (as Trustee) entered into the Pooling and Servicing Agreement ("PSA"), which created the Trust; the PSA is attached as Exhibit 2 to this Complaint. The PSA and the MLPA (the "Agreements") both have a defined closing date of July 6, 2007.

16. *Fourth*, upon the closing of the transaction, the Trustee issued Certificates to Certificateholders.

17. *Fifth*, the parties to the securitization agreed that, after closing, Loan payments were to be collected by "Servicers," parties independent of the Trustee, and then passed on to the Trust for payment of income to Certificateholders.

18. The entire transaction was set up so that Morgan Stanley Capital could sell the Loans to the Trust and their future cash flows to Certificateholders in exchange for collecting substantial fees up front. The Certificateholders' ability to receive those future cash flows largely depended on borrowers' ability to repay the Loans, which in turn depended on the quality of the Loans and their compliance with underwriting guidelines. Because Certificateholders had no way of verifying the underwriting and due diligence that had been done as to the Loans, they had to rely on the representations of Mortgage Stanley Capital in that regard.

## II. MORGAN STANLEY CAPITAL'S CONTRACTUAL OBLIGATIONS

### A. Morgan Stanley Capital's Representations and Warranties

19. Certificateholders are several steps removed from the actual borrowers whose future payments they effectively purchased. As is standard in the securitization industry, Certificateholders did not have access to loan-level detail about whether the individual Loans in the pool – which comprised thousands of homes and borrowers across the country – were in fact what they were represented to be.

20. Morgan Stanley Capital, by contrast, had a great deal more information. As discussed below, prior to acquiring any Loans, Morgan Stanley Capital was able to conduct a review of the loan seller as well as conduct Loan due diligence, including an underwriting guideline review.

21. To address the Certificateholders' lack of knowledge, Morgan Stanley Capital made a series of representations and warranties concerning the Loans' quality and characteristics in the

5

MLPA. MLPA § 10(a), (b)(1)-(24). The representations and warranties cover, among numerous factors, such basic issues as the absence of fraud, error, or negligence when originating the Loans and the Loans' compliance with underwriting standards. Morgan Stanley Capital also has a duty under the MLPA to repurchase Loans that breach any representations and warranties such that the breach "materially and adversely affects the value of the interest" of the Trust and Certificateholders in that Loan (the "Defective Mortgage Loans" and each a "Defective Mortgage Loan").

22. At closing, Morgan Stanley Capital delivered to the Purchaser a schedule containing certain data about the individual Mortgage Loans (the "Mortgage Loan Schedule"). See MLPA § 3. Morgan Stanley Capital also represented and warranted that the information contained in such Mortgage Loan Schedule would be complete and true. MLPA §10(a).

23. In making these representations and warranties, Morgan Stanley Capital assured the various participants in the securitization, including the Trustee and the Certificateholders, that Morgan Stanley Capital would bear the risk that the Loans failed to adhere to minimum quality standards. Morgan Stanley Capital thus accepted the risk that the Loans might be defective and carry concealed risks arising from such things as un-creditworthy borrowers, inflated appraisals, or poor underwriting. Morgan Stanley Capital's representations and warranties expressly survived the closing of the 2007-1 Deal.

24. These representations included:

    a. "The information set forth in the Mortgage Loan Schedule relating to the Mortgage Loans is complete, true and correct as of the Cut-off Date," MLPA § 10(a)(1);

    b. All requirements of any federal, state or local law had been complied with, MLPA § 10(a)(2);

    c. The mortgage and related agreements were, to Morgan Stanley Capital's

knowledge, not falsified and contained no untrue statement or omission of material fact required to be stated therein, MLPA § 10(b)(5);

d. "[T]here [was] no default, breach, violation or event which would permit acceleration existing under the Mortgage or the Mortgage Note and no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event which would permit acceleration," MLPA § 10(b)(7);

e. "No MSMCH Represented Mortgage Loan has an LTV greater than 100%," MLPA § 10(b)(21); and

f. Origination of the mortgage did not involve any predatory or deceptive lending practice, MLPA § 10(a)(2).

25. Through several representations and warranties – such as the no-fraud representation set forth above and the representation and warranty that borrowers would not be approved for a higher-cost product unless their credit history, income, assets, and liabilities warranted such a step, *see* MLPA § 10(b)(13) – Morgan Stanley Capital also represented and warranted that the Loans were originated consistent with the underwriting guidelines.

26. Morgan Stanley Capital's representations and warranties and its obligation to remedy any breaches thereof provided assurances that moderated the risks inherent to owning Certificates that provided an income stream based on whether borrowers repaid the Loans. Allocating the risks associated with Defective Mortgage Loans to Morgan Stanley Capital was an important component of the 2007-1 Deal and reflected Morgan Stanley Capital's significant informational advantages over Certificateholders.

## B. Morgan Stanley Capital's Notice and Repurchase Obligations

27. The parties to the MLPA agreed that if Morgan Stanley Capital breached any of its representations and warranties as to any Loan, and that such breach "materially and adversely affects the value of the interest" of the Trust and Certificateholders in that Loan, Morgan Stanley

7

Capital would be obligated to cure the breach(es) or repurchase the affected Loan(s). MLPA § 10.

28. Morgan Stanley Capital thus promised to protect the Trust (for the benefit of the Certificateholders) and make it whole in the event that a Loan breached applicable representations and warranties. That promise – an industry-standard, bargained-for protection – ensures that Morgan Stanley Capital retains the risk of Defective Mortgage Loans throughout the securitization. The remedial framework comprises two main components: notice and repurchase.

1. Notice

29. *First*, Morgan Stanley Capital was obligated to provide "prompt written notice" of a breach upon "discovery." MLPA § 10. Morgan Stanley Capital's duty applies regardless of whether the other parties to the securitization learned about the breach. MLPA § 10. It also applies whether or not the breaching Loan is in default.

