UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

DEUTSCHE BANK NATIONAL TRUST CO., :
solely in its capacity as Trustee for the :
MORGAN STANLEY STRUCTURED TRUST I :
2007-1, :
                                                            :
                                        Plaintiff, :
                                                            :
            -v-                                         :
                                                            :
MORGAN STANLEY MORTGAGE CAPITAL :
HOLDINGS LLC, as Successor-by-Merger to :
MORGAN STANLEY MORTGAGE CAPITAL :
INC., :
                                                            :
                                        Defendant. :

------------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: January 25, 2018

14-cv-3020 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

This is one of a number of cases concerning residential mortgage-backed

securitization trusts created in the lead-up to the financial crisis of 2007. Deutsche

Bank National Trust Co. ("Deutsche Bank" or "plaintiff"), in its capacity as Trustee

for the Morgan Stanley Structured Trust I 2007-1 ("MSST 2007-1" or the "Trust"),

commenced this action against Morgan Stanley Mortgage Capital Holdings LLC[1]

("Morgan Stanley" or "defendant") on April 28, 2014. (See Compl., ECF No. 2.)

Plaintiff alleges, in relevant part, that defendant damaged the Trust by:

(1) transferring a substantial number of materially breaching loans into the Trust;

and (2) failing to notify the Trustee of those breaches as required. (See id. ¶¶ 70-

111.)

---

[1] Morgan Stanley Mortgage Capital Holdings LLC is successor-by-merger to Morgan Stanley
Mortgage Capital Inc., the entity that originally sponsored the securitization at issue here. For sake
of convenience, the Court refers to defendant as "Morgan Stanley" throughout this Opinion & Order.

Currently before the Court is defendant's motion for summary judgment under Fed. R. Civ. P. 56 ("Rule 56"). (ECF No. 111.) Plaintiff opposed that motion on June 22, 2017 (ECF No. 120), and defendant replied on July 24, 2017 (ECF No. 124). This action was originally assigned to Judge Laura Taylor Swain, but was transferred to the undersigned for all purposes on September 11, 2017. On December 19, 2017, the Court requested additional briefing regarding Morgan Stanley's earlier-filed motion to dismiss (ECF No. 138); it received the parties' respective submissions on January 8, 2018 (ECF Nos. 139 and 140).

In resolving the present motion, this Court is not charting new territory—many if not all of Morgan Stanley's arguments have been considered and decided by other courts in this circuit and elsewhere. For the reasons stated below, this Court concludes that there are triable issues of fact, and therefore DENIES defendant's motion for summary judgment.

I.    BACKGROUND

The following facts are drawn from the parties' respective submissions under Local Civ. R. 56.1 as well as documents submitted in connection with the pending motion for summary judgment. The facts are undisputed unless otherwise noted.

A.    The MSST 2007-1 Securitization

In 2007, Morgan Stanley sponsored the creation of Morgan Stanley Structured Trust I 2007-1 ("MSST 2007-1" or the "Trust"), a residential mortgage-backed securitization trust originally containing 4,374 individual mortgage loans (the "Mortgage Loans"). (Pl.'s Resp. to Def.'s Local Civ. R. 56.1 Statement of

Undisputed Material Facts and Statement of Additional Facts ("Pl.'s 56.1 Resp.") ¶¶ 1-3, 8, ECF No. 121.) Although MSST 2007-1 is the only trust at issue here, similar trusts created in the lead-up to the 2007 financial crisis (including others sponsored by Morgan Stanley) have spurred extensive litigation in this circuit and across the country.[2]

As sponsor of the MSST 2007-1 securitization, Morgan Stanley acquired the underlying Mortgage Loans from third-party originators (the "Originators"), and then pooled and conveyed them to the Trust through a series of transactions described infra. (Id. ¶¶ 3-6.) Although Morgan Stanley acquired, pooled, transferred, and made certain representations and warranties concerning the Mortgage Loans, it did not originate any of the Mortgage Loans.

The Mortgage Loans, once transferred to MSST 2007-1, effectively served as collateral for resulting financial instruments known as residential mortgage-backed securities ("RMBS"). (Id. ¶¶ 6-7.) Those securities (or "certificates") were sold to investors (or "certificateholders") in exchange for the right to receive future principal and interest payments as borrowers repaid their loans to the Trust. Deutsche Bank, the plaintiff herein, was party to the agreement that created the Trust, and serves as Trustee of MSST 2007-1. (Id. ¶ 1.)

---

[2] This Court refers the reader to the Second Circuit's recent decision in Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc., 873 F.3d 85 (2d Cir. 2017) ("Nomura Holding II") for helpful background regarding the securitization process and the RMBS industry in general.

B.    The Governing Agreements

Like most RMBS trusts, MSST 2007-1 was created pursuant to a coordinated series of transactions involving multiple financial entities.  Two of those transactions are of primary relevance here: (1) the Mortgage Loan Purchase Agreement by which Morgan Stanley (and an associated entity) sold certain mortgage loans to a depositor; and (2) the Pooling and Servicing Agreement by which the depositor transferred all right, title, and interest in those mortgage loans to the Trust in exchange for certificates.

1.    The Mortgage Loan Purchase Agreement

By agreement dated May 1, 2007, Morgan Stanley sold an initial pool of mortgage loans to EMC Mortgage Corporation ("EMC"), a wholly-owned subsidiary of Bear, Stearns & Co., Inc. ("Bear Stearns").  (Id. ¶ 4.)  Morgan Stanley and EMC then sold that pool, along with other mortgage loans, to Bear Stearns Asset Backed Securities I LLC ("BSABS") pursuant to a Mortgage Loan Purchase Agreement ("MLPA") dated July 6, 2007.  (Id. ¶ 5.)  The MLPA explicitly anticipated that BSABS would concurrently "deposit the Mortgage Loans into a trust fund . . . and create [MSST 2007-1] . . . under a pooling and servicing agreement, to be dated as of June 1, 2007."  (Decl. of Brian S. Weinstein ("Weinstein Decl.") Ex. F ("MLPA") at 1, ECF No. 114-10.)

As relevant here, the MLPA contains a number of representations and warranties ("R&Ws") that Morgan Stanley made regarding the included loans.  Although the parties disagree about the meaning, scope, and application of certain

R&Ws, the language itself is certain and undisputed.  Below is a brief summary of
the R&Ws most relevant to the current motion:

- First, in § 10(a), Morgan Stanley made three R&Ws "[w]ith respect to each
  Mortgage Loan" included in the MLPA.  (Id. § 10(a) at 12-13.)  Specifically,
  Morgan Stanley represented and warranted that: (1) the information set
  forth in the attached "Mortgage Loan Schedule" was "complete, true and
  correct as of the Cut-off Date"; (2) it had complied with "[a]ny and all
  requirements of any federal, state or local law" applicable to the loan; and
  (3) no Mortgage Loan was a "High Cost Loan" or "Covered Loan," as those
  terms were defined in the MLPA.  (Id.)

- Second, in § 10(b), Morgan Stanley made twenty-four additional R&Ws
  with respect to "MSMCH Represented Mortgage Loans," defined to
  include all loans originated by one of eight originators.[3]  (Id. § 10(b) at 13-
  17.)  Of note, Morgan Stanley represented and warranted that: (1) "[n]o
  fraud, error, omission, misrepresentation, negligence or similar occurrence
  . . . has taken place on the part of MSMCH, or, to the knowledge of
  MSMCH . . . or any other party involved in the origination of the [loan]"
  (Id. § 10(b)(5) at 14); (2) each mortgage file contains a property appraisal
  that satisfies certain regulatory requirements (Id. § 10(b)(20) at 17); and

---

[3] The MLPA defines "MSMCH Represented Mortgage Loans" as those originated by: (1) Aames
Capital Corporation; (2) Aegis Mortgage Corporation; (3) Decision One Mortgage Company, LLC;
(4) First NLC Financial Services, LLC; (5) MILA, Inc.; (6) New Century Mortgage Corporation;
(7) Option One Mortgage Corporation; and (8) Wilmington Finance Inc.  (MLPA § 1 at 4.)  The list
does not include loans originated by Fremont Investment & Loan, Accredited Home Lenders, Inc.,
and WMC Mortgage Corp.  (Pl.'s 56.1 Resp. ¶ 32.)

(3) "[n]o MSMCH Represented Mortgage Loan has an LTV greater than 100%" (Id. § 10(b)(21) at 17).

The MLPA also contains a "Repurchase Protocol" that sets out a procedure for addressing potential breaches of the various R&Ws:

> Upon discovery or receipt of notice by MSMCH or the Purchaser of a breach of any representation or warranty of MSMCH set forth in this Section 10 which materially and adversely affects the value of the interests of the Purchaser in any of the MSMCH Represented Mortgage Loans . . . the party discovering or receiving notice of such breach shall give prompt written notice to the others.  In the case of any such breach . . . within 90 days from the date of discovery by MSMCH, or the date MSMCH is notified . . . of such breach . . . MSMCH will, (i) cure such breach in all material respects, (ii) purchase the affected Mortgage Loan at the applicable Purchase Price or (iii) if within two years of the Closing Date, substitute a qualifying Replacement Mortgage Loan in exchange for such MSMCH Represented Mortgage Loan.[4]

(Id. § 10 at 18.)  Although loans originated by Accredited Home Lenders, Inc. ("Accredited") are not "MSMCH Represented Mortgage Loans," Morgan Stanley further agreed to "cure, substitute or repurchase" any Accredited-originated loan that breached "a representation or warranty set forth in this Section 10 made by Accredited with respect to an Accredited Mortgage loan" in the event Accredited failed to do so (the "Backstop Provision").  (Id.)

Additionally, the MLPA includes the following "Sole Remedy Provision" (or "SRP"):

> [t]he obligations of MSMCH to cure, purchase or substitute a qualifying Replacement Mortgage Loan shall constitute the Purchaser's, the Trustee's and the Certificateholder's <u>sole and exclusive remedy</u> under this Agreement

---

[4] The MLPA defines "Purchase Price" as "100% of the principal remaining unpaid on such Mortgage Loans as of the date of Purchase (including if a foreclosure has already occurred, the principal balance of the related Mortgage Loan at the time the Mortgaged Property was acquired" along with "accrued and unpaid interest thereon at the applicable Mortgage Rate through and including the last day of the month of such purchase." (Id. § 1 at 5.)

or otherwise respecting a breach of representations or warranties hereunder with respect to the MSMCH Represented Mortgage Loans.

(Id. (emphasis added).)

> 2. The Pooling and Servicing Agreement

Concurrently with execution of the MLPA (and as specifically contemplated by that agreement), BSABS transferred "all right, title and interest" in the Mortgage Loans to the Trust pursuant to a Pooling and Servicing Agreement ("PSA") dated June 1, 2017, thereby creating MSST 2007-1. (Pl.'s 56.1 Resp. ¶¶ 1, 6.) Deutsche Bank and Wells Fargo Bank, National Association ("Wells Fargo") were parties to the PSA as "Trustee" and "Master Servicer and Securities Administrator," respectively. (Id. ¶ 1.) The transaction closed on July 6, 2007. (Weinstein Decl. Ex. B ("PSA") at § 1.01, ECF No. 114-2.)