2. Repurchase

a. The Scope and Purpose of the Repurchase Obligation

30. *Second*, Morgan Stanley Capital also expressly obligated itself to cure any defects in a Loan that materially and adversely affected a Loan's value, or to repurchase that Loan at the applicable purchase price. MLPA § 10. (Although Morgan Stanley Capital formerly had the option under the MLPA to substitute new replacement Loans for Defective Mortgage Loans, that option expired on the two-year anniversary of the Closing Date.)

31. Specifically, Morgan Stanley Capital agreed that, if a Loan breached one of the representations and warranties it made, and that breach "materially and adversely affects the value of the interests of the Purchaser" in that Loan, Morgan Stanley Capital was obligated to

8

"cure such breach in all material respects" or repurchase the Loan at the applicable "Purchase Price" (the definition of which is also discussed further below). MLPA § 10.

32. The obligation to cure or repurchase may be triggered by Morgan Stanley Capital's discovery of its own breaches, or by notice to Morgan Stanley Capital of such a breach from another party. MLPA § 10. Thus, regardless of whether Morgan Stanley Capital itself or another party discovers a breach, the MLPA makes clear that Morgan Stanley Capital is obliged "to cure such breach in all material respects" or to repurchase the materially defective Loan.

33. In addition, certain of the Loans sold into the Trust were originated by an entity called Accredited Home Lenders, Inc. ("Accredited"). The MLPA provides that, if a Loan originated by Accredited (an "Accredited Mortgage Loan") contains any breach of a representation and warranty made by Accredited that materially and adversely affects the value of the Loan, and if Accredited fails to cure any such breach or repurchase the Loan, "[Morgan Stanley Capital] will cure, substitute or repurchase such Accredited Mortgage Loan" within the 90-day period. MLPA § 10.

34. Morgan Stanley Capital is obligated to cure or repurchase regardless of whether or not it has any knowledge of the breach when it occurs. MLPA § 10. By contrast, Morgan Stanley Capital did not negotiate for, and did not receive, any contractual right to "rebut" notices of material breaches or any mechanism to challenge whether a breach actually exists.

35. Morgan Stanley Capital must cure or repurchase a Defective Mortgage Loan regardless of the Loan's performance. The MLPA makes clear that Morgan Stanley Capital's cure-or-repurchase obligation continues regardless of whether any Defective Mortgage Loan is modified, foreclosed, or liquidated.

36. The transaction parties expressed their intent that the obligation to cure or

9

repurchase would accrue under specified conditions. The MLPA stated:

> Any cause of action against MSMCH or relating to or arising out of a breach by MSMCH of any representations and warranties made in this Section 10 shall accrue as to any MSMCH Represented Mortgage Loan upon (i) discovery of such breach by MSMCH or notice thereof by the party discovering such breach and (ii) failure by MSMCH to cure such breach, purchase such MSMCH Represented Mortgage Loan or substitute a qualifying Replacement Mortgage Loan pursuant to the terms hereof.

MLPA § 10.

37. The Trustee is contractually empowered pursuant to the PSA to enforce Morgan Stanley Capital's obligations, including its repurchase obligations arising from breaches of the representations and warranties. PSA § 2.02(d).

38. Absent a repurchase obligation, mortgage securitization can alter the relationship that traditionally incentivized prudent lending, i.e., the originator retaining the risk of loss through the life of the loan. In the securitization context, originators earn a profit from the sale of the loan rather than the interest spread. Once the loans are sold, the credit risk on those loans shifts to investors. And investors lack the loan-level information needed to fairly assess that credit risk.

39. Thus, the representations and warranties regarding Loan underwriting, combined with the obligations of notice and cure or repurchase, provide an economically rational means of addressing the credit risk assumed by Certificateholders.

### b. The Purchase Price

40. The MLPA establishes the amount of money the Trust is to receive in the event of a material breach. That amount is the "Purchase Price," defined as:

> (i) 100% of the principal remaining unpaid on such Mortgage Loan as of the date of purchase (including if a foreclosure has already occurred, the principal balance of the related Mortgage Loan at the time the Mortgaged Property was acquired), net of any Servicing Advances and Advances attributable to principal and payable

to the purchaser of the Mortgage Loan if such purchaser is also the servicer of such Mortgage Loan, (ii) accrued and unpaid interest thereon at the applicable Mortgage Rate through and including the last day of the month of such purchase, net of any portion of the Servicing Fee and any Servicing Advances and Advances attributable to interest that is payable to the purchaser of the Mortgage Loan if such purchaser is also the servicer of such Mortgage Loan, plus (iii) any costs and damages (if any) incurred by the Purchaser in connection with any violation of such Mortgage Loan of any anti-predatory lending laws.

41. As that definition makes clear, Morgan Stanley Capital did not negotiate a sunset provision that would end its repurchase obligations in the event a Loan was liquidated as a result of a foreclosure necessitated by a borrower's failure to repay the Loan. To the contrary, the definition of "Purchase Price" could not be clearer: When "a foreclosure has already occurred," the "Purchase Price" includes "the principal balance of the related Mortgage Loan at the time the Mortgaged Property was acquired."

42. The MLPA thus makes it clear that Morgan Stanley Capital's representations and warranties and the associated cure-or-repurchase obligation continue regardless of modification, foreclosure, or liquidation of a Loan. This is consistent with industry practice. Within the residential mortgage-backed securities industry, "repurchase" obligations like those set forth in the MLPA are understood to encompass a sponsor's broad and general duty to make a Trust whole, regardless of the Loan's status as performing or non-performing, active or liquidated. Similarly here, the text and purpose of the Purchase Price definition in the MLPA are clear that this two-part remedial framework operates to make the Trust whole, regardless of when the repurchase takes place. If this were not the case, it would create perverse incentives for responsible parties such as Morgan Stanley Capital to delay repurchasing defective mortgage loans until the point at which the loan had been liquidated, and thereby inoculate the responsible party from its repurchase obligations. This was not the parties' intent when building the repurchase obligation into the Agreements.