> C. Pre-Litigation History

> 1. Accredited's Bankruptcy Proceedings

In 2009, Accredited—the originator of certain loans included in MSST 2007-1—filed for bankruptcy in the United States Bankruptcy Court for the District of Delaware. See Voluntary Pet. (Chapter 11), In re Accredited Home Lenders Holding Co., No. 09-BK-11516 (Bankr. D. Del. May 1, 2009), ECF No. 1. Deutsche Bank, in its capacity as Trustee for any trust "which hold[s] mortgage loans originated or sold by [Accredited]" and on behalf of "itself, the Trusts, and the owners of certain [RMBS] issued by the Trusts," filed a proof of claim in those proceedings on October 6, 2009. (See Weinstein Decl. Ex. JJ ("DB Claim") § 1 at 1, ECF No. 114-42.) The DB Claim explicitly referred to Accredited's obligation to

cure or repurchase materially breaching loans, and "assert[ed] a contingent, unliquidated claim against [Accredited] for indemnification for, <u>inter alia</u>, all losses, claims, expenses and damages . . . arising out of or based upon any [such] breaches." (<u>Id.</u> § 14 at 3.)

On November 27, 2009, the bankruptcy court approved a stipulation that ostensibly resolved the DB Claim. <u>See</u> Order, <u>In Re Accredited Home Lenders Holding Co.</u>, No. 09-BK-11516 (Bankr. D. Del. Nov. 27, 2009), ECF No. 3103. In exchange for a "non-priority general unsecured claim in the amount of $2,995,283.82," Deutsche Bank agreed to the following release:

> . . . DB, solely in its capacity as Trustee for each of the <u>applicable trusts</u>, fully and forever releases, surrenders, gives up and discharges the Debtors, the Trustee, the Plan Administrator, the Trust Advisory Board and each of their respective professionals and advisors (collectively, the "Released Parties") from any and all claims . . . whether now known or hereinafter known, that DB ever had, may have had or may have against the Released Parties solely with respect to the DB Claim[.]

(Weinstein Decl. Ex. LL ("Accredited Release") §§ 2-3 at 7-8, ECF No. 114-44 (emphasis added).) Although the term "applicable trusts" is not explicitly defined, the stipulation does include a clause stating:

> This Stipulation is inapplicable and has no effect on any other trusts upon which DB serves as trustee but is not specifically referenced on the attached Exhibit A and the Parties reserve all of their respective rights, claims, defenses, setoffs, or otherwise with respect to such other trusts.

(<u>Id.</u> § 12 at 10.) Furthermore, the stipulation provided that the claim amount would be "allocated to the securitization trusts . . . set forth on the chart attached hereto as Exhibit A." (<u>Id.</u> § 2 at 7.) MSST 2007-1 is <u>not</u> referenced in the attached Exhibit A to the stipulation.

2.    The Morgan Stanley Demand

On April 2, 2013, two MSST 2007-1 certificateholders sent a letter (the "Breach Letter") to Deutsche Bank as Trustee, asserting that they had discovered "material and adverse breaches of representations and warranties by Morgan Stanley" in 1,620 individual loans.  (Pl.'s 56.1 Resp. ¶¶ 59-60.)  The Breach Letter requested that Deutsche Bank make a formal written demand on Morgan Stanley to "cure the breaches or repurchase the mortgage loans affected thereby within the time frame set out in the MLPA," and explicitly stated that "this repurchase request reflects only current findings." (Weinstein Decl. Ex. S, ECF No. 114-23.)  The certificateholders further "reserve[d] the right to give notice of additional breaches relating to any mortgage loans held by the Trust." (Id.)  On April 4, 2013, Deutsche Bank forwarded the Breach Letter to Morgan Stanley, and formally requested that Morgan Stanley "cure any material breaches . . . or repurchase such Mortgage Loans" within the timeframe specified in the Repurchase Protocol.  (Id.; see also Pl.'s 56.1 Resp. ¶ 60.)

Morgan Stanley formally responded to the Breach Letter on July 3, 2013.  (Pl.'s 56.1 Resp. ¶ 63.)  While stating that the "allegations in the [Breach Letter] [were] insufficient" to establish breaches of the relevant R&Ws, Morgan Stanley agreed to repurchase 149 of the 1,620 identified loans "as a business accommodation." (Id.; see also Weinstein Decl. Ex. T at 3, ECF No. 114-24.)  Morgan Stanley refused to cure or repurchase any of the remaining loans identified in the Breach Letter.

### 3. The Accredited Demand

On April 3, 2013, the same certificateholders who sent the Breach Letter sent a second letter (the "Accredited Letter") to Deutsche Bank asserting that they had discovered "material and adverse breaches of representations and warranties" by Accredited. (See Compl. Ex. 4, ECF No. 2-6; see also Pl.'s 56.1 Resp. ¶ 61.) Similar to the Breach Letter, the Accredited Letter explicitly states that "[r]e-underwriting loan files continues and will likely uncover additional breaches." (Compl. Ex. 4 at 7.) Accredited's bankruptcy counsel responded directly to the certificateholders on April 8, 2013, asserting Accredited had been liquidated in 2011 and that Deutsche Bank had filed proofs of claims (and received distributions) in Accredited's 2009 bankruptcy proceedings. (Id. at 9; Pl.'s 56.1 Resp. ¶ 62.)

### D. Litigation History

In its capacity as Trustee, Deutsche Bank commenced this action against Morgan Stanley on April 28, 2014. It brought a total of four claims relating to the MSST 2007-1 securitization, namely that Morgan Stanley breached its contractual obligations by: (1) transferring a large number of defective loans to the Trust (the "R&W Claim"); (2) refusing to cure or repurchase the defective loans (the "Cure Claim"); and (3) failing to provide notice of the breaches as required by the governing agreements (the "Notice Claim"). (See id. ¶¶ 70-106.) The Complaint further alleged that Morgan Stanley's conduct breached the implied covenant of good faith and fair dealing (the "Covenant Claim"). (Id. ¶¶ 107-111.) As a remedy, the Complaint sought an order of specific performance of Morgan Stanley's cure or

repurchase obligation, as well as "compensatory, consequential, and/or recissory damages . . . in an amount to be proven at trial." (Id. ¶¶ 31-32.)

Morgan Stanley moved to dismiss the complaint on July 21, 2014. (ECF No. 18.) On April 3, 2015, Judge Swain issued a Memorandum Opinion & Order dismissing the Cure, Notice, and Covenant Claims, reasoning "the notice/cure/repurchase protocol is remedial and cannot constitute a basis for an independent breach," and that "New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled."[5] (ECF No. 47 at 13, 15 (internal citations omitted).) Judge Swain denied Morgan Stanley's motion to dismiss the R&W Claim, and reserved decision on whether the SRP (the sole remedy provision) precluded Deutsche Bank's prayer for damages (as opposed to specific performance). (Id. at 12, 15.)

While Morgan Stanley's motion to dismiss was pending, on September 18, 2014, Deutsche Bank filed a motion requesting the right to use statistical sampling to prove liability and damages at trial. (ECF No. 26.) Morgan Stanley opposed that motion, arguing that statistical sampling is incompatible with the SRP, which requires loan-by-loan proof of breach. (ECF No. 27.) Judge Swain addressed this

---

[5] By order dated December 19, 2017, this Court solicited the parties' views "as to whether certain legal developments" subsequent to Judge Swain's decision "may/may not have rendered Judge Swain's decision to dismiss [the Notice Claim] incorrect." (ECF No. 138.) After reviewing the parties' supplemental briefing on this point (ECF Nos. 139 and 140), this Court issued an Opinion & Order on January 10, 2018 vacating Judge Swain's prior decision to dismiss the Notice Claim (ECF No. 141). As it currently stands, there are two live claims in this action: the R&W Claim (alleging breach of various R&Ws), and the Notice Claim (alleging breach of Morgan Stanley's independent obligation to notify the Trustee of those breaches).

issue during conferences held on September 19, 2014 (ECF No. 35) and May 20, 2015 (ECF No. 54), and determined that Deutsche Bank's request for a formal ruling on sampling was "premature."  That said, Judge Swain did direct the parties to "take a sampling approach to the litigation" pending resolution of certain key legal issues.[6]  (See Tr. of Initial Pretrial Conf. ("IPTC Tr.") at 4, ECF No. 54.)

Following an extended discovery period (which included full expert briefing based on statistical sampling), Morgan Stanley moved for summary judgment on May 8, 2017.  (ECF No. 111.)  Morgan Stanley's motion argues, in sum, that: (1) the SRP requires loan-by-loan notice and evidence of breach, and therefore precludes the use of sampling to prove liability and/or damages; (2) Deutsche Bank did not comply with the terms of the Repurchase Protocol prior to or during this litigation; (3) Deutsche Bank misinterpreted various R&Ws; (4) Deutsche Bank's expert reports failed to create a genuine dispute as to materiality of alleged breaches; and (5) Morgan Stanley is not liable for MSST 2007-1 loans originated by Accredited, Fremont, or WMC.  (See generally Mem. of Law in Supp. of Def.'s Mot. for Summ J. ("Def.'s Mem."), ECF No. 112.)  Deutsche Bank opposed Morgan Stanley's motion on June 22, 2017, arguing that the SRP does not preclude an award of damages or the use of sampling, that it properly interpreted the relevant R&Ws, and that Morgan Stanley is ultimately liable for all breaching loans included in the Trust.  (See

---

[6] Judge Swain stated that in the event the Court ultimately held that loan-by-loan proof was required, those loans included in the sample would be "the first tranche of loans to be subject to prove up on a loan by loan basis."  (Id.)

generally Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Mem."), ECF No. 120.)

For the reasons stated below, this Court concludes that Deutsche Bank's breach of contract claims must proceed to trial, and that statistical sampling is an appropriate means of attempting to prove both liability and damages in this case. This Court further concludes that there are genuine issues of material fact that prevent entry of summary judgment as to all remaining issues.

II.     LEGAL PRINCIPLES

A.     Summary Judgment Standard

Summary judgment may be granted when a movant shows, based on admissible evidence in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In reviewing a motion for summary judgment, the Court construes all evidence in the light most favorable to the nonmoving party, and draws all inferences and resolves all ambiguities in its favor. Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010). The Court's role is to determine whether there are any triable issues of material fact, not to weigh the evidence or resolve any factual disputes. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

B. Enforceability of Contractual Limitation Clauses

Under the MLPA, "[t]he obligations of MSMCH to cure, purchase or substitute a qualifying Replacement Mortgage Loan shall constitute the . . . <u>sole and exclusive remedy</u> under this Agreement."  (MLPA § 10 at 18 (emphasis added).)  Morgan Stanley argues that this "sole remedy provision" limits Deutsche Bank's recovery in this action to specific performance of the Repurchase Protocol.  (Def.'s Mem. at 9-11.)  In resolving that argument, this Court must consider the enforceability of contractual limitation clauses under New York law.