11

### C. The Basic Bargain

43. Thus, the basic bargain of the parties was as follows: Morgan Stanley Capital received substantial fees in connection with its participation in the 2007-1 Deal. In exchange for that money, Morgan Stanley Capital conveyed the Loans and the right to receive Loan payments into the Trust; it made an extensive series of representations and warranties regarding the creditworthiness of the borrowers and the riskiness of the Loans; it promised to notify the Trustee of breaches of representations and warranties; and it promised to cure or repurchase Loans that breached the representations and warranties.

### III. MORGAN STANLEY CAPITAL BREACHED ITS REPRESENTATIONS AND WARRANTIES

44. The pool of Loans Morgan Stanley Capital sold to the Trust is replete with material breaches of the representations and warranties concerning the quality of the Loans and the borrowers' creditworthiness.

45. Those breaches are grossly negligent given that, on information and belief, the Loans were made without following minimal underwriting standards or verifying basic and critical information about mortgage borrowers. Upon information and belief, discovery will show still further evidence of Morgan Stanley Capital's gross negligence pervading the pool of the entire 2007-1 Deal.

46. Morgan Stanley Capital's decision to include at least 1,620 Loans in the Trust that materially breached the representations and warranties it made – and its subsequent decision to refuse to cure or repurchase over 90% of those Loans – fundamentally upset the transaction contemplated by the parties and their Agreements. The sheer volume of Defective Mortgage Loans sold to the Trust by Morgan Stanley Capital far exceeds the reasonable expectations of the parties and the scenarios contemplated in the contracts. While the Agreements provide for the occasional, one-off repurchase of a defective Loan, the cure-or-repurchase mechanism was

simply not designed to deal with the thousands of Defective Mortgage Loans currently in the Trust.

## A. The Breach Notice and Repurchase Demand

47. On April 4, 2013, the Trustee sent a letter (the "Letter") to Morgan Stanley Capital enclosing a breach notice (the "Breach Notice"). The Breach Notice informed Morgan Stanley Capital that it had breached one or more representations and warranties for each of 1,620 unique Loans. It also demanded that Morgan Stanley Capital cure or repurchase each Defective Mortgage Loan within the 90-day period required by the MLPA and PSA. A redacted copy of the Letter and Breach Notice is attached to this Complaint as Exhibit 3. Given the pervasive nature of the breaches identified throughout the Trust in the Breach Notice, Morgan Stanley Capital has received sufficient notice of widespread breaches in the Trust to trigger its cure or repurchase obligation with respect to all Defective Mortgage Loans. As of the date of the filing of this Complaint, the 90-day cure period required by the MLPA and PSA has passed, and Morgan Stanley Capital has failed to cure or repurchase all but 149 of those Loans.

48. Of the 1,620 Defective Mortgage Loans, approximately 300 were Loans originated by Accredited. The Certificateholder copied Accredited on the breach notice sent to the Trustee on April 3, 2013 concerning the defective Accredited Mortgage Loans; on April 8, 2013, Accredited's legal counsel responded that the company had filed for bankruptcy; that the corporation had been dissolved; and that it had distributed all its assets, leaving it unable to cure or repurchase the defective Accredited Mortgage Loans. (A redacted copy of that breach notice (and Accredited's response) is attached to this Complaint as Exhibit 4.) Under Section 10 of the MLPA, Morgan Stanley Capital is thus responsible for curing or repurchasing those Loans as well.

49. The 1,620 Defective Mortgage Loans were identified through a forensic analysis

13

process. Some of the Defective Mortgage Loans were identified by a forensic analysis that combined a review of publicly available records, tax records, and credit records with the use of a proprietary, industry-standard automated valuation model ("AVM") to determine the value of each mortgaged property as of the origination date. Other Defective Mortgage Loans were identified through forensic accounting methodologies and analysis of publicly available records. These two forensic analyses revealed that 1,344 Loans were defective.

50. Finally, 513 Defective Mortgage Loans (including some of the same Defective Mortgage Loans discussed above) were identified through a forensic review of the Loan files underlying the Loans. The re-underwriting process involved a thorough analysis of Loan files, including Loan applications, documentation of the borrower's assets, and publicly available information such as bankruptcy records. (The process by which a lender decides whether to make a loan is referred to as the "underwriting" of the loan; the process of reviewing existing loans to assess their compliance with applicable standards is known as "re-underwriting.") The loan-file review was performed by an industry-recognized firm (the "Re-Underwriting Firm") with specialized expertise in re-underwriting mortgage loans to assess their compliance with applicable underwriting guidelines and originator representations and warranties.

51. The breaches identified by the Re-Underwriting Firm are extensive, demonstrating a wholesale abandonment of underwriting guidelines and prudent underwriting practices. The paragraphs below summarize several of the most common types of defects discovered, together with representative examples of each.

### i. Income Misrepresentations

52. The Trust is replete with Defective Mortgage Loans in which the borrowers reported grossly incorrect incomes. In most of these cases, the income misrepresentations were so blatant that Morgan Stanley Capital must have known (or at least should have known) about

14

them at the time the Loans were originated. Many of the claimed incomes were wholly unreasonable given the borrower's asserted employment, locale, and years of job experience. Frequently, borrowers claimed that their incomes were many times greater than the expected range of incomes for the borrower's stated occupation, as determined by data published by the United States Bureau of Labor Statistics and frequently utilized in the industry during the mortgage underwriting process.

53. A loan with inaccurate income information breaches numerous representations and warranties made by Morgan Stanley Capital. For example, if the borrower secured a loan he could not afford by misrepresenting income, then the loan would at least breach the representations that "there [was] no default, breach, violation or event which would permit acceleration existing under the Mortgage or the Mortgage Note and no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event which would permit acceleration." MLPA § 10(b)(7). It would also breach the representation that the Loan was free from "fraud, error, omission, misrepresentation, negligence or similar occurrence[s]." *Id.* § 10(b)(5). These borrower misrepresentations and similar occurrences are defaults under the applicable Loan documents.