As a general matter, "when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms."  <u>W.W.W. Assoc., Inc. v. Giancontieri</u>, 77 N.Y.2d 157, 162 (1990).  Accordingly, courts applying New York law have routinely held that contractual clauses that limit or exculpate a party from its own negligence are enforceable because they "represent the parties' agreement on the allocation of the risk of economic loss in certain eventualities."  <u>See</u> <u>Nomura Home Equity Loan, Inc., Series 2006-FM2, by HSBC Bank USA, Nat'l Ass'n v. Nomura Credit & Capital, Inc., No. 39</u>, 2017 WL 6327110, at *3 (2017) (citation omitted) ("Nomura Home Equity II");  <u>see also</u> <u>Sommer v. Fed. Signal Corp.</u>, 79 N.Y.2d 540, 554 (1992) (citation omitted).

Despite this, it is well-established that "a party may not insulate itself from damages caused by grossly negligent conduct."  <u>Sommer</u>, 79 N.Y.2d at 554 (citations omitted).  As a matter of public policy, liability for such conduct, which must "smack[] of intentional wrongdoing" and/or evince "a reckless indifference to the

rights of others," cannot be contracted away.  See Abacus Fed. Sav. Bank v. ADT

Sec. Servs., Inc., 18 N.Y.3d 675, 683 (2012) (quoting Kalisch-Jarcho, Inc. v. City of

New York, 58 N.Y.2d 377, 385 (1983)).  "This applies equally to contract clauses

purporting to exonerate a party from liability and clauses limiting damages to a

nominal sum."  Sommer, 79 N.Y.2d at 554.

It is less clear whether (and when) the gross negligence exception described

in Sommer applies to other types of limitations clauses—for instance, those that

limit the type or form of recovery rather than the amount.  As an initial matter, it is

worth noting that Sommer does not purport to provide an exhaustive list of the

types of contractual clauses that are ineffective as against gross negligence.  There

is authority to suggest that the exception applies to a broader set of clauses,

including some specific to the RMBS context.  See ACE Sec. Corp. Home Equity

Loan Tr., Series 2007-HE3 v. DB Structured Prod., Inc., 5 F. Supp. 3d 543, 555

(S.D.N.Y. 2014) (noting that "numerous courts have held or assumed that less

dramatic limitations on remedies, such as caps on damages or restrictions on the

types of damages available, can also be void where gross negligence or willful

misconduct is shown" and collecting cases) ("ACE").  For instance, in Morgan

Stanley Mortg. Loan Tr. 2006-13ARX v. Morgan Stanley Mortg. Capital Holdings

LLC, 143 A.D.3d 1, 7 (1st Dept. 2016) ("13ARX"), the First Department held that

the gross negligence exception applies to clauses that limit a party to "sole remedies

that are illusory."  Further, in Nomura Home Equity Loan, Inc. v. Nomura Credit &

Capital, Inc., 133 A.D.3d 96, 105 (1st Dept. 2015) ("Nomura Home Equity I"), the

First Department held that the sole remedy of repurchase is "impossible to fulfill" for loans that have been foreclosed upon or liquidated, and that defendant should be permitted to pursue monetary damages for such loans.

On the other hand, New York law draws a distinction between clauses that purport to limit liability and those that merely serve as conditions precedent to suit or recovery. See A.H.A. Gen. Const., Inc. v. N.Y.C. Hous. Auth., 92 N.Y.2d 20, 30-31 (1998). In A.H.A. Gen. Const., Inc., the Court of Appeals held that the gross negligence exception did not apply directly to a clause that required a party to "promptly notice and document its claims made under the provisions of the contract" prior to filing suit. Id. Although the clause at issue in A.H.A. Gen. Const., Inc. did not go so far as to limit the form or amount of recovery assuming the condition precedent was satisfied, it does suggest that there is a difference— perhaps an important one—between those clauses that "insulate" a party from liability, and those that merely require compliance with a specific procedure prior to recovery.

C.    Equitable Remedies

As previously noted, Morgan Stanley has argued that Deutsche Bank's recovery in this action (to the extent any recovery is warranted) is limited to specific performance of the Repurchase Protocol. (See Def.'s Mem. at 9-11.) Under New York law, specific performance is an equitable remedy for breach of contract. See ACE, 5 F. Supp. 3d at 554; see also Warberg Opportunistic Trading Fund, L.P. v. GeoResources, Inc., 112 A.D.3d 78, 86 (1st Dept. 2013). The decision of whether to

award an equitable remedy like specific performance rests in the sound discretion of the trial court, and generally, specific performance "will not be ordered where money damages would be adequate to protect the expectation interest of the injured party." See Sokoloff v. Harriman Estates Dev. Corp., 96 N.Y.2d 409, 415 (2001) (internal quotation omitted). "In determining whether money damages would be an adequate remedy, a trial court must consider, among other factors, the difficulty of proving damages with reasonable certainty and of procuring a suitable substitute performance with a damages award." Id. (citation omitted).

Where, as here, a contract purports to establish specific performance as the "sole and exclusive remedy," (MLPA § 10 at 18), the inquiry is more or less reversed. See Wells Fargo Bank, N.A. v. Bank of Am., N.A., 2013 WL 1285289, at *10 (S.D.N.Y. 2013), vacated on other grounds, 627 F. App'x 27 (2d Cir. 2015) ("When specific performance is contemplated by the contract, courts tend to find that irreparable harm would be suffered unless specific performance is granted." (citation omitted).) ("Wells Fargo"). Instead of being an alternative or "fall back" remedy, specific performance is contractually elevated to a primary position. Notwithstanding this, the law is also clear that the parties' agreement to an equitable remedy does not eliminate the court's discretion. The Court of Appeals has made clear that "where the granting of equitable relief appears to be impossible or impracticable, equity may award damages in lieu of the desired equitable remedy." Doyle v. Allstate Ins. Co., 1 N.Y.2d 439, 443 (1956). Further, a court "may order a sum of money to be paid to the plaintiff . . . when that form of relief becomes

necessary in order to prevent a failure of justice and when it is for any reason impracticable to grant the specific relief demanded." Id. (citations omitted).

In the RMBS context, several courts have relied on this general principle in holding that sole remedy provisions similar to the one in this case do not conclusively foreclose an award of money damages, particularly with respect to loans that have already been liquidated or foreclosed. See ACE, 5 F. Supp. 3d at 554; U.S. Bank, Nat'l Ass'n v. UBS Real Estate Sec. Inc., 205 F. Supp. 3d 386, 414–415 (S.D.N.Y. 2016); Deutsche Alt-A Sec. Mortg. Loan Tr., Series 2006-OA1 v. DB Structured Prod., Inc., 958 F. Supp. 2d 488, 497 n.3 (S.D.N.Y. 2013) ("Deutsche Alt-A"); MASTR Adjustable Rate Mortgages Tr. 2006-OA2 v. UBS Real Estate Sec. Inc., 2013 WL 4399210, at *3–4 (S.D.N.Y. 2013) ("MARM I"); Wells Fargo, 2013 WL 1285289, at *11; 13ARX, 143 A.D.3d at 9; Nomura Home Equity I, 133 A.D.3d at 106.

Although the above-cited cases almost uniformly consider an alternate award of monetary damages in the context of loans that have been liquidated or foreclosed (thereby making specific performance "impossible"), the underlying legal principle (oft-cited in those cases) clearly states that a trial court may eschew equitable relief when it is "impossible or impracticable." Doyle, 1 N.Y.2d at 443 (emphasis added). The "or" clearly signals that there are circumstances where, though technically possible, an award of equitable relief is impracticable; the Court is unaware of a case suggesting that the trial court's discretion with regards to equitable relief is

strictly limited to circumstances in which enforcement of the equitable remedy is "impossible."

D.    Statistical Sampling

Sampling is a statistical means of "estimat[ing], to specified levels of accuracy, the characteristics of a 'population' . . . by observing those characteristics in a relatively small segment, or sample of the population." Manual of Complex Litigation § 11.493, p. 102 (4th ed. 2004). Properly done, statistical sampling is not guesswork—it is a scientific method of making accurate inferences (to varying degrees of statistical certainty depending on the methodology employed) about a large population based on careful analysis of a representative subset of that population. See generally Robert M. Lawless et al., Empirical Methods in Law 117-35 (2nd ed. 2016). As the Supreme Court has noted, statistical sampling "is a means to establish or defend against liability," and "is used in various substantive realms of the law." Tyson Foods, Inc. v. Bouaphakeo, 136 S. Ct. 1036, 1046 (2016) (citations omitted). Additionally, "[i]n many cases, a representative sample is the only practicable means to collect and present relevant data establishing a defendant's liability." Id. (internal quotation omitted).

Courts applying New York law have repeatedly approved the use of statistical sampling a means of proving liability and damages in RMBS cases. See Assured Guaranty Municipal Corp. v. Flagstar Bank, FSB, 920 F. Supp. 2d 475, 512 (S.D.N.Y. 2013) ("Flagstar II") ("Sampling is a widely accepted method of proof in cases brought under New York law, including cases relating to RMBS and involving

repurchase claims."); see also Deutsche Bank Nat'l Trust Co v. WMC Mortg., LLC, 2014 WL 3824333, at *9 (D. Conn. 2014) ("[S]tatistical sampling is, in principle, an acceptable way of proving liability and damages in an RMBS case such as this one.") (emphasis in original); Syncora Guarantee Inc. v. EMC Mortg. Corp., 2011 WL 1135007, at *6 n.4 (S.D.N.Y. 2011); Assured Guar. Mun. Corp. v. DB Structured Prod., Inc., 997 N.Y.S.2d 97 (Sup. Ct. 2014) ("[F]orcing [plaintiff] to re-underwrite all of the loans is commercially unreasonable and . . . sampling may be used to compute damages.") (citations omitted).

Most recently, the Second Circuit implicitly approved the use of statistical sampling to calculate RMBS damages in Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc., 873 F.3d 85 (2d Cir. 2017) ("Nomura Holding II").  There, the Second Circuit upheld a sweeping $806 million judgment entered by Judge Denise Cote following a bench trial in which statistical sampling featured prominently.  See generally Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc., 104 F. Supp. 3d 441, 453 (S.D.N.Y. 2015) ("Nomura Holding I").  It is thus clear that statistical sampling is, in certain circumstances, an acceptable method of proof in RMBS cases.

A narrower issue is whether statistical sampling is available where, as here, the governing agreements contain a "sole remedy provision."  There is authority on both sides.  On the one hand, Flagstar II rejected the argument that statistical sampling is incompatible with RMBS claims that require loan-by-loan analysis, concluding:

> [t]he very purpose of creating a representative sample of sufficient size is so
> that, despite the unique characteristics of the individual members populating
> the underlying pool, the sample is nonetheless reflective of the proportion of
> the individual members in the pool exhibiting any given characteristic.

920 F. Supp. 2d at 512. Other courts in this District have disagreed, reasoning that statistical sampling does not supply adequate or relevant proof regarding non-sample loans. See, e.g., MASTR Adjustable Rate Mortgages Tr. 2006-OA2 v. UBS Real Estate Sec. Inc., 2015 WL 764665, at *10-11 (S.D.N.Y. 2015) ("MARM II"); Homeward Residential, Inc. v. Sand Canyon Corp., 2017 WL 5256760, at *7 (S.D.N.Y. 2017).