54. Misrepresentation of income "materially and adversely" affects the value of the Loans and the Certificateholders' interest in those Loans – for obvious reasons. Borrowers who take out mortgages by misrepresenting income are far less likely to pay those Loans on time on time – if they can pay them at all – making the mortgages more risky than they appear. The following are a few of the Loans that reflect breaches relating to misrepresentation of income:

- **Loan A (\*\*\*\*\*\*\*565[1]):** In a loan that closed in 2006, the borrower secured a mortgage with an original principal balance of $536,000. In the loan application, the borrower reported an income of $12,000 per month from her employment at a

---

[1] Loan numbers are partially redacted for consumer confidentiality purposes.

15

collections agency. A 2006 W-2 form submitted to the originator's loss-mitigation department, however, revealed that the borrower's actual monthly income was only $1,347.95, barely *10%* of the figured claimed on the loan application.

- **Loan B (*****321):** In a loan that closed in 2006, the borrower secured a mortgage with an original principal balance of $188,000. In the loan application, the borrower claimed to earn $11,250 per month as a commercial driver. That claimed income is so unreasonable that it would have put the originator on notice of possible misrepresentations. Data from the United States Bureau of Labor Statistics show that the 90th percentile of income for a commercial driver in the borrower's geographic area in 2006 was $4,104.17 per month, barely a third of what the borrower claimed to earn on the loan application. The originator, accordingly, should have been on notice for misrepresentation given the borrower's unreasonably large income. But there is no evidence in the loan file that the originator did any additional work to verify the borrower's income.

- **Loan C (*******750):** In a loan that closed in 2007, the borrower secured a mortgage with an original principal balance of $225,000. In the loan application, the borrower claimed to earn $6,550 per month as a truck driver. However, no evidence in the loan file shows any effort by the originator to verify the claimed income. Later bankruptcy filings revealed the borrower's real income at the time of origination was $3,333.33 per month, roughly *half* that claimed on the loan application.

- **Loan D (*******951):** In a loan that closed in 2007, the borrower secured a mortgage with an original principal balance of $216,000. On the loan application, the borrower claimed to earn $3,896 per month as a "school transportation associate" for a school district. A 2006 W-2 acquired by the originator's loss-mitigation department revealed that the borrower's actual monthly income was $663.83, just a fraction of the claimed amount.

### ii.   Misrepresentations of Debt Obligations

55.   The Re-Underwriting Firm also discovered numerous Loans to borrowers with debt obligations that were not disclosed on the loan application. Undisclosed debt obligations, at the very least, violate the no-default and no-fraud representations set forth above, as well as the representation that the information set forth in the Mortgage Loan Schedule was complete, true, and correct, MLPA § 10(a)(1). Breaches arising from misrepresentation of debt obligations have a material and adverse effect on the value of the applicable Loan for much the same reason that income misrepresentations do: they increase the possibility that the borrower does not have

sufficient means to repay the Loan. The following are a few of the many examples of breaches relating to misrepresentation of debt obligations:

- **Loan E (\*\*\*\*\*\*\*\*875):** In a loan that closed in 2007, the borrower secured a mortgage with an original principal balance of $628,000.00. Analysis by the Re-Underwriting Firm revealed that the borrower failed to disclose two separate mortgages that the borrower had taken out in the two weeks prior to the loan's closing date. Those undisclosed debts totaled over $1 million, with total monthly payments of approximately $6,104.

- **Loan F (\*\*\*\*\*\*\*286):** In a loan that closed in 2007, the borrower secured a mortgage with an original principal balance of $359,900.00. Analysis by the Re-Underwriting Firm revealed that the borrower failed to disclose a separate mortgage in the amount of $379,000 that the borrower had taken out only three months prior to the loan's closing date. As a result of the undisclosed additional debt, the borrower's actual debt-to-income ratio ("DTI") at the time of origination was 439.71%, far above the allowed DTI.

- **Loan G (\*\*\*\*\*\*595):** In a loan that closed in 2007, the borrower secured a mortgage with an original principal balance of $290,700.00. Analysis by the Re-Underwriting Firm revealed that the borrower failed to disclose multiple mortgages that the borrower had taken out only a week prior to the closing date of the Morgan Stanley Capital loan. In the week before closing, the borrower had refinanced two properties and purchased a third property with liens totaling $848,000 and corresponding monthly payments of $6,125. Because the borrower did not report any of those mortgages, the loan application contains demonstrable misrepresentations.

### iii. Employment Misrepresentations

56. The Re-Underwriting Firm also discovered numerous Loans for which the borrowers misrepresented their employment status at origination, their employment history, or both. Misrepresentations of employment violate, at the least, the no-default and no-fraud representations set forth above and the representation that the information set forth in the Mortgage Loan Schedule was complete, true, and correct, MLPA § 10(a)(1). Such misrepresentations also have a "material and adverse" effect on the value of the applicable Loan. A borrower's employment status is critical to his or her ability to repay the Loan, and misrepresentations concerning employment obscure that the Loan was far riskier than

17

represented. The following are a few of the many examples of breaches relating to misrepresentation of employment:

- **Loan H (\*\*\*\*\*\*\*748):** In a loan that closed in 2007, the borrower secured a mortgage with an original principal balance of $359,800.00. The borrower claimed on the loan application to work as a framer for a construction company. However, the credit report obtained during origination, as well as a later-filed tax return, reveal that the borrower never held that occupation. The file contains no evidence that the originator ever obtained any documentation to verify the borrower's employment, let alone to investigate the obvious discrepancy in the loan file.

- **Loan I (\*\*\*\*\*\*\*\*\*\*585):** In a loan that closed in 2006, the borrower secured a mortgage with an original principal balance of $705,000.00. The borrower claimed on the loan application to work for a construction company. However, the credit report obtained during origination, as well as a later-filed tax return, reveal that the borrower never held that occupation, and was actually a self-employed owner of a candy store. The file contains no evidence that the originator ever obtained any documentation to verify the borrower's employment, let alone to investigate the obvious discrepancy in the loan file.