E.    Notice of Breach

The MLPA provides that Morgan Stanley's cure or repurchase obligation is triggered upon: (1) Morgan Stanley's discovery of a qualifying breach; or (2) prompt written notice of a qualifying breach. (MLPA § 10 at 18.) Following such discovery or notice, Morgan Stanley has ninety days to "(i) cure such breach in all material respects, (ii) purchase the affected Mortgage Loan at the applicable Purchase Price or (iii) if within two years of the Closing Date, substitute a qualifying Replacement Mortgage Loan." (Id.) This type of language is common in RMBS transactions, and courts have disagreed as to whether it requires loan-by-loan notice (or "actual notice") as to each alleged breach, or whether notice of a "pervasive" breach is sufficient to trigger the repurchase obligation for all breaching loans in the trust.

In Assured Guaranty Municipal Corp. v. Flagstar Bank, FSB, 2011 WL 5335566, at *7 (S.D.N.Y. 2011) ("Flagstar I"), Judge Rakoff endorsed the "pervasive breach" theory, holding that:

> . . . notification [to defendant] of pervasive breaches affecting the charged off loans . . . rendered [defendant] constructively aware—or, at minimum, put [defendant] on inquiry notice—of the substantial likelihood that these breaches extended beyond the charged off loan population and into the broader loan portfolio[.]

(internal quotations omitted).[7] Other courts applying New York law have agreed, denying motions to dismiss premised on plaintiff's failure to specifically enumerate each and every claimed loan in a pre-suit breach letter. See, e.g., Deutsche Alt-A, 958 F. Supp. 2d at 497 n.3; Nomura Home Equity I, 133 A.D.3d at 108 (holding that initial breach notices "put defendant on notice that the certificateholders whom plaintiffs (as trustees) represented were investigating the mortgage loans and might uncover additional defective loans for which claims could be made.") Indeed, Judge Swain endorsed Judge Rakoff's "pervasive breach" theory in partially denying Morgan Stanley's motion to dismiss in this very case. (ECF No. 47 at 6-7.)

Judge Castel disagreed with this logic in MARM II. Concluding that "the repurchase remedy negotiated by the parties is loan specific," Judge Castel rejected plaintiff's argument that "evidence of [a] so-called 'pervasive breach' imposes an obligation upon [defendant] to cure or repurchase all defective loans in the pool." 2015 WL 764665, at *10–11. In a separate order, Judge Castel further held that "[t]he parties could have, but did not, bargain for an inquiry notice standard" and "could have, but did not, bargain for an obligation that if the aggregate number of

---

[7] Although the underlying agreements in Flagstar I contained a provision allowing the plaintiff to "take whatever action at law or in equity that may appear necessary or desirable . . . to enforce performance of any obligation of [defendant]," that does not undercut the persuasiveness of the court's holding as applied to these facts. The Flagstar I agreements also included a "sole remedy" provision similar to the one at issue here, and Judge Rakoff interpreted the aforementioned clause as simply allowing plaintiff to bring suit "in the event that . . . [defendant] refuses to comply with its repurchase obligations." Id. at *5.

loans in breach exceeded a certain threshold, a duty to reexamine all loans would be triggered." MASTR Adjustable Rate Mortgages Tr. 2006-OA2 v. UBS Real Estate Sec. Inc., 2015 WL 797972, at *4 (S.D.N.Y. 2015) ("MARM III").

## III.  DISCUSSION

Morgan Stanley's motion raises a number of complex and overlapping legal arguments.  That said, the arguments are not novel—most, if not all, have previously (and repeatedly) been raised in RMBS actions like this one.  As such, multiple courts have had occasion to pass (explicitly or implicitly) upon the issues raised herein, resulting in a large and growing body of law that this Court must grapple with.  Unsurprisingly, given the fact-intensive nature of some issues and the lack of controlling precedent on others, that body of law contains disagreements large and small.  It is impossible (and unnecessary) to reconcile every case, and reasonable minds can certainly differ on what the law should be for cases like this.  But for the reasons stated below, this Court is persuaded that summary judgment is inappropriate, and that plaintiff's claims must proceed to trial.

### A.  The Sole Remedy Provision is Voidable

The force and effect of the Sole Remedy Provision looms large in this action.  It is the primary focus of the parties' respective briefs, and has the potential to affect multiple key areas of dispute.  According to Morgan Stanley, plaintiff's failure to comply with the strictures of the SRP both before and during this litigation doom its claims for relief.  (See generally Def.'s Mem. at 9-23.)  Plaintiff counters that the SRP is voidable given its allegations of gross negligence, and that in all events, the

SRP does not foreclose recovery of damages.  (See generally Pl.'s Mem. at 13-21.)

The Court agrees with plaintiff.

Although courts routinely enforce arms-length clauses that limit or exculpate

a party from damages caused by <u>negligent</u> conduct, as discussed above, it is well-

established that as a matter of public policy, "a party may not insulate itself from

damages caused by <u>grossly negligent</u> conduct." <u>Sommer</u>, 79 N.Y.2d at 554

(emphasis added).  Under New York law, grossly negligent conduct must "smack[] of

intentional wrongdoing" and/or evince "a reckless indifference to the rights of

others." <u>Abacus</u>, 18 N.Y.3d at 683 (quotation omitted).

Here, Deutsche Bank has alleged and now proffered facts in support of its

contention that Morgan Stanley knowingly and intentionally "conveyed a pool of

defective mortgage loans" to the Trust "as part of a plan to empty [its] position" of

such loans before the housing market collapsed.  (Pl.'s Mem. at 1.)  Deutsche Bank

points to a series of documents, e-mails, and deposition statements that it claims

establish that, <u>at the time it entered into</u> the MLPA, Morgan Stanley knew a

critical number of the MSST 2007-1 loans contained material breaches.  (Pl.'s 56.1

Resp. ¶¶ 129-149, 154-161.)  Morgan Stanley disputes the context and significance

those documents (Def.'s Local Civ. R. 56.1 Reply Statement of Undisputed Material

Facts ("Def.'s 56.1 Reply") ¶¶ 129-149, 154-161, ECF No. 125), and argues that

Deutsche Bank has "grossly mischaracterize[d] the evidence in this case."  (Def.'s

Mem. of Law in Further Supp. of Def.'s Mot. for Summ. J. ("Def.'s Reply Mem.") at

5, ECF No. 124.)  It is axiomatic that on summary judgment, the Court's task is to

determine whether there exists a genuine dispute of material fact, not to weigh the evidence.  See Anderson, 477 U.S. at 248-49.  Here, it is clear that there is a genuine dispute as to whether Morgan Stanley knowingly transferred materially breaching loans into MSST 2007-1.

Morgan Stanley next argues that, even assuming it did intentionally transfer breaching loans into the Trust "based on its own economic self-interest," that does not constitute gross negligence absent "evidence of malicious intent."  (Def.'s Reply Mem. at 5; see also Def.'s Mem. at 13-15.)  It is true that "in a contract between sophisticated parties . . . New York applies a more exacting standard of gross negligence than it would in other contexts."  Alitalia Linee Aeree Italiane, S.p.A. v. Airline Tariff Pub. Co., 580 F. Supp. 2d 285, 294 (S.D.N.Y. 2008) (citation omitted).  And in ACE, the court suggested that "contractual nonperformance that is merely in a defendant's economic self-interest does not suffice" to establish gross negligence.  5 F. Supp. 3d at 556.  Respectfully, however, this Court disagrees with that interpretation of New York law as applied to the type of allegations here.

The two primary cases cited by Morgan Stanley (and in ACE) are Five Star Development Resort Communities LLC v. iStar RC Paradise Valley LLC, 2012 WL 4119561 (S.D.N.Y. 2012) and Metropolitan Life Insurance Co. v. Noble Lowndes International, Inc., 84 N.Y.2d 430 (1994).  Both of those cases involved situations where the breaching party was alleged to have ceased performance because it was no longer economically prudent for them to continue.  See Five Star, 2012 WL 4119561, at *1-2; Metropolitan Life, 84 N.Y. 2d at 433.  Those types of cases, in

which a party enters into a contract in good faith and later determines that it is economically imprudent to perform as required, are easily distinguished from cases where, as here, a party is alleged to have been in breach—pervasively so—<u>ab initio</u>; that is, at the time the contract was entered into. Put another way, the cited cases do not address a situation in which a party is claimed to have entered into a contract knowing full well that it intended to breach, or intentionally disregarded a high likelihood that it would, or that the required performance was impossible. <u>Cf.</u> <u>Kalisch-Jarcho, Inc.</u>, 58 N.Y.2d at 416-17 (holding that conduct "smacks of intentional wrongdoing" when, <u>inter alia</u>, "it is fraudulent, malicious or prompted by the sinister intention of one acting in bad faith"). In the latter example, the breaching party's conduct certainly "smacks of intentional wrongdoing" and/or evinces "a reckless indifference to the rights of others," which is all that is required for "gross negligence" under New York law. <u>See</u> <u>Abacus</u>, 18 N.Y.3d at 683 (quotation omitted).

Even assuming no bad faith, there are circumstances in which a party's conduct from the outset (<u>e.g.</u>, intentionally transferring a large number of breaching loans into the trust, as asserted here) eliminates the chance for adequate performance. Here, Deutsche Bank has asserted and proffered evidence in support that up to 93% of the loans in MSST 2007-1 contain material breaches (a vast number of which are asserted to have existed <u>ab initio</u>), but Morgan Stanley has only repurchased a grand total of 149 "as a business accommodation." Regardless of whether such conduct (<u>e.g.</u>, non-performance) is now in Morgan Stanley's economic

self-interest—and notably, Morgan Stanley has argued at certain points that the conduct alleged here would <u>not</u> be in its self-interest—plaintiff's allegations regarding the circumstances in existence at the time of contract formation, if proven, could well constitute gross negligence.

The ruling that Morgan Stanley seeks on this issue would limit the public policy exception from <u>Kalisch-Jarcho</u> and <u>Sommer</u> to a very narrow set of cases— those where the breaching party acts primarily to hurt its counterpart, rather than to help itself. But that is rarely how sophisticated parties conduct themselves. And it certainly cannot be the correct interpretation of <u>Kalisch-Jarcho</u> or <u>Sommer</u>, neither of which included any allegation that the breaching party acted as asserted here. Thus, <u>Metropolitan Life</u> and its related cases are best read as standing for the proposition that <u>not all</u> willful or intentional breaches are "grossly negligent" within the meaning of <u>Kalisch-Jarcho</u> and <u>Sommer</u>. Those cases do not establish, despite certain language in <u>ACE</u> suggesting otherwise, that economic self-interest <u>ipso facto</u> absolves a party from the consequences of its intentional breach, particularly one asserted to be "locked and loaded" at the time of contract formation.