- **Loan J (\*\*\*\*\*\*\*208):** In a loan that closed in 2006, the borrower secured a mortgage with an original principal balance of $179,980.00. In the loan application, the borrower's claimed occupation was acting as the owner/operator of a fitness business. A letter in the loan file purportedly written by a tax preparer verified the borrower's claimed self-employment. Later research by the Re-Underwriting Firm revealed that the tax preparer had in fact never provided that letter, and that the information in that letter was not accurate.

### iv. Debt-to-Income Ratio Exceeding Guidelines

57. The Re-Underwriting Firm also discovered that the Trust contained numerous Loans with breaches due to higher than represented DTIs (i.e., the percentage of a consumer's income that goes toward paying debts). Loans containing misrepresentations about DTI likewise breach the no-fraud and no-default representations and warranties identified above, as well as the representation that the Mortgage Loan Schedule is complete and correct, MLPA § 10(a)(1). Breaches arising from incorrect DTI also have a material and adverse effect on the value of the applicable Loan and the interest therein of the Certificateholders because a borrower with dangerously high level of debt obligations in relation to the borrower's income is less likely to be

able to repay the Loan, making it more risky than represented. The following are a few of the many examples of breaches relating to incorrect DTI:

- **Loan K (\*\*\*\*\*422):** The loan approval in the loan file permitted a maximum DTI of 50% for a stated income loan. However, the borrower's real income, as verified through a 2007 tax return that was submitted to the originator's loss-mitigation department, resulted in an actual DTI of 401.61%.

- **Loan L (\*\*\*\*\*\*911):** The loan approval in the loan file permitted a maximum DTI of 43% for a full income loan. However, the borrower's real income, as verified through documents created in the loss-mitigation process, resulted in an actual DTI of 778%.

### v. Misrepresentations of Occupancy

58. The Re-Underwriting Firm also discovered that the Trust contained numerous Loans with breaches due to misrepresentations of occupancy (regarding whether the owner of the property actually intends to reside there). Misrepresentations of occupancy breach the no-fraud and no-default representations identified above, as well as the representation that "[t]he information set forth in the Mortgage Loan Schedule relating to the Mortgage Loans is complete, true and correct as of the Cut-off Date," MLPA § 10(a)(1). Breaches arising from misrepresentations of occupancy materially and adversely affect the value of that Loan and the interest therein of the Certificateholders because non-owner-occupied mortgages are generally riskier than owner-occupied mortgages. A borrower is less likely to default on, and walk away from, a mortgage secured by her primary residence than she is with respect to a Loan secured by a second home or investment property. Owner-occupied properties are also generally better maintained and hold their value better than otherwise equivalent rental or investment properties. The following are a few of the many examples of breaches relating to misrepresentation of occupancy:

- **Loan M (\*\*\*\*\*\*\*495):** In a loan that closed in 2007, the borrower secured a mortgage with an original principal balance of $149,000. In the loan application,

19

the borrower claimed that the mortgaged property would be owner-occupied. However, a contact information form that the borrower signed as a part of the loan application listed the borrower's previous address as the place to send mail to the borrower. Post-closing documentation relating to the mortgage was, in fact, sent to the borrower's previous address. Later analysis by the Re-Underwriting Firm confirmed that the borrower has continued to live at his previous address from the closing date of the Morgan Stanley Capital loan through the present year.

- **Loan N (\*\*\*\*\*\*\*841):** In a loan that closed in 2007, the borrower secured a mortgage with an original principal balance of $138,600.00. The borrower claimed on the loan application that the mortgaged property would be owner-occupied. However, lender correspondence about the borrower's loan sent to the mortgaged property was returned unopened. Further, a letter sent to the originator's loss-mitigation office claimed that the borrower never occupied the mortgaged property. Although those red flags would put any originator on notice of misrepresentation, there is no evidence in the loan file that the originator attempted to verify the borrower's occupancy status. Later analysis by the Re-Underwriting Firm revealed that the borrower continued to reside at his previous address through the present year.

- **Loan O (\*\*\*\*\*565):** In a loan that closed in 2006, the borrower secured a mortgage with an original principal balance of $536,000.00. On the loan application, the borrower claimed that the mortgaged property would be owner-occupied. However, documents later submitted to the originator – as well as information later revealed by the work of the Re-Underwriting Firm – demonstrate that the borrower continued to reside at her previous home and instead rented out both units of the mortgaged property.

### vi.  Non-Arm's Length Transactions

59.  The Re-Underwriting Firm also discovered that the Trust contained numerous Loans that were tainted by collusion between buyers, sellers, brokers, and other parties who were supposed to be negotiating on an arm's-length basis. Non-arm's length transactions, at the least, breach the representation and warranty that the Mortgage Notes are legal, valid, and binding, MLPA § 10(b)(5), as well as the representation that Morgan Stanley Capital held good, indefeasible, and marketable title in the affected Loan at the time such Loan was sold to the Trust, *id.* § 10(b)(18). Non-arm's-length transactions may also put the originator on notice of other borrower misrepresentations. Non-arm's-length transactions materially and adversely

affect the value of the subject Loan, by making it less likely that the resulting Loan is the product of sound underwriting and related practices. The following are a few of the many Loans that were not the product of arm's-length transactions.

- **Loan P (*******284):** The borrower secured a mortgage with an original principal balance of $120,000.00. Information on the deed of trust showed that the borrower's husband was both the mortgage broker listed on the loan application and the client listed on the appraisal. Likewise, the person signing the appraisal report for the subject property was the same person who signed a form verifying the borrower's employment. Those signs would have put any underwriter on notice that the transaction was not an arm's length one. However, there is no evidence in the loan file that the underwriter performed any inquiry into possible borrower collusion.