Finally, Morgan Stanley argues that the SRP at issue here is not the type of clause contemplated by <u>Sommer</u> because it does not "exonerate a party from liability" or "limit[] damages to a nominal sum." On this point, Morgan Stanley is correct—although the SRP regulates the process, nature, and scope of Deutsche Bank's available remedies, it does not exonerate Morgan Stanley from liability or limit its liability to a "nominal sum." But that alone is not dispositive of the

relevant question, which is whether the SRP is voidable as contrary to public policy. Although <u>Sommer</u> is a leading case, it does not purport to exhaustively list the types of clauses that are ineffective as against gross negligence. And the underlying logic—that courts should not sanction or enforce contractual clauses that shield a party from the consequences of their grossly negligent behavior—applies equally to clauses that exonerate a party and those that establish practical barriers to recovery. <u>Cf.</u> <u>13ARX</u>, 143 A.D.3d at 7 (holding that the gross negligence exception applies to clause that limit a party to "remedies that are illusory").

As noted in <u>ACE</u>, "numerous courts have held or assumed that less dramatic limitations on remedies, such as caps on damages <u>or restrictions on the types of</u> <u>damages available</u>, can also be void where gross negligence or willful misconduct is shown." 5 F. Supp. 3d at 555 (emphasis added) (collecting cases). If the SRP were enforced according to its terms, Deutsche Bank's only available remedy would be specific performance of the Repurchase Protocol. Given that Deutsche Bank has alleged that as many as <u>93%</u> of the loans in the Trust are in breach (and that Morgan Stanley <u>knowingly</u> transferred those loans into the Trust), that would present a significant restriction on Deutsche Bank's otherwise available remedies (<u>e.g.</u>, compensatory, consequential, and/or rescissory damages, attorneys' fees, costs, and expenses, and pre- and post-judgment interest), both from a practical and an economic standpoint.

Morgan Stanley points to a line of New York cases holding that conditions precedent to suit or recovery are not limitations clauses subject to the public policy

exception.  <u>See, e.g.</u>, <u>A.H.A. Gen. Const., Inc.</u>, 92 N.Y.2d at 30-31 (holding that the gross negligence exception did not apply directly to a clause that required a party to "promptly notice and document its claims made under the provisions of the contract" prior to filing suit).  But in those cases, the clauses in question did not purport to limit the form or amount of recovery assuming the condition precedent was satisfied.  The SRP here is therefore easily distinguishable in the sense that it tightly limits the types of remedies available to Deutsche Bank and creates real barriers to recovery.

Contrary to Morgan Stanley's assertion, the Court's holding here is not a "radical expansion of the limited exception" envisioned by New York courts.  (Def.'s Mem. at 13.)  It is merely a recognition that a party need not completely (or effectively) exculpate itself from liability to "insulate" itself from damages in a way that contravenes public policy.  And to be clear, the Court's holding here is <u>not</u> that the SRP is unenforceable, only that it <u>may</u> be; Deutsche Bank must of course substantiate its allegations at trial.  For now, the Court only concludes that the SRP may be voidable in light of the allegations of gross negligence in this action.

B.    <u>Deutsche Bank is Not Limited to Equitable Remedies</u>

Even if this Court were to hold that the SRP is not voidable for reasons of public policy (or in the event Deutsche Bank is unable to prove its allegations of knowledge/intent), the Court would still not limit Deutsche Bank to the equitable remedy of specific performance.  It is well-established that "[t]he decision whether or not to award specific performance is one that rests in the sound discretion of the

trial court." See Sokoloff, 96 N.Y.2d at 415. And although an award of specific performance may be favored when it is specifically called for in the contract, see Wells Fargo, 2013 WL 1285289, at *10, the Court of Appeals has made clear that courts may "award damages in lieu of the desired equitable remedy" "where the granting of equitable relief appears to be impossible or impracticable" or "in order to prevent a failure of justice . . . when it is for any reason impracticable to grant the specific relief demanded." Doyle, 1 N.Y.2d at 443; see also ACE, 5 F. Supp. 3d at 554. That principle has been repeatedly cited and applied in RMBS cases, most often when loans subject to cure/repurchase have been liquidated or foreclosed. See, e.g., ACE, 5 F. Supp. 3d at 554; U.S. Bank, Nat'l Ass'n, 205 F. Supp. 3d at 414-15; Deutsche Alt-A, 958 F. Supp. 2d at 501–502; MARM I, 2013 WL 4399210, at *3-4; Wells Fargo, 2013 WL 1285289, at *11; 13ARX, 143 A.D.3d at 9; Nomura Home Equity I, 133 A.D.3d at 106. Here, the Court concludes that it would be impracticable and inequitable to limit Deutsche Bank to specific performance of the Repurchase Protocol.

First, the Court concludes that loan-by-loan re-underwriting and analysis is impracticable given the scope of the alleged breach in this action. Deutsche Bank is quite correct to point out that in previous cases where loan-by-loan analysis and proof was required, the process proved to be extraordinary and, measured against various benchmarks, impractical. (Pl.'s Mem. at 15-16.) For instance, in MARM II, the court held that language in the applicable repurchase protocol required loan-by-loan proof of materiality. 2015 WL 764665, at *10. Following a bench trial in which

only 20 out of 9,342 loans at issue (or approximately 0.0021%) were fully analyzed, the court concluded that "the sheer volume of loans, several thousand for which findings and conclusions are necessary" necessitated the appointment of a series of masters under Fed. R. Civ. P. 53(a)(1)(C).  See U.S. Bank, Nat'l Ass'n v. UBS Real Estate Sec. Inc., 205 F. Supp. 3d 386, 526 (S.D.N.Y. 2016) ("MARM IV").  On May 1, 2017, the appointed master (former District Judge Barbara S. Jones) issued a Report and Recommendation setting out a procedure for individualized review of the outstanding loans, which required full briefing from both parties on each disputed loan at a rate of 400 loans per month.  (See No. 12-cv-7322, ECF No. 545, "Report and Recommendation".)  That review process will be ongoing for the foreseeable future, and the final cost, both in terms of time and resources expended, will be extraordinary.  To the extent the Repurchase Protocol here demands such a procedure, the Court concludes that it is demonstrably impracticable, and will permit an award of damages in lieu of specific performance.  See Doyle, 1 N.Y.2d at 443.

Second, allowing for an alternative award of damages is consistent with broader principles of equity.  Deutsche Bank has alleged that Morgan Stanley not only knowingly and intentionally transferred thousands of breaching loans into the Trust, but also violated the Repurchase Protocol by failing to notify Deutsche Bank and subsequently failing to cure/repurchase the defective loans.  (See generally Compl.)  And the primary relief that Deutsche Bank is seeking—i.e., the "Purchase

Price" of materially nonconforming loans—is completely fungible.[8]  In light of the allegations and the relief sought, "whether the Trustee's remedy is characterized as 'compensatory damages,' 'rescissory damages,' or 'specific performance' . . . has little practical significance given that the form of the relief (if not necessarily the quantum) is the same in each case: the payment of money to make Plaintiff whole." Deutsche Alt-A, 958 F. Supp. 2d at 501 (citations omitted).

As noted above, there is an economic reality to re-underwriting thousands of loans, and an impracticability to timely review of such a massive number.  Given that the ultimate form of relief—a payment of money—is the same whether the Court orders specific performance or allows an alternative award of damages, this Court is persuaded that it would be inequitable to require specific performance even in light of the SRP.  After all, specific performance is an equitable remedy for breach of contract.  See ACE, 5 F. Supp. 3d at 554; see also Warberg Opportunistic Trading Fund, 112 A.D.3d at 86.  And there's nothing equitable about a remedy, contractually "required" or otherwise, that dramatically increases the cost and burdens of litigation and frustrates timely resolution.

Morgan Stanley may argue that the form of recovery is not necessarily the same, since the Repurchase Protocol initially permitted Morgan Stanley to remedy the breach by substituting a new loan.  (MLPA § 10 at 18.)  In light of plaintiff's assertions and proffered proof, that argument is unavailing for at least three

---

[8] As Morgan Stanley has conceded, "Purchase Price" is defined in such a way as to allow recovery even for foreclosed or liquidated loans.  (Def.'s Mem. at 12.)  Therefore, there is a fungible and contractually defined price that Deutsche Bank is able to recover for every loan in the Trust that contains a material breach.

reasons.  First, Morgan Stanley concedes that the substitution remedy expired two years after the Trust was created.  (Id.; see also Def.'s Mem. at 9.)  As such, that particular remedy is no longer available, and Morgan Stanley's only option is to cure or repurchase breaching loans.  Second, if Morgan Stanley were permitted to replace up to 93% of the loan pool, even within that two-year window, the Trust would be unrecognizable.  It strikes the Court as deeply inequitable to effectively force Deutsche Bank to enter into an entirely new contractual relationship with Morgan Stanley, particularly given the allegations of intent and bad faith.  Third, the MLPA only gives Morgan Stanley "90 days from the date of discovery" to cure/repurchase any materially breaching loan.  (MLPA § 10 at 18.)  If Morgan Stanley knew about the material breaches when the Trust was created, "the 90-day cure period has long since expired," and therefore awarding damages would not "deprive [defendant] of its side of the contractual repurchase bargain."  See Flagstar II, 920 F. Supp. 2d at 514 (internal quotations and citations omitted).

The reality is that the Repurchase Protocol was not designed or intended to remedy a breach of the nature or magnitude alleged here.  By analogy, in the UCC context, when "a limited remedy . . . fails of its essential purpose, the buyer is relieved of its restrictions and may resort to other remedies."  See, e.g., Cayuga Harvester v. Allis-Chalmers Corp., 95 A.D.2d 5, 6-7 (4th Dept. 1983) (referencing N.Y. U.C.C. Law § 2-719); see also Telecom Int'l Am., Ltd. v. AT & T Corp., 280 F.3d 175, 194 (2d Cir. 2001).  Although the "failure of essential purpose" doctrine is not directly applicable here, it is nonetheless instructive for purposes of this Court's

equitable consideration.  See <u>ACE</u>, 5 F. Supp. 3d at 555 n.3 (noting that the "UCC's 'failure of essential purpose' doctrine appears to be consistent with broader principles of equity").  A repurchase protocol theoretically provides security for certificateholders by giving the sponsor a means of maintaining the integrity of the trust and remedying the types of isolated breaches that might be expected to pop up in the loan pool over time.  But as plaintiff asserts and has proffered evidence in support, if Morgan Stanley knew that it was transferring thousands of defective loans into the Trust at the time of contract formation, then the Trust was doomed to breach and the Repurchase Protocol doomed to impracticability.  If Deutsche Bank can prove its allegations, it would be inequitable to give Morgan Stanley the benefit of such a limitation clause.

In any event, Deutsche Bank can certainly seek damages (if there are any) for breach of the MLPA's notice provision.  See <u>Nomura Home Equity I</u>, 133 A.D.3d at 108 (holding that the motions court had "erred in not allowing plaintiff to pursue damages for defendant's failure to give prompt written notice after it discovered material breaches of the representations and warranties").  The SRP makes clear that the Repurchase Protocol is the "sole and exclusive remedy . . . <u>respecting a breach of representations or warranties hereunder</u>."  (MLPA § 10 at 18 (emphasis added).)  Because the notice provision is independent of those underlying representations and warranties, the SRP does not limit Deutsche Bank's recovery for the Notice Claim (if there are any damages for such a breach).  See <u>13ARX</u>, 143 A.D.3d at 7 ("[A] seller's failure to provide the trustee with notice of material

breaches it discovers in the underlying loans states and independently breached contractual obligation."); see also Law Debenture Tr. Co. of New York v. WMC Mortg., LLC, 2017 WL 3401254, at *19 (D. Conn. 2017) (noting that RMBS notice claims are "viable in law, and beyond the reach of the 'sole remedy' provision in the underlying contracts").