- **Loan Q (*****526):** The borrower secured a mortgage with an original principal balance of $159,000.00. The mortgage broker listed on the Loan Approval and final HUD-1 was also listed as the selling real estate agency on the final HUD-1. Additionally, data from the California Department of Real Estate[2] showed that the two companies are the same, and the loan officer listed on the loan approval was the designated officer of the company. Those signs would have put any underwriter on notice that the transaction was not an arm's length one. But there is no evidence within the loan file that the lender investigated this non-arm's-length transaction.

- **Loan R (*******873):** The borrower secured a mortgage with an original principal balance of $100,000.00. The mortgage broker on the loan application and the selling real estate agency shown on the purchase contact were affiliated businesses. The loan application and the purchase contract showed that the entities both operated at the same address. And the California Department of Real Estate showed that the entities were both in fact the same broker doing business under two separate brand names. Those signs would have put any underwriter on notice that the transaction was not an arm's length one. However, there was no evidence within the loan file that the lender investigated this non-arm's-length transaction.

## IV. MORGAN STANLEY CAPITAL BREACHES ITS NOTICE AND REPURCHASE OBLIGATIONS

### A. Morgan Stanley Capital's Breaches of Its Notice Obligations

60. The foregoing breaches and many others throughout the Loans are so pervasive, and their nature is so flagrant, that Morgan Stanley Capital must have discovered them long ago.

---

[2] The California Department of Real Estate became the California Bureau of Real Estate on July 1, 2013.

61. On information and belief, Morgan Stanley Capital performed such due diligence review on the Loans prior to including them in the 2007-1 Deal, and thus had knowledge of deficiencies in the loan pool. The Prospectus Supplement supplied to investors in connection with the 2007-1 Deal provided as follows:

> Prior to acquiring any residential mortgage loans, MSMCH conducts a review of the related mortgage loan seller that is based upon the credit quality of the selling institution. MSMCH's review process may include reviewing select financial information for credit and risk assessment and conducting an underwriting guideline review, senior level management discussion and/or background checks. . .
>
> The underwriting guideline review entails a review of the mortgage loan origination processes and systems. In addition, such review may involve a consideration of corporate policy and procedures relating to state and federal predatory lending, origination practices by jurisdiction, historical loan level loss experience, quality control practices, significant litigation and/or material investors.

62. In addition, upon information and belief, a reputable mortgage loan due diligence provider provided due diligence to Morgan Stanley, and found that 63,000 loans that Morgan Stanley had sponsored had a rejection rate of 37 percent; nevertheless, Morgan Stanley Capital waived in 56 percent of them, without ever notifying the Trustee or any of the Trust's certificateholders.

63. If Morgan Stanley Capital performed pre-securitization due diligence on the Loans consistent with representations that it made in the Prospectus Supplement, Morgan Stanley Capital would have discovered material violations of underwriting guidelines that breach its representations and warranties regarding the Mortgage Loans. Indeed, the high rate of breaches identified in the Breach Notice demonstrates that any due diligence conducted on the Loans would necessarily have identified breaches of representations and warranties.

64. Nevertheless, Morgan Stanley Capital has never issued notification to the Trustee indicating it has discovered any breaches of the representations and warranties it made.

65. Morgan Stanley Capital's breach of its duty to notify is grossly negligent given that Morgan Stanley Capital had previously discovered pervasive problems with the Loans. Upon information and belief, discovery will show still further evidence of Morgan Stanley Capital's gross negligence in failing to exclude Defective Mortgage Loans they had discovered from the Trust or notify the Trustee or any other parties regarding such discovered breaches.

66. Morgan Stanley Capital's awareness of widespread defects in the Loans also shows that it has waived any benefit it might obtain from the notice provisions in Section 10 of the MLPA because providing further notice to Morgan Stanley Capital would be futile. Morgan Stanley Capital has known for years that Defective Mortgage Loans were included in the loan pool, but Morgan Stanley Capital refused to fulfill its obligations to provide notice of those defects and to cure or repurchase such Defective Mortgage Loans. Providing notice to Morgan Stanley Capital of defects it already discovered would be pointless because Morgan Stanley Capital failed to honor its obligations after discovering Defective Mortgage Loans.

**B. Morgan Stanley Capital's Breaches of Its Repurchase Obligations**

67. The 90-day period for Morgan Stanley Capital to cure or repurchase the Defective Mortgage Loans identified in the Letter and Breach Notice (including the defective Accredited Mortgage Loans) expired on July 3, 2013. At the conclusion of that period, Morgan Stanley Capital had failed to cure or repurchase a single one of the Defective Mortgage Loans identified by the Trustee, notwithstanding its clear obligation to do so under the PSA and MLPA. Since then, Morgan Stanley Capital has repurchased 149 Loans but has failed to abide by its contractual obligations with respect to the remaining 1,471.

68. Morgan Stanley Capital's refusal to honor its obligations shifted the risk occasioned by the Defective Mortgage Loans onto the Trust and Certificateholders in violation of the PSA and MLPA's terms and the commercially reasonable expectations of the parties.

69. The purpose of the repurchase remedy is to secure for the Trust (on behalf of the Certificateholders) the economic benefit of the bargain and to place the risk of Defective Mortgage Loans upon Morgan Stanley Capital. To the extent the repurchase remedy does not achieve that purpose, Plaintiff is entitled to alternative remedies, including an award of damages.

## CLAIMS FOR RELIEF
### Count One
### (Breach of Contract — Breach of
### Morgan Stanley Capital's Representations and Warranties)

70. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 69, inclusive, of this Complaint as if fully incorporated herein.

71. Morgan Stanley Capital made certain representations and warranties concerning the condition of the Loans to facilitate their ultimate sale to the Trust in exchange for valid consideration paid. These representations and warranties were made by Morgan Stanley Capital to the Trustee, who acts under the PSA for the benefit of the Certificateholders.