None of this is to prejudge the fact or quantum of any damages that Deutsche Bank may be entitled to recover if it is able to prove its claims. The consequence of this Court's determinations herein is that Deutsche Bank may proceed to seek damages in lieu of specific performance. Deutsche Bank of course will need to substantiate its allegations at trial to recover anything at all.

C.     Statistical Sampling is an Acceptable Method of Proof

In many ways, the propriety of statistical sampling in this case is part and parcel of the aforementioned dispute regarding the SRP. As set forth above, there should be no serious dispute in 2018 that statistical sampling is a generally accepted method of proof in RMBS cases. See e.g., Flagstar II, 920 F. Supp. 2d at 512 ("Sampling is a widely accepted method of proof in cases brought under New York law, including cases relating to RMBS and involving repurchase claims.") The issue here is whether sampling remains appropriate in the face of the SRP, which Morgan Stanley argues requires loan-by-loan proof of material breach. As set forth above, the Court has already concluded that the SRP is voidable, and further that it would be impracticable and inequitable to limit Deutsche Bank's recovery to specific performance of the Repurchase Protocol. Thus, the Court need not directly tackle

the issue of whether, under different circumstances in which the SRP is not voidable, sampling may not be appropriate. Here, Deutsche Bank is permitted to seek damages on both the R&W and Notice Claims, and statistical sampling is an entirely appropriate method of attempting to prove both liability and damages.[9]

That said, the Court wishes to make two broader points regarding statistical sampling and the claims at issue here. First, the Court is persuaded that statistical sampling is consistent with Deutsche Bank's obligations under the Repurchase Protocol, even if one credits Morgan Stanley's interpretation. After all, the entire purpose of statistical sampling is to determine "the proportion of the individual members in the pool exhibiting any given characteristic" "despite the unique characteristics of the individual members populating the underlying pool." See Flagstar II, 920 F. Supp. 2d at 512. Thus, proper statistical sampling is not a shot in the dark—it is a well-established and scientifically sound method of inferring (to varying degrees of certainty) how many individual loans in the pool contain material breaches. Here, the Repurchase Protocol is triggered upon discovery or notice "of a breach of any representation or warranty . . . which materially and adversely affects the value of . . . any of the MSMCH Represented Mortgage Loans." (MLPA § 10 at 18 (emphasis added).) A statistically significant sample demonstrating that 93% (or any other percentage) of the underlying loans contain material breaches undoubtedly satisfies that requirement.

---

[9] Of course, the reliability and admissibility of Deutsche Bank's statistical evidence are still subject to review under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). In holding that sampling is an appropriate method of proof in this action, the Court does not pre-judge the expert work that may have been conducted in connection therewith.

Even if the Court were to agree with Morgan Stanley that the Repurchase Protocol requires loan-by-loan proof and that statistical sampling is an improper method of proof, it would still not grant summary judgment in favor of Morgan Stanley. During an initial pretrial conference in this case, Judge Swain directed the parties to "take a sampling approach to the litigation" pending resolution of certain issues addressed herein. (IPTC Tr. at 4.) Judge Swain further stated that in the event she ultimately determined that loan-by-loan proof was required (as opposed to statistical sampling), the loans included in the sample would be "the <u>first tranche</u> of loans to be subject to prove up on a loan by loan basis." (<u>Id.</u> (emphasis added).) The obvious implication is that Deutsche Bank would be permitted to go back and begin re-underwriting disputed loans that were not included in the initial sample. Given Judge Swain's directives, it would be a bait-and-switch to turn around and grant summary judgment on non-sample loans now.

D.     <u>Morgan Stanley Had Adequate Notice</u>

Under the MLPA, Morgan Stanley's cure or repurchase obligation is triggered "[u]pon discovery or receipt of notice by MSMCH or the Purchaser of a [material] breach of any representation or warranty . . . in any of the MSMCH Represented Mortgage Loans." (MLPA § 10 at 18.) Morgan Stanley argues that because (1) "<u>actual</u> notice or discovery of material breaches in particular loans" is required, (2) it lacked the requisite notice for loans not specifically identified in the Breach Letter or Complaint, and therefore (3) had no obligation to cure or repurchase such loans. (Def.'s Mem. at 16, 18-19 (emphasis in original).) This Court disagrees.

First, the contract does not plainly and unequivocally require loan-by-loan notice or discovery. Morgan Stanley's primary argument is that the context and structure of the Repurchase Protocol, which discusses "such breach" and "the affected Mortgage Loan," is "inherently loan specific." (Def.'s Mem. at 16.) But that argument conflates the notice that is required to trigger the Repurchase Protocol with what is required of Morgan Stanley to fulfill its cure/repurchase obligation. Ultimately, Morgan Stanley is correct that individual loans can only be substituted or repurchased on a loan-by-loan basis. Yet the contract does not explicitly require that the party providing notice specifically identify or offer proof as to each and every loan subject to cure/repurchase, let alone that they do so in order to satisfy the threshold notice requirement.

The only language in the MLPA regarding adequacy of notice states that it must relate to a "breach of any representation or warranty . . . which materially and adversely affects the value of the interests of the Purchaser in <u>any</u> of the MSMCH Represented Mortgage Loans." (MLPA § 10 at 18 (emphasis added).) Notably absent is any requirement that the notifying party provide "actual" or "loan-by-loan" notice of breach in particular loans. Notice of a pervasive breach within a representative sample of loans undoubtedly provides <u>some</u> notice, and the MLPA is completely silent as to whether such notice is effective only as to the identified loans, or whether it triggers a broader obligation.

In <u>Flagstar I</u>, the court held that notice of "pervasive breaches" affecting a group of loans "rendered [defendant] constructively aware—or, at a minimum, put

[defendant] on inquiry notice—of the substantial likelihood that these breaches extended . . . into the broader loan portfolio," thereby triggering the repurchase protocol as to all potentially breaching loans. 2011 WL 5335566, at *7; see also; Flagstar II, 920 F. Supp. 2d at 512-513 (same); Deutsche Alt-A, 958 F. Supp. 2d at 497 n.3; Nomura Home Equity I, 133 A.D.3d at 108 (holding that initial breach notices "put defendant on notice that the certificateholders whom plaintiffs (as trustees) represented were investigating the mortgage loans and might uncover additional defective loans for which claims could be made."). That is exactly what happened here. The Breach Letter specifically identified 1,620 loans, which amounted to more than one-third of the underlying loan pool. (Weinstein Decl. Ex. S.) Deutsche Bank made clear that the Letter "reflect[ed] only current findings," and expressly "reserve[d] the right to give notice of additional breaches." (Id.) Similarly, although the complaint only specifically identifies 1,620 allegedly defective loans, it plainly envisions a more extensive breach rate. (See Compl. ¶ 3 (alleging that "nearly 93%" of the 553 loans selected for forensic review breached Morgan Stanley's R&Ws, and that "[o]n information and belief, the remainder of the Loans, if reviewed, would exhibit a similar defect rate").) Based on the notice provided, and given that the MLPA does not contain an explicit "actual notice" requirement, this Court concludes that Morgan Stanley was constructively aware (or put on inquiry notice) of pervasive breaches throughout the Trust, thereby triggering the Repurchase Protocol as to all potentially breaching loans.

At the motion to dismiss stage, Judge Swain reached a similar conclusion, holding that the Complaint "sufficiently pleads constructive notice of the additional breaches" not specifically identified in the Breach Letter. (ECF No. 47 at 7.) Confusingly, Morgan Stanley now argues that Judge Swain's holding related solely to "notice pleading" standard under Fed. R. Civ. P. 8(a)(2), and not the "notice" required under the MLPA. (Def.'s Mem. at 18 ("There is a critical difference between the 'notice' required for purposes of notice pleading at the motion to dismiss stage, and the 'notice' required under the terms of the contract . . . .").) But that argument mischaracterizes both the arguments made to the Court at that time as well as Judge Swain's ruling.

First, if non-identified loans were not properly included in this action, it made no sense for Judge Swain to have spent significant time addressing whether the Complaint provided adequate notice of the fact that Deutsche Bank was seeking relief as to them. In other words, if Judge Swain believed that constructive or inquiry notice was insufficient to satisfy the contractual notice provision, she would have dismissed the non-identified loans regardless of whether they were sufficiently pled or "noticed" in the Complaint. Second, Judge Swain specifically considered and discussed the line of cases dealing with the notice required under similar RMBS contracts, and held that "Plaintiff's letter gave adequate notice with respect to breaching loans beyond the 1,620 specifically mentioned." (See ECF No. 47 at 5-6 (discussing <u>Flagstar I</u> and subsequent cases).)

The reality is that Morgan Stanley's argument has already been raised and rejected in this very case. And while the Court is well aware that not every court is in agreement on this issue, see, e.g., MARM II, 2015 WL 764665, at *10-11, it happens to agree with Judge Swain's holding for the reasons stated above.[10] The MLPA does not explicitly include an "actual notice" standard, and Morgan Stanley reads far too much into the fact that the Repurchase Protocol contains certain singular phrases (e.g., "the affected Mortgage Loan") in the portion detailing Morgan Stanley's cure/repurchase obligation. This Court concludes that there is no good reason to reverse Judge Swain's prior determination on this issue.

Second, and independently, Deutsche Bank has alleged that Morgan Stanley knowingly and intentionally transferred the materially breaching loans into the Trust. (See Pl.'s Mem. at 1; Pl.'s 56.1 Resp. ¶¶ 129-149, 154-161.) Because the Repurchase Protocol is triggered by Morgan Stanley's independent discovery of a material breach, that allegation alone precludes summary judgment on all of the loans at issue here. Morgan Stanley's argument that the MLPA requires Deutsche Bank to "present loan-by-loan evidence that Morgan Stanley actually discovered a material breach" is unavailing. (Def.'s Mem. at 19.) The import of Deutsche Bank's allegation is that, by virtue of Morgan Stanley's due diligence, it had knowledge of each and every MSST 2007-1 loan that contained a material breach. There is certainly a dispute of material fact as to whether that allegation is true, but it is

---

[10] Of note, the MARM II court concluded that plaintiffs had not properly alleged or provided notice of a "pervasive breach." Id., at *12 n.4. Thus, although the court clearly signaled that it disagreed with the result in Flagstar I, the question was not directly presented because the factual predicate was not satisfied.

sufficient to prevent entry of summary judgment on "notice" grounds.  See Deutsche Alt-A, 958 F. Supp. 2d at 497 (citing Flagstar I, 2011 WL 5335566, at *5); ACE, 5 F. Supp. 3d at 558-60.