72. Morgan Stanley Capital obligated itself in Section 10 of the MLPA to cure or repurchase Loans upon notice or discovery that such Loans are in breach of the representations and warranties it made and that such breaches materially and adversely affect the value of the Loans or the interests of the Trust and Certificateholders therein.

73. Morgan Stanley Capital has breached the representations and warranties it made with respect to the Defective Mortgage Loans held by the Trust.

74. The Trustee has performed all of its obligations under the PSA and MLPA required to be performed in connection with the matters described herein, and has not breached any

24

obligation or excused the performance by Morgan Stanley of any of its obligations under the PSA and MLPA. The Trustee has substantially complied with any applicable notice requirements, or compliance has been rendered futile by Morgan Stanley Capital's actions.

75. Morgan Stanley Capital's breaches of representations and warranties have materially and adversely affected the value of the Trustee's and Certificateholders' interests in the Defective Mortgage Loans within the meaning of Section 10 of the MLPA.

76. Morgan Stanley Capital's cure and repurchase obligations arise whether Morgan Stanley Capital discovers the Defective Mortgage Loans on its own or is provided notice thereof by the Trustee.

77. Morgan Stanley Capital discovered the Defective Mortgage Loans on its own, thereby triggering its cure and repurchase obligations.

78. Pursuant to the Breach Notice, Morgan Stanley Capital was notified under the PSA and MLPA that it had breached the representations and warranties it made with respect to 1,620 specific Loans (including approximately 300 Loans originated by Accredited), and that those breaches materially and adversely affected the value of the Loans and the interest of the Trustee or the Certificateholders therein, again triggering its repurchase obligations, and placing it on notice that widespread breaches existed throughout the entire pool of Loans. The aggregate Purchase Price for the 1,620 noticed Loans is approximately $320,268,383.

79. As a direct and proximate result of Morgan Stanley Capital's breaches of the representations and warranties it made, the Trust has suffered and continues to suffer significant damages. Accordingly, Morgan Stanley Capital should be required to pay compensatory damages for the harm it has caused the Trust by breaching the representations and warranties it made.

80.     Plaintiff is therefore entitled to damages caused to the Trust by Morgan Stanley Capital's conduct, in an amount to be proven at trial.

81.     Plaintiff is also entitled to an order of specific performance requiring Morgan Stanley Capital to repurchase all Defective Mortgage Loans in the Trust that Morgan Stanley Capital has not yet repurchased. The Trustee reserves the right to seek repurchase of additional Loans (and to introduce evidence of additional breaches affecting previously noticed Defective Mortgage Loans) based on discovery, investigation, and further forensic analysis of loan files for other Mortgage Loans held in the Trust.

82.     The Trust is also entitled to rescission or rescissory damages. Rescission is warranted because Morgan Stanley Capital is in willful and material breach of the PSA, as shown by its failure to repurchase Loans and repudiation of its repurchase obligations after explicit notice from the Trustee, and because, upon information and belief, Morgan Stanley Capital was aware that the Defective Mortgage Loans were in breach well before receiving the Trustee's notice.

83.     Morgan Stanley Capital's breaches are so widespread as to defeat the purpose of the contract. Allowing Morgan Stanley Capital to escape its contractual repurchase obligations at the Trust's expense would be inequitable. To the extent rescission itself is impractical, or would not achieve its essential purpose, rescissory damages should be awarded to achieve the financial equivalent for the Trust of rescission.

### Count Two
### (Breach of Contract — Breach of Morgan Stanley Capital's Repurchase Obligations)

84.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 83, inclusive, of this Complaint as if fully incorporated herein.

85. Morgan Stanley Capital made certain representations and warranties concerning the Loans to the Trust and the Trustee.

86. Morgan Stanley Capital obligated itself in Section 10 of the MLPA to cure or repurchase Loans upon notice or discovery that such Mortgage Loans are in breach of its representations and warranties and that such breaches materially and adversely affect the value of the Loans or the interests of the Trustee and Certificateholders therein.

87. The Defective Mortgage Loans held in the Trust breach Morgan Stanley Capital's representations and warranties. Such breaches have materially and adversely affected the value of such Loans and the Trustee's and Certificateholders' interests therein within the meaning of Section 10 of the MLPA.

88. Pursuant to Section 10 of the MLPA, Morgan Stanley Capital is obligated to cure each such breach or repurchase the subject Defective Mortgage Loan at the contractually defined Purchase Price.

89. Pursuant to the Breach Notice, Morgan Stanley Capital was notified under the PSA and MLPA that it had breached the representations and warranties it made with respect to 1,620 specific Loans (including approximately 300 Loans originated by Accredited), and that those breaches materially and adversely affected the value of the Loans and the interest of the Trustee or the Certificateholders therein, again triggering its repurchase obligations, and placing it on notice that widespread breaches existed throughout the entire pool of Loans. The aggregate Purchase Price for the 1,620 noticed Loans is approximately $320,268,383.

90. Morgan Stanley Capital has failed to cure any of its breaches of representations and warranties and failed to repurchase over 90% of the Loans for which it has breached

representations and warranties. Those failures constitute further breaches of Morgan Stanley Capital's obligations under the PSA and MLPA and a repudiation of those contracts.

91. The Trustee has performed all of the obligations under the PSA and MLPA that it is required to perform in connection with the matters described herein and has not breached any obligation or excused the performance by Morgan Stanley Capital of any of its obligations under the Agreements. The Trustee has complied with any applicable notice requirements, or compliance has been rendered futile by Morgan Stanley Capital's actions.

92. Plaintiff is, therefore, entitled to an order of specific performance requiring Morgan Stanley Capital to repurchase all Defective Mortgage Loans that Morgan Stanley Capital has not yet repurchased at the Purchase Price. The Trustee reserves the right to seek repurchase of additional Loans (and to introduce evidence of additional breaches affecting previously noticed Defective Mortgage Loans) based on discovery, investigation, and further forensic analysis of loan files for other Loans held in the Trust.