E.  Morgan Stanley Is Liable For Breaching Accredited Loans

Putting the above arguments aside, Morgan Stanley argues that Deutsche Bank affirmatively released any claim it might otherwise have had with respect to loans originated by Accredited during Accredited's bankruptcy proceedings in 2009. (Def.'s Mem. at 38-39.)  In response, Deutsche Bank argues that the release only pertains to Accredited and other "Released Parties," and that Morgan Stanley is not properly considered a "guarantor" or "surety."  (Pl.'s Mem. at 39-40.)  The Court disagrees with both arguments, but is nonetheless persuaded that the release does not preclude plaintiff's claims in this action.

As an initial matter, it is undisputed that the Accredited Release only explicitly discharged claims against "the Debtors" (i.e., Accredited) and other "Released Parties" not including defendant.  (See Accredited Release § 3.)  However, that alone is not dispositive of whether the release precludes plaintiff's claims in this action.  It is well-established that "a creditor's release of a principal debtor operates to discharge parties, such as guarantors, who are only secondarily liable on a debt."  Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc., 188 F.3d 31, 34 (2d Cir. 1999.)  Because the Backstop Provision provides that Morgan Stanley will cure/repurchase breaching Accredited loans in the event Accredited fails to do so, Morgan Stanley is effectively a

guarantor or surety of Accredited's primary liability as to those loans. (See MLPA §
10 at 18.) Therefore, it is possible that the Accredited Release, though not directly
applicable to Morgan Stanley by its terms, nonetheless precludes the claims in this
action.

That said, the Accredited Release is only relevant to this action to the extent
it discharges Accredited's own principal liability for MSST 2007-1 loans. It is true
that the DB Claim was brought by Deutsche Bank in its capacity as Trustee for any
trust "which hold[s] mortgage loans originated or sold by [Accredited]," and that
MSST 2007-1 fits that description. (See DB Claim § 1.) But Deutsche Bank only
executed the Accredited Release in its capacity as Trustee for specifically named
trusts, each of which received an allocation of the claim. (See Accredited Release §
2-3.) Additionally, the Accredited Release explicitly states that it is "inapplicable
and has no effect on any other trusts upon which DB serves as trustee but is not
specifically referenced on the attached Exhibit A." (Id. § 12.) As to such non-
referenced trusts, "the Parties reserve all of their respective rights, claims,
defenses, setoffs, or otherwise." (Id.)

MSST 2007-1 is not "specifically referenced on the attached Exhibit A."
Therefore, it could not be clearer that the Accredited Release does not discharge
Accredited's principal liability with respect to that trust.[11] Even though the DB
Claim itself appears to cover the Accredited-originated loans in MSST 2007-1, the

---

[11] While the parties briefed this issue and referenced the applicable documents, neither focused on
§ 12 of the Accredited Release or the corresponding schedule of covered trusts. Furthermore,
Accredited's bankruptcy counsel does not appear to have referenced this provision of the Accredited
Release in responding to the Accredited Letter on April 8, 2018. (See Pl.'s 56.1 Resp. ¶ 62.)

release does not.  Therefore, Morgan Stanley remains liable for breaching

Accredited loans by virtue of the Backstop Provision in § 10 of the MLPA.

F.    Morgan Stanley Is Liable for Breaching Fremont and WMC Loans

Morgan Stanley additionally argues that it is not liable for any R&Ws made

by Fremont Investment & Loan ("Fremont") or WMC Mortgage Corp. ("WMC") in

their independent agreements, and that the MLPA does not obligate it to cure or

repurchase any breaching loans originated by those companies.  (Def.'s Mem. at 40.)

The Court agrees.  However, for the reasons stated below, the Court is nonetheless

persuaded that Morgan Stanley is liable for certain breaches with respect to the

Fremont and WMC loans.

As a threshold matter, it is undisputed that Fremont and WMC loans are not

"MSMCH Represented Mortgage Loans" under the terms of the MLPA.  (See MLPA

§ 1 at 4; see also Pl.'s 56.1 Resp. ¶ 32.)  Therefore, none of the R&Ws in § 10(b) of

the MLPA apply to Fremont or WMC loans.  Furthermore, Morgan Stanley did not

guarantee any of Fremont or WMC's independent R&Ws, and did not agree to

cure/repurchase Fremont and/or WMC loans in the event those originators failed to

do so.  As such, breaching Fremont and WMC loans are not subject to

cure/repurchase under the MLPA.  (See MLPA § 10 at 18 (stating that the

Repurchase Protocol is triggered upon notice/discovery of a material breach "which

materially and adversely affects the value of the interests of the Purchaser in any of

the MSMCH Represented Mortgage Loans," and that Morgan Stanley may substitute a qualifying loan for "such MSMCH Represented Mortgage Loan").).)[12]

However, § 10(a) of the MLPA contains three R&Ws that are applicable to "<u>each</u> Mortgage Loan" in the MSST 2007-1 pool. (<u>Id.</u> § 10(a) at 12-13.) Of particular relevance, Morgan Stanley warranted that "[t]he information set forth in the Mortgage Loan Schedule relating to the Mortgage Loans is complete, true and correct as of the Cut-off Date." (<u>Id.</u> § 10(a)(1) at 12.) To the extent Fremont and WMC-originated loans breach that R&W, Morgan Stanley may be liable for ordinary breach of contract damages in amount to be proven at trial. Put simply, it makes no difference whether the Fremont and WMC loans are subject to cure/repurchase under § 10 or any other provision—a breach is a breach, and given that the Court has already held that plaintiff may seek damages as to loans that <u>are</u> subject to cure/repurchase, it could not be clearer that plaintiff may seek damages as to those that aren't.

G.    <u>Deutsche Bank Has Correctly Construed the Relevant R&Ws</u>

There is a dispute regarding the proper interpretation of the primary R&Ws at issue in this action. Morgan Stanley argues that "Deutsche Bank [has] misconstrue[d] and misapplie[d]" the relevant R&Ws in an effort to enlarge the

---

[12] In its reply brief, Morgan Stanley states that "it is undisputed that the sole remedy provision applies to all loans," and that "Deutsche Bank may seek repurchase of Fremont and WMC loans . . . if it could establish a breach of Section 10(a)." (Def.'s Reply Mem. at 20.) But while the SRP clearly covers <u>all</u> breaches of MSMCH Represented Mortgage Loans (including both §§ 10(a) and 10(b) breaches), it does not cover <u>any</u> breach of a non-represented loan. (<u>See</u> MLPA § 10 at 18.) There may have been tactical reasons for defendant's attempted concession, but it is wrong under the contract and therefore this Court does not credit it.

protection they provide, and that it is entitled to summary judgment as a result. (Def.'s Mem. at 30-37.)  The Court will address each disputed R&W in turn.

        1.     § 10(a)(1)

Section 10(a)(1) of the MLPA (the "MLS Representation"), which applies to "each Mortgage Loan" in the Trust, relates to the information contained in the Mortgage Loan Schedule[13] ("MLS") attached thereto.  (MLPA § 10(a)(1) at 12.) Specifically, the MLS Representation states that "[t]he information set forth in the Mortgage Loan Schedule relating to the Mortgage Loan is complete, true and correct as of the Cut-off Date."  (Id.)

According to Morgan Stanley, the MLS Representation only guarantees that the information in the MLS was correctly <u>transcribed</u> from the underlying loan files. (Def.'s Mem. at 34-35.)  In response, Deutsche Bank argues that the MLS Representation affirmatively guarantees that the information in the MLS is <u>actually correct</u>, regardless of what is included in the underlying loan file.  (Pl.'s Mem. at 36-37.)  Like the majority of courts to have considered this exact issue, this Court agrees with Deutsche Bank's interpretation.

In <u>MARM IV</u>, Judge Castel held that nearly identical language in an RMBS agreement was <u>not</u> merely a "transcription rep," but rather "an unqualified warranty" that "expressly warrants the truth and correctness of information 'furnished' in the MLS" and "imposes a form of strict or absolute liability for a

---

[13] The MLS is a schedule containing all of the loans in the Trust along with certain data regarding each loan, such as, <u>inter alia</u>, the original principal amount of the loan and the loan-to-value ratio. (MLPA § 1 at 3-4.)

materially untrue or incorrect statement on the MLS." 205 F. Supp. 3d at 428-29; see also Bank of N.Y. Mellon v. WMC Mortg., LLC, 136 A.D.3d 1, 6-7 (1st Dept. 2015), aff'd, 28 N.Y.3d 1039 (2016). That is the correct interpretation of the language here as well. Section 10(a)(1) does not contain any language limiting its scope to accurate transcription of the information contained therein. Rather, it states plainly and unequivocally that the information in the MLS is "true and correct." Defendant's argument that such an interpretation vitiates or renders § 10(b)(5) superfluous is unconvincing—that section not only covers an entirely different subset of loans, it relates to fraud and misrepresentation on the part of or to the knowledge of Morgan Stanley. To the extent the MLS contains any information that was not "true and correct" as of the cut-off date, that would constitute a breach of § 10(a)(1) regardless of whether it was correctly transcribed.

Separately, Morgan Stanley argues that "Mortgage Loan Schedule" is a "defined term setting forth an exclusive list of information to be included on the MLS." (Def.'s Mem. at 36.) According to Morgan Stanley, because debt-to-income ratio ("DTI") is not included in that list, alleged breaches of § 10(a)(1) premised on an incorrect DTI must be dismissed. In response, Deutsche Bank argues that the listing of required fields in the definition of "Mortgage Loan Schedule" is not exclusive, and that Morgan Stanley is liable for any incorrect information actually included in the MLS under § 10(a)(1). (Pl.'s Mem. at 37.) The Court agrees with plaintiff.

Although "Mortgage Loan Schedule" is a defined term in both the PSA and MLPA, and although DTI is not included as a required field, nothing in the definition of "Mortgage Loan Schedule" states that the listed fields are intended to be or must be exclusive.  (See, e.g., MLPA § 1 at 3-4.)  Further, the MLS Representation applies without qualification to "[t]he information set forth in the Mortgage Loan Schedule."  (Id. § 10(a)(1) at 12.)  Therefore, it is clear that defendant guaranteed the truth and accuracy of all information actually contained in the MLS, regardless of whether such information was required to be in the MLS by definition.

Based on Deutsche Bank's submissions, it appears that DTI information was included in the MLS.  (See Decl. of Justin V. Shur ("Shur Decl.") Exs. 29 and 30, ECF Nos. 122-29 and 122-30.)  Morgan Stanley did not contest that in its reply on this motion.  Accordingly, summary judgment to Morgan Stanley on this issue is DENIED.

   2. § 10(b)(5)

Section 10(b)(5) of the MLPA, which only applies to MSMCH Represented Mortgage Loans, guarantees in relevant part that "[n]o fraud, error, omission, misrepresentation, negligence or similar occurrence . . . has taken place on the part of MSMCH, or, to the knowledge of MSMCH . . . or any other party involved in the origination" of those loans.  (MLPA § 10(b)(5) at 14.)  The parties disagree as to whether this R&W covers an originator's knowing noncompliance with applicable underwriting guidelines.  The Court is persuaded that it does.