93. As a direct and proximate cause of Morgan Stanley Capital's breaches of its repurchase obligation, the Trust has suffered and continues to suffer significant damages. Accordingly, Morgan Stanley Capital should be required to pay compensatory damages for the harm it caused to the Trust by its conduct.

94. The Trust is also entitled to rescission or rescissory damages. Rescission is warranted because Morgan Stanley Capital is in willful and material breach of the Agreements, as shown by its failure to repurchase Loans and repudiation of its repurchase obligations after explicit notice from the Trustee, and because, upon information and belief, Morgan Stanley Capital discovered that the Defective Mortgage Loans were in breach well before receiving the Trustee's notice. Morgan Stanley Capital's breaches are so widespread as to defeat the purpose

28

of the contract. Allowing Morgan Stanley Capital to escape its contractual repurchase obligations at the Trust's expense would be inequitable. To the extent rescission itself is impractical, or would not achieve its essential purpose, rescissory damages should be awarded to achieve the financial equivalent for the Trust of rescission.

95. Plaintiff is therefore entitled to damages caused to the Trust by Morgan Stanley Capital's conduct, in an amount to be proven at trial.

### Count Three
### (Breach of Contract — Breach of Morgan Stanley Capital's Obligation to Notify)

96. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 95, inclusive, of this Complaint as if fully incorporated herein.

97. Morgan Stanley Capital made certain representations and warranties in the MLPA, including representations and warranties regarding the condition of the Loans.

98. Under Section 10 of the MLPA, Morgan Stanley Capital was required to give prompt written notice to the Trustee upon discovery of a breach of these representations and warranties.

99. Upon information and belief, Morgan Stanley Capital discovered that the Defective Mortgage Loans breached Morgan Stanley Capital's representations and warranties but failed to give prompt written notice of any breaches to the Trustee. Morgan Stanley Capital thereby breached its obligations to the Trustee under the PSA and MLPA.

100. The Trustee has performed the obligations under the PSA and MLPA required to bring suit and has not excused the performance by Morgan Stanley Capital of any of its obligations under the Agreements.

101. The Trust has been injured and suffered damages because of Morgan Stanley Capital's breaches.

102. Morgan Stanley Capital must specifically perform its obligations under the PSA and MLPA and give prompt written notice of any breaches of its representations and warranties.

103. Morgan Stanley Capital must also pay the Trust damages caused by its failure to notify the Trustee and other parties that representations and warranties had been breached.

104. Morgan Stanley Capital is therefore entitled to damages caused to the Trust by Morgan Stanley Capital's conduct, in an amount to be proven at trial.

105. The Trust is also entitled to rescission or rescissory damages. Rescission is warranted because Morgan Stanley Capital is in willful and material breach of the Agreements, as shown by its failure to provide notice even though Morgan Stanley Capital was aware that the Defective Mortgage Loans were in breach. Such breaches are so widespread as to defeat the purpose of the contract. Allowing Morgan Stanley Capital to escape its contractual repurchase obligations at the Trust's expense would be inequitable. To the extent rescission itself is impractical, or would not achieve its essential purpose, rescissory damages should be awarded to achieve the financial equivalent for the Trust of rescission.

106. Plaintiff is therefore entitled to damages caused to the Trust by Morgan Stanley Capital's conduct, in an amount to be proven at trial.

### Count Four
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

107. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 106, inclusive, as if fully incorporated herein.

108. Morgan Stanley Capital has contended – wrongly – that Plaintiff is entitled to no relief even though hundreds of breaching Loans were discovered by Morgan Stanley Capital yet deposited into the pool, causing the Trust to suffer massive losses.

109. By (i) depositing large numbers of Defective Mortgage Loans into the Trust, (ii)

30

then keeping silent about the defects, and (iii) contending that the Trustee has no right to have those breaching Loans repurchased, Morgan Stanley Capital breached the implied covenant of good faith and fair dealing.

110. Morgan Stanley Capital acted in a commercially unreasonable manner and took bad-faith steps, or failed to take steps it was obligated to take. Morgan Stanley Capital failed to disclose the Defective Mortgage Loans and voluntarily cure or repurchase over 90% of the Loans. Morgan Stanley Capital's wrongful conduct is designed to deprive the Trustee, the Trust, and the Certificateholders of the benefit of their bargain and prevent them from realizing the intended purpose of the MLPA and PSA.

111. The Trust has been damaged and will continue to be damaged in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, the Trust, acting through the Trustee, respectfully requests that the Court enter judgment in its favor and against Morgan Stanley Capital as follows:

(1) Enter Judgment in favor of Plaintiff and against Morgan Stanley Capital on Plaintiff's claims that Morgan Stanley Capital has breached the representations and warranties it made, its notice obligations, and its cure and repurchase obligations with respect to each of the Defective Mortgage Loans including, but not limited to, each of the Defective Mortgage Loans identified in the Breach Notices (and including the defective Accredited Mortgage Loans), at the defined purchase price;

(2) Enter an order of specific performance requiring Morgan Stanley Capital to repurchase each of the Defective Mortgage Loans that Morgan Stanley Capital has not yet repurchased including, but not limited to, each of the Defective Mortgage Loans identified in the

Breach Notice (and including the defective Accredited Mortgage Loans), at the defined Purchase Price;

(3)     Award compensatory, consequential, and/or rescissory damages against Morgan Stanley Capital in an amount to be proven at trial;

(4)     Award attorneys' fees, costs, and other related expenses;

(5)     Award pre-judgment and post-judgment interest; and

(6)     Award such further relief as this Court deems just and proper.

Dated: April 28, 2014

Respectfully submitted,

Steven F. Molo
Justin M. Ellis
MOLO LAMKEN LLP
540 Madison Avenue
New York, NY 10022
(212) 607-8160 (telephone)
(212) 607-8161 (facsimile)

*Attorneys for Plaintiff*