Defendant is correct that § 10(b)(5) does not explicitly reference underwriting guidelines or guarantee that any of the originators complied with same. But § 10(b)(5), as written, is very broad—it warrants without qualification that "[n]o fraud, error, omission, misrepresentation, negligence, or similar occurrence" has taken place. (Id.) The question, then, is whether knowing noncompliance with applicable underwriting guidelines falls into any of those categories (e.g., whether it constitutes "fraud, error, omission, misrepresentation, negligence, or similar occurrence" on the part of the originator or any other party). This Court concludes that, at the very least, such conduct may constitute evidence of cognizable "negligence" in the origination of the loan.[14]

To the extent "any . . . party involved in the origination" of a MSMCH Represented Mortgage Loan knowingly violated the applicable underwriting guidelines, such conduct could constitute, at the very least, some evidence of a breach of § 10(b)(5).

3. § 10(b)(20)

Section 10(b)(20) of the MLPA, which only applies to MSMCH Represented Mortgage Loans, guarantees that each mortgage file "contains an appraisal of the related Mortgaged Property" that

> satisf[ies] the requirements of Fannie Mae or Freddie Mac and Title XI of the
> Financial Institutions Reform, Recovery, and Enforcement Act of 1989

---

[14] Morgan Stanley's argument that this interpretation of § 10(b)(5) is inconsistent with certain R&Ws made by Accredited, Fremont, and WMC in their independent agreements with Morgan Stanley, or that all of these agreements should be read as an integrated whole, is without merit. The agreements in question were executed between different parties, in different years, for entirely different purposes. Further, neither the Trustee nor the certificateholders were party to any of the agreements between Morgan Stanley and the originators.

["FIRREA"] and the regulations promulgated thereunder, all as in effect on
the date the MSMCH Represented Mortgage Loan was originated.

(MLPA § 10(b)(20) at 17.)  Morgan Stanley argues, in sum, that while § 10(b)(20)

only requires compliance with either Fannie Mae or Freddie Mac, plaintiff's expert

analysis does not adequately distinguish between the two.  (Def.'s Mem. at 37-38.)

Deutsche Bank argues that because certain FIRREA regulations are incorporated

into both Fannie Mae and Freddie Mac requirements, an appraisal that is

noncompliant under FIRREA is also noncompliant under both Fannie Mae and

Freddie Mac, making distinction unnecessary.

 The Uniform Standards of Professional Appraisal Practice ("USPAP") were

promulgated pursuant to FIRREA, and it is undisputed that § 10(b)(20) guarantees

all appraisals and appraisers complied with USPAP, regardless of their compliance

with Fannie Mae or Freddie Mac.  (See Def.'s Mem. at 38 ("[B]y its plain terms,

[§ 10(b)(20)] only requires compliance with USPAP and 'the requirements of Fannie

Mae or Freddie Mac'") (alterations omitted); see also Pl.'s Mem. at 38.)  Therefore, a

violation of USPAP is sufficient, standing alone, to breach § 10(b)(20).  It is

unnecessary at this stage to resolve the parties' dispute as to the adequacy of

plaintiff's expert analysis with regards to Fannie Mae and Freddie Mac

regulations—there is certainly a genuine dispute of material fact regarding

violation of USPAP, and that is sufficient to preclude summary judgment.

    4.    § 10(b)(21)

Section 10(b)(21) of the MLPA relates to the loan-to-value ratio or "LTV" of

the applicable loans, warranting that "[n]o MSMCH Represented Mortgage Loan

has an LTV greater than 100%." (MLPA § 10(b)(21) at 17.) Put differently, it guarantees that no individual loan amount (the numerator) exceeds the "value" of the corresponding mortgaged property (the denominator). The parties' dispute with regard to this R&W principally concerns the proper means (and therefore, method of proof) of determining the value of a mortgaged property for purposes of proving breach/non-breach. Morgan Stanley argues, in sum, that certain defined terms in the PSA (i.e., "Loan-to-Value Ratio" and "Appraised Value") prevent Deutsche Bank from using anything but the actual appraised value of a mortgaged property at a defined point in time. (Def.'s Mem. at 36-37.) In response, Deutsche Bank argues that § 10(b)(21) is a warrant against appraisals that result in LTVs that are without basis, incredible, or otherwise fraudulent. (Pl.'s Mem. at 37-38.) Deutsche Bank has stated that it may use an Automated Valuation Model ("AVM") to calculate what it intends to assert is a more accurate appraisal. (Id.) Based on its view as to how the PSA and MLPA are interpreted, Morgan Stanley's position is that the ex-post AVM must be precluded. The Court takes no position as to the propriety of plaintiff's particular method of proof at this stage in the litigation, but agrees that such proof is not limited to what may be included with the defined phrase "Appraised Value" in the PSA.

First, while it is true that both "Loan-to-Value Ratio" [15] and "Appraised

---

[15] "Loan-to-Value Ratio" is defined as "[t]he fraction, expressed as a percentage, the numerator of which is the original principal balance of the related Mortgage Loan and the denominator of which is the Appraised Value of the related Mortgage Property." (PSA § 1.01 at 31.) "Appraised Value" is defined (in various circumstances) as "the appraised value of the Mortgaged Property based upon the appraisal made at the time of such refinancing," "the appraised value of the Mortgaged Property based upon the appraisal made by a fee appraiser at the time of the origination of the related Mortgage Loan," or "the sales price of the Mortgaged Property at the time of such origination." (Id. § 1.01 at 10.)

Value"[16] are defined terms in the PSA, the three capitalized letters "LTV" is not a defined term in either the PSA or the MLPA. And the use of "LTV" (versus the defined term "Loan-to-Value Ratio") in § 10(b)(21) appears to be intentional, since both the defined terms "Loan-to-Value Ratio" and "Appraised Value" are used in separate parts of the MLPA (indeed, "Appraised Value" is used in a separate R&W). (See MLPA § 1 at 3 (stating that the Mortgage Loan Schedule should include, inter alia, the "Loan-to-Value Ratio at origination"); see also MLPA § 10(b)(4)(iii) at 13-14.) The intentional use of the defined terms in one place in the contract, and avoidance of such usage in another, is persuasive evidence that the parties did not intend to import any definitional restrictions from the PSA into § 10(b)(21), which uses neither. As such, any restriction that "Appraised Value" places on calculation of "Loan-to-Value Ratio" is irrelevant to calculation of "LTV."

Second, and separately, the PSA makes clear that its definitions apply "unless the context otherwise requires." (PSA § 1.01 at 9.) Here, even if the Court were to assume (though there is no evidence to suggest this is the case) that the parties' use of "LTV" in § 10(b)(21) was a scrivener's error, it would still not limit plaintiffs to the "Appraised Value" in attempting to prove breach. Limiting the calculation of LTV to the "Appraised Value" of the loan—an appraisal defined to have been performed before the MLPA was executed—effectively reduces § 10(b)(21) to a guarantee of accurate mathematical calculation, regardless of the actual

---

[16] "Appraised Value" is defined (in various circumstances) as "the appraised value of the Mortgaged Property based upon the appraisal made at the time of such refinancing," "the appraised value of the Mortgaged Property based upon the appraisal made by a fee appraiser at the time of the origination of the related Mortgage Loan," or "the sales price of the Mortgaged Property at the time of such origination." (Id. § 1.01 at 10.)

credibility of the appraisals (and thus the credibility of the LTV itself). A "far more reasonable reading" of § 10(b)(21) "is that, if the LTV based on the actual value of the property is greater than 100%, the representation and warranty is breached." (Pl.'s Mem. at 38.) That interpretation provides security to the certificateholders by guaranteeing the accuracy of the appraisals and resulting LTVs, which are of great importance in assessing risk. And it is substantially the same interpretation implicitly adopted by the court in Nomura Holding I. See 104 F. Supp. 3d at 567.

Although the Court is persuaded that plaintiffs are not limited to using the "Appraised Value" of a mortgaged property in attempting to prove a breach of § 10(b)(21), it takes no position at this stage as to the propriety of plaintiff's particular "AVM" method. Similar to statistical sampling, the precise method by which plaintiffs attempt to calculate a credible valuation may be subject to review under Daubert, 509 U.S. 579 (1993).

H.    Disputes of Material Fact

As previously discussed, the Court's task on summary judgment is to determine whether there exists a genuine dispute of material fact, not to weigh the evidence. Anderson, 477 U.S. at 248-49. Further, the moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp., 477 U.S. at 323. Morgan Stanley raises a series of arguments premised on Deutsche Bank's failure to create a genuine dispute of material fact. Some of these arguments have already been addressed herein, but the following are of particular note.

1.      Morgan Stanley's Knowledge/Discovery of Breach

Morgan Stanley argues at various points that Deutsche Bank has failed to create a genuine dispute as to its alleged independent knowledge/discovery of material breaches in the underlying loan pool.  But as previously noted, this Court concludes that Deutsche Bank has proffered sufficient evidence to create a dispute as to whether Morgan Stanley knowingly and intentionally "conveyed a pool of defective mortgage loans" to the Trust "as part of a plan to empty [its] position" of such loans before the housing market collapsed.  (Pl.'s Mem. at 1; see also Pl.'s 56.1 Resp. ¶¶ 129-149, 154-161.)  As such, and for the reasons previously noted, there is also a genuine dispute as to whether Morgan Stanley acted with "gross negligence" under New York law.

2.      "Materiality" of Breaches

Morgan Stanley argues that Deutsche Bank has failed to create a genuine dispute as to the materiality of any particular breach, which is required to trigger Morgan Stanley's cure/repurchase obligation under the MLPA.  (See Def.'s Mem. at 24-25.)  According to Morgan Stanley, plaintiff's experts have only provided "conclusory" opinions regarding the materiality of specific breaches, and conclusory opinions are insufficient to defeat summary judgment.  (Id. at 25 (citing, inter alia, Major League Baseball Properties, Inc. v. Salvino, Inc., 542 F.3d 290, 311 (2d Cir. 2008)).)  In response, Deutsche Bank argues that its experts provided adequate analysis regarding the materiality of alleged breaches, and that courts should be wary of granting summary judgment when conflicting expert reports are presented.

(Pl.'s Mem. at 30-31 (citing, <u>inter alia</u>, <u>Harris v. Provident Life & Accident Ins. Co.</u>, 310 F.3d 73, 79 (2d Cir. 2002)).)  The Court is persuaded that plaintiff's expert reports are wholly sufficient to create a genuine dispute as to the materiality of defendant's alleged breaches.

It is clear to this Court that the materiality of any particular breach is a question of fact under New York law.  <u>See</u> <u>Orlander v. Staples, Inc.</u>, 802 F.3d 289, 298 (2d Cir. 2015).  The Court believes that plaintiff's experts have done enough to create a genuine dispute as to the materiality of the alleged breaches.  (<u>See</u> Pl.'s Mem. at 30-34.)  To the extent Morgan Stanley raises any other challenges to the sufficiency of plaintiff's expert reports, the Court believes those concerns are best reserved for independent <u>Daubert</u> briefing.

IV.     CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is DENIED in its entirety.

The Clerk of Court is directed to terminate the open motion at ECF No. 111.

SO ORDERED.

Dated:     New York, New York
           January 25, 2018

_____
          KATHERINE B. FORREST
          United States District Judge