# Exhibit B – Part 2

failure results from any party's inability or failure to deliver, on a timely basis, any information from such party needed to prepare, arrange for execution or file any such report, Form or amendment, and does not result from its own negligence, bad faith or willful misconduct.

(c)     Notwithstanding the provisions of Section 12.01, this Section 4.18 may be amended without the consent of the Certificateholders.

(d)     Any report, notice or notification to be delivered by the Master Servicer or the Securities Administrator to the Depositor pursuant to this Section 4.18, may be delivered via email to RegABNotifications@bear.com or, in the case of a notification, telephonically by calling Reg AB Compliance Manager at 212-272-7525.

Section 4.19   Intention of the Parties and Interpretation.

Each of the parties acknowledges and agrees that the purpose of Sections 4.16, 4.17 and 4.18 of this Agreement is to facilitate compliance by the Depositor and the Master Servicer with the provisions of Regulation AB.  Therefore, each of the parties agrees that (a) the obligations of the parties hereunder shall be interpreted in such a manner as to accomplish that purpose, (b) the parties' obligations hereunder will be supplemented and modified as necessary to be consistent with any such amendments, interpretive advice or guidance, convention or consensus among active participants in the asset-backed securities markets, advice of counsel, or otherwise in respect of the requirements of Regulation AB, (c) the parties shall comply with reasonable requests made by the Depositor, the Master Servicer or the Securities Administrator for delivery of additional or different information as the Depositor, the Master Servicer or the Securities Administrator may determine in good faith is necessary to comply with the provisions of Regulation AB, and (d) no amendment of this Agreement shall be required to effect any such changes in the obligations of the parties to this transaction as are necessary to accommodate evolving interpretations of the provisions of Regulation AB.

Section 4.20   UCC.

The Seller shall file any financing statements, continuation statements or amendments thereto required by any change in the Uniform Commercial Code.

Section 4.21   Optional Purchase of Certain Mortgage Loans.

With respect to any Mortgage Loan which is delinquent in payment by 90 days or more or is an REO Property, Saxon or the Majority Class CE Certificateholder shall have the right to purchase any such Mortgage Loan or REO Property from the Trust at a price equal to the Purchase Price; provided, however, that such Mortgage Loan is still 90 days or more Delinquent or is an REO Property as of the date of such purchase.  This purchase option, if not exercised, shall not be thereafter reinstated unless the delinquency is cured and the Mortgage Loan thereafter again becomes 90 days or more delinquent or becomes an REO Property, in which case the option shall again become exercisable as of the first day of the related Fiscal Quarter. This right may be assigned by the Seller to a third party, including a holder of a Class of Certificates.

[TPW: NYLEGAL:691857.8] 17297-00533 11/15/2007 06:00 PM

CONFIDENTIAL

MSM MSSTI 20071 0001589

If at any time Saxon or the Majority Class CE Certificateholder remits to the Securities Administrator a payment for deposit in the Distribution Account covering the amount of the Purchase Price for such a Mortgage Loan, and Saxon or the Majority Class CE Certificateholder provides to the Trustee a certification signed by a Servicing Officer stating that the amount of such payment has been deposited in the Distribution Account, then the Trustee shall execute the assignment of such Mortgage Loan prepared and delivered to the Trustee, at the request of the Saxon or the Majority Class CE Certificateholder, without recourse, representation or warranty, to Saxon or the Majority Class CE Certificateholder which shall succeed to all the Trustee's right, title and interest in and to such Mortgage Loan, and all security and documents relative thereto. Such assignment shall be an assignment outright and not for security. The Saxon or the Majority Class CE Certificateholder will thereupon own such Mortgage, and all such security and documents, free of any further obligation to the Trustee or the Certificateholders with respect thereto.

Section 4.22    Reserve Fund; Payments to and from Swap Administrator; Supplemental Interest Trust; Yield Maintenance Agreement.

(a)    Pursuant to the Swap Administration Agreement, the Supplemental Interest Trust shall be established and maintained in the name of the Supplemental Interest Trust Trustee, as a separate trust, the corpus of which shall be held by the Supplemental Interest Trust Trustee, for the benefit of the Holders of the Class A, Class M, Class B and Class CE Certificates and the Swap Provider. The Supplemental Interest Trust shall hold the Swap Agreement, the Swap Administration Agreement, REMIC VI Regular Interest IO, the Swap Collateral Account and the Swap Account. The Swap Account shall be an Eligible Account, and funds on deposit therein shall be held separate and apart from, and shall not be commingled with, any other moneys, including, without limitation, other moneys of the Trustee held pursuant to this Agreement. Amounts in the Swap Account shall, at the direction of the Majority Class CE Certificateholder, be invested in Permitted Investments that mature no later than the Business Day prior to the next succeeding Distribution Date. All net income and gain from such investments shall be distributed to the Class CE Certificateholders, on a *pro rata* basis, not as a distribution in respect of any interest in any REMIC, on such Distribution Date. In the absence of written instructions to the Securities Administrator, amounts on deposit in the Swap Account shall remain uninvested. All amounts earned on amounts on deposit in the Swap Account shall be taxable to the Class CE Certificateholders. Any losses on such investments shall be deposited in the Swap Account by the Majority Class CE Certificateholder out of its own funds immediately as realized, on a pro rata basis. In performing its duties hereunder and under the Swap Agreement and Swap Administration Agreement, the Supplemental Interest Trust Trustee shall be entitled to the same rights, protections and indemnities as provided to the Securities Administrator hereunder. On each Distribution Date, the Securities Administrator shall remit such amounts received from the Swap Administrator to the Holders of the Class A, Class M and Class B Certificates in the manner provided in clause (e) below.

(b)    On or before the Closing Date, the Securities Administrator shall establish a Reserve Fund on behalf of the Holders of the Certificates. On the Closing Date, the Depositor shall cause an amount equal to the Reserve Fund Deposit to be deposited into the Reserve Fund. The Reserve Fund shall be an Eligible Account. The Reserve Fund shall be entitled "Reserve Fund, Deutsche Bank National Trust Company as Trustee for the benefit of holders of Morgan Stanley Structured Trust I 2007-1, Asset-Backed Certificates, Series 2007-1". The Securities

97

[TPW: NYLEGAL:691857.8] 17297-00533  11/15/2007 06:00 PM

CONFIDENTIAL

Administrator shall deposit in the Reserve Fund all payments received from the Yield Maintenance Agreement Provider pursuant to the Yield Maintenance Agreement. On each Distribution Date, the Securities Administrator shall remit such amounts received from the Yield Maintenance Agreement Provider to the Holders of the Class A, Class M and Class B Certificates in the manner provided in clause (d) below. In addition, on each Distribution Date as to which there is a Basis Risk Shortfall Carry Forward Amount payable to any Class of Class A, Class M and Class B Certificates, the Securities Administrator shall deposit the amounts distributable pursuant to clause (B) of Section 6.04(a)(3) into the Reserve Fund, and the Securities Administrator has been directed by the Class CE Certificateholders to distribute any amounts then on deposit in the Reserve Fund from amounts otherwise distributable pursuant to clause (B) of Section 6.04(a)(3) to the Holders of the Class A, Class M and Class B Certificates in respect of the Basis Risk Shortfall Carry Forward Amounts for each such Class in the priorities set forth in clause (B) of Section 6.04(a)(3). Any amount paid to the Holders of Class A, Class M and Class B Certificates from amounts distributable pursuant to clause (B) of Section 6.04(a)(3) pursuant to the preceding sentence in respect of Basis Risk Shortfall Carry Forward Amounts shall be treated as distributed to the Class CE Certificateholders in respect of the Class CE Certificates and paid by the Class CE Certificateholders to the Holders of the Class A, Class M and Class B Certificates. Any payments to the Holders of the Class A Certificates and/or Class M Certificates in respect of Basis Risk Shortfall Carry Forward Amounts, whether pursuant to the second preceding sentence or pursuant to clause (d) or clause (e) below, shall not be payments with respect to a Regular Interest in a REMIC within the meaning of Section 860G(a)(1) of the Code.

(c)     Net Swap Payments and Swap Termination Payments (other than Swap Termination Payments resulting from a Swap Provider Trigger Event and other than to the extent already paid by the Swap Administrator on behalf of the Supplemental Interest Trust Trustee from any upfront payment received pursuant to any replacement interest rate swap agreement that may be entered into by the Supplemental Interest Trust Trustee) payable by the Swap Administrator, on behalf of the Supplemental Interest Trust Trustee, to the Swap Provider pursuant to the Swap Agreement shall be deducted from Interest Funds, and to the extent of any such remaining amounts due, from Principal Funds, prior to any distributions to the Certificateholders. On or before each Distribution Date, such amounts shall be remitted to the Swap Administrator, and deposited into the Swap Account, first to make any Net Swap Payment owed to the Swap Provider pursuant to the Swap Agreement for such Distribution Date and for prior Distribution Dates, if any, and second to make any Swap Termination Payment (not due to a Swap Provider Trigger Event and other than to the extent already paid by the Swap Administrator on behalf of the Supplemental Interest Trust Trustee from any upfront payment received pursuant to any replacement interest rate swap agreement that may be entered into by the Supplemental Interest Trust Trustee) owed to the Swap Provider pursuant to the Swap Agreement for such Distribution Date and for prior Distribution Dates, if any. For federal income tax purposes, such amounts paid to the Supplemental Interest Trust on each Distribution Date shall first be deemed paid to the Supplemental Interest Trust in respect of REMIC VI Regular Interest IO to the extent of the amount distributable on such REMIC VI Regular Interest IO on such Distribution Date, and any remaining amount shall be deemed paid to the Supplemental Interest Trust in respect of a Class IO Distribution Amount. Any Swap Termination Payment triggered by a Swap Provider Trigger Event owed to the Swap Provider pursuant to the Swap Agreement will be subordinated to distributions to the Holders of the Class A, Class M and Class

98

[TPW: NYLEGAL:691857.8] 17297-00533  11/15/2007 06:00 PM

CONFIDENTIAL

MSM_MSSTI 20071  0001591

B Certificates and shall be paid as set forth under Section 6.04(a)(3). In addition, the Swap Administrator shall remit to the Swap Provider any Swap Optional Termination Payment paid as part of the Mortgage Loan Purchase Price and remitted to the Supplemental Interest Trust pursuant to Section 11.01.

(d)    On or before each Distribution Date on or prior to the Yield Maintenance Agreement Scheduled Termination Date, amounts payable by the Yield Maintenance Agreement Provider pursuant to the Yield Maintenance Agreement to the Trustee shall be deposited by the Securities Administrator, acting on behalf of the Trustee, into the Reserve Fund. On each Distribution Date on or prior to the Yield Maintenance Agreement Scheduled Termination Date, to the extent required, the Securities Administrator shall withdraw such amounts from the Reserve Fund to distribute to the Class A, Class M and Class B Certificates any unpaid Basis Risk Shortfall Carry Forward Amounts with respect to those Certificates for such Distribution Date in the following manner and priority: first, among those Classes of Certificates, pro rata, based upon their respective Certificate Principal Balances, and second, any remaining amounts allocated among those Classes of Certificates, pro rata, based on any Basis Risk Shortfall Carry Forward Amounts remaining unpaid.

(e)    On or before each Distribution Date, Net Swap Payments payable by the Swap Provider pursuant to the Swap Agreement to the Swap Administrator, on behalf of the Supplemental Interest Trust Trustee, will be deposited by the Swap Administrator, acting on behalf of the Supplemental Interest Trust Trustee, into the Swap Account pursuant to the Swap Administration Agreement. On each Distribution Date, to the extent required, the Securities Administrator shall withdraw such amounts from the Swap Account to distribute to the Class A Certificates and Class M Certificates in the following order of priority:

(i)    to each Class of Class A Certificates, on a *pro rata* basis, to pay Current Interest and any Interest Carry Forward Amount to the extent due to the interest portion of a Realized Loss with respect to the related Mortgage Loans, in each case to the extent not fully paid pursuant to Section 6.04(a)(1);

(ii)    sequentially to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class B-1, Class B-2, Class B-3 and Class B-4 Certificates, in that order, to pay Current Interest to the extent not fully paid pursuant to Section 6.04(a)(1) and any Interest Carry Forward Amount, in each case to the extent due to the interest portion of a Realized Loss;

(iii)    to pay as principal to the Class A, Class M and Class B Certificates to be applied as part of the Extra Principal Distribution Amount payable under Section 6.04(a)(2) to the extent that the Overcollateralization Amount is reduced below the Overcollateralization Target Amount, as a result of Realized Losses and to the extent not paid by Excess Spread pursuant to Section 6.04(a)(3) for such Distribution Date, to be distributed in the same manner and priority as the Principal Distribution Amount. For the avoidance of doubt, any amounts distributable pursuant to this clause (iii) shall be limited to rebuilding the Overcollateralization Amount to the extent the Overcollateralization Target Amount has been reduced through Realized Losses.

[TPW: NYLEGAL:691857.8] 17297-00533  11/15/2007 06:00 PM

CONFIDENTIAL                                                                 MSM_MSSTI_20071_0001592

(iv)     to each Class of Class A Certificates, on a *pro rata* basis based on the Certificate Principal Balances thereof, if any, to pay any Basis Risk Shortfall Carry Forward Amounts for such Classes, in each case to the extent not covered by amounts then on deposit in the Reserve Fund;

(v)     sequentially to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6 Class B-1, Class B-2, Class B-3 and Class B-4 Certificates, in that order, to pay any Basis Risk Shortfall Carry Forward Amounts for such Classes for such Distribution Date, in each case to the extent not covered by amounts then on deposit in the Reserve Fund;

(vi)     to the Class A, Class M and Class B Certificates, any remaining unpaid Basis Risk Shortfall Carry Forward Amounts, pro rata, based on their respective remaining unpaid Basis Risk Shortfall Carry Forward Amounts after the allocation of payments as set forth in clauses (iv) and (v) above, in each case to the extent not covered by amounts then on deposit in the Reserve Fund; and

(vii)     sequentially to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class B-1, Class B-2, Class B-3 and Class B-4 Certificates, in that order, any Unpaid Realized Loss Amount for such Distribution Date.

Any amounts remaining in the Swap Account after the distributions described in clauses (i) through (vii) above will be distributed by the Swap Administrator as set forth in the Swap Administration Agreement.

(f)     The Reserve Fund is an "outside reserve fund" within the meaning of Treasury Regulation Section 1.860G-2(h) and shall be an asset of the Trust Fund but not an asset of any REMIC. The Trustee on behalf of the Trust shall be the nominal owner of the Reserve Fund. The Class CE Certificateholders shall be the beneficial owner of the Reserve Fund, on a *pro rata* basis, subject to the power of the Securities Administrator to transfer amounts under Section 6.04. Amounts in the Reserve Fund shall, at the direction of the Majority Class CE Certificateholder, be invested in Permitted Investments that mature no later than the Business Day prior to the next succeeding Distribution Date. All net income and gain from such investments shall be distributed to the Class CE Certificateholders, on a *pro rata* basis, not as a distribution in respect of any interest in any REMIC, on such Distribution Date. In the absence of written instructions to the Securities Administrator, amounts on deposit in the Reserve Fund shall remain uninvested. All amounts earned on amounts on deposit in the Reserve Fund shall be taxable to the Class CE Certificateholders. Any losses on such investments shall be deposited in the Reserve Fund by the Class CE Certificateholders out of their own funds immediately as realized on a *pro rata* basis. Any amounts remaining on deposit in the Reserve Fund following the termination of the Trust Fund pursuant to Section 10.01(a) and the final distribution to Certificateholders in accordance with Section 10.02 on the final Distribution Date shall be distributed to the Class CE Certificateholders, on a pro rata basis, not as a distribution in respect of any interest in any REMIC, on such Distribution Date. The Swap Account, which is created and maintained by the Swap Administrator pursuant to the Swap Administration Agreement, is an "outside reserve fund" within the meaning of Treasury Regulation Section 1.860G-2(h) and shall not be an asset of any REMIC created hereunder. The beneficial owner of the Swap

[TPW: NYLEGAL:691857.8] 17297-00533  11/15/2007 06:00 PM

CONFIDENTIAL                                                                  MSM_MSSTI_20071_0001593

Account is identified, and other matters relating to the Swap Account are addressed, in the Swap Administration Agreement.

(g)     The Securities Administrator shall treat the Holders of Certificates (other than the Class P, Class CE and Class R Certificates) as having entered into a notional principal contract with respect to the Holders of the Class CE Certificates. Pursuant to each such notional principal contract, all Holders of Certificates (other than the Class P, Class CE and Class R Certificates) shall be treated as having agreed to pay, on each Distribution Date, to the Holders of the Class CE Certificates an aggregate amount equal to the excess, if any, of (i) the amount payable on such Distribution Date on the REMIC III Regular Interest corresponding to such Class of Certificates over (ii) the amount payable on such Class of Certificates on such Distribution Date (such excess, a "Class IO Distribution Amount"). A Class IO Distribution Amount payable from interest collections shall be allocated on a *pro rata* basis among such Certificates based on the excess of, with respect to each such Certificate, (i) the amount of interest otherwise payable to the REMIC III Regular Interest relating to such Certificate over (ii) the amount of interest payable to such Certificate at a per annum rate equal to the Net Rate Cap, and a Class IO Distribution Amount payable from principal collections shall be allocated to the most subordinate Class of Certificates (other than the Class P Certificates and the Class R Certificates) with an outstanding principal balance to the extent of such balance. In addition, pursuant to such notional principal contract, the Holders of the Class CE Certificates shall be treated as having agreed to pay Basis Risk Shortfall Carry Forward Amounts to the Holders of the Certificates (other than the Class CE, Class P and Class R Certificates) in accordance with the terms of this Agreement. Any payments to the Certificates from amounts deemed received in respect of this notional principal contract shall not be payments with respect to a Regular Interest in a REMIC within the meaning of Code Section 860G(a)(1). However, any payment from the Certificates (other than the Class CE, Class P and Class R Certificates) of a Class IO Distribution Amount shall be treated for tax purposes as having been received by the Holders of such Certificates in respect of their interests in REMIC III and as having been paid by such Holders to the Holders of the Class CE Certificates pursuant to the notional principal contract. Thus, each Certificate (other than the Class P Certificates and Class R Certificates) shall be treated as representing not only ownership of Regular Interests in a REMIC, but also ownership of an interest in, and obligations with respect to, a notional principal contract.

(h)     Upon a Swap Early Termination other than in connection with the Optional Termination of the Trust, the Swap Administrator, pursuant to the Swap Administration Agreement, shall use reasonable efforts to appoint a successor swap provider to enter into a new interest rate swap agreement on terms substantially similar to the Swap Agreement, with a successor swap provider meeting all applicable eligibility requirements. If the Swap Administrator receives a Swap Termination Payment from the Swap Provider in connection with such Swap Early Termination, the Swap Administrator will apply such Swap Termination Payment to any upfront payment required to appoint the successor swap provider. If the Swap Administrator is required to pay a Swap Termination Payment to the Swap Provider in connection with such Swap Early Termination, the Swap Administrator will apply any upfront payment received from the successor swap provider to pay such Swap Termination Payment. If the Swap Administrator is unable to appoint a successor swap provider within 30 days of the Swap Early Termination, then the Swap Administrator will deposit any Swap Termination Payment received from the original Swap Provider into a separate, non-interest bearing reserve

[TPW: NYLEGAL:691857.8] 17297-00533  11/15/2007 06:00 PM

CONFIDENTIAL

MSM_MSSTI_20071_0001594

account and will, on each subsequent Distribution Date, withdraw from the amount then remaining on deposit in such reserve account an amount equal to the Net Swap Payment, if any, that would have been paid to the Swap Administrator by the original Swap Provider calculated in accordance with the terms of the original Swap Agreement, and distribute such amount to the Holders of the Class A Certificates and Class M Certificates or for such other purpose specified in the Swap Administration.Agreement in accordance with the terms thereof.

(i)      In the event that the Swap Provider fails to perform any of its obligations under the Swap Agreement (including, without limitation, its obligation to make any payment or transfer collateral), or breaches any of its representations and warranties thereunder, or in the event that an Event of Default, Termination Event, or Additional Termination Event (each as defined in the Swap Agreement) occurs with respect to the Swap Agreement, the Supplemental Interest Trust Trustee shall, provided the Supplemental Interest Trust Trustee has actual knowledge of such failure, breach or occurrence by the Swap Provider, immediately, but no later than the next Business Day following such failure, breach, or occurrence, notify the Depositor and send any notices and make any demands, on behalf of the Supplemental Interest Trust, in accordance with the Swap Agreement.

(j)      In the event that the Swap Provider's obligations are guaranteed by a third party under a guaranty relating to the Swap Agreement (such guaranty the "Guaranty" and such third party the "Guarantor"), then to the extent that the Swap Provider fails to make any payment by the close of business on the day it is required to make payment under the terms of the Swap Agreement, the Supplemental Interest Trust Trustee shall, as soon as practicable, but no later than two (2) Business Days after the Swap Provider's failure to pay, demand that the Guarantor make any and all payments then required to be made by the Guarantor pursuant to such Guaranty. The Swap Provider or the Depositor shall promptly provide the Supplemental Interest Trust Trustee with a copy of such Guaranty; provided that, the Supplemental Interest Trust Trustee shall in no event be liable for any failure or delay in the performance by the Swap Provider or any Guarantor of its obligations hereunder or pursuant to the Swap Agreement and the Guaranty, nor for any special, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits) in connection therewith.

(k)      The Supplemental Interest Trust Trustee shall cause any replacement swap provider to provide a copy of the replacement interest rate swap agreement to the Depositor.

(l)      In the event that the Yield Maintenance Agreement Provider fails to perform any of its obligations under the Yield Maintenance Agreement (including, without limitation, its obligation to make any payment or transfer collateral), or breaches any of its representations and warranties thereunder, or in the event that any Event of Default, Termination Event, or Additional Termination Event (each as defined in the Yield Maintenance Agreement) occurs with respect to the Yield Maintenance Agreement, the Securities Administrator shall, promptly following actual notice of such failure, breach or event, notify the Depositor and send any notices and make any demands, on behalf of the Trust, required to enforce the rights of the Trust under the Yield Maintenance Agreement.

(m)      In the event that the Yield Maintenance Agreement Provider's obligations are guaranteed by a third party under a guaranty relating to the Yield Maintenance Agreement (such guaranty the "Guaranty" and such third party the "Guarantor"), then to the extent that the Yield

102

CONFIDENTIAL                                                    MSM_MSSTI_20071_0001595

Maintenance Agreement Provider fails to make any payment by the close of business on the day it is required to make payment under the terms of the Yield Maintenance Agreement, the Securities Administrator shall, promptly following actual notice of the Yield Maintenance Agreement Provider's failure to pay, demand that the Guarantor make any and all payments then required to be made by the Guarantor pursuant to such Guaranty. The Yield Maintenance Agreement Provider or the Depositor shall promptly provide the Securities Administrator with a copy of such Guaranty; provided, that the Securities Administrator shall in no event be liable for any failure or delay in the performance by the Yield Maintenance Agreement Provider or any Guarantor of its obligations hereunder or pursuant to the Yield Maintenance Agreement and the Guaranty, nor for any special, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits) in connection therewith.

(n)     Upon an early termination of the Yield Maintenance Agreement other than in connection with the optional termination of the Trust, the Securities Administrator, pursuant to this Agreement, will use reasonable efforts to appoint a successor yield maintenance agreement provider selected by the Depositor to enter into a new yield maintenance agreement on terms substantially similar to the Yield Maintenance Agreement, with a successor yield maintenance agreement provider meeting all applicable eligibility requirements. The Securities Administrator will apply any Yield Maintenance Agreement termination payment received from the original Yield Maintenance Agreement Provider in connection with such early termination of the Yield Maintenance Agreement to the upfront payment required to appoint the successor yield maintenance agreement provider.

If the Securities Administrator is unable to appoint a successor yield maintenance agreement provider selected by the Depositor within 30 days of the early termination of the Yield Maintenance Agreement, then the Securities Administrator will deposit any Yield Maintenance Agreement termination payment received from the original Yield Maintenance Agreement Provider into a separate, non-interest bearing reserve account and will, on each subsequent Distribution Date, withdraw from the amount then remaining on deposit in such reserve account an amount equal to the payment, if any, that would have been paid to the Securities Administrator by the original Yield Maintenance Agreement Provider calculated in accordance with the terms of the original Yield Maintenance Agreement, and distribute such amount in accordance with the terms of this Agreement.

Section 4.23   Tax Treatment of Class IO Distribution Amounts in the Event of Resecuritization of Class A, Class M or Class B Certificates.

In the event that any Class A, Class M or Class B Certificate is resecuritized in a REMIC (the "Resecuritization REMIC"), for federal income tax purposes, (i) payments on the REMIC III Regular Interest corresponding to such Class A, Class M or Class B Certificate shall, for the avoidance of doubt, be deemed to include the related Class IO Distribution Amount, and (ii) to the extent provided in the operative documents for the Resecuritization REMIC, (a) payments on the "regular interests" issued by the Resecuritization REMIC shall be deemed to include in the aggregate such Class IO Distribution Amount, and (b) such Class IO Distribution Amount shall be deemed paid to the Holders of the Class CE Certificates pursuant to a notional principal contract entered into by the holders of one or more "regular interests" issued by the Resecuritization REMIC ("Resecuritization Holders") and the Holders of the Class CE Certificates. In such event, Class IO Distribution Amounts deemed paid by Resecuritization

103

[TPW: NYLEGAL:691857.8] 17297-00533  11/15/2007 06:00 PM

Holders under clause (b) of the immediately preceding sentence shall be paid on behalf of such holders pursuant to Section 4.22(c) hereof.

[TPW: NYLEGAL:691857.8] 17297-00533  11/15/2007 06:00 PM

CONFIDENTIAL                                   MSM_MSSTI_20071_0001597

# ARTICLE V

# ACCOUNTS

Section 5.01    Master Servicer Account.

(a)        In the event that the Master Servicer and Securities Administrator are no longer affiliated, the Master Servicer shall establish and maintain an account (which shall at all times be an Eligible Account) separate from the Distribution Account into which any funds remitted by the Servicers will be deposited.  No later than noon New York time on the Business Day prior to each Distribution Date, the Master Servicer shall remit any such funds to the Paying Agent for deposit in the Distribution Account.  The Master Servicer shall make the following permitted withdrawals and transfers from such account:

(i)        The Master Servicer will, from time to time on demand of a Servicer or the Securities Administrator, make or cause to be made such withdrawals or transfers from the account as the Master Servicer has designated for such transfer or withdrawal pursuant to this Agreement and the related Servicing Agreement. The Master Servicer may clear and terminate the account pursuant to Section 11.01 and remove amounts from time to time deposited in error.

(ii)        On an ongoing basis, the Master Servicer shall withdraw from the account (i) any expenses, costs and liabilities recoverable by the Trustee, the Master Servicer or the Securities Administrator or the related Custodian pursuant to Sections 4.03, 8.04 and 10.05 and (ii) any amounts payable to the Master Servicer as set forth in Section 4.14; provided, however, that the Master Servicer shall be obligated to pay from its own funds any amounts which it is required to pay under Section 8.03(a).

(iii)        In addition, on or before each Business Day prior to each Distribution Date, the Master Servicer shall deposit in the Distribution Account (or remit to the Paying Agent for deposit therein) any Monthly Advances required to be made by the Master Servicer with respect to the Mortgage Loans.

(iv)        No later than noon New York time on each Business Day prior to each Distribution Date, the Master Servicer will transfer all Available Funds on deposit in the account with respect to the related Distribution Date to the Paying Agent for deposit in the Distribution Account.

Section 5.02    Distribution Account.

(a)        The Securities Administrator shall establish and maintain in the name of the Trustee, for the benefit of the Certificateholders, the Distribution Account as a segregated trust account or accounts.  The Distribution Account shall be an Eligible Account.  The Master Servicer will remit to the Securities Administrator for deposit in the Distribution Account the following amounts, in each case to the extent received from the related Servicer:

(i)        any Advance and any Compensating Interest Payments;

105

[TPW: NYLEGAL:691857.8] 17297-00533  11/15/2007 06:00 PM

CONFIDENTIAL

(ii)    any Insurance Proceeds, Liquidation Proceeds or Subsequent Recoveries received by or on behalf of the Master Servicer or which were not deposited in a Protected Account;

(iii)    the Purchase Price with respect to any Mortgage Loans purchased by the Seller or Section 2.02 or 2.03, the Purchase Price with respect to any Mortgage Loans purchased by Saxon or the Majority Class CE Certificateholder pursuant to Section 4.21, and all proceeds of any Mortgage Loans or property acquired with respect thereto repurchased by Saxon or the Majority Class CE Certificateholder pursuant to Section 11.01;

(iv)    any amounts required to be deposited with respect to losses on investments of deposits in an Account; and

(v)    any other amounts received by or on behalf of the Master Servicer or the Trustee and required to be deposited in the Distribution Account pursuant to this Agreement.

(b)    All amounts deposited to the Distribution Account shall be held by the Securities Administrator in the name of the Trustee in trust for the benefit of the Certificateholders in accordance with the terms and provisions of this Agreement. The requirements for crediting the Distribution Account shall be exclusive, it being understood and agreed that, without limiting the generality of the foregoing, payments in the nature of late payment charges or assumption, tax service, statement account or payoff, substitution, satisfaction, release and other like fees and charges, need not be credited by the Master Servicer or the related Servicer to the Distribution Account. In the event that the Master Servicer shall deposit or cause to be deposited to the Distribution Account any amount not required to be credited thereto, the Securities Administrator, upon receipt of a written request therefor signed by a Servicing Officer of the Master Servicer, shall promptly transfer such amount to the Master Servicer, any provision herein to the contrary notwithstanding.

(c)    The Distribution Account shall constitute a trust account of the Trust Fund segregated on the books of the Securities Administrator and held by the Securities Administrator and the Distribution Account and the funds deposited therein shall not be subject to, and shall be protected from, all claims, liens, and encumbrances of any creditors or depositors of the Securities Administrator (whether made directly, or indirectly through a liquidator or receiver of the Securities Administrator. The amount at any time credited to the Distribution Account may be, as directed by the Master Servicer, held either uninvested in a trust or deposit account of the Securities Administrator with no liability for interest or other compensation thereof, except as otherwise agreed in writing with the Master Servicer, or invested in the name of the Trustee, in such Permitted Investments as may be selected by the Master Servicer on such direction which mature not later than the Business Day next preceding the succeeding Distribution Date, except if such Permitted Investment is an obligation of or is managed by the institution that maintains such fund or account, then such Permitted Investment shall mature not later than such Distribution Date. Permitted Investments in respect of the Distribution Account shall not be sold or disposed of prior to their maturity. All investment earnings on amounts on deposit in the Distribution Account or benefit from funds uninvested therein during the Master Servicer Float Period shall be for the account of the Master Servicer. The Master Servicer shall be permitted to

106

CONFIDENTIAL

receive distribution of any and all investment earnings during the Master Servicer Float Period from the Distribution Account on each Distribution Date. If there is any loss on a Permitted Investment or demand deposit during the Master Servicer Float Period, the Master Servicer shall deposit the amount of the loss in the Distribution Account. With respect to the Distribution Account and the funds deposited therein, the Securities Administrator shall take such action as may be necessary to ensure that the Certificateholders shall be entitled to the priorities afforded to such a trust account (in addition to a claim against the estate of the Securities Administrator) as provided by 12 U.S.C. § 92a(e), and applicable regulations pursuant thereto, if applicable, or any applicable comparable state statute applicable to state chartered banking corporations.

Section 5.03    Permitted Withdrawals and Transfers from the Distribution Account.

(a)    The Securities Administrator will make such withdrawals or transfers from the Distribution Account as the Master Servicer has designated for such transfer or withdrawal pursuant to this Agreement or any Servicing Agreement (limited in the case of amounts due the Master Servicer to those not withdrawn from the Distribution Account in accordance with the terms of this Agreement; provided that the Securities Administrator shall not be responsible for such determination and may rely on the Master Servicer's instructions under this Section 5.03):

(i)    to reimburse the Master Servicer, the related Servicer for any Advance or Servicing Advance of its own funds, the right of the Master Servicer, the related Servicer to reimbursement pursuant to this subclause (i) being limited to amounts received on a particular Mortgage Loan (including, for this purpose, the Purchase Price therefor, Insurance Proceeds and Liquidation Proceeds) which represent late payments or recoveries of the principal of or interest on such Mortgage Loan respecting which such Advance or Servicing Advance was made;

(ii)    to reimburse the Master Servicer, the related Servicer from Insurance Proceeds or Liquidation Proceeds relating to a particular Mortgage Loan for amounts expended by the Master Servicer, the related Servicer in good faith in connection with the restoration of the related Mortgaged Property which was damaged by an uninsured cause or in connection with the liquidation of such Mortgage Loan;

(iii)    to reimburse the Master Servicer, the related Servicer from Insurance Proceeds relating to a particular Mortgage Loan for insured expenses incurred with respect to such Mortgage Loan and to reimburse the Master Servicer, the related Servicer from Liquidation Proceeds from a particular Mortgage Loan for Liquidation Expenses incurred with respect to such Mortgage Loan; provided that the Master Servicer shall not be entitled to reimbursement for Liquidation Expenses with respect to a Mortgage Loan to the extent that (i) any amounts with respect to such Mortgage Loan were paid as Excess Liquidation Proceeds pursuant to clause (x) of this Subsection (a) to the Master Servicer; and (ii) such Liquidation Expenses were not included in the computation of such Excess Liquidation Proceeds;

(iv)    to reimburse the Master Servicer or a Servicer for advances of funds pursuant to this Agreement or the related Servicing Agreement, and the right to reimbursement pursuant to this subclause being limited to amounts received on the

[TPW: NY LEGAL:691857.8] 17297-00533  11/15/2007 06:00 PM

CONFIDENTIAL

MSM_MSSTI_20071_0001600

related Mortgage Loan (including, for this purpose, the Purchase Price therefor, Insurance Proceeds and Liquidation Proceeds) which represent late recoveries of the payments for which such advances were made;

(v)     to reimburse the Master Servicer or a Servicer for any Advance or advance, after a Realized Loss has been allocated with respect to the related Mortgage Loan if the Advance or advance has not been reimbursed pursuant to clauses (i) through (iv);

(vi)     to pay the Master Servicer as set forth in Section 4.14;

(vii)     to reimburse the Master Servicer for expenses, costs and liabilities incurred by and reimbursable to it pursuant to Sections 4.03, 8.04(c) and (d) and 12.02 or otherwise reimbursable to it pursuant to this Agreement;

(viii)     to pay to the Master Servicer, as additional servicing compensation, any Excess Liquidation Proceeds to the extent not retained by the related Servicer;

(ix)     to reimburse or pay the related Servicer any such amounts as are due thereto under this Agreement or the related Servicing Agreement and have not been retained by or paid to the related Servicer, to the extent provided herein and in the related Servicing Agreement;

(x)     to reimburse the Trustee, each Custodian, the Securities Administrator, the Supplemental Interest Trust Trustee or the Swap Administrator for expenses, costs and liabilities incurred by or reimbursable to it pursuant to this Agreement, the Swap Agreement, the Yield Maintenance Agreement or the Custodial Agreements;

(xi)     to make distributions to the Swap Administrator for payment to the Swap Provider as provided in this Agreement;

(xii)     to remove amounts deposited in error; and

(xiii)     to clear and terminate the Distribution Account pursuant to Section 11.01.

(b)     The Master Servicer shall keep and maintain separate accounting, on a Mortgage Loan by Mortgage Loan basis, for the purpose of accounting for any reimbursement from the Distribution Account pursuant to subclauses (i) through (iv), inclusive, and (vi) or with respect to any such amounts which would have been covered by such subclauses had the amounts not been retained by the Master Servicer without being deposited in the Distribution Account under Section 5.08.

(c)     On each Distribution Date, the Securities Administrator shall distribute the Interest Funds and Principal Funds to the extent of funds on deposit in the Distribution Account to the Holders of the Certificates in accordance with the Remittance Report upon which the Securities Administrator may conclusively rely.

[TPW: NYLEGAL:691857.8] 17297-00533  11/15/2007 06:00 PM

CONFIDENTIAL

MSM_MSSTI_20071_0001601

Section 5.04    Yield Maintenance Credit Support Annex.

The Securities Administrator is hereby directed to perform the obligations of the custodian as defined under the Yield Maintenance Credit Support Annex (the "Yield Maintenance Custodian").

On or before the Closing Date, the Yield Maintenance Custodian  shall establish a collateral account (the "Yield Maintenance Collateral Account").  The Yield Maintenance Collateral Account shall be held in the name of the Yield Maintenance Custodian in trust for the benefit of the Certificateholders.  The Yield Maintenance Collateral Account must be an Eligible Account and  shall be entitled "Morgan Stanley Structured Trust I 2007-1, Asset-Backed Certificates, Series 2007-1, Yield Maintenance Collateral Account, Wells Fargo Bank, National Association as Yield Maintenance Custodian for the benefit of holders of Asset-Backed Certificates, Series 2007-1."

The Yield Maintenance Custodian  shall credit to Yield Maintenance Collateral Account all collateral (whether in the form of cash or securities) posted by the Yield Maintenance Agreement Provider to secure the obligations of the Yield Maintenance Agreement Provider in accordance with the terms of the Yield Maintenance Agreement.  The Yield Maintenance Custodian  shall maintain and apply all collateral and earnings thereon on deposit in the Yield Maintenance Collateral Account in accordance with Yield Maintenance Credit Support Annex.

Cash collateral posted by the Yield Maintenance Agreement Provider in accordance with the Yield Maintenance Credit Support Annex shall be invested at the written direction of the Yield Maintenance Agreement Provider in Permitted Investments in accordance with the requirements of the Yield Maintenance Credit Support Annex.  In the absence of written direction, cash collateral shall remain uninvested. All amounts earned on amounts on deposit in the Yield Maintenance Collateral Account (whether cash collateral or securities) shall be for the account of and taxable to the Yield Maintenance Agreement Provider.

Upon the occurrence of an Event of Default or Specified Condition (each as defined in the Yield Maintenance Agreement) with respect to the Yield Maintenance Agreement Provider or upon occurrence or designation of an Early Termination Date (as defined in the Yield Maintenance Agreement) as a result of any such Event of Default or Specified Condition with respect to the Yield Maintenance Agreement Provider, and, in either such case, unless the Yield Maintenance Agreement Provider has paid in full all of its Obligations (as defined in the Yield Maintenance Credit Support Annex) that are then due, then any collateral posted by the Yield Maintenance Agreement Provider in accordance with the Yield Maintenance Credit Support Annex shall be applied to the payment of any Obligations due to Party B (as defined in the Yield Maintenance Agreement) in accordance with the Yield Maintenance Credit Support Annex.  To the extent that the Yield Maintenance Custodian is required to return any of the Posted Collateral (as defined in the Yield Maintenance Credit Support Annex) to the Yield Maintenance Agreement Provider under the terms of the Yield Maintenance Credit Support Annex, the Yield Maintenance Custodian shall return such collateral  in accordance with the Yield Maintenance Credit Support Annex.

[TPW: NYLEGAL:691857.8] 17297-00533  11/15/2007 06:00 PM

CONFIDENTIAL                                                                                    MSM_MSSTI_20071_0001602

Section 5.05   Investment of Funds in the Protected Accounts and the Distribution Account.

(a)      Each Servicer may invest the funds in the related Protected Account and the related Escrow Account (to the extent permitted by law and the related Mortgage Loan documents) and the Master Servicer may (but is not obligated to) invest funds in the Distribution Account during the Master Servicer Float Period, and, with respect to the portion of funds in the Distribution Account deposited by a Servicer, shall (except during the Master Servicer Float Period) invest such funds in the Distribution Account at the direction of such Servicer in the Wells Fargo Advantage Prime Investments Money Market Fund (for purposes of this Section 5.05, such Accounts are referred to as an "Investment Account"), in one or more Permitted Investments bearing interest or sold at a discount, and maturing, unless payable on demand, no later than the Business Day immediately preceding the date on which such funds are required to be withdrawn from such account pursuant to this Agreement; provided, however, that the Master Servicer shall have no obligation to invest funds deposited into the Distribution Account by a Servicer on the related Remittance Date later than 10:00 a.m. (Pacific Standard Time). If no investment instruction is given in a timely manner, the Master Servicer shall hold the funds in the Distribution Account uninvested. All such Permitted Investments shall be held to maturity, unless payable on demand. Any investment of funds in an Investment Account (other than investments made during the Master Servicer Float Period) shall be made in the name of the Master Servicer in Permitted Investments selected by the applicable Servicer. The applicable Servicer shall be entitled to income from (except with respect to investment direction of funds and any income and gain realized on any investment in the Distribution Account during the Master Servicer Float Period, which shall be for the sole benefit of the Master Servicer) over each such related investment, and any certificate or other instrument evidencing any such investment shall be delivered directly to the applicable Servicer, or with respect to investments during the Master Servicer Float Period, the Master Servicer or its agent (with a copy to the Master Servicer or its agent if related to investment of funds in the Distribution Account not during the Master Servicer Float Period), together with any document of transfer necessary to transfer title to such investment to the applicable Servicer, or with respect to investments during the Master Servicer Float Period, the Master Servicer or its agent. In the event amounts on deposit in an Investment Account are at any time invested in a Permitted Investment payable on demand, the applicable Servicer, or with respect to investments during the Master Servicer Float Period, the Master Servicer may:

(x)      consistent with any notice required to be given thereunder, demand that payment thereon be made on the last day such Permitted Investment may otherwise mature hereunder in an amount equal to the lesser of (1) all amounts then payable thereunder and (2) the amount required to be withdrawn on such date; and

(y)      demand payment of all amounts due thereunder that such Permitted Investment would not constitute a Permitted Investment in respect of funds thereafter on deposit in an Investment Account.

(b)      All income and gain realized from the investment of funds deposited in the related Protected Account or Escrow Account held by or on behalf of the related Servicer, shall be for the benefit of such Servicer and shall be subject to its withdrawal in the manner set forth in the related Servicing Agreement. Such Servicer shall deposit in its Protected Account or

[TPW: NYLEGAL:691857.8] 17297-00533  11/15/2007 06:00 PM

CONFIDENTIAL

MSM_MSSTI_20071_0001603

Escrow Account, as applicable, the amount of any loss of principal incurred in respect of any such Permitted Investment made with funds in such accounts immediately upon realization of such loss.

(c)     All income and gain realized from the investment of the portion of funds deposited in the Distribution Account by a Servicer and held by the Master Servicer, shall be for the benefit of such Servicer (except for any income or gain realized from the investment of funds on deposit in the Distribution Account during the Master Servicer Float Period, which shall be for the benefit of the Master Servicer) and shall be subject to the Master Servicer's withdrawal in the manner set forth in Section 5.03. Each Servicer shall deposit in the Distribution Account (except with respect to losses incurred during the Master Servicer Float Period) the amount of any loss of principal incurred in respect of any such Permitted Investment made with funds in such accounts immediately upon realization of such loss.

(d)     Except as otherwise expressly provided in this Agreement, if any default occurs in the making of a payment due under any Permitted Investment, or if a default occurs in any other performance required under any Permitted Investment, the Master Servicer shall take such action as may be appropriate to enforce such payment or performance, including the institution and prosecution of appropriate proceedings.

(e)     The Master Servicer shall not be liable for the amount of any loss incurred with respect of any investment or lack of investment of funds held in any Investment Account or the Distribution Account (except that if any losses are incurred from the investment of funds deposited in the Distribution Account during the Master Servicer Float Period, the Master Servicer shall be responsible for reimbursing the Trust for such loss immediately upon realization of such loss) if made in accordance with this Section 5.05.

(f)     The Master Servicer or its Affiliates shall be permitted to receive additional compensation that could be deemed to be in the Master Servicer's economic self-interest for (i) serving as investment adviser, administrator, shareholder, servicing agent, custodian or sub-custodian with respect to certain of the Permitted Investments, (ii) using Affiliates to effect transactions in certain Permitted Investments and (iii) effecting transactions in certain Permitted Investments. Such compensation shall not be considered an amount that is reimbursable or payable pursuant to this Agreement.

111

[TPW: NYLEGAL:691857.8] 17297-00533  11/15/2007 06:00 PM

CONFIDENTIAL

MSM_MSSTI_20071_0001604

# ARTICLE VI

# DISTRIBUTIONS AND ADVANCES

Section 6.01   Advances.

The Master Servicer shall cause the related Servicer to remit any Advance required pursuant to the terms of the related Servicing Agreement. The related Servicer shall be obligated to make any such Advance only to the extent that such advance would not be a Nonrecoverable Advance. If the related Servicer shall have determined that it has made a Nonrecoverable Advance or that a proposed Advance or a lesser portion of such Advance would constitute a Nonrecoverable Advance, the related Servicer shall deliver (i) to the Securities Administrator for the benefit of the Certificateholders funds constituting the remaining portion of such Advance, if applicable, and (ii) to the Master Servicer an Officer's Certificate setting forth the basis for such determination. Subject to the Master Servicer's recoverability determination, in the event that a Servicer (other than Wells Fargo) fails to make a required Advance, the Master Servicer, as successor servicer, shall be required to remit the amount of such Advance to the Distribution Account. If Wells Fargo, as a Servicer, or the Master Servicer was required to make an Advance but failed to do so, the Trustee upon receiving notice or becoming aware of such failure, and pursuant to the applicable terms of this Agreement, shall appoint a successor servicer who will make such Advance, or the Trustee as successor master servicer shall be required to remit the amount of such Advance to the Distribution Account, unless the Trustee shall have determined that such Advance is a Nonrecoverable Advance. If the Trustee cannot find a successor servicer to replace Wells Fargo as Servicer the Trustee shall become the successor servicer and shall be required to remit the amount of such Advance to the Distribution Account, unless the Trustee shall have determined that such Advance is a Nonrecoverable Advance.

Section 6.02   Compensating Interest Payments.

(a)   The Master Servicer shall cause each Servicer under the related Servicing Agreement to remit any required Compensating Interest Payments to the Distribution Account on the Remittance Date.

(b)   The Master Servicer shall be required to remit the amount of any such Prepayment Interest Shortfalls required to be paid by the related Servicer pursuant to Section 6.02(a), to the extent of the Master Servicing Compensation for such Distribution Date, in the event the related Servicer fails to do so.

Section 6.03   REMIC Distributions.

On each Distribution Date the Securities Administrator shall be deemed to have allocated distributions to the REMIC Regular Interests, the Class CE Interest, the Class IO Interest and the Class P Interest in accordance with Section 6.07 hereof.

112

CONFIDENTIAL                                                MSM_MSSTI_20071_0001605

Section 6.04    Distributions.

(a)    On each Distribution Date, an amount equal to the Interest Funds and Principal Funds for such Distribution Date shall be withdrawn by the Securities Administrator from the Distribution Account and distributed in the following order of priority:

(1)    Interest Funds shall be distributed in the following manner and order of priority:

(A)    to the Class A-1, Class A-2, Class A-3 and Class A-4 Certificates, the Current Interest and any Interest Carry Forward Amount for each such Class, pro rata in accordance with the amount of accrued interest due thereon; and

(B)    from remaining Interest Funds sequentially, to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class B-1, Class B-2, Class B-3 and Class B-4 Certificates, in that order, the Current Interest for each such Class.

Any Excess Spread to the extent necessary to meet a level of overcollateralization equal to the Overcollateralization Target Amount will be the Extra Principal Distribution Amount and will be included as part of the Principal Distribution Amount. Any Remaining Excess Spread together with any Overcollateralization Release Amount will be applied as Excess Cashflow and distributed pursuant to clauses (3)(A) through (F) below.

On any Distribution Date, any Relief Act Interest Shortfalls and any Prepayment Interest Shortfalls to the extent not covered by Compensating Interest will be allocated as set forth in the definition of "Current Interest" herein.

(2)    On each Distribution Date, the Principal Distribution Amount shall be distributed in the following manner and order of priority:

(A)    For each Distribution Date (i) prior to the Stepdown Date or (ii) on which a Trigger Event is in effect:

(i)    To the Class A Certificates, the Principal Distribution Amount for such Distribution Date, sequentially to the Class A-1, Class A-2, Class A-3 and Class A-4 Certificates, in that order, in each case until the Certificate Principal Balance thereof is reduced to zero;

(ii)    To the Class M-1 Certificates, from any remaining Principal Distribution Amount for such Distribution Date, until the Certificate Principal Balance thereof is reduced to zero;

(iii)    To the Class M-2 Certificates, from any remaining Principal Distribution Amount for such Distribution Date, until the Certificate Principal Balance thereof is reduced to zero;

113

[TPW: NYLEGAL:691857.8] 17297-00533  11/15/2007 06:00 PM

CONFIDENTIAL

MSM_MSSTI_20071_0001606

(iv)    To the Class M-3 Certificates, from any remaining Principal Distribution Amount for such Distribution Date, until the Certificate Principal Balance thereof is reduced to zero;

(v)    To the Class M-4 Certificates, from any remaining Principal Distribution Amount for such Distribution Date, until the Certificate Principal Balance thereof is reduced to zero;

(vi)    To the Class M-5 Certificates, from any remaining Principal Distribution Amount for such Distribution Date, until the Certificate Principal Balance thereof is reduced to zero;

(vii)    To the Class M-6 Certificates, from any remaining Principal Distribution Amount for such Distribution Date, until the Certificate Principal Balance thereof is reduced to zero;

(viii)    To the Class B-1 Certificates, from any remaining Principal Funds for such Distribution Date, until the Certificate Principal Balance thereof is reduced to zero;

(ix)    To the Class B-2 Certificates, from any remaining Principal Distribution Amount for such Distribution Date, until the Certificate Principal Balance thereof is reduced to zero;

(x)    To the Class B-3 Certificates, from any remaining Principal Distribution Amount for such Distribution Date, until the Certificate Principal Balance thereof is reduced to zero; and

(xi)    To the Class B-4 Certificates, from any remaining Principal Distribution Amount for such Distribution Date, until the Certificate Principal Balance thereof is reduced to zero.

(B)    For each Distribution Date on or after the Stepdown Date, so long as a Trigger Event is not in effect:

(i)    To the Class A Certificates, an amount up to the Class A Principal Distribution Amount for such Distribution Date, sequentially to the Class A-1, Class A-2, Class A-3 and Class A-4 Certificates, in that order, in each case until the Certificate Principal Balance thereof is reduced to zero, provided however, that if on such Distribution Date, if the aggregate Certificate Principal Balance of the Subordinated Certificates and Class CE Certificates has been reduced to zero, an amount up to the Class A Principal Distribution Amount for such Distribution Date will be distributed to the Class A Certificates pro rata, based on the Certificate Principal Balances thereof, in each case until the Certificate Principal Balance thereof is reduced to zero;

(ii)    To the Class M-1 Certificates, from any remaining Principal Distribution Amount for such Distribution Date, the Class M-1 Principal Distribution Amount, until the Certificate Principal Balance thereof is reduced to zero;

114

CONFIDENTIAL

MSM_MSSTI_20071_0001607

(iii)   To the Class M-2 Certificates, from any remaining Principal Distribution Amount for such Distribution Date, the Class M-2 Principal Distribution Amount, until the Certificate Principal Balance thereof is reduced to zero;

(iv)   To the Class M-3 Certificates, from any remaining Principal Distribution Amount for such Distribution Date, the Class M-3 Principal Distribution Amount, until the Certificate Principal Balance thereof is reduced to zero;

(v)   To the Class M-4 Certificates, from any remaining Principal Distribution Amount for such Distribution Date, the Class M-4 Principal Distribution Amount, until the Certificate Principal Balance thereof is reduced to zero;

(vi)   To the Class M-5 Certificates, from any remaining Principal Distribution Amount for such Distribution Date, the Class M-5 Principal Distribution Amount, until the Certificate Principal Balance thereof is reduced to zero;

(vii)   To the Class M-6 Certificates, from any remaining Principal Distribution Amount for such Distribution Date, the Class M-6 Principal Distribution Amount, until the Certificate Principal Balance thereof is reduced to zero;

(viii)   To the Class B-1 Certificates, from any remaining Principal Distribution Amount for such Distribution Date, the Class B-1 Principal Distribution Amount, until the Certificate Principal Balance thereof is reduced to zero;

(ix)   To the Class B-2 Certificates, from any remaining Principal Distribution Amount for such Distribution Date, the Class B-2 Principal Distribution Amount, until the Certificate Principal Balance thereof is reduced to zero;

(x)   To the Class B-3 Certificates, from any remaining Principal Distribution Amount for such Distribution Date, the Class B-3 Principal Distribution Amount, until the Certificate Principal Balance thereof is reduced to zero; and

(xi)   To the Class B-4 Certificates, from any remaining Principal Distribution Amount for such Distribution Date, the Class B-4 Principal Distribution Amount, until the Certificate Principal Balance thereof is reduced to zero.

Notwithstanding the foregoing clauses (A) and (B), to the extent a Net Swap Payment or Swap Termination Payment is payable from principal collections, Principal Distribution Amounts will be deemed paid to the most subordinate class of related Certificates (other than the Class R Certificates and Class P Certificates), until the Certificate Principal Balance thereof has been reduced to zero.

(3)   Any Excess Cashflow shall be distributed in the following manner and order of priority:

(A)   Sequentially, to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6 Class B-1, Class B-2, Class  B-3 and Class B-4 Certificates, in that order, first, in an amount equal to the Interest Carry Forward Amount for each such Class, and second, in an

[TPW: NYLEGAL:691857.8] 17297-00533  11/15/2007 06:00 PM

CONFIDENTIAL

MSM_MSSTI_20071_0001608

amount equal to the Unpaid Realized Loss Amount for each such Class, in each case to the extent not paid pursuant to Section 4.22(e);

(B)     From any remaining Excess Cashflow otherwise distributable to the Class CE Interest and the Class CE Certificates, to the Reserve Fund, (i) first, to pay any unpaid Basis Risk Shortfall Carry Forward Amounts to the Class A, Class M and Class B Certificates in the same order and priority in which Current Interest is allocated among those Classes of Certificates, with the allocation to the Class A Certificates being (a) first, among those Classes of Certificates pro rata, based on their respective Certificate Principal Balances and (b) second, any remaining amounts to those Classes of Certificates, pro rata, based on any Basis Risk Shortfall Carry Forward Amounts remaining unpaid, in each case, to the extent not paid pursuant to Sections 4.22(d) and 4.22(e) and to the extent such amounts exceed the amounts then on deposit in the Reserve Fund, and (ii) second, to maintain a balance in the Reserve Fund equal to the Reserve Fund Deposit;

(C)     From any remaining Excess Cashflow, to the Swap Administrator for payment to the Swap Provider, any Swap Termination Payments due to a Swap Provider Trigger Event (other than to the extent already paid by the Swap Administrator from any upfront payment received pursuant to any replacement interest rate swap agreement that may be entered into by the Supplemental Interest Trust Trustee);

(D)     From any remaining Excess Cashflow, to the Class CE Interest and Class CE Certificates, an amount equal to the Class CE Distribution Amount, reduced by amounts distributed in clause (B) above; and

(E)     From any remaining Excess Cashflow, to the Class R-1, Class R-2, Class R-3 and Class RX Certificates, based on the related REMIC in which such amount remains.

In addition, notwithstanding the foregoing, on any Distribution Date after the Distribution Date on which the Certificate Principal Balance of a Class of Class A, Class B or Class M Certificates has been reduced to zero, that Class of Certificates will be retired and will no longer be entitled to distributions, including distributions in respect of Basis Risk Shortfall Carry Forward Amounts.

(b)     Subject to Section 11.02 hereof respecting the final distribution, on each Distribution Date the Securities Administrator shall make distributions to each Certificateholder of record on the preceding Record Date either by wire transfer in immediately available funds to the account of such Holder at a bank or other entity having appropriate facilities therefor, if (i) such Holder has so notified the Securities Administrator at least 5 Business Days prior to the related Record Date and (ii) such Holder shall hold Regular Certificates with aggregate principal denominations of not less than $1,000,000 or evidencing a Percentage Interest aggregating 10% or more with respect to such Class or, if not, by check mailed by first class mail to such Certificateholder at the address of such Holder appearing in the Certificate Register. Notwithstanding the foregoing, but subject to Section 11.02 hereof respecting the final distribution, distributions with respect to Certificates registered in the name of a Depository shall be made to such Depository in immediately available funds.

[TPW: NYLEGAL:691857.8] 17297-00533 11/15/2007 06:00 PM

CONFIDENTIAL                                                                                      MSM_MSSTI_20071_0001609

(c)     Prior to each Distribution Date, or if the Master Servicer and the Securities Administrator are no longer affiliated, on or before 5:00 p.m. Eastern time on the fifth Business Day immediately preceding each Distribution Date, the Master Servicer shall deliver a report to the Securities Administrator in the form of a computer readable magnetic tape (or by such other means as the Master Servicer and the Securities Administrator may agree from time to time) containing such data and information, as agreed to by the Master Servicer and the Securities Administrator such as to permit the Securities Administrator to prepare the Monthly Statement to Certificateholders and to direct the Securities Administrator in writing to make the required distributions for the related Distribution Date (the "Remittance Report").

Section 6.05    Allocation of Realized Losses.

(a)     All Realized Losses on the Mortgage Loans shall be allocated by the Securities Administrator on each Distribution Date as follows:  first, to Excess Spread through an increased distribution of the Extra Principal Distribution Amount; second, in reduction of any Overcollateralization Amount, third, to the Class B-4 Certificates, in reduction of the Certificate Principal Balance thereof, until reduced to zero; fourth, to the Class B-3 Certificates, in reduction of the Certificate Principal Balance thereof, until reduced to zero; fifth, to the Class B-2 Certificates, in reduction of the Certificate Principal Balance thereof, until reduced to zero; sixth, to the Class B-1 Certificates, in reduction of the Certificate Principal Balance thereof, until reduced to zero, seventh; to the Class M-6 Certificates, in reduction of the Certificate Principal Balance thereof, until reduced to zero; eighth, to the Class M-5 Certificates, in reduction of the Certificate Principal Balance thereof, until reduced to zero; ninth, to the Class M-4 Certificates, in reduction of the Certificate Principal Balance thereof, until reduced to zero; tenth, to the Class M-3 Certificates, in reduction of the Certificate Principal Balance thereof, until reduced to zero; eleventh, to the Class M-2 Certificates, in reduction of the Certificate Principal Balance thereof, until reduced to zero; and twelfth, to the Class M-1 Certificates, in reduction of the Certificate Principal Balance thereof, until reduced to zero. All Realized Losses to be allocated to the Certificate Principal Balances of all Classes on any Distribution Date shall be so allocated after the actual distributions to be made on such date as provided above. All references above to the Certificate Principal Balance of any Class of Certificates shall be to the Certificate Principal Balance of such Class immediately prior to the relevant Distribution Date, before reduction thereof by any Realized Losses, in each case to be allocated to such Class of Certificates, on such Distribution Date.

(b)     Any allocation of Realized Losses to Excess Spread shall be made by reducing the amount otherwise payable in respect of the Class CE Interest and the Class CE Certificates pursuant to clause (D) of Section 6.04(a)(3).

(c)     Notwithstanding the foregoing, no such allocation of any Realized Loss shall be made on a Distribution Date to any Class of Certificates to the extent that such allocation would result in the reduction of the aggregate Certificate Principal Balance of all the Certificates as of such Distribution Date (other than the Class CE Certificates and Class P Certificates) after giving effect to all distributions and prior allocations of Realized Losses on the Mortgage Loans on such date, to an amount less than the aggregate Stated Principal Balance of all of the Mortgage Loans as of the first day of the month of such Distribution Date (such limitation, the "Loss Allocation Limitation").  In addition in no event will the Certificate Principal Balance of any Certificate be reduced more than once in respect of any particular amount both (i) allocable to such Certificate

117

[TPW: NYLEGAL:691857.8] 17297-00533  11/15/2007 06:00 PM

CONFIDENTIAL

in respect of Realized Losses and (ii) payable as principal to the Holder of such Certificate from Remaining Excess Spread.

As used herein, an allocation of a Realized Loss on a "*pro rata* basis" among two or more specified Classes of Certificates means an allocation on a *pro rata* basis, among the various Classes so specified, to each such Class of Certificates on the basis of their then outstanding Certificate Principal Balances prior to giving effect to distributions to be made on such Distribution Date. All Realized Losses and all other losses allocated to a Class of Certificates hereunder will be allocated among the Certificates of such Class in proportion to the Percentage Interests evidenced thereby.

(d)      (i)      All Realized Losses on the Mortgage Loans shall be allocated on each Distribution Date, first, to REMIC I Regular Interest I-Non-Swap-Cash, until the Uncertificated Principal Balance of such REMIC I Regular Interest is reduced to zero, second, to REMIC I Regular Interest I-Non-Swap, until the Uncertificated Principal Balance of such REMIC I Regular Interest is reduced to zero, and third, to REMIC I Regular Interest I-13-A through REMIC I Regular Interest I-74-B, starting with the lowest numerical denomination until the Uncertificated Principal Balance of each such REMIC I Regular Interest has been reduced to zero, provided that, for REMIC I Regular Interests with the same numerical denomination, such Realized Losses shall be allocated *pro rata* between such REMIC I Regular Interests.

(ii)      All Realized Losses on the Mortgage Loans shall be allocated by the Securities Administrator on each Distribution Date to the following REMIC I Regular Interests in the specified percentages, as follows:  first, to Uncertificated Accrued Interest payable to REMIC II Regular Interest AA and REMIC II Regular Interest ZZ up to an aggregate amount equal to the REMIC II Interest Loss Allocation Amount (without duplication of shortfalls allocated pursuant to Section 1.02), 98.00% and 2.00%, respectively; second, to the Uncertificated Principal Balances of REMIC II Regular Interest AA and REMIC II Regular Interest ZZ up to an aggregate amount equal to the REMIC II Principal Loss Allocation Amount, 98.00% and 2.00%, respectively; third, to the Uncertificated Principal Balances of REMIC II Regular Interest AA, REMIC II Regular Interest B-4 and REMIC II Regular Interest ZZ, 98.00%, 1.00% and 1.00%, respectively, until the Uncertificated Principal Balance of REMIC II Regular Interest B-4 has been reduced to zero; fourth, to the Uncertificated Principal Balances of REMIC II Regular Interest AA, REMIC II Regular Interest B-3 and REMIC II Regular Interest ZZ, 98.00%, 1.00% and 1.00%, respectively, until the Uncertificated Principal Balance of REMIC II Regular Interest B-3 has been reduced to zero; fifth, to the Uncertificated Principal Balances of REMIC II Regular Interest AA, REMIC II Regular Interest B-2 and REMIC II Regular Interest ZZ, 98.00%, 1.00% and 1.00%, respectively, until the Uncertificated Principal Balance of REMIC II Regular Interest B-2 has been reduced to zero; sixth, to the Uncertificated Principal Balances of REMIC II Regular Interest AA, REMIC II Regular Interest B-1 and REMIC II Regular Interest ZZ, 98.00%, 1.00% and 1.00%, respectively, until the Uncertificated Principal Balance of REMIC I Regular Interest B-1 has been reduced to zero; seventh, to the Uncertificated Principal Balances of REMIC II Regular Interest AA, REMIC II Regular Interest M-6 and REMIC II Regular Interest ZZ, 98.00%, 1.00% and 1.00%, respectively, until the Uncertificated Principal Balance of REMIC II Regular Interest M-6 has been reduced to zero; eighth, to the Uncertificated Principal Balances of REMIC II Regular Interest AA, REMIC II Regular Interest M-5 and REMIC II Regular Interest ZZ, 98.00%, 1.00% and 1.00%, respectively, until the Uncertificated Principal Balance of REMIC II Regular Interest M-5 has

118

CONFIDENTIAL

been reduced to zero; ninth, to the Uncertificated Principal Balances of REMIC II Regular Interest AA, REMIC II Regular Interest M-4 and REMIC II Regular Interest ZZ, 98.00%, 1.00% and 1.00%, respectively, until the Uncertificated Principal Balance of REMIC II Regular Interest M-4 has been reduced to zero; tenth, to the Uncertificated Principal Balances of REMIC II Regular Interest AA, REMIC II Regular Interest M-3 and REMIC II Regular Interest ZZ, 98.00%, 1.00% and 1.00%, respectively, until the Uncertificated Principal Balance of REMIC II Regular Interest M-3 has been reduced to zero; eleventh, to the Uncertificated Principal Balances of REMIC II Regular Interest AA, REMIC II Regular Interest M-2 and REMIC II Regular Interest ZZ, 98.00%, 1.00% and 1.00%, respectively, until the Uncertificated Principal Balance of REMIC II Regular Interest M-2 has been reduced to zero; and twelfth, to the Uncertificated Principal Balances of REMIC II Regular Interest AA, REMIC II Regular Interest M-1 and REMIC II Regular Interest ZZ, 98.00%, 1.00% and 1.00%, respectively, until the Uncertificated Principal Balance of REMIC II Regular Interest M-1 has been reduced to zero.

Section 6.06   Monthly Statements to Certificateholders.

(a)   Not later than each Distribution Date, the Securities Administrator shall prepare and make available to each Holder of Certificates, the Trustee, the Swap Provider, the Yield Maintenance Agreement Provider, the Master Servicer and the Depositor a statement setting forth for the Certificates:

(i)   the applicable accrual periods for calculating distributions and general Distribution Dates;

(ii)   the total cash flows received and the general sources thereof;

(iii)   the amount, if any, of fees or expenses accrued and paid, with an identification of the payee and the general purpose of such fees including the related amount of the Servicing Fees paid to or retained by the related Servicer for the related Due Period;

(iv)   the amount of any Net Swap Payment payable to the Trust, any Net Swap Payment payable to the Swap Provider, any Swap Termination Payment payable to the Trust and any Swap Termination Payment payable to the Swap Provider;

(v)   the amount of the related distribution to Holders of the Class A, Class M and Class B Certificates (by Class) allocable to principal, separately identifying (A) the aggregate amount of any Principal Prepayments included therein, (B) the aggregate of all scheduled payments of principal included therein and (C) the Extra Principal Distribution Amount (if any);

(vi)   the amount of such distribution to Holders of each Class of Class A Certificates and Class M Certificates allocable to interest and the portion thereof, if any, provided by the Swap Agreement and the amount of coverage remaining under either credit enhancement;

(vii)   the amount of such distribution to Holders of each Class of Class A, Class M and Class B Certificates allocable to interest

119

[TPW: NYLEGAL:691857.8] 17297-00533  11/15/2007 06:00 PM

CONFIDENTIAL

(viii)   the amount of the distribution made on such Distribution Date to the Holders of the Class P Certificates allocable to Prepayment Charges

(ix)   the Interest Carry Forward Amounts and any Basis Risk Shortfall Carry Forward Amounts for each Class of Certificates (if any);

(x)   the Pass-Through Rate for each Class of Class A, Class M and Class B Certificates with respect to the current Interest Accrual Period, and, if applicable, whether such Pass-Through Rate was limited by the applicable Net Rate Cap;

(xi)   the number and Stated Principal Balance of all of the Mortgage Loans for the related Distribution Date, together with updated pool composition information including the following:   weighted average mortgage rate and weighted average remaining term;

(xii)   the Certificate Principal Balance or Certificate Notional Amount, as applicable, of each Class before and after giving effect (i) to all distributions allocable to principal on such Distribution Date and (ii) the allocation of any Applied Realized Loss Amounts for such Distribution Date;

(xiii)   the number and aggregate Stated Principal Balance of the Mortgage Loans (A) Delinquent (exclusive of Mortgage Loans in foreclosure and bankruptcy and those Liquidated Mortgage Loans as of the end of a Prepayment Period) (1) 30 days Delinquent, (2) 60 days Delinquent and (3) 90 days or more Delinquent, (B) in foreclosure and delinquent (1) 30 days Delinquent, (2) 60 days Delinquent and (3) 90 days or more Delinquent and (C) in bankruptcy and delinquent (1) 30 days Delinquent, (2) 60 days Delinquent and (3) 90 days or more Delinquent, in each case as of the close of business on the last day of the calendar month preceding such Distribution Date;

(xiv)   the amount of aggregate Advances included in the distribution on such Distribution Date (including the general purpose of such Advances), the aggregate amount of unreimbursed Advances as of the end of the Due Period, and the general source of funds for reimbursements;

(xv)   the amount of, if any, of excess cashflow or excess spread and the application of such excess cashflow;

(xvi)   the cumulative amount of Applied Realized Loss Amounts through the end of the preceding month;

(xvii)   if applicable, material modifications, extensions or waivers to Mortgage Loan terms, fees, penalties or payments during the preceding calendar month or that have become material over time;

(xviii) with respect to any Mortgage Loan that was liquidated during the preceding calendar month, the aggregate Stated Principal Balance of, and Realized Loss on, such Mortgage Loans as of the close of business on the Determination Date preceding such Distribution Date;

120

CONFIDENTIAL

(xix)   unless otherwise set forth in the Form 10-D relating to such Distribution Date, material breaches of pool asset representation or warranties or transaction covenants which have been reported to the securities administrator in accordance with this Agreement or the related Servicing Agreement;

(xx)   the total number and principal balance of any real estate owned or REO Properties as of the end of the related Due Period;

(xxi)   the three month rolling average of the percent equivalent of a fraction, the numerator of which is the aggregate Stated Principal Balance of the Mortgage Loans that are 60 days or more delinquent or are in bankruptcy or foreclosure or are REO Properties, and the denominator of which is the aggregate Stated Principal Balance of all of the Mortgage Loans in each case as of the end of the Prepayment Period;

(xxii)   the Realized Losses as of the close of business on the last day of the calendar month preceding such Distribution Date and the cumulative Realized Losses through the end of the related Prepayment Period;

(xxiii)   whether a Trigger Event exists;

(xxiv)   information on loss and delinquency used for determining early amortization, liquidation, stepdowns or other performance triggers and whether the trigger was met;

(xxv)   the amount of the Prepayment Charges remitted by the Servicers and the amount on deposit in the Reserve Fund;

(xxvi)   the amount the distributions to Holders of the Certificates in respect of Basis Risk Shortfall Carry Forward Amounts and the portion thereof, if any, provided by the Yield Maintenance Agreement; and

(xxvii)   updated pool composition data including the following:  weighted average mortgage rate and weighted average remaining term.

The Securities Administrator may make the foregoing Monthly Statement (and, at its option, any additional files containing the same information in an alternative format) available each month to Certificateholders via the Securities Administrator's internet website. The Securities Administrator's internet website shall initially be located at "www.ctslink.com". Assistance in using the website can be obtained by calling the Securities Administrator's customer service desk at (866) 846-4526. Parties that are unable to use the above distribution options are entitled to have a paper copy mailed to them via first class mail by calling the customer service desk and indicating such. The Securities Administrator may change the way Monthly Statements are distributed in order to make such distributions more convenient or more accessible to the above parties.

(b)   The Securities Administrator's responsibility for making the above information available to the Certificateholders is limited to the availability, timeliness and accuracy of the information derived from the Master Servicer and the Servicers. The Securities

[TPW: NYLEGAL:691857.8] 17297-00533  11/15/2007 06:00 PM

CONFIDENTIAL                                                                              MSM_MSSTI_20071_0001614

Administrator will make available a copy of each statement provided pursuant to this Section 6.06 to each Rating Agency.

(c)     Within a reasonable period of time after the end of each calendar year, the Securities Administrator shall furnish upon request to each Person who at any time during the calendar year was a Certificateholder, the information set forth in clauses (a)(v) and (a)(vii) of this Section 6.06 aggregated for such calendar year or applicable portion thereof during which such Person was a Certificateholder. Such obligation of the Securities Administrator shall be deemed to have been satisfied to the extent that substantially comparable information shall be provided by the Trustee or the Securities Administrator pursuant to any requirements of the Code as from time to time in effect.

(d)     Upon filing with the Internal Revenue Service, the Securities Administrator shall furnish to the Holders of the Residual Certificates the applicable Form 1066 and each applicable Form 1066Q and shall respond promptly to written requests made not more frequently than quarterly by any Holder of a Residual Certificate with respect to the following matters:

(i)     The original projected principal and interest cash flows on the Closing Date on each class of Regular Interests and Residual Interests created hereunder and on the Mortgage Loans, based on the Prepayment Assumption;

(ii)     The projected remaining principal and interest cash flows as of the end of any calendar quarter with respect to each class of Regular Interests and Residual Interests created hereunder and the Mortgage Loans, based on the Prepayment Assumption;

(iii)     The applicable Prepayment Assumption and any interest rate assumptions used in determining the projected principal and interest cash flows described above;

(iv)     The original issue discount (or, in the case of the Mortgage Loans, market discount) or premium accrued or amortized through the end of such calendar quarter with respect to each class of Regular Interests or Residual Interests created hereunder and to the Mortgage Loans, together with each constant yield to maturity used in computing the same;

(v)     The treatment of Realized Losses with respect to the Mortgage Loans or the Regular Interests created hereunder, including the timing and amount of any cancellation of indebtedness income of a REMIC with respect to such Regular Interests or bad debt deductions claimed with respect to the related Mortgage Loans;

(vi)     The amount and timing of any non-interest expenses of a REMIC; and

(vii)     Any taxes (including penalties and interest) imposed on the REMIC, including, without limitation, taxes on "prohibited transactions," "contributions" or "net income from foreclosure property" or state or local income or franchise taxes.

122

CONFIDENTIAL

The information pursuant to clauses (i), (ii), (iii) and (iv) above shall be provided by the Depositor pursuant to Section 10.12.

Section 6.07    REMIC Designations and REMIC Distributions.

(a)    The Trustee shall elect that each of REMIC I, REMIC II, REMIC III, REMIC IV, REMIC V and REMIC VI shall be treated as a REMIC under Section 860D of the Code. Any inconsistencies or ambiguities in this Agreement or in the administration of this Agreement shall be resolved in a manner that preserves the validity of such REMIC elections. The assets of REMIC I shall include the Mortgage Loans and all interest owing in respect of and principal due thereon, the Distribution Account, the Protected Accounts, any REO Property, any proceeds of the foregoing and any other assets subject to this Agreement (other than the Reserve Fund, any Prepayment Charge Waiver Amounts, the Yield Maintenance Agreement, the Yield Maintenance Collateral Account and, for the avoidance of doubt, the Supplemental Interest Trust, the Swap Agreement, the Swap Account, the Swap Collateral Account and any rights or obligations in respect of the Swap Administration Agreement). The REMIC I Regular Interests shall constitute the assets of REMIC II. The REMIC II Regular Interests shall constitute the assets of REMIC III. The Class CE Interest shall constitute assets of REMIC IV. The Class P Interest shall constitute assets of REMIC V. The Class IO Interest shall constitute assets of REMIC VI.

(b)    (1)    On each Distribution Date, the Interest Funds and Principal Funds, in the following order of priority, shall be deemed distributed by REMIC I to REMIC II on account of the REMIC I Regular Interests (other than REMIC I Regular Interest P) or withdrawn from the Distribution Account and distributed to the Holders of the Class R-1 Certificates, as the case may be:

(i)    from Interest Funds, determined without regard to clause (ii)(B) of the definition thereof, to holders of REMIC I Regular Interest I-Non-Swap and each of the REMIC I Regular Interests I-13-A through I-74-B, on a *pro rata* basis, in an amount equal to (A) the Uncertificated Accrued Interest for each such REMIC I Regular Interest for such Distribution Date, plus (B) any amounts payable in respect thereof remaining unpaid from previous Distribution Dates;

(ii)    to the extent of the portion of Principal Funds consisting of the Special Deposit, determined without regard to clause (ii)(B) of the definition of Principal Funds, to holders of REMIC I Regular Interest I-Non-Swap-Cash, until the Uncertificated Principal Balance of such REMIC I Regular Interest is reduced to zero; and

(iii)    to the extent of Principal Funds, determined without regard to clause (ii)(B) of the definition thereof, remaining after the distribution made pursuant to clause (ii) above, first, to holders of REMIC I Regular Interest I-Non-Swap, until the Uncertificated Principal Balance of such REMIC I Regular Interest is reduced to zero, and second, to holders of  REMIC I Regular Interests I-13-A through I-74-B, starting with the lowest numerical denomination, until the Uncertificated Principal Balance of each such REMIC I Regular Interest is reduced to zero, provided that, for such REMIC I Regular Interests with the same numerical denomination, such payments of principal shall be allocated on a *pro rata* basis between such REMIC I Regular Interests; and

123

CONFIDENTIAL

(iv)     any remaining amount to the Holders of the Class R-1 Certificates.

(2)     On each Distribution Date, all amounts representing Prepayment Charges shall be deemed distributed in respect of REMIC I Regular Interest P, provided that such amounts shall not reduce the Uncertificated Principal Balance of REMIC I Regular Interest P. On the Distribution Date immediately following the expiration of the latest Prepayment Charge term as identified on the Mortgage Loan Schedule, $100 shall be deemed distributed in respect of REMIC I Regular Interest P in reduction of the Uncertificated Principal Balance thereof.

(c)     (1)     On each Distribution Date, the Interest Funds and Principal Funds, in the following order of priority, shall be deemed distributed by REMIC II to REMIC III on account of the REMIC II Regular Interests (other than REMIC II Regular Interest P) or withdrawn from the Distribution Account and distributed to the Holders of the Class R-2 Certificates, as the case may be:

(i)     from Interest Funds, determined without regard to clause (ii)(B) of the definition thereof, to holders of REMIC II Regular Interest IO, in an amount equal to (A) the Uncertificated Accrued Interest for such REMIC II Regular Interest for such Distribution Date, plus (B) any amounts in respect thereof remaining unpaid from previous Distribution Dates;

(ii)     to the extent of Interest Funds, determined without regard to clause (ii)(B) of the definition thereof remaining after the distribution pursuant to clause (i) above, to holders of the REMIC II Regular Interests (other than REMIC II Regular Interest P), pro rata, in an amount equal to (A) the Uncertificated Accrued Interest for each such REMIC II Regular Interest for such Distribution Date, plus (B) any amounts in respect thereof remaining unpaid from previous Distribution Dates. Amounts payable as Uncertificated Accrued Interest in respect of REMIC II Regular Interest ZZ shall be reduced and deferred when the REMIC II Overcollateralization Amount is less than the REMIC II Overcollateralization Target Amount, by the lesser of (x) the amount of such difference and (y) the REMIC II Regular Interest ZZ Maximum Interest Deferral Amount, and such amount will be payable to the holders of each REMIC II Regular Interest for which a Class A, Class M or Class B Certificate is the Corresponding Certificate, allocated in the same proportion as the Extra Principal Distribution Amount is allocated to the Corresponding Certificates, and the Uncertificated Principal Balance of REMIC II Regular Interest ZZ shall be increased by such amount;

(iii)     from Principal Funds, determined without regard to clause (ii)(B) of the definition thereof, remaining after the distributions pursuant to clause (ii) above, allocated as follows:

(A)     98.00% of such remainder to holders of REMIC II Regular Interest AA, until the Uncertificated Principal Balance of such REMIC II Regular Interest is reduced to zero; and

(B)     2.00% of such remainder, first, to holders of each REMIC II Regular Interest for which a Class A, Class M or Class B Certificate is the Corresponding Certificate, in an aggregate amount equal to 1.00% of

124

CONFIDENTIAL

MSM_MSSTI_20071_0001617

and in the same proportion as principal payments are allocated to the Corresponding Certificates, until the Uncertificated Principal Balances of such REMIC II Regular Interests are reduced to zero, and second, to the holders of REMIC II Regular Interest ZZ, until the Uncertificated Principal Balance of such REMIC II Regular Interest is reduced to zero; and

(iv)    any remaining amount to the Holders of the Class R-2 Certificates.

(2)    On each Distribution Date, amounts representing Prepayment Charges on the Mortgage loans deemed distributed in respect of REMIC I Regular Interest P shall be deemed to be distributed to REMIC II Regular Interest P, provided that such amounts shall not reduce the Uncertificated Principal Balance of REMIC II Regular Interest P. On the Distribution Date immediately following the expiration of the latest Prepayment Charge term as identified on the Mortgage Loan Schedule, an amount equal to $100 deemed distributed in respect of REMIC I Regular Interest P in reduction of the Uncertificated Principal Balance thereof shall be deemed to be distributed to REMIC II Regular Interest P in reduction of the Uncertificated Principal Balance thereof.

(d)    On each Distribution Date, interest shall be deemed payable from REMIC III to the holders of each REMIC III Regular Interest the ownership of which is represented by the Class A, Class M and Class B Certificates at a pass-through rate equal to the lesser of (i) the Pass-Through Rate for the Corresponding Certificate determined without regard to the Net Rate Cap and (ii) the Net Rate Cap for the REMIC III Regular Interest the ownership of which is represented by the Corresponding Certificate for such Distribution Date, in each case on a principal balance equal to the Certificate Principal Balance of the Corresponding Certificate for such Distribution Date. For the avoidance of doubt, principal shall be payable to, and shortfalls, losses and prepayments shall be allocable to, the REMIC III Regular Interests the ownership of which is represented by the Class A, Class M and Class B Certificates as such amounts are payable and allocable to the Corresponding Certificates.

(e)    On each Distribution Date, an amount equal to the amounts distributed pursuant to Section 6.04(a)(3)(B) and (D) on such date shall be deemed distributed from REMIC III to REMIC IV in respect of the Class CE Distribution Amount distributable on the Class CE Interest.

(f)    On each Distribution Date, 100% of the amounts deemed distributed on REMIC II Regular Interest P shall be deemed distributed by REMIC III to REMIC V in respect of the Class P Interest.

(g)    On each Distribution Date, 100% of the amounts deemed distributed on REMIC II Regular Interest IO shall be deemed distributed by REMIC III to REMIC VI in respect of the Class IO Interest. Such amounts shall be deemed distributed by REMIC VI in respect of REMIC VI Regular Interest IO for deposit into the Supplemental Interest Trust. Reserve Fund.

125

[TPW: NYLEGAL:691857.8] 17297-00533  11/15/2007 06:00 PM

CONFIDENTIAL                                                      MSM_MSSTI_20071_0001618

Section 6.08    Class P Certificate Account.

The Securities Administrator shall establish and maintain with itself a separate, segregated trust account for each of the Class P Certificates, titled "Morgan Stanley Structured Trust I 2007-1, Class P Certificate Account" (the "Class P Certificate Account"). On the Closing Date, the Depositor will deposit, or cause to be deposited in the Class P Certificate Account $100.00. Prepayment charges shall be allocated to the Class P Certificate. The amount on deposit in the Class P Certificate Account shall be held uninvested. On the Distribution Date immediately following the expiration of the latest Prepayment Charge term as identified on the Mortgage Loan Schedule, the Securities Administrator shall withdraw the amount on deposit in the Class P Certificate Account and remit such amount to the Holders of the Class P Certificates in reduction of the Certificate Principal Balance thereof.

126

CONFIDENTIAL                                                                 MSM_MSSTI_20071_0001619

# ARTICLE VII

## THE CERTIFICATES

Section 7.01   The Certificates.

The Certificates shall be substantially in the forms attached hereto as Exhibits A-1 through A-6. The Certificates shall be issuable in registered form, in the minimum dollar denominations, integral dollar multiples in excess thereof (except that one Certificate of each Class may be issued in a different amount which must be in excess of the applicable minimum dollar denomination) and aggregate dollar denominations as set forth in the following table:

| Class | Minimum Denomination | Integral Multiple in Excess of Minimum | Initial Certificate Principal Balance | Pass-Through Rate |
|---|---|---|---|---|
| A-1 | $ 25,000 | $ 1,000 | $ 315,835,000 | Class A-1 Pass-Through Rate |
| A-2 | $ 25,000 | $ 1,000 | $ 26,710,000 | Class A-2 Pass-Through Rate |
| A-3 | $ 25,000 | $ 1 | $ 127,595,000 | Class A-3 Pass-Through Rate |
| A-4 | $ 25,000 | $ 1 | $ 78,612,000 | Class A-4 Pass-Through Rate |
| M-1 | $ 25,000 | $ 1,000 | $ 37,858,000 | Class M-1 Pass-Through Rate |
| M-2 | $ 25,000 | $ 1,000 | $ 27,566,000 | Class M-2 Pass-Through Rate |
| M-3 | $ 25,000 | $ 1,000 | $ 15,437,000 | Class M-3 Pass-Through Rate |
| M-4 | $ 25,000 | $ 1,000 | $ 13,967,000 | Class M-4 Pass-Through Rate |
| M-5 | $ 25,000 | $ 1,000 | $ 11,762,000 | Class M-5 Pass-Through Rate |
| M-6 | $ 25,000 | $ 1,000 | $ 7,719,000 | Class M-6 Pass-Through Rate |
| B-1 | $ 25,000 | $ 1,000 | $ 11,394,000 | Class B-1 Pass-Through Rate |
| B-2 | $ 25,000 | $ 1,000 | $ 9,189,000 | Class B-2 Pass-Through Rate |
| B-3 | $ 25,000 | $ 1,000 | $ 12,129,000 | Class B-3 Pass-Through Rate |
| B-4 | $ 25,000 | $ 1,000 | $ 9,923,000 | Class B-4 Pass-Through Rate |
| CE | $ 25,000 | $ 1,000 | $ 735,100,463.83 [(1)] | [(3)] |
| P | $ 100 | N/A | $ 100.00[(2)] | N/A |
| R-1 | 100% | N/A | N/A [(2)] | N/A |
| R-2 | 100% | N/A | N/A [(2)] | N/A |
| R-3 | 100% | N/A | N/A [(2)] | N/A |
| RX | 100% | N/A | N/A [(2)] | N/A |

(1)   This is a notional amount.
(2)   The Class P, Class R-1, Class R-2, Class R-3 and Class RX Certificates are not entitled to distributions in respect of interest
(3)   As defined in "Pass-Through Rate" definition.

The Certificates shall be executed by manual or facsimile signature on behalf of the Securities Administrator by an authorized officer. Certificates bearing the manual or facsimile signatures of individuals who were, at the time when such signatures were affixed, authorized to sign on behalf of the Securities Administrator shall bind the Securities Administrator, notwithstanding that such individuals or any of them have ceased to be so authorized prior to the authentication and delivery of such Certificates or did not hold such offices at the date of such authentication and delivery. No Certificate shall be entitled to any benefit under this Agreement, or be valid for any purpose, unless there appears on such Certificate the countersignature of the Securities Administrator by manual signature, and such countersignature upon any Certificate shall be conclusive evidence, and the only evidence, that such Certificate has been duly countersigned and delivered hereunder. All Certificates shall be dated the date of their countersignature. On the Closing Date, the Securities Administrator shall authenticate the Certificates to be issued at the written direction of the Depositor, or any affiliate thereof.

127

[TPW: NYLEGAL:691857.8] 17297-00533  11/15/2007 06:00 PM

CONFIDENTIAL

The Depositor shall provide, or cause to be provided, to the Securities Administrator on a continuous basis, an adequate inventory of Certificates to facilitate transfers.

Section 7.02   Certificate   Register;   Registration   of   Transfer   and   Exchange   of Certificates.

(a)     The Securities Administrator shall maintain, or cause to be maintained in accordance with the provisions of Section 7.09 hereof, a Certificate Register for the Trust Fund in which, subject to the provisions of subsections (b) and (c) below and to such reasonable regulations as it may prescribe, the Securities Administrator shall provide for the registration of Certificates and of Transfers and exchanges of Certificates as herein provided. Upon surrender for registration of Transfer of any Certificate, the Securities Administrator shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Certificates of the same Class and of like aggregate Percentage Interest.

At the option of a Certificateholder, Certificates may be exchanged for other Certificates of the same Class in authorized denominations and evidencing the same aggregate Percentage Interest upon surrender of the Certificates to be exchanged at the office or agency of the Securities Administrator. Whenever any Certificates are so surrendered for exchange, the Securities Administrator shall execute, authenticate, and deliver the Certificates that the Certificateholder making the exchange is entitled to receive. Every Certificate presented or surrendered for registration of Transfer or exchange shall be accompanied by a written instrument of Transfer in form satisfactory to the Securities Administrator duly executed by the Holder thereof or his attorney duly authorized in writing.

No service charge to the Certificateholders shall be made for any registration of Transfer or exchange of Certificates, but payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with any Transfer or exchange of Certificates may be required.

All Certificates surrendered for registration of Transfer or exchange shall be canceled and subsequently destroyed by the Securities Administrator in accordance with the Securities Administrator's customary procedures.

(b)     No Transfer of a Private Certificate shall be made unless such Transfer is made pursuant to an effective registration statement under the Securities Act and any applicable state securities laws or is exempt from the registration requirements under the Securities Act and such state securities laws. In the event that a Transfer is to be made in reliance upon an exemption from the Securities Act and such laws, in order to assure compliance with the Securities Act and such laws, the Certificateholder desiring to effect such Transfer and such Certificateholder's prospective transferee shall each certify to the Securities Administrator in writing the facts surrounding the Transfer in substantially the forms set forth in Exhibit D (the "Transferor Certificate") and (x) deliver a letter in substantially the form of either Exhibit E (the "Investment Letter") or Exhibit F (the "Rule 144A Letter") or (y) there shall be delivered to the Securities Administrator an Opinion of Counsel addressed to the Securities Administrator that such Transfer may be made pursuant to an exemption from the Securities Act, which Opinion of Counsel shall not be an expense of the Depositor, the Seller, the Master Servicer, the Securities Administrator or the Trustee; provided, however, that such representation letters will not be

128

CONFIDENTIAL

required in connection with any transfer of any such Certificate by the Depositor to an affiliate of the Depositor and the Trustee and the Securities Administrator shall be entitled to conclusively rely upon a representation (which, upon the request of the Trustee or the Securities Administrator, shall be a written representation) from the Depositor of the status of such transferee as an affiliate of the Depositor. The Depositor shall provide to any Holder of a Private Certificate and any prospective transferee designated by any such Holder, information regarding the related Certificates and the Mortgage Loans and such other information as shall be necessary to satisfy the condition to eligibility set forth in Rule 144A(d)(4) for Transfer of any such Certificate without registration thereof under the Securities Act pursuant to the registration exemption provided by Rule 144A. The Securities Administrator and the Master Servicer shall cooperate with the Depositor in providing the Rule 144A information referenced in the preceding sentence, including providing to the Depositor such information regarding the Certificates, the Mortgage Loans and other matters regarding the Trust Fund as the Depositor shall reasonably request to meet its obligation under the preceding sentence. Notwithstanding the provisions of the immediately preceding sentence, no restrictions shall apply with respect to the transfer or registration of transfer of a beneficial interest in any Certificate that is a Global Certificate of a Class to a transferee that takes delivery in the form of a beneficial interest in the Global Certificate of such Class provided that each such transferee shall be deemed to have made such representations and warranties contained in the Rule 144A and Related Matters Certificate as are sufficient to establish that it is a QIB. Each Holder of a Private Certificate desiring to effect such Transfer shall, and does hereby agree to, indemnify the Trustee, the Depositor, the Seller, the Securities Administrator and the Master Servicer against any liability that may result if the Transfer is not so exempt or is not made in accordance with such federal and state laws.

No transfer of any Class CE Certificate shall be made unless the proposed transferee of such Class CE Certificate (1) provides to the Securities Administrator the appropriate tax certification forms that would eliminate any withholding or deduction for taxes from amounts payable by the Swap Provider, pursuant to the Swap Agreement, to the Swap Administrator on behalf of the Supplemental Interest Trust (i.e., IRS Form W-9 or IRS Form W-8BEN, W-8IMY, W-8EXP or W-8ECI, as applicable (or any successor form thereto), together with any applicable attachments) and (2) agrees to update such forms (a) upon expiration of any such forms, (b) as required under then applicable U.S. Treasury Regulations and (c) promptly upon learning that such forms have become obsolete or incorrect, each as a condition to such transfer. In addition, no transfer of any Class CE Certificate shall be made if such transfer would cause the Supplemental Interest Trust to be beneficially owned by two or more persons for federal income tax purposes, or continue to be so treated, unless (i) each proposed transferee of such Class CE Certificate complies with the foregoing conditions and (ii) the proposed majority holder of the Class CE Certificates (or each holder, if there is or would be no majority holder) (A) provides, or causes to be provided, on behalf of the Supplemental Interest Trust, if applicable, to the Securities Administrator, the appropriate tax certification forms that would be required from the Supplemental Interest Trust to eliminate any withholding or deduction for taxes from amounts payable by the Swap Provider, pursuant to the Swap Agreement, to the Swap Administrator on behalf of the Supplemental Interest Trust (i.e., IRS Form W-9 or IRS Form W-8BEN, W-8IMY, W-8EXP or W-8ECI, as applicable (or any successor form thereto), together with any applicable attachments) and (B) agrees to update such forms (x) upon expiration of any such forms, (y) as required under then applicable U.S. Treasury Regulations and (z) promptly upon learning that such forms have become obsolete or incorrect. If, under applicable U.S. Treasury Regulations,

129

[TPW: NYLEGAL:691857.8] 17297-00533  11/15/2007 06:00 PM

MSM_MSSTI_20071_0001622

such tax certification form may only be signed by a trustee acting on behalf of the Supplemental Interest Trust, then the Supplemental Interest Trust Trustee shall sign such certification form if so requested by a holder of the Class CE Certificates. Upon receipt of any tax certification form pursuant to the conditions set forth in this paragraph from a holder of any Class CE Certificate, the Securities Administrator shall forward such tax certification form to the Supplemental Interest Trust Trustee. The Supplemental Interest Trust Trustee shall forward such tax certification form provided to it to the Swap Provider. Each holder of a Class CE Certificate and each transferee thereof shall be deemed to have consented to the Supplemental Interest Trust Trustee forwarding to the Swap Provider any tax certification form it has provided and updated in accordance with these transfer restrictions. Any purported sales or transfers of any Class CE Certificate to a transferee which does not comply with the requirements of this paragraph shall be deemed null and void under this Agreement.

No Transfer of an ERISA Restricted Certificate shall be made unless either (i) the Master Servicer and the Securities Administrator shall have received a representation from the transferee of such Certificate acceptable to and in form and substance satisfactory to the Master Servicer and the Securities Administrator, to the effect that such transferee is not an employee benefit plan subject to Section 406 of ERISA and/or a plan subject to Section 4975 of the Code, or a Person acting on behalf of any such plan or using the assets of any such plan, or (ii) in the case of any such ERISA Restricted Certificate presented for registration in the name of an employee benefit plan subject to ERISA, or a plan subject to Section 4975 of the Code (or comparable provisions of any subsequent enactments), or a trustee of any such plan or any other person acting on behalf of any such plan, the Securities Administrator shall have received an Opinion of Counsel for the benefit of the Trustee, the Master Servicer and the Securities Administrator and on which they may rely, satisfactory to the Securities Administrator, to the effect that the purchase and holding of such ERISA Restricted Certificate is permissible under applicable law, will not constitute or result in the assets of the Trust being deemed to be "plan assets" under ERISA or the Code, will not result in any prohibited transactions under ERISA or Section 4975 of the Code and will not subject the Trustee, the Master Servicer, the Depositor or the Securities Administrator to any obligation in addition to those expressly undertaken in this Agreement, which Opinion of Counsel shall not be an expense of the Trustee, the Master Servicer, the Depositor or the Securities Administrator, or, in the case of a Class B-4 Certificate, the transferee provides a representation, or deemed representation in the case of the Global Certificate or an opinion of counsel to the effect that the proposed transfer and holding of such Certificate and the servicing, management and operation of the Trustee and its assets: (I) will not result in any prohibited transaction which is not covered under an individual or class prohibited transaction exemption, including, but not limited to, Prohibited Transaction Class Exemption ("PTCE") 84-14, PTCE 91-38, PTCE 90-1, PTCE 95-60 or PTCE 96-23 and (II) will not give rise to any additional obligations on the part of the Depositor, the Securities Administrator, the Master Servicer or the Trustee.  Notwithstanding anything else to the contrary herein, any purported transfer of an ERISA Restricted Certificate to or on behalf of an employee benefit plan subject to Section 406 of ERISA and/or a plan subject to Section 4975 of the Code without the delivery of the Opinion of Counsel as described above shall be void and of no effect; provided that the restriction set forth in this sentence shall not be applicable if there has been delivered to the Securities Administrator an Opinion of Counsel meeting the requirements of clause (ii) of the first sentence of this paragraph. None of the Trustee, the Securities Administrator or the Master Servicer shall be required to monitor, determine or inquire as to compliance with the transfer

130

CONFIDENTIAL                                                                 MSM_MSSTI_20071_0001623

restrictions with respect to any ERISA Restricted Certificate that is a Book-Entry Certificate, and none of the Trustee, the Securities Administrator or the Master Servicer shall have any liability for transfers of any such Book-Entry Certificates made through the book-entry facilities of any Depository or between or among participants of the Depository or Certificate Owners made in violation of the transfer restrictions set forth herein. None of the Trustee, the Securities Administrator or the Master Servicer shall be under any liability to any Person for any registration of transfer of any ERISA Restricted Certificate that is in fact not permitted by this Section 7.02(b) or for making any payments due on such Certificate to the Holder thereof or taking any other action with respect to such Holder under the provisions of this Agreement. The Trustee and the Securities Administrator shall each be entitled, but not obligated, to recover from any Holder of any ERISA Restricted Certificate that was in fact an employee benefit plan subject to Section 406 of ERISA or a plan subject to Section 4975 of the Code or a Person acting on behalf of any such plan at the time it became a Holder or, at such subsequent time as it became such a plan or Person acting on behalf of such a plan, all payments made on such ERISA Restricted Certificate at and after either such time. Any such payments so recovered by the Trustee or the Securities Administrator shall be paid and delivered by the Trustee or the Securities Administrator to the last preceding Holder of such Certificate that is not such a plan or Person acting on behalf of a plan.

Prior to the termination of the Supplemental Interest Trust, each beneficial owner of a Class A Certificate, Class M Certificate, Class B-1 Certificate, Class B-2 Certificate, Class B-3 Certificate or any interest therein, shall be deemed to have represented by virtue of its acquisition or holding of the Offered Certificate, or interest therein that either (i) such transferee is not an employee benefit plan subject to Section 406 of ERISA or a plan subject to Section 4975 of the Code (either a "Plan"), or a Person acting on behalf of a Plan or using the assets of a Plan, or (ii) the transferee provides a representation, or is deemed to represent in the case of the Global Certificate that (A) such plan is an accredited investor within the meaning of the Exemption and (B) the proposed transfer or holding of such Certificate and the separate right to receive payments from the Supplemental Interest Trust are eligible for exemptive relief under Prohibited Transaction Class Exemption ("PTCE") 84-14, PTCE 91-38, PTCE 90-1, PTCE 95-60 or PTCE 96-23.

Subsequent to the termination of the Supplemental Interest Trust, each beneficial owner of a Class M Certificate, Class B-1 Certificate, Class B-2 Certificate, Class B-3 Certificate or any interest therein shall be deemed to have represented, by virtue of its acquisition or holding of that certificate or interest therein, that either (a)(i) it is not a Plan or investing with "Plan Assets" within the meaning of Department of Labor Regulation 29 C.F.R. Section 2510.3-101, as modified by Section 3(42) of ERISA, (ii) it has acquired and is holding such certificate in reliance on the Exemption, and that it understands that there are certain conditions to the availability of the Exemption, including that the certificate must be rated, at the time of purchase, not lower than "BBB-" (or its equivalent) by S&P, Fitch, Dominion Bond Rating Service Limited (known as DBRS Limited), Dominion Bond Rating Service, Inc. (known as DBRS, Inc.) or Moody's, and the certificate is so rated or (iii) (1) it is an insurance company, (2) the source of funds used to acquire or hold the certificate or interest therein is an "insurance company general account," as such term is defined in PTCE 95-60, and (3) the conditions in Sections I and III of PTCE 95-60 have been satisfied.

[TPW: NYLEGAL:691857.8] 17297-00533 11/15/2007 06:00 PM

CONFIDENTIAL

MSM_MSSTI_20071_0001624

(c)     Each Person who has or who acquires any Ownership Interest in a Residual Certificate shall be deemed by the acceptance or acquisition of such Ownership Interest to have agreed to be bound by the following provisions, and the rights of each Person acquiring any Ownership Interest in a Residual Certificate are expressly subject to the following provisions:

(i)     Each Person holding or acquiring any Ownership Interest in a Residual Certificate shall be a Permitted Transferee and shall promptly notify the Securities Administrator of any change or impending change in its status as a Permitted Transferee.

(ii)     No Ownership Interest in a Residual Certificate may be registered on the Closing Date or thereafter transferred, and the Securities Administrator shall not register the Transfer of any Residual Certificate unless, in addition to the certificates required to be delivered to the Securities Administrator under subparagraph (b) above, the Securities Administrator shall have been furnished with an affidavit (a "Transferee Affidavit") of the initial owner or the proposed transferee in the form attached hereto as Exhibit C and an affidavit (a "Transferor Affidavit") of the initial owner or proposed transferor in the form attached hereto as Exhibit R.

(iii)     Each Person holding or acquiring any Ownership Interest in a Residual Certificate shall agree (A) to obtain a Transferee Affidavit from any other Person to whom such Person attempts to Transfer its Ownership Interest in a Residual Certificate, (B) to obtain a Transferee Affidavit from any Person for whom such Person is acting as nominee, trustee or agent in connection with any Transfer of a Residual Certificate and (C) not to Transfer its Ownership Interest in a Residual Certificate or to cause the Transfer of an Ownership Interest in a Residual Certificate to any other Person if it has actual knowledge that such Person is not a Permitted Transferee and unless it furnishes the Securities Administrator with a Transferor Affidavit.

(iv)     Any attempted or purported Transfer of any Ownership Interest in a Residual Certificate in violation of the provisions of this Section 7.02(c) shall be absolutely null and void and shall vest no rights in the purported Transferee. If any purported transferee shall become a Holder of a Residual Certificate in violation of the provisions of this Section 7.02(c), then the last preceding Permitted Transferee shall be restored to all rights as Holder thereof retroactive to the date of registration of Transfer of such Residual Certificate. Neither the Trustee nor the Securities Administrator shall be under any liability to any Person for any registration of Transfer of a Residual Certificate that is in fact not permitted by Section 7.02(b) and this Section 7.02(c) or for making any payments due on such Certificate to the Holder thereof or taking any other action with respect to such Holder under the provisions of this Agreement so long as the Transfer was registered after receipt of the related Transferee Affidavit and Transferor Affidavit. The Securities Administrator shall be entitled but not obligated to recover from any Holder of a Residual Certificate that was in fact not a Permitted Transferee at the time it became a Holder or, at such subsequent time as it became other than a Permitted Transferee, all payments made on such Residual Certificate at and after either such time. Any such payments so recovered by the Securities Administrator shall be paid and

132

CONFIDENTIAL

MSM_MSSTI_20071_0001625

delivered by the Securities Administrator to the last preceding Permitted Transferee of such Certificate.

(v)     The Master Servicer shall make available within 60 days of written request from the Securities Administrator, all information necessary to compute any tax imposed under Section 860E(e) of the Code as a result of a Transfer of an Ownership Interest in a Residual Certificate to any Holder who is not a Permitted Transferee.

The restrictions on Transfers of a Residual Certificate set forth in this Section 7.02(c) shall cease to apply (and the applicable portions of the legend on a Residual Certificate may be deleted) with respect to Transfers occurring after delivery to the Securities Administrator of an Opinion of Counsel addressed to the Securities Administrator, which Opinion of Counsel shall not be an expense of the Trustee, the Securities Administrator, the Seller or the Master Servicer to the effect that the elimination of such restrictions will not cause REMIC I, REMIC II, REMIC III, REMIC IV, REMIC V or REMIC VI, as applicable, to fail to qualify as a REMIC at any time that the Certificates are outstanding or result in the imposition of any tax on the Trust Fund, a Certificateholder or another Person. Each Person holding or acquiring any Ownership Interest in a Residual Certificate hereby consents to any amendment of this Agreement that, based on an Opinion of Counsel addressed to the Securities Administrator and furnished to the Securities Administrator, is reasonably necessary (a) to ensure that the record ownership of, or any beneficial interest in, a Residual Certificate is not transferred, directly or indirectly, to a Person that is not a Permitted Transferee and (b) to provide for a means to compel the Transfer of a Residual Certificate that is held by a Person that is not a Permitted Transferee to a Holder that is a Permitted Transferee.

(d)     The preparation and delivery of all certificates and opinions referred to above in this Section 7.02 shall not be an expense of the Trust Fund, the Trustee, the Depositor, the Seller, the Securities Administrator or the Master Servicer.

(e)     Subject to Subsection 7.02(i), so long as a Global Certificate of such Class is outstanding and is held by or on behalf of the Depository, transfers of beneficial interests in such Global Certificate, or transfers by holders of Individual Certificates of such Class to transferees that take delivery in the form of beneficial interests in the Global Certificate, may be made only in accordance with Subsection 7.02(b) and in accordance with the rules of the Depository:

(i)     In the case of a beneficial interest in the Global Certificate being transferred to an Institutional Accredited Investor, such transferee shall be required to take delivery in the form of an Individual Certificate or Certificates and the Securities Administrator shall register such transfer only upon compliance with the provisions of Subsection 7.02(b).

(ii)     In the case of a beneficial interest in a Class of Global Certificates being transferred to a transferee that takes delivery in the form of an Individual Certificate or Certificates of such Class, except as set forth in clause (i) above, the Securities Administrator shall register such transfer only upon compliance with the provisions of Subsection 7.02(b).

[TPW: NYLEGAL:691857.8] 17297-00533  11/15/2007 06:00 PM

CONFIDENTIAL                                                           MSM_MSSTI_20071_0001626

(iii)    In the case of an Individual Certificate of a Class being transferred to a transferee that takes delivery in the form of a beneficial interest in a Global Certificate of such Class, the Securities Administrator shall register such transfer if the transferee has provided the Securities Administrator with a Rule 144A and Related Matters Certificate or comparable evidence as to its QIB status.

(iv)    No restrictions shall apply with respect to the transfer or registration of transfer of a beneficial interest in the Global Certificate of a Class to a transferee that takes delivery in the form of a beneficial interest in the Global Certificate of such Class; provided that each such transferee shall be deemed to have made such representations and warranties contained in the Rule 144A and Related Matters Certificate as are sufficient to establish that it is a QIB.

(f)    Subject to Subsection 7.02(h), an exchange of a beneficial interest in a Global Certificate of a Class for an Individual Certificate or Certificates of such Class, an exchange of an Individual Certificate or Certificates of a Class for a beneficial interest in the Global Certificate of such Class and an exchange of an Individual Certificate or Certificates of a Class for another Individual Certificate or Certificates of such Class (in each case, whether or not such exchange is made in anticipation of subsequent transfer, and, in the case of the Global Certificate of such Class, so long as such Certificate is outstanding and is held by or on behalf of the Depository) may be made only in accordance with this Subsection 7.02(e) and in accordance with the rules of the Depository:

(i)    A holder of a beneficial interest in a Global Certificate of a Class may at any time exchange such beneficial interest for an Individual Certificate or Certificates of such Class.

(ii)    A holder of an Individual Certificate or Certificates of a Class may exchange such Certificate or Certificates for a beneficial interest in the Global Certificate of such Class if such holder furnishes to the Securities Administrator a Rule 144A and Related Matters Certificate or comparable evidence as to its QIB status.

(iii)    A holder of an Individual Certificate of a Class may exchange such Certificate for an equal aggregate principal amount of Individual Certificates of such Class in different authorized denominations without any certification.

(g)    (i)    Upon acceptance for exchange or transfer of an Individual Certificate of a Class for a beneficial interest in a Global Certificate of such Class as provided herein, the Securities Administrator shall cancel such Individual Certificate and shall (or shall request the Depository to) endorse on the schedule affixed to the applicable Global Certificate (or on a continuation of such schedule affixed to the Global Certificate and made a part thereof) or otherwise make in its books and records an appropriate notation evidencing the date of such exchange or transfer and an increase in the certificate balance of the Global Certificate equal to the certificate balance of such Individual Certificate exchanged or transferred therefor.

(ii)    Upon acceptance for exchange or transfer of a beneficial interest in a Global Certificate of a Class for an Individual Certificate of such Class as provided herein, the Securities Administrator shall (or shall request the Depository to) endorse on

134

CONFIDENTIAL

the schedule affixed to such Global Certificate (or on a continuation of such schedule affixed to such Global Certificate and made a part thereof) or otherwise make in its books and records an appropriate notation evidencing the date of such exchange or transfer and a decrease in the certificate balance of such Global Certificate equal to the certificate balance of such Individual Certificate issued in exchange therefor or upon transfer thereof.

(h)    Any Individual Certificate issued in exchange for or upon transfer of another Individual Certificate or of a beneficial interest in a Global Certificate shall bear the applicable legends set forth in Exhibit A-2.

(i)    Subject to the restrictions on transfer and exchange set forth in this Section 7.02, the holder of any Individual Certificate may transfer or exchange the same in whole or in part (in an initial certificate balance equal to the minimum authorized denomination set forth in Section 7.01 above or any integral multiple of $1.00 in excess thereof) by surrendering such Certificate at the Corporate Trust Office, or at the office of any transfer agent, together with an executed instrument of assignment and transfer satisfactory in form and substance to the Securities Administrator and the Securities Administrator in the case of transfer and a written request for exchange in the case of exchange. The holder of a beneficial interest in a Global Certificate may, subject to the rules and procedures of the Depository, cause the Depository (or its nominee) to notify the Securities Administrator and the Securities Administrator in writing of a request for transfer or exchange of such beneficial interest for an Individual Certificate or Certificates. Following a proper request for transfer or exchange, the Securities Administrator shall, within five Business Days of such request made at the Corporate Trust Office, sign, countersign and deliver at the Corporate Trust Office, to the transferee (in the case of transfer) or holder (in the case of exchange) or send by first class mail at the risk of the transferee (in the case of transfer) or holder (in the case of exchange) to such address as the transferee or holder, as applicable, may request, an Individual Certificate or Certificates, as the case may require, for a like aggregate Percentage Interest and in such authorized denomination or denominations as may be requested. The presentation for transfer or exchange of any Individual Certificate shall not be valid unless made at the Corporate Trust Office by the registered holder in person, or by a duly authorized attorney-in-fact.

Neither the Trustee nor the Securities Administrator nor the Master Servicer shall be required to monitor, determine or inquire as to compliance with the transfer restrictions with respect to the Global Certificates. Any attempted or purported transfer of any Certificate in violation of the provisions of Subsections (a) or (b) above shall be void ab initio and such Certificate shall be considered to have been held continuously by the prior permitted Certificateholder. Any transferor of any Certificate in violation of such provisions, shall indemnify and hold harmless the Trustee, the Securities Administrator and the Master Servicer from and against any and all liabilities, claims, costs or expenses incurred by the Securities Administrator, the Trustee or the Master Servicer as a result of such attempted or purported transfer. Neither the Trustee nor the Securities Administrator shall have any liability for transfer of any such Global Certificates in or through book-entry facilities of any Depository or between or among Depository Participants or Certificate Owners made in violation of the transfer restrictions set forth herein.

[TPW: NYLEGAL:691857.8] 17297-00533 11/15/2007 06:00 PM

CONFIDENTIAL                                                                      MSM_MSSTI_20071_0001628

Section 7.03    Mutilated, Destroyed, Lost or Stolen Certificates.

If any mutilated Certificate is surrendered to the Securities Administrator, or the Securities Administrator receives evidence to its satisfaction of the destruction, loss or theft of any Certificate and of the ownership thereof.

Section 7.04    Persons Deemed Owners.

The Securities Administrator, the Trustee and any agent of the Securities Administrator or the Trustee may treat the person in whose name any Certificate is registered as the owner of such Certificate for the purpose of receiving distributions as provided in this Agreement and for all other purposes whatsoever, and neither the Securities Administrator, the Trustee nor any agent of the Securities Administrator or the Trustee shall be affected by any notice to the contrary.

Section 7.05    Access to List of Certificateholders' Names and Addresses.

If three or more Certificateholders (a) request such information in writing from the Securities Administrator, (b) state that such Certificateholders desire to communicate with other Certificateholders with respect to their rights under this Agreement or under the Certificates, and (c) provide a copy of the communication that such Certificateholders propose to transmit or if the Depositor or the Master Servicer shall request such information in writing from the Securities Administrator, then the Securities Administrator shall, within ten Business Days after the receipt of such request, provide the Depositor, the Master Servicer or such Certificateholders at such recipients' expense the most recent list of the Certificateholders of the Trust Fund held by the Securities Administrator, if any. The Depositor and every Certificateholder, by receiving and holding a Certificate, agree that the Securities Administrator shall not be held accountable by reason of the disclosure of any such information as to the list of the Certificateholders hereunder, regardless of the source from which such information was derived.

Section 7.06    Book-Entry Certificates.

The Offered Certificates, upon original issuance, shall be issued in the form of one or more typewritten Certificates representing the Book-Entry Certificates, to be delivered to the Depository by or on behalf of the Depositor. Such Certificates shall initially be registered on the Certificate Register in the name of the Depository or its nominee, and no Certificate Owner of such Certificates will receive a definitive certificate representing such Certificate Owner's interest in such Certificates, except as provided in Section 7.08. Unless and until definitive, fully registered Certificates ("Definitive Certificates") have been issued to the Certificate Owners of such Certificates pursuant to Section 7.08:

(a)     the provisions of this Section shall be in full force and effect;

(b)     the Depositor, the Securities Administrator and the Trustee may deal with the Depository and the Depository Participants for all purposes (including the making of distributions) as the authorized representative of the respective Certificate Owners of such Certificates;

[TPW: NYLEGAL:691857.8] 17297-00533  11/15/2007 06:00 PM

CONFIDENTIAL                                                          MSM_MSSTI_20071_0001629

(c)     registration of the Book-Entry Certificates may not be transferred by the Securities Administrator except to another Depository;

(d)     the rights of the respective Certificate Owners of such Certificates shall be exercised only through the Depository and the Depository Participants and shall be limited to those established by law and agreements between the Owners of such Certificates and the Depository and/or the Depository Participants. Pursuant to the Depository Agreement, unless and until Definitive Certificates are issued pursuant to Section 7.08, the Depository will make book-entry transfers among the Depository Participants and receive and transmit distributions of principal and interest on the related Certificates to such Depository Participants;

(e)     the Depository may collect its usual and customary fees, charges and expenses from its Depository Participants;

(f)     the Securities Administrator may rely and shall be fully protected in relying upon information furnished by the Depository with respect to its Depository Participants; and

(g)     to the extent that the provisions of this Section conflict with any other provisions of this Agreement, the provisions of this Section shall control.

For purposes of any provision of this Agreement requiring or permitting actions with the consent of, or at the direction of, Certificateholders evidencing a specified percentage of the aggregate unpaid principal amount of any Class of Certificates, such direction or consent may be given by Certificate Owners (acting through the Depository and the Depository Participants) owning Book-Entry Certificates evidencing the requisite percentage of principal amount of such Class of Certificates.

The Private Certificates shall initially be held in fully registered certificated form. If at any time the Holders of all of the Certificates of one or more such Classes request that the Securities Administrator cause such Class to become Global Certificates, the Depositor (with the assistance of the Securities Administrator) will take such action as may be reasonably required to cause the Depository to accept such Class or Classes for trading if it may legally be so traded.  If at anytime there are to be Global Certificates, the Global Certificates shall be delivered to the Depository by the Depositor or deposited with the Securities Administrator as custodian for the Depository.

All transfers by Certificate Owners of such respective Classes of Book-Entry Certificates and any Global Certificates shall be made in accordance with the procedures established by the Depository Participant or brokerage firm representing such Certificate Owners. Each Depository Participant shall only transfer Book-Entry Certificates of Certificate Owners it represents or of brokerage firms for which it acts as agent in accordance with the Depository's normal procedures.

Section 7.07   Notices to Depository.

Whenever any notice or other communication is required to be given to Certificateholders of a Class with respect to which Book-Entry Certificates have been issued, unless and until

137

[TPW: NYLEGAL:691857.8] 17297-00533  11/15/2007 06:00 PM

CONFIDENTIAL

Definitive Certificates shall have been issued to the related Certificate Owners, the Securities Administrator shall give all such notices and communications to the Depository.

Section 7.08   Definitive Certificates.

If, after Book-Entry Certificates have been issued with respect to any Certificates, (a) the Depositor or the Depository advises the Securities Administrator that the Depository is no longer willing or able to discharge properly its responsibilities under the Depository Agreement with respect to such Certificates and the Depositor is unable to locate a qualified successor, (b) the Depositor, at its sole option, advises the Securities Administrator that it elects to terminate the book-entry system with respect to such Certificates through the Depository or (c) after the occurrence and continuation of an Event of Default, Certificate Owners of such Book-Entry Certificates having not less than 51% of the Voting Rights evidenced by any Class of Book-Entry Certificates advise the Securities Administrator and the Depository in writing through the Depository Participants that the continuation of a book-entry system with respect to Certificates of such Class through the Depository (or its successor) is no longer in the best interests of the Certificate Owners of such Class, then the Securities Administrator shall notify all Certificate Owners of such Certificates, through the Depository, of the occurrence of any such event and of the availability of Definitive Certificates to applicable Certificate Owners requesting the same. The Depositor shall provide the Securities Administrator with an adequate inventory of certificates to facilitate the issuance and transfer of Definitive Certificates. Upon surrender to the Securities Administrator of any such Certificates by the Depository, accompanied by registration instructions from the Depository for registration, the Securities Administrator shall countersign and deliver such Definitive Certificates. Neither the Depositor nor the Securities Administrator shall be liable for any delay in delivery of such instructions and each may conclusively rely on, and shall be protected in relying on, such instructions. Upon the issuance of such Definitive Certificates, all references herein to obligations imposed upon or to be performed by the Depository shall be deemed to be imposed upon and performed by the Securities Administrator, to the extent applicable with respect to such Definitive Certificates and the Trustee and the Securities Administrator shall recognize the Holders of such Definitive Certificates as Certificateholders hereunder.

Section 7.09   Maintenance of Office or Agency.

The Securities Administrator will maintain or cause to be maintained at its expense an office or offices or agency or agencies at Wells Fargo Bank, National Association, Sixth Street and Marquette Avenue, Minneapolis, Minnesota 55479 where Certificates may be surrendered for registration of transfer or exchange. The Securities Administrator will give prompt written notice to the Certificateholders of any change in such location of any such office or agency.

[TPW: NYLEGAL:691857.8] 17297-00533  11/15/2007 06:00 PM

CONFIDENTIAL

MSM_MSSTI_20071_0001631

# ARTICLE VIII

## THE MASTER SERVICER

Section 8.01    Liabilities of the Depositor and the Master Servicer.

Each of the Depositor and the Master Servicer shall be liable in accordance herewith only to the extent of the obligations specifically imposed upon and undertaken by it herein.

Section 8.02    Merger or Consolidation of the Depositor or the Master Servicer.

(a)    Each of the Depositor and the Master Servicer will keep in full force and effect its existence, rights and franchises as a corporation under the laws of the state of its incorporation, and will obtain and preserve its qualification to do business as a foreign corporation in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this Agreement, the Certificates or any of the Mortgage Loans and to perform its duties under this Agreement.

(b)    Any Person into which the Depositor or the Master Servicer may be merged or consolidated, or any corporation resulting from any merger or consolidation to which the Depositor or the Master Servicer shall be a party, or any Person succeeding to the business of the Depositor or the Master Servicer, shall be the successor of the Depositor or the Master Servicer hereunder, without the execution or filing of any paper or further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding.

Section 8.03    Indemnification of the Trustee, the Master Servicer and the Securities Administrator.

(a)    The Master Servicer agrees to indemnify the Indemnified Persons for, and to hold them harmless against, any loss, liability or expense (including reasonable legal fees and disbursements of counsel) incurred on their part that may be sustained in connection with, arising out of, or relating to, any claim or legal action (including any pending or threatened claim or legal action) relating to this Agreement, including the powers of attorney delivered pursuant to Sections 4.01 and 4.05 hereof, the Assignment Agreements, the Custodial Agreements or the Certificates (i) related to the Master Servicer's failure to perform its duties in compliance with this Agreement (except as any such loss, liability or expense shall be otherwise reimbursable pursuant to this Agreement) or (ii) incurred by reason of the Master Servicer's willful misfeasance, bad faith or gross negligence in the performance of duties hereunder or by reason of reckless disregard of obligations and duties hereunder, provided, in each case, that with respect to any such claim or legal action (or pending or threatened claim or legal action), the Trustee shall have given the Master Servicer and the Seller written notice thereof promptly after a responsible officer of the Trustee shall have with respect to such claim or legal action actual knowledge thereof; provided, however, the failure to give such notice shall not relieve the Master Servicer of its indemnification obligations hereunder. This indemnity shall survive the resignation or removal of the Trustee, Master Servicer or the Securities Administrator and the termination of this Agreement.

[TPW: NYLEGAL:691857.8] 17297-00533  11/15/2007 06:00 PM

CONFIDENTIAL                                                      MSM_MSSTI_20071_0001632

Section 8.04   Limitations on Liability of the Depositor, the Master Servicer and Others.

Subject to the obligation of the Master Servicer to indemnify the Indemnified Persons pursuant to Section 8.03:

(a)   Neither the Depositor, the Master Servicer nor any of the directors, officers, employees or agents of the Depositor and the Master Servicer shall be under any liability to the Indemnified Persons, the Trust Fund or the Certificateholders for taking any action or for refraining from taking any action in good faith pursuant to this Agreement, or for errors in judgment; provided, however, that this provision shall not protect the Depositor, the Master Servicer or any such Person against any breach of warranties or representations made herein or any liability which would otherwise be imposed by reason of such Person's willful misfeasance, bad faith or gross negligence in the performance of duties or by reason of reckless disregard of obligations and duties hereunder.

(b)   The Depositor, the Master Servicer and any director, officer, employee or agent of the Depositor and the Master Servicer may rely in good faith on any document of any kind prima facie properly executed and submitted by any Person respecting any matters arising hereunder.

(c)   The Depositor, the Master Servicer the Securities Administrator, the Trustee, the Supplemental Interest Trust Trustee, each Custodian and any director, officer, employee or agent of the Depositor, the Master Servicer, the Securities Administrator, the Trustee, the Supplemental Interest Trust Trustee or each Custodian shall be indemnified by the Trust and held harmless thereby against any loss, liability or expense (including reasonable legal fees and disbursements of counsel) incurred on their part that may be sustained in connection with, arising out of, or related to, any claim or legal action (including any pending or threatened claim or legal action) relating to this Agreement, the Assignment Agreements, the Custodial Agreements, the Swap Agreement, the Yield Maintenance Agreement, the Certificates or the Servicing Agreements (except with respect to the Master Servicer only, to the extent that the Master Servicer is indemnified by the related Servicer under the related Servicing Agreement), other than (i) any such loss, liability or expense related to the Master Servicer's failure to perform its respective duties in compliance with this Agreement (except as any such loss, liability or expense shall be otherwise reimbursable pursuant to this Agreement), or to any Custodian's failure to perform its duties under the related Custodial Agreement, or (ii) any such loss, liability or expense incurred by reason of the Master Servicer's or a Custodian's willful misfeasance, bad faith or gross negligence in the performance of duties hereunder or under the related Custodial Agreement, as applicable, or by reason of reckless disregard of obligations and duties hereunder or under the related Custodial Agreement, as applicable.

(d)   None of the Depositor, the Master Servicer or the Securities Administrator shall be under any obligation to appear in, prosecute or defend any legal action that is not incidental to its duties under this Agreement and that in its opinion may involve it in any expense or liability; provided, however, the Master Servicer or the Securities Administrator may in its discretion, with the consent of the Trustee (which consent shall not be unreasonably withheld), undertake any such action which it may deem necessary or desirable with respect to this Agreement and the rights and duties of the parties hereto and the interests of the Certificateholders hereunder. In such event, the legal expenses and costs of such action and any

140

[TPW: NYLEGAL:691857.8] 17297-00533  11/15/2007 06:00 PM

CONFIDENTIAL

liability resulting therefrom shall be expenses, costs and liabilities of the Trust Fund, and the Master Servicer or the Securities Administrator shall be entitled to be reimbursed therefor out of the Distribution Account as provided by Section 5.08. Nothing in this Subsection 8.04(d) shall affect the Master Servicer's or the Securities Administrator's obligation to supervise, or to take such actions as are necessary to ensure, the servicing and administration of the Mortgage Loans pursuant to Subsection 4.01(a).

(e)     In taking or recommending any course of action pursuant to this Agreement, unless specifically required to do so pursuant to this Agreement, the Master Servicer or the Securities Administrator shall not be required to investigate or make recommendations concerning potential liabilities which the Trust might incur as a result of such course of action by reason of the condition of the Mortgaged Properties but shall give notice to the Trustee if it has notice of such potential liabilities.

(f)     The Master Servicer shall not be liable for any acts or omissions of the Servicers, except as otherwise expressly provided herein.

Section 8.05    Master Servicer Not to Resign.

(a)     Except as provided in Section 8.07, the Master Servicer shall not resign from the obligations and duties hereby imposed on it except (i) with the prior written consent of the Trustee (which consent shall not be unreasonably withheld) or (ii) upon a determination that any such duties hereunder are no longer permissible under applicable law and such impermissibility cannot be cured. Any such determination permitting the resignation of the Master Servicer shall be evidenced by an Opinion of Counsel to such effect, addressed to and delivered to, the Trustee. No such resignation by the Master Servicer shall become effective until the Trustee or a successor to the Master Servicer reasonably satisfactory to the Trustee shall have assumed the responsibilities and obligations of the Master Servicer in accordance with Section 9.02 hereof. The Trustee shall notify the Rating Agencies of the resignation of the Master Servicer.

Section 8.06    Successor Master Servicer.

In connection with the appointment of any successor Master Servicer or the assumption of the duties of the Master Servicer or the Trustee may make such arrangements for the compensation of such successor master servicer out of payments on the Mortgage Loans as the Trustee and such successor master servicer shall agree. If the successor master servicer does not agree that such market value is a fair price, such successor master servicer shall obtain two quotations of market value from third parties actively engaged in the servicing of single-family mortgage loans. In no event shall the compensation of any successor master servicer exceed that permitted the Master Servicer without the consent of all of the Certificateholders.

Section 8.07    Sale and Assignment of Master Servicing.

The Master Servicer may sell and assign its rights and delegate its duties and obligations in its entirety as Master Servicer under this Agreement; provided, however, that: (i) the purchaser or transferee accepting such assignment and delegation (a) shall be a Person which (or an Affiliate thereof the primary business of which is the servicing of conventional residential

141

CONFIDENTIAL

mortgage loans) shall be qualified to service mortgage loans for Fannie Mae or Freddie Mac; (b) shall have a net worth of not less than $10,000,000 (unless otherwise approved by each Rating Agency pursuant to clause (ii) below); (c) shall be reasonably satisfactory to the Trustee (as evidenced in a writing signed by the Trustee); and (d) shall execute and deliver to the Trustee an agreement, in form and substance reasonably satisfactory to the Trustee, which contains an assumption by such Person of the due and punctual performance and observance of each covenant and condition to be performed or observed by it as master servicer under this Agreement, any custodial agreement from and after the effective date of such agreement; (ii) each Rating Agency shall be given prior written notice of the identity of the proposed successor to the Master Servicer and each Rating Agency's rating of the Certificates in effect immediately prior to such assignment, sale and delegation will not be downgraded, qualified or withdrawn as a result of such assignment, sale and delegation, as evidenced by a letter to such effect delivered to the Master Servicer and the Trustee; (iii) the Master Servicer assigning and selling the master servicing shall deliver to the Trustee an Officer's Certificate and an Opinion of Counsel addressed to the Trustee, each stating that all conditions precedent to such action under this Agreement have been completed and such action is permitted by and complies with the terms of this Agreement; and (iv) in the event the Master Servicer is terminated without cause by EMC, EMC shall pay, from its own funds and without any right of reimbursement, the terminated Master Servicer a termination fee equal to 0.25% of the aggregate Stated Principal Balance of the Mortgage Loans at the time the master servicing of the Mortgage Loans is transferred to the successor Master Servicer. No such assignment or delegation shall affect any liability of the Master Servicer arising prior to the effective date thereof.

[TPW: NYLEGAL:691857.8] 17297-00533  11/15/2007 06:00 PM

CONFIDENTIAL

MSM_MSSTI_20071_0001635

# ARTICLE IX

## DEFAULT; TERMINATION OF MASTER SERVICER;

Section 9.01    Events of Default.

"Event of Default," wherever used herein, means any one of the following events:

(i)    any failure by the Master Servicer to remit to the Securities Administrator any amounts received or collected by the Master Servicer in respect of the Mortgage Loans and required to be remitted by it (other than any Advance) pursuant to this Agreement, which failure shall continue unremedied for one Business Day after the date on which written notice of such failure shall have been given to the Master Servicer by the Trustee or the Depositor, or to the Trustee and the Master Servicer by the Holders of Certificates evidencing not less than 25% of the Voting Rights evidenced by the Certificates; or

(ii)    any failure by the Master Servicer to observe or perform in any material respect any other of the covenants or agreements on the part of the Master Servicer contained in this Agreement or any breach of a representation or warranty by the Master Servicer, which failure or breach shall continue unremedied for a period of 60 days after the date on which written notice of such failure shall have been given to Master Servicer by the Trustee or the Depositor, or to the Trustee and the Master Servicer by the Holders of Certificates evidencing not less than 25% of the Voting Rights evidenced by the Certificates; or

(iii)    a decree or order of a court or agency or supervisory authority having jurisdiction in the premises for the appointment of a receiver or liquidator in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against the Master Servicer and such decree or order shall have remained in force undischarged or unstayed for a period of 60 consecutive days; or

(iv)    the Master Servicer shall consent to the appointment of a receiver or liquidator in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings of or relating to the Master Servicer or all or substantially all of the property of the Master Servicer; or

(v)    the Master Servicer shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of, or commence a voluntary case under, any applicable insolvency or reorganization statute, make an assignment for the benefit of its creditors, or voluntarily suspend payment of its obligations;

(vi)    the Master Servicer assigns or delegates its duties or rights under this Agreement in contravention of the provisions permitting such assignment or delegation under Sections 8.05 or 8.07; or

143

[TPW: NYLEGAL:691857.8] 17297-00533  11/15/2007 06:00 PM

CONFIDENTIAL

MSM_MSSTI_20071_0001636

(vii)   The Master Servicer fails to deposit, or cause to be deposited, in the Distribution Account any Advance required to be made by the Master Servicer (other than a Nonrecoverable Advance) by 5:00 p.m. New York City time on the Business Day prior to the related Distribution Date.

If an Event of Default shall occur, then, and in each and every such case, so long as such Event of Default shall not have been remedied, the Trustee may, and at the direction of the Holders of Certificates evidencing not less than 25% of the Voting Rights evidenced by the Certificates, the Trustee shall, by notice in writing to the Master Servicer and the Swap Provider, with a copy to the Rating Agencies, may terminate all of the rights and obligations (but not the liabilities) of the Master Servicer (and the Securities Administrator if the Master Servicer and the Securities Administrator are the same entity) under this Agreement and in and to the Mortgage Loans and the proceeds thereof, other than its rights as a Certificateholder hereunder. On or after the receipt by the Master Servicer of such written notice, all authority and power of the Master Servicer (and, if applicable, the Securities Administrator) hereunder, whether with respect to the Mortgage Loans or otherwise, shall pass to and be vested in the Trustee, or any successor appointed pursuant to Section 9.02 (a "Successor Master Servicer" and, if applicable, "Successor Securities Administrator"). Such Successor Master Servicer shall thereupon if such Successor Master Servicer is a successor to the Master Servicer, make any Advance required by Article VI, subject, in the case of the Trustee, to Section 9.02. The Trustee is hereby authorized and empowered to execute and deliver, on behalf of the terminated Master Servicer and, if applicable, the terminated Securities Administrator, as attorney- in-fact or otherwise, any and all documents and other instruments, and to do or accomplish all other acts or things necessary or appropriate to effect the purposes of such notice of termination, whether to complete the transfer and endorsement or assignment of any Mortgage Loans and related documents, or otherwise. Unless expressly provided in such written notice, no such termination shall affect any obligation of the Master Servicer to pay amounts owed pursuant to Article VIII or Article X. The Master Servicer and, if applicable, the Securities Administrator agrees to cooperate with the Trustee in effecting the termination of the Master Servicer's and, if applicable, the Securities Administrator's responsibilities and rights hereunder, including, without limitation, the transfer to the applicable Successor Master Servicer of all cash amounts which shall at the time be credited to the Distribution Account maintained pursuant to Section 5.08, or thereafter be received with respect to the applicable Mortgage Loans. The Trustee shall promptly notify the Rating Agencies of the occurrence of an Event of Default known to the Trustee. The Securities Administrator shall promptly notify the Trustee in writing of the occurrence of an Event of Default under clauses (i) or (vii) above.

Notwithstanding any termination of the activities of the Master Servicer hereunder, the Master Servicer shall be entitled to receive, out of any late collection of a Scheduled Payment on a Mortgage Loan that was due prior to the notice terminating the Master Servicer's rights and obligations as Master Servicer hereunder and received after such notice, that portion thereof to which the Master Servicer would have been entitled pursuant to Sections 5.05 and to receive any other amounts payable to the Master Servicer hereunder the entitlement to which arose prior to the termination of its activities hereunder.

Notwithstanding the foregoing, if an Event of Default described in clause (vii) of this Section 9.01 shall occur and the Securities Administrator fails to make such Advance described in clause (vii), the Trustee upon receiving notice or becoming aware of such failure, and pursuant

144

CONFIDENTIAL

MSM_MSSTI_20071_0001637

to the applicable terms of this Agreement, shall, by notice in writing to the Master Servicer, which may be delivered by telecopy, immediately terminate all of the rights and obligations of the Master Servicer thereafter arising under this Agreement, but without prejudice to any rights it may have as a Certificateholder or to reimbursement of Advances and other advances of its own funds, and the Trustee shall act as provided in Section 8.02 to carry out the duties of the Master Servicer, including the obligation to make any Advance the nonpayment of which was an Event of Default described in clause (vii) of this Section 9.01. Any such action taken by the Trustee must be prior to the distribution on the relevant Distribution Date.

Section 9.02    Trustee to Act; Appointment of Successor.

On and after the time the Master Servicer receives a notice of termination pursuant to Section 9.01 hereof the Trustee shall automatically become the successor to the Master Servicer with respect to the transactions set forth or provided for herein and after a transition period (not to exceed 90 days), shall have all the rights and powers of, and be subject to all the responsibilities, duties and liabilities relating thereto placed on the Master Servicer by the terms and provisions hereof; provided, however that, pursuant to Article VI hereof, the Trustee in its capacity as successor Master Servicer shall be responsible for making any Advances required to be made by the Master Servicer immediately upon the termination of the Master Servicer and any such Advance shall be made on the Distribution Date on which such Advance was required to be made by the predecessor Master Servicer. Effective on the date of such notice of termination, as compensation therefor, the Trustee shall be entitled to all compensation, reimbursement of expenses and indemnifications that the Master Servicer would have been entitled to if it had continued to act hereunder, provided, however, that the Trustee shall not be (i) liable for any acts or omissions of the Master Servicer, (ii) obligated to make Advances if it is prohibited from doing so under applicable law, (iii) responsible for expenses of the Master Servicer pursuant to Section 2.03 or (iv) obligated to deposit losses on any Permitted Investment directed by the Master Servicer. Notwithstanding the foregoing, the Trustee may, if it shall be unwilling to so act, or shall, if it is prohibited by applicable law from making Advances pursuant to Article VI or if it is otherwise unable to so act, appoint, or petition a court of competent jurisdiction to appoint, any established mortgage loan servicing institution the appointment of which does not adversely affect the then current rating of the Certificates by each Rating Agency as the successor to the Master Servicer hereunder in the assumption of all or any part of the responsibilities, duties or liabilities of the Master Servicer hereunder. Any Successor Master Servicer shall (i) be an institution that is a Fannie Mae and Freddie Mac approved seller/servicer in good standing, that has a net worth of at least $15,000,000 and (ii) be willing to act as successor servicer of any Mortgage Loans under this Agreement or the related Servicing Agreement with respect to which the original Servicer has been terminated as servicer, and shall have executed and delivered to the Depositor, the Trustee an agreement accepting such delegation and assignment, that contains an assumption by such Person of the rights, powers, duties, responsibilities, obligations and liabilities of the Master Servicer (other than any liabilities of the Master Servicer hereof incurred prior to termination of the Master Servicer under Section 9.01 or as otherwise set forth herein), with like effect as if originally named as a party to this Agreement, provided that each Rating Agency shall have acknowledged in writing that its rating of the Certificates in effect immediately prior to such assignment and delegation will not be qualified or reduced as a result of such assignment and delegation. If the Trustee assumes the duties and responsibilities of the Master Servicer in accordance with this Section 9.02, the

[TPW: NYLEGAL:691857.8] 17297-00533  11/15/2007 06:00 PM

CONFIDENTIAL

MSM_MSSTI_20071_0001638

Trustee shall not resign as Master Servicer until a Successor Master Servicer has been appointed and has accepted such appointment. Pending appointment of a successor to the Master Servicer hereunder, the Trustee, unless the Trustee is prohibited by law from so acting, shall, subject to Section 4.04 hereof, act in such capacity as hereinabove provided. In connection with such appointment and assumption, the Trustee may make such arrangements for the compensation of such successor out of payments on Mortgage Loans or otherwise as it and such successor shall agree; provided that no such compensation unless agreed to by the Certificateholders shall be in excess of that permitted the Master Servicer hereunder. The Trustee and such successor shall take such action, consistent with this Agreement, as shall be necessary to effectuate any such succession. Neither the Trustee nor any other Successor Master Servicer shall be deemed to be in default or incur any liability hereunder by reason of any failure to make, or any delay in making, any distribution hereunder or any portion thereof or any failure to perform, or any delay in performing, any duties or responsibilities hereunder, in either case caused by the failure of the Master Servicer and the Securities Administrator to deliver or provide, or any delay in delivering or providing, any cash, information, documents or records to it.

The costs and expenses of the Trustee in connection with the termination of the Master Servicer, appointment of a Successor Master Servicer and, if applicable, any transfer of servicing, including, without limitation, all costs and expenses associated with the complete transfer of all servicing data and the completion, correction or manipulation of such servicing data as may be required by the Trustee to correct any errors or insufficiencies in the servicing data or otherwise to enable the Trustee or the Successor Master Servicer to service the related Mortgage Loans properly and effectively, to the extent not paid by the terminated Master Servicer, shall be payable to the Trustee pursuant to Section 10.05. Any successor to the Master Servicer as successor servicer under any Subservicing Agreement shall give notice to the applicable Mortgagors of such change of servicer and shall, during the term of its service as successor servicer maintain in force the policy or policies that the Master Servicer is required to maintain pursuant to Section 4.04.

Section 9.03   Notification to Certificateholders and Rating Agencies.

(a)   Upon any termination of or appointment of a successor to the Master Servicer, the Trustee shall give prompt written notice thereof to Certificateholders, the Swap Provider and to each Rating Agency.

(b)   Within 60 days after the occurrence of any Event of Default, the Trustee shall transmit by mail to all Certificateholders and the Swap Provider notice of each such Event of Default hereunder actually known to a Responsible Officer of the Trustee, unless such Event of Default shall have been cured or waived.

Section 9.04   Waiver of Defaults.

The Trustee shall transmit by mail to all Certificateholders and the Swap Provider, within 60 days after the occurrence of any Event of Default actually known to a Responsible Officer of the Trustee, unless such Event of Default shall have been cured, notice of each such Event of Default hereunder known to the Trustee. Holders of Certificates evidencing not less than 51% of the Voting Rights may, on behalf of all Certificateholders, waive any default by the Master Servicer in the performance of its obligations hereunder and the consequences thereof, except a

146

CONFIDENTIAL

default in the making of or the causing to be made of any required distribution on the Certificates. Upon any such waiver of a past default, such default shall be deemed to cease to exist, and any Event of Default arising therefrom shall be deemed to have been timely remedied for every purpose of this Agreement. No such waiver shall extend to any subsequent or other default or impair any right consequent thereon except to the extent expressly so waived. The Trustee shall give notice of any such waiver to the Rating Agencies.

[TPW: NYLEGAL:691857.8] 17297-00533  11/15/2007 06:00 PM

CONFIDENTIAL

MSM_MSSTI_20071_0001640

## ARTICLE X

## CONCERNING THE TRUSTEE AND THE
## SECURITIES ADMINISTRATOR

Section 10.01  Duties of Trustee and Securities Administrator.

(a)      The Trustee, prior to the occurrence of an Event of Default and after the curing or waiver of all Events of Default which may have occurred, and the Securities Administrator each undertake to perform such duties and only such duties as are specifically set forth in this Agreement as duties of the Trustee and the Securities Administrator, respectively. If an Event of Default has occurred and has not been cured or waived, the Trustee shall exercise such of the rights and powers vested in it by this Agreement, and the same degree of care and skill in their exercise, as a prudent person would exercise under the circumstances in the conduct of such Person's own affairs.

(b)      Upon receipt of all resolutions, certificates, statements, opinions, reports, documents, orders or other instruments which are specifically required to be furnished to the Trustee or the Securities Administrator pursuant to any provision of this Agreement, the Trustee or the Securities Administrator, respectively, shall examine them to determine whether they are, on their face, in the form required by this Agreement; provided, however, that neither the Trustee nor the Securities Administrator shall be responsible for the accuracy or content of any resolution, certificate, statement, opinion, report, document, order or other instrument furnished by the Master Servicer; provided, further, that neither the Trustee nor the Securities Administrator shall be responsible for the accuracy or verification of any calculation provided to it pursuant to this Agreement.

(c)      On each Distribution Date, the Securities Administrator shall make monthly distributions and the final distribution to the Certificateholders from funds in the Distribution Account as provided in Sections 6.04 and 11.02 herein based solely on the applicable Remittance Report.

(d)      No provision of this Agreement shall be construed to relieve the Trustee or the Securities Administrator from liability for its own negligent action, its own negligent failure to act or its own willful misconduct; provided, however, that:

(i)      Prior to the occurrence of an Event of Default, and after the curing or waiver of all such Events of Default which may have occurred with respect to the Trustee and at all times with respect to the Securities Administrator, the duties and obligations of the Trustee and the Securities Administrator shall be determined solely by the express provisions of this Agreement, the Swap Agreement, the Yield Maintenance Agreement and the Custodial Agreements, neither the Trustee nor the Securities Administrator shall be liable except for the performance of their respective duties and obligations as are specifically set forth in this Agreement, the Swap Agreement, the Yield Maintenance Agreement and the Custodial Agreements, no implied covenants or obligations shall be read into this Agreement, the Swap Agreement, the Yield Maintenance Agreement and the Custodial Agreements against the Trustee or the Securities Administrator and, in the absence of bad faith on the part of the Trustee or the

148

CONFIDENTIAL

MSM_MSSTI_20071_0001641

Securities Administrator, respectively, the Trustee or the Securities Administrator, respectively, may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to the Trustee or the Securities Administrator, respectively, and conforming to the requirements of this Agreement, the Swap Agreement, the Yield Maintenance Agreement and the Custodial Agreements;

(ii)      Neither the Trustee nor the Securities Administrator shall be liable in its individual capacity for an error of judgment made in good faith by a Responsible Officer or Responsible Officers of the Trustee or an officer or officers of the Securities Administrator, respectively, unless it shall be proved that the Trustee or the Securities Administrator, respectively, was negligent in ascertaining the pertinent facts;

(iii)      Neither the Trustee nor the Securities Administrator shall be liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the directions of the Holders of Certificates evidencing not less than 25% of the aggregate Voting Rights of the Certificates (or such other percentage as specifically set forth herein), if such action or non-action relates to the time, method and place of conducting any proceeding for any remedy available to the Trustee or the Securities Administrator, respectively, or exercising any trust or other power conferred upon the Trustee or the Securities Administrator, respectively, under this Agreement, the Swap Agreement, the Yield Maintenance Agreement and the Custodial Agreements;

(iv)      The Trustee shall not be required to take notice or be deemed to have notice or knowledge of any default or Event of Default unless a Responsible Officer of the Trustee shall have actual knowledge thereof. In the absence of such notice, the Trustee may conclusively assume there is no such default or Event of Default;

(v)      The Securities Administrator shall not in any way be liable by reason of any insufficiency in any Account held in the name of Trustee unless it is determined by a court of competent jurisdiction in a non-appealable judgment that the Securities Administrator's gross negligence or willful misconduct was the primary cause of such insufficiency (except to the extent that the Securities Administrator is obligor and has defaulted thereon);

(vi)      The Trustee shall not in any way be liable by reason of any insufficiency in any Account held in the name of Trustee unless it is determined by a court of competent jurisdiction in a non-appealable judgment that the Trustee's gross negligence or willful misconduct was the primary cause of such insufficiency (except to the extent that the Trustee is obligor and has defaulted thereon);

(vii)      Anything in this Agreement to the contrary notwithstanding, in no event shall the Trustee or the Securities Administrator be liable for special, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Trustee or the Securities Administrator, respectively, has been advised of the likelihood of such loss or damage and regardless of the form of action; and

149

CONFIDENTIAL                                                                 MSM_MSSTI_20071_0001642

(viii)   None of the Securities Administrator, the Master Servicer, the Seller, the Depositor or the Trustee shall be responsible for the acts or omissions of the other (or of any Custodian), it being understood that this Agreement shall not be construed to render them partners, joint venturers or agents of one another.

Neither the Trustee nor the Securities Administrator shall be required to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if there is reasonable ground for believing that the repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it, and none of the provisions contained in this Agreement shall in any event require the Trustee or the Securities Administrator to perform, or be responsible for the manner of performance of, any of the obligations of the Master Servicer hereunder or any Servicer under the related Servicing Agreement.

(e)   All funds received by the Securities Administrator and required to be deposited in the Distribution Account pursuant to this Agreement shall be promptly so deposited by the Securities Administrator.

Section 10.02  Certain Matters Affecting the Trustee and the Securities Administrator.

(a)   Except as otherwise provided in Section 10.01:

(i)   The Trustee and the Securities Administrator may rely and shall be protected in acting or refraining from acting in reliance on any resolution or certificate of the Seller, the Master Servicer or the related Servicer, any certificates of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties;

(ii)   The Trustee and the Securities Administrator may consult with counsel and any advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection with respect to any action taken or suffered or omitted by it hereunder in good faith and in accordance with such advice or Opinion of Counsel;

(iii)   Neither the Trustee nor the Securities Administrator shall be under any obligation to exercise any of the trusts or powers vested in it by this Agreement, other than its obligation to give notices pursuant to this Agreement, or to institute, conduct or defend any litigation hereunder or in relation hereto at the request, order or direction of any of the Certificateholders pursuant to the provisions of this Agreement, unless such Certificateholders shall have offered to the Trustee or the Securities Administrator, as applicable, reasonable security or indemnity against the costs, expenses and liabilities which may be incurred therein or thereby. Nothing contained herein shall, however, relieve the Trustee of the obligation, upon the occurrence of an Event of Default of which a Responsible Officer of the Trustee has actual knowledge (which has not been cured or waived), to exercise such of the rights and powers vested in it by this Agreement, and to use the same degree of care and skill in their exercise, as a prudent person would exercise under the circumstances in the conduct of his own affairs;

150

CONFIDENTIAL

(iv)    Prior to the occurrence of an Event of Default hereunder and after the curing or waiver of all Events of Default which may have occurred with respect to the Trustee and at all times with respect to the Securities Administrator, neither the Trustee nor the Securities Administrator shall be liable in its individual capacity for any action taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Agreement;

(v)    Neither the Trustee nor the Securities Administrator shall be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond or other paper or document, unless requested in writing to do so by Holders of Certificates evidencing not less than 25% of the aggregate Voting Rights of the Certificates and provided that the payment within a reasonable time to the Trustee or the Securities Administrator, as applicable, of the costs, expenses or liabilities likely to be incurred by it in the making of such investigation is, in the opinion of the Trustee or the Securities Administrator, as applicable, reasonably assured to the Trustee or the Securities Administrator, as applicable, by the security afforded to it by the terms of this Agreement. The Trustee or the Securities Administrator may require reasonable indemnity against such expense or liability as a condition to taking any such action. The reasonable expense of every such examination shall be paid by the Certificateholders requesting the investigation;

(vi)    The Trustee and the Securities Administrator may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or through Affiliates, agents or attorneys; provided, however, that the Trustee may not appoint any paying agent other than the Securities Administrator to perform any paying agent functions under this Agreement without the express written consent of the Master Servicer, which consents will not be unreasonably withheld. Neither the Trustee nor the Securities Administrator shall be liable or responsible for the misconduct or negligence of any of the Trustee's or the Securities Administrator's agents or attorneys or paying agent appointed hereunder by the Trustee or the Securities Administrator with due care and, when required, with the consent of the Master Servicer;

(vii)    Should the Trustee or the Securities Administrator deem the nature of any action required on its part to be unclear, the Trustee or the Securities Administrator, respectively, may require prior to such action that it be provided by the Depositor with reasonable further instructions; the right of the Trustee or the Securities Administrator to perform any discretionary act enumerated in this Agreement shall not be construed as a duty, and neither the Trustee nor the Securities Administrator shall be accountable for other than its negligence or willful misconduct in the performance of any such act;

(viii)    Neither the Trustee nor the Securities Administrator shall be required to give any bond or surety with respect to the execution of the trust created hereby or the powers granted hereunder, except as provided in Subsection 10.07; and

(ix)    Neither the Trustee nor the Securities Administrator shall have any duty to conduct any affirmative investigation as to the occurrence of any condition

151

CONFIDENTIAL                                    MSM_MSSTI_20071_0001644

requiring the repurchase of any Mortgage Loan by any Person pursuant to this Agreement, or the eligibility of any Mortgage Loan for purposes of this Agreement.

(b)     [reserved].

(c)     The Securities Administrator, the Swap Administrator and the Supplemental Interest Trust Trustee are hereby directed by the Depositor to execute, deliver and perform its respective obligations under the Swap Administration Agreement and to perform the obligations of the Securities Administrator, the Swap Administrator and the Supplemental Interest Trust Trustee, respectively, thereunder on the Closing Date and thereafter on behalf of the Holders of the Certificates (and any amendments or supplements to the Swap Administration Agreement as may be requested by the Majority Class CE Certificateholder regarding the distributions to be made to it or its designees thereunder). The Sellers, the Master Servicer, the Depositor and the Certificateholders by acceptance of their Certificates acknowledge and agree that the Securities Administrator, the Swap Administrator and the Supplemental Interest Trust Trustee shall execute, deliver and perform its respective obligations under the Swap Administration Agreement and shall do so solely in its capacity as Securities Administrator, the Swap Administrator and the Supplemental Interest Trust Trustee and not in its individual capacity. Amounts payable by the Securities Administrator on any Distribution Date to the Swap Administrator shall be paid by the Securities Administrator as provided herein. The Securities Administrator, the Swap Administrator and the Supplemental Interest Trust Trustee in their individual capacities shall have no responsibility for any of the undertakings, agreements or representations by it with respect to the Swap Administration Agreement, including, without limitation, for making any payments thereunder.

The Securities Administrator, not in its individual capacity but solely in its separate capacity as Supplemental Interest Trust Trustee, is hereby directed to exercise the rights, perform the obligations, and make any representations to be exercised, performed, or made by the Supplemental Interest Trust Trustee, as described herein. The Supplemental Interest Trust Trustee is hereby directed to execute and deliver the Swap Agreement on behalf of Party B (as defined therein) and to exercise the rights, perform the obligations, and make the representations of Party B thereunder, solely in its capacity as Supplemental Interest Trust Trustee on behalf of Party B (as defined therein) and not in its individual capacity.

The Seller, the Master Servicer, the Depositor and the Certificateholders by acceptance of their Certificates acknowledge and agree that:

(i) the Supplemental Interest Trust Trustee shall execute and deliver the Swap Agreement on behalf of Party B (as defined therein),

(ii) the Supplemental Interest Trust Trustee shall exercise the rights, perform the obligations, and make the representations of Party B thereunder, solely in its capacity as Supplemental Interest Trust Trustee on behalf of Party B (as defined therein) and not in its individual capacity, and

(iii) the Swap Administrator shall also be entitled to exercise the rights and obligated to perform the obligations of Party B under the Swap Agreement.

152

CONFIDENTIAL                                                                                    MSM_MSSTI_20071_0001645

Every provision of this Agreement relating to the conduct or affecting the liability of or affording protection to the Securities Administrator shall apply to the Securities Administrator's execution (as Supplemental Interest Trust Trustee) of the Swap Agreement, and the performance of its duties and satisfaction of its obligations thereunder. Every provision of this Agreement relating to the conduct or affecting the liability of or affording protection to the Securities Administrator shall apply to the Securities Administrator's execution (as Swap Administrator) of the Swap Agreement, and the performance of its duties and satisfaction of its obligations thereunder.

The Securities Administrator is hereby directed to execute and deliver the Yield Maintenance Agreement on behalf of Party B (as defined therein) and to exercise the rights, perform the obligations, and make the representations of Party B thereunder, solely in its capacity as Securities Administrator on behalf of Party B (as defined therein) and not in its individual capacity.

The Seller, the Master Servicer, the Depositor and the Certificateholders by acceptance of their Certificates acknowledge and agree that:

> (i) the Securities Administrator shall execute and deliver the Yield Maintenance Agreement on behalf of Party B (as defined therein), and

> (ii) the Securities Administrator shall exercise the rights, perform the obligations, and make the representations of Party B thereunder, solely in its capacity as Securities Administrator on behalf of Party B (as defined therein) and not in its individual capacity.

It is acknowledged and agreed that the Person serving as Securities Administrator hereunder shall also serve as Swap Administrator under the Swap Administration Agreement and act as Supplemental Interest Trust Trustee under the Swap Agreement. The Swap Administrator shall not have any liability for any failure or delay in payments to the Trust which are required under the Swap Administration Agreement where such failure or delay is due to the failure or delay of the Swap Provider in making such payment to the Swap Administrator. Wells Fargo Bank National Association in its individual capacity and as Swap Administrator, the Securities Administrator and the Supplemental Interest Trust Trustee shall be entitled to be indemnified and held harmless by the Trust from and against any and all losses, claims, expenses or other liabilities that arise by reason of or in connection with the performance or observance by each of the Swap Administrator, the Securities Administrator and the Supplemental Interest Trust Trustee of its duties or obligations under the Swap Agreement, the Swap Administration Agreement or the Yield Maintenance Agreement, except to the extent that the same is due to the Swap Administrator's, the Securities Administrator's or the Supplemental Interest Trust Trustee's gross negligence, willful misconduct or fraud. Any Person appointed as successor securities administrator pursuant to Section 10.09 shall also be required to serve as successor Swap Administrator and successor supplemental interest trust trustee under the Swap Agreement and the Swap Administration Agreement.

[TPW: NYLEGAL:691857.8] 17297-00533  11/15/2007 06:00 PM

CONFIDENTIAL          MSM_MSSTI_20071_0001646

Section 10.03 Trustee and Securities Administrator Not Liable for Certificates or Mortgage Loans.

The recitals contained herein and in the Certificates (other than the signature and countersignature of the Securities Administrator on the Certificates) shall be taken as the statements of the Depositor, and neither the Trustee nor the Securities Administrator shall have any responsibility for their correctness. Neither the Trustee nor the Securities Administrator makes any representation as to the validity or sufficiency of the Certificates (other than the signature and countersignature of the Securities Administrator on the Certificates) or of any Mortgage Loan except as expressly provided in Sections 2.02 and 2.06 hereof; provided, however, that the foregoing shall not relieve the Trustee, or the related Custodian on its behalf, of the obligation to review the Mortgage Files pursuant to Section 2.02 of this Agreement. Neither the Trustee or the Securities Administrator shall be accountable for the use or application by the Depositor of any of the Certificates or of the proceeds of such Certificates, or for the use or application of any funds paid to the Depositor with respect to the Mortgage Loans. Subject to Section 2.06, neither the Trustee nor the Securities Administrator shall be responsible for the legality or validity of this Agreement or any document or instrument relating to this Agreement, the validity of the execution of this Agreement or of any supplement hereto or instrument of further assurance, or the validity, priority, perfection or sufficiency of the security for the Certificates issued hereunder or intended to be issued hereunder. Neither the Trustee nor the Securities Administrator shall at any time have any responsibility or liability for or with respect to the legality, validity and enforceability of any Mortgage or any Mortgage Loan, or the perfection and priority of any Mortgage or the maintenance of any such perfection and priority, or for or with respect to the sufficiency of the Trust Fund or its ability to generate the payments to be distributed to Certificateholders, under this Agreement. Neither the Trustee nor the Securities Administrator shall have any responsibility for filing any financing or continuation statement in any public office at any time or to otherwise perfect or maintain the perfection of any security interest or lien granted to it hereunder or to record this Agreement.

Section 10.04  Trustee and Securities Administrator May Own Certificates.

Each of the Trustee and the Securities Administrator in its individual capacity or in any capacity other than as Trustee or Securities Administrator hereunder may become the owner or pledgee of any Certificates with the same rights it would have if it were not the Trustee or the Securities Administrator, as applicable, and may otherwise deal with the parties hereto.

Section 10.05  Trustee's and Securities Administrator's Fees and Expenses.

The fees and expenses of the Trustee and the Securities Administrator shall be paid in accordance with a side letter agreement with the Master Servicer and at the expense of the Master Servicer. In addition, the Trustee and the Securities Administrator shall be entitled to recover from the Distribution Account pursuant to Section 5.03 all reasonable out-of-pocket expenses, disbursements and advances and the expenses of the Trustee and the Securities Administrator, respectively, in connection with any Event of Default, any breach of this Agreement, the Swap Agreement, the Yield Maintenance Agreement or the Custodial Agreements or any claim or legal action (including any pending or threatened claim or legal action) incurred or made by the Trustee or the Securities Administrator, respectively, in the administration of the trusts hereunder (including the reasonable compensation, expenses and

154

CONFIDENTIAL

MSM_MSSTI_20071_0001647

disbursements of its counsel) except any such expense, disbursement or advance as may arise from its negligence or intentional misconduct or which is the responsibility of the Certificateholders or the Trust Fund hereunder. If funds in the Distribution Account are insufficient therefor, the Trustee and the Securities Administrator shall recover such expenses, disbursements or advances from the Depositor and the Depositor hereby agrees to pay such expenses, disbursements or advances upon demand. Such compensation and reimbursement obligation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust.

Section 10.06 Eligibility Requirements for Trustee and Securities Administrator.

The Trustee and any successor Trustee and the Securities Administrator and any successor Securities Administrator shall during the entire duration of this Agreement be a state bank or trust company or a national banking association organized and doing business under the laws of a state or the United States of America, authorized under such laws to exercise corporate trust powers, having a combined capital and surplus and undivided profits of at least $40,000,000 or, in the case of a successor Trustee, $50,000,000, subject to supervision or examination by federal or state authority and, in the case of the Trustee, rated "BBB" or higher by Fitch, Inc. with respect to their long-term rating and rated "BBB" or higher by Standard & Poor's and "Baa2" or higher by Moody's with respect to any outstanding long-term unsecured unsubordinated debt, and, in the case of a successor Trustee or successor Securities Administrator other than pursuant to Section 10.10, rated in one of the two highest long-term debt categories of, or otherwise acceptable to, each of the Rating Agencies (which consent shall not be unreasonably withheld). The Trustee shall not be an Affiliate of the Master Servicer. If the Trustee publishes reports of condition at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section 10.06 the combined capital and surplus of such corporation shall be deemed to be its total equity capital (combined capital and surplus) as set forth in its most recent report of condition so published. In case at any time the Trustee or the Securities Administrator, as applicable, shall cease to be eligible in accordance with the provisions of this Section 10.06, the Trustee or the Securities Administrator shall resign immediately in the manner and with the effect specified in Section 10.08.

Section 10.07 Insurance.

The Trustee and the Securities Administrator, at their own expense, shall at all times maintain and keep in full force and effect: (i) fidelity insurance, (ii) theft of documents insurance and (iii) forgery insurance (which may be collectively satisfied by a "Financial Institution Bond" and/or a "Bankers' Blanket Bond"). All such insurance shall be in amounts, with standard coverage and subject to deductibles, as are customary for insurance typically maintained by banks or their affiliates which act as custodians for investor-owned mortgage pools. A certificate of an officer of the Trustee or the Securities Administrator as to the Trustee's or the Securities Administrator's, respectively, compliance with this Section 10.07 shall be furnished to any Certificateholder upon reasonable written request.

155

[TPW: NYLEGAL:691857.8] 17297-00533 11/15/2007 06:00 PM

CONFIDENTIAL

Section 10.08  Resignation and Removal of Trustee and Securities Administrator.

The Trustee and the Securities Administrator may at any time resign (including, in the case of the Securities Administrator, in connection with the resignation or termination of the Master Servicer) and be discharged from the Trust hereby created by giving written notice thereof to the Depositor, the Seller, the Securities Administrator (or the Trustee, if the Securities Administrator resigns) and the Master Servicer, with a copy to the Rating Agencies, the Yield Maintenance Agreement Provider and the Swap Provider. Upon receiving such notice of resignation, the Depositor shall promptly appoint a successor trustee or successor securities administrator, as applicable, by written instrument, in triplicate, one copy of which instrument shall be delivered to each of the resigning trustee or securities administrator, as applicable, and the successor trustee or securities administrator, as applicable. If no successor trustee or successor securities administrator shall have been so appointed and have accepted appointment within 30 days after the giving of such notice of resignation, the resigning Trustee or Securities Administrator may petition any court of competent jurisdiction for the appointment of a successor trustee or securities administrator.

If at any time (i) the Trustee or the Securities Administrator shall cease to be eligible in accordance with the provisions of Section 10.06 hereof and shall fail to resign after written request thereto by the Depositor, (ii) the Trustee or the Securities Administrator shall become incapable of acting, or shall be adjudged as bankrupt or insolvent, or a receiver of the Trustee or the Securities Administrator or of its property shall be appointed, or any public officer shall take charge or control of the Trustee or the Securities Administrator or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, or (iii)(A) a tax is imposed with respect to the Trust Fund by any state in which the Trustee or the Securities Administrator or the Trust Fund is located, (B) the imposition of such tax would be avoided by the appointment of a different trustee or securities administrator and (C) the Trustee or the Securities Administrator, as applicable fails to indemnify the Trust Fund against such tax, then the Depositor or the Master Servicer may remove the Trustee or the Securities Administrator, as applicable, and appoint a successor trustee or successor securities administrator, as applicable, by written instrument, in multiple copies, a copy of which instrument shall be delivered to the Trustee, the Securities Administrator, each Master Servicer, the Swap Provider, the Yield Maintenance Agreement Provider and the successor trustee or successor securities administrator, as applicable.

The Holders evidencing at least 51% of the Voting Rights of each Class of Certificates may at any time remove the Trustee or Securities Administrator and appoint a successor trustee or securities administrator by written instrument or instruments, in multiple copies, signed by such Holders or their attorneys-in-fact duly authorized, one complete set of which instruments shall be delivered by the successor trustee or successor securities administrator to each of the Master Servicer, the Trustee or Securities Administrator so removed and the successor trustee or securities administrator so appointed. Notice of any removal of the Trustee or Securities Administrator shall be given to each Rating Agency by the Trustee or successor trustee.

Any resignation or removal of the Securities Administrator shall also result in the resignation or removal, as applicable, of Wells Fargo Bank, National Association as Swap Administrator and Master Servicer. Any resignation or removal of the Securities Administrator and appointment of a successor securities administrator pursuant to any of the provisions of this Section 10.08 shall become effective upon acceptance of appointment by the successor securities

156

CONFIDENTIAL                                                      MSM_MSSTI_20071_0001649

administrator and successor master servicer as provided in Section 10.09 hereof and upon acceptance of appointment by a successor swap administrator under the Swap Administration Agreement.

Any resignation or removal of the Trustee and appointment of a successor trustee pursuant to any of the provisions of this Section 10.08 shall become effective upon acceptance of appointment by the successor trustee as provided in Section 10.09 hereof.

Section 10.09  Successor Trustee or Securities Administrator.

Any successor trustee or securities administrator appointed as provided in Section 10.08 hereof shall execute, acknowledge and deliver to the Depositor and to its predecessor trustee or predecessor securities administrator, as applicable, and the Master Servicer an instrument accepting such appointment hereunder and thereupon the resignation or removal of the predecessor trustee or securities administrator shall become effective and such successor trustee or securities administrator, without any further act, deed or conveyance, shall become fully vested with all the rights, powers, duties and obligations of its predecessor hereunder, with the like effect as if originally named as trustee or securities administrator herein.

No successor trustee or securities administrator shall accept appointment as provided in this Section 10.09 unless at the time of such acceptance such successor trustee or securities administrator shall be eligible under the provisions of Section 10.06 hereof and its appointment shall not adversely affect the then current rating of the Certificates.

Upon acceptance of appointment by a successor trustee or securities administrator as provided in this Section 10.09, the successor trustee or securities administrator shall mail notice of the succession of such trustee or securities administrator hereunder to all Holders of Certificates. If the successor trustee or securities administrator fails to mail such notice within ten days after acceptance of appointment, the Depositor shall cause such notice to be mailed at the expense of the Trust Fund.

Section 10.10  Merger or Consolidation of Trustee or Securities Administrator.

Any corporation, state bank or national banking association into which the Trustee or the Securities Administrator may be merged or converted or with which it may be consolidated or any corporation, state bank or national banking association resulting from any merger, conversion or consolidation to which the Trustee or the Securities Administrator shall be a party, or any corporation, state bank or national banking association succeeding to substantially all of the corporate trust business of the Trustee or of the business of the Securities Administrator, shall be the successor of the Trustee or the Securities Administrator hereunder, provided that such corporation shall be eligible under the provisions of Section 10.06 hereof without the execution or filing of any paper or further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding.

Section 10.11  Appointment of Co-Trustee or Separate Trustee.

Notwithstanding any other provisions of this Agreement, at any time, for the purpose of meeting any legal requirements of any jurisdiction in which any part of the Trust Fund or

157

[TPW: NYLEGAL:691857.8] 17297-00533  11/15/2007 06:00 PM

CONFIDENTIAL

Any separate trustee or co-trustee may, at any time, constitute the Trustee its agent or attorney-in-fact, with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Agreement on its behalf and in its name. If any separate trustee or co- trustee shall die, become incapable of acting, resign or be removed, all of its estates, properties, rights, remedies and trusts shall vest in and be exercised by the Trustee, to the extent permitted by law, without the appointment of a new or successor trustee.

Section 10.12  Tax Matters.

It is intended that the Trust Fund shall constitute one or more REMICs, and that the affairs of the Trust Fund shall be conducted so that each REMIC formed hereunder qualifies as a "real estate mortgage investment conduit" as defined in and in accordance with the REMIC Provisions. In furtherance of such intention, the Securities Administrator covenants and agrees that it shall act as agent (and the Securities Administrator is hereby appointed to act as agent) on behalf of the Trust Fund. The Trustee and/or the Securities Administrator, as agent on behalf of the Trust Fund, shall do or refrain from doing, as applicable, the following: (a) the Securities Administrator shall prepare and file, or cause to be prepared and filed, in a timely manner, U.S. Real Estate Mortgage Investment Conduit Income Tax Returns (Form 1066 or any successor form adopted by the Internal Revenue Service) and prepare and file or cause to be prepared and filed with the Internal Revenue Service and applicable state or local tax authorities income tax or information returns for each taxable year with respect to each such REMIC containing such information and at the times and in the manner as may be required by the Code or state or local tax laws, regulations or rules, and furnish or cause to be furnished, to Certificateholders the schedules, statements or information at such times and in such manner as may be required thereby; (b) the Securities Administrator shall apply for an employer identification number with the Internal Revenue Service via a Form SS-4 or other comparable method for each REMIC that is or becomes a taxable entity, and within thirty days of the Closing Date, furnish or cause to be furnished to the Internal Revenue Service on Forms 8811 or as otherwise may be required by the Code, the name, title, address, and telephone number of the person that the Holders of the Certificates may contact for tax information relating thereto, together with such additional information as may be required by such form, and update such information at the time or times in the manner required by the Code for the Trust Fund; (c) the Securities Administrator, on behalf of the Trustee, shall make, or cause to be made, elections on behalf of each REMIC formed hereunder to be treated as a REMIC on the federal tax return of such REMIC for its first taxable year (and, if necessary, under applicable state law); (d) the Securities Administrator shall prepare and forward, or cause to be prepared and forwarded, to the Certificateholders and to the Internal Revenue Service and, if necessary, state tax authorities, all information returns and reports as and when required to be provided to them in accordance with the REMIC Provisions, including without limitation, the calculation of any original issue discount using the Prepayment Assumption; (e) the Securities Administrator shall provide information necessary for the computation of tax imposed on the transfer of a Residual Certificate to a Person that is not a Permitted Transferee, or an agent (including a broker, nominee or other middleman) of a Person that is not a Permitted Transferee, or a pass-through entity in which a Person that is not a Permitted Transferee is the record Holder of an interest (the reasonable cost of computing and furnishing such information may be charged to the Person liable for such tax); (f) each of the Securities Administrator and the Trustee shall, to the extent under its control, conduct the affairs of the Trust Fund at all times that any Certificates are outstanding so as to maintain the status of

159

[TPW: NYLEGAL:691857.8] 17297-00533  11/15/2007 06:00 PM

CONFIDENTIAL

MSM_MSSTI_20071_0001652

each REMIC formed hereunder as a REMIC under the REMIC Provisions; (g) neither the Trustee nor the Securities Administrator shall knowingly or intentionally take any action or omit to take any action that could (i) cause the termination of the REMIC status of any REMIC formed hereunder or (ii) result in the imposition of a tax upon the Trust Fund (including but not limited to the tax on prohibited transactions as defined in Section 860F(a)(2) of the Code and the tax on contributions to a REMIC set forth in Section 860G(d) of the Code); (h) the Securities Administrator shall pay, from the sources specified in this Section 10.12, the amount of any federal, state and local taxes, including prohibited transaction taxes as described below, imposed on any REMIC formed hereunder prior to the termination of the Trust Fund when and as the same shall be due and payable (but such obligation shall not prevent the Trustee, the Securities Administrator at the written request of the Trustee, or any other appropriate Person from contesting any such tax in appropriate proceedings and shall not prevent the Securities Administrator from withholding payment of such tax, if permitted by law, pending the outcome of such proceedings); (i) the Trustee shall sign or cause to be signed federal, state or local income tax or information returns or any other document prepared by the Securities Administrator pursuant to this Section 10.12 requiring a signature thereon by the Trustee; (j) the Securities Administrator shall maintain records relating to each REMIC formed hereunder including but not limited to the income, expenses, assets and liabilities of each such REMIC and adjusted basis of the Trust Fund property determined at such intervals as may be required by the Code, as may be necessary to prepare the foregoing returns, schedules, statements or information; (k) the Securities Administrator shall, for federal income tax purposes, maintain books and records with respect to the REMICs on a calendar year and on an accrual basis; (l) neither the Trustee nor the Master Servicer nor the Securities Administrator shall enter into any arrangement not otherwise provided for in this Agreement by which the REMICs will receive a fee or other compensation for services nor permit the REMICs to receive any income from assets other than "qualified mortgages" as defined in Section 860G(a)(3) of the Code or "permitted investments" as defined in Section 860G(a)(5) of the Code; and (m) as and when necessary and appropriate, the Trustee, or at the written request of the Trustee, the Securities Administrator, shall represent the Trust Fund in any administrative or judicial proceedings relating to an examination or audit by any governmental taxing authority, request an administrative adjustment as to any taxable year of any REMIC formed hereunder, enter into settlement agreements with any governmental taxing agency, extend any statute of limitations relating to any tax item of the Trust Fund, and otherwise act on behalf of each REMIC formed hereunder in relation to any tax matter involving any such REMIC.

In order to enable each of the Trustee and the Securities Administrator to perform its duties as set forth herein, the Depositor shall provide, or cause to be provided, to the Trustee or the Securities Administrator within 10 days after the Closing Date all information or data that the Trustee or the Securities Administrator requests in writing and determines to be relevant for tax purposes to the valuations and offering prices of the Certificates, including, without limitation, the price, yield, prepayment assumption and projected cash flows of the Certificates and the related Mortgage Loans. Thereafter, the Depositor shall provide to the Trustee or the Securities Administrator promptly upon written request therefor, any such additional information or data that the Trustee or the Securities Administrator may, from time to time, request in order to enable the Trustee or the Securities Administrator to perform its duties as set forth herein. The Depositor hereby indemnifies each of Trustee and the Securities Administrator for any losses, liabilities, damages, claims or expenses of the Trustee or the Securities Administrator arising

[TPW: NYLEGAL:691857.8] 17297-00533  11/15/2007 06:00 PM

CONFIDENTIAL                                                         MSM_MSSTI_20071_0001653

from any errors or miscalculations of the Trustee or the Securities Administrator, as applicable, that result from any failure of the Depositor to provide, or to cause to be provided, accurate information or data to the Trustee or the Securities Administrator, as applicable, on a timely basis.

In the event that any tax is imposed on "prohibited transactions" of any of REMIC I, REMIC II, REMIC III, REMIC IV, REMIC V or REMIC VI as defined in Section 860F(a)(2) of the Code, on the "net income from foreclosure property" of the Trust Fund as defined in Section 860G(c) of the Code, on any contribution to any of REMIC I, REMIC II, REMIC III, REMIC IV, REMIC V or REMIC VI after the Startup Day pursuant to Section 860G(d) of the Code, or any other tax is imposed, including, without limitation, any federal, state or local tax or minimum tax imposed upon any of REMIC I, REMIC II, REMIC III, REMIC IV, REMIC V or REMIC VI and is not paid as otherwise provided for herein, such tax shall be paid (i) by the Master Servicer or the Securities Administrator, if any such tax arises out of or results from a breach by the Master Servicer or the Securities Administrator of any of its obligations under this Agreement, provided, however, in no event shall the Master Servicer or the Securities Administrator have any liability (1) for any action or omission that is taken in accordance with and compliance with the express terms of, or which is expressly permitted by the terms of, this Agreement, (2) for any losses other than those arising out of a negligent performance by the Master Servicer or the Securities Administrator of its duties and obligations set forth herein, or (3) for any special or consequential damages to Certificateholders (in addition to payment of principal and interest on the Certificates), (ii) by any party hereto (other than the Master Servicer or the Securities Administrator) to the extent any such tax arises out of or results from a breach by such other party of any of its obligations under this Agreement or (iii) in all other cases, or in the event that any liable party hereto fails to honor its obligations under the preceding clauses (i) or (ii), first with amounts otherwise to be distributed to the Class R Certificateholders, and second with amounts otherwise to be distributed to all the Holders of the following Certificates in the following order of priority: first, to the Class B-4 Certificates, second, to the Class B-3 Certificates, third, to the Class B-2 Certificates, fourth, to the Class B-1 Certificates, fifth, to the Class M-6 Certificates, sixth, to the Class M-5 Certificates, seventh, to the Class M-4 Certificates, eighth, to the Class M-3 Certificates, ninth, to the Class M-2 Certificates, tenth, to the Class M-1 Certificates, and eleventh, to the Class A Certificates (*pro rata* based on the amounts to be distributed). Notwithstanding anything to the contrary contained herein, to the extent that such tax is payable by the Holder of any Certificates, the Securities Administrator is hereby authorized to retain on any Distribution Date, from the Holders of the Class R Certificates (and, if necessary, second, from the Holders of the other Certificates in the priority specified in the preceding sentence), funds otherwise distributable to such Holders in an amount sufficient to pay such tax. The Securities Administrator shall include in its Remittance Report instructions as to distributions to such parties taking into account the priorities described in the preceding sentence. The Securities Administrator shall promptly notify in writing the party liable for any such tax of the amount thereof and the due date for the payment thereof.

Notwithstanding any other provision of this Agreement, the Securities Administrator shall comply with all federal withholding requirements respecting payments to Certificateholders of interest or original issue discount that the Securities Administrator reasonably believes are applicable under the Code. The consent of Certificateholders shall not be required for such withholding. In the event the Securities Administrator does withhold any amount from interest

[TPW: NYLEGAL:691857.8] 17297-00533  11/15/2007 06:00 PM

CONFIDENTIAL

MSM_MSSTI_20071_0001654

or original issue discount payments or advances thereof to any Certificateholder pursuant to federal withholding requirements, the Securities Administrator shall indicate the amount withheld to such Certificateholders.

The Trustee, the Master Servicer and the Securities Administrator each agree that, in the event it should obtain any information necessary for the other party to perform its obligations pursuant to this Section 10.12, it will promptly notify and provide such information to such other party. Notwithstanding anything in this Agreement to the contrary, the Trustee agrees that, in the event that the Trustee obtains actual knowledge that the Securities Administrator has breached any of its obligations pursuant to this Section 10.12, the Trustee shall perform such obligations on its behalf to the extent that the Trustee possesses all documents necessary to so perform and receives reasonable compensation therefor, provided, however, that the Trustee shall not be liable for any losses resulting from any such breach.

For the avoidance of doubt, notwithstanding anything stated to the contrary herein, neither the Supplemental Interest Trust Trustee nor the Swap Administrator nor the Securities Administrator shall have any responsibility for the entity-level tax filing or tax preparation of the Supplemental Interest Trust.

[TPW: NYLEGAL:691857.8] 17297-00533  11/15/2007 06:00 PM

CONFIDENTIAL                                                                    MSM_MSSTI_20071_0001655

## ARTICLE XI

## TERMINATION

Section 11.01  Termination upon Liquidation or Repurchase of all Mortgage Loans.

(a)      Subject to Section 11.03, the obligations and responsibilities of the Depositor, the Master Servicer, the Securities Administrator and the Trustee created hereby with respect to the Trust Fund shall terminate upon the earlier of (a) the exercise of Saxon (or its designee) or the Majority Class CE Certificateholder (or its designee) of its right to repurchase all of the Mortgage Loans (and REO Properties) remaining in the Trust Fund at a price (the "Mortgage Loan Purchase Price") equal to the sum of (i) 100% of the Stated Principal Balance of each Mortgage Loan (other than in respect of REO Property), (ii) accrued interest thereon at the applicable Mortgage Rate to, but not including, the first day of the month of such purchase, (iii) the appraised value of any REO Property in the Trust Fund (up to the Stated Principal Balance of the related Mortgage Loan), such appraisal to be conducted by an appraiser mutually agreed upon by the Master Servicer and the Trustee, and (iv) unreimbursed out-of pocket costs of the Servicers, the Custodians or the Master Servicer, including unreimbursed servicing advances and the principal portion of any unreimbursed Advances, made on the Mortgage Loans prior to the exercise of such repurchase right, (v) any unreimbursed costs and expenses of the Trustee and the Securities Administrator payable pursuant to Section 10.05, (vi) any Swap Termination Payment (which shall include any Net Swap Payment payable to the Trust Fund for the final Distribution Date) payable to the Swap Provider which remains unpaid or which is due to the exercise of such option (the "Swap Optional Termination Payment") and (b) the later of (i) the maturity or other liquidation (or any Advance with respect thereto) of the last Mortgage Loan remaining in the Trust Fund and the disposition of all REO Property and (ii) the distribution to Certificateholders of all amounts required to be distributed to them pursuant to this Agreement, as applicable. In no event shall the trusts created hereby continue beyond the earlier of (i) the expiration of 21 years from the death of the last survivor of the descendants of Joseph P. Kennedy, the late Ambassador of the United States to the Court of St. James, living on the date hereof and (ii) the Latest Possible Maturity Date.

(b)      The right to repurchase all Mortgage Loans and REO Properties by Saxon or the Majority Class CE Certificateholder pursuant to clause (a) in the preceding paragraph shall be conditioned upon the Stated Principal Balance of all of the Mortgage Loans in the Trust Fund, at the time of any such repurchase, aggregating 5% or less of the aggregate Cut-off Date Principal Balance of all of the Mortgage Loans. If Saxon or the Majority Class CE Certificateholder elects to terminate the Trust Fund pursuant to this Section 11.01 (such termination, an "Optional Termination"), Saxon or the Majority Class CE Certificateholder, as applicable, shall, at least 20 days prior to the last date on which notice of such Optional Termination is required to be mailed to the Certificateholders pursuant to 11.02(ii), notify in writing (which may be done in electronic format) the Depositor, the Master Servicer, the Trustee, the Securities Administrator and the Swap Provider of the final Distribution Date on which Saxon or the Majority Class CE Certificateholder, as applicable, as applicable, intends to terminate the Trust Fund.

(c)      In connection with any Optional Termination, four Business Days prior to the final Distribution Date specified in the notice required pursuant to Section 10.01(b), the Securities Administrator shall, no later than 4:00 pm New York City time on such day, request in

163

CONFIDENTIAL                                                                              MSM_MSSTI_20071_0001656

writing (which may be done by facsimile) and by phone from the Swap Provider the amount of the Estimated Swap Termination Payment (as defined in the Swap Agreement) and otherwise in accordance with the notice requirements of Part 5(c)(v) of the Swap Agreement. The Swap Provider shall, no later than 2:00 pm on the following Business Day, notify in writing (which may be done in electronic format) the Securities Administrator of the amount of the Estimated Swap Termination Payment (as defined in the Swap Agreement) and the Securities Administrator shall promptly on the same day notify Saxon, the Majority Class CE Certificateholder or the Master Servicer, as applicable, of the amount of the Estimated Swap Termination Payment.

(d)      Two Business Days prior to the final Distribution Date specified in the notice required pursuant to Section 11.01(b), (i) Saxon or the Majority Class CE Certificateholder, as applicable, shall, no later than 1:00 pm New York City time on such day, deposit funds in the Distribution Account in an amount equal to the sum of the Mortgage Loan Purchase Price (other than the Swap Optional Termination Payment) and the Estimated Swap Termination Payment, and (ii) if the Securities Administrator shall have determined that the aggregate Stated Principal Balance of all of the Mortgage Loans in the Trust Fund as of the related Determination Date is not more than 5% of the aggregate Cut-off Date Principal Balance of all of the Mortgage Loans, and that all other requirements of the Optional Termination have been met, including without limitation, the deposit required pursuant to this clause (d) as well as the requirements specified in Section 10.03, then the Securities Administrator shall, on the same Business Day, provide written notice to Saxon or the Majority Class CE Certificateholder, as applicable, the Depositor, the Master Servicer, the Supplemental Interest Trust Trustee, the Trustee, the Custodians and the Swap Provider (in accordance with the applicable provision of the Swap Agreement) confirming (a) its receipt of the Mortgage Loan Purchase Price (other than the Swap Optional Termination Payment) and the Estimated Swap Termination Payment and (b) that all other requirements of the Optional Termination have been met. Upon the Securities Administrator's providing the notice described in the preceding sentence, the Optional Termination shall become irrevocable, the notice to Certificateholders of such Optional Termination provided pursuant to the second paragraph of Section 11.02 shall become unrescindable, the Swap Provider shall determine the Swap Optional Termination Payment in accordance with the Swap Agreement, and the Swap Provider shall provide to the Securities Administrator written notice of the amount of the Swap Optional Termination Payment not later than one Business Day prior to the final Distribution Date specified in the notice required pursuant to Section 10.02(ii) and in the event that the Securities Administrator fails to provide the notice described in the preceding sentence, any notice provided under Section 11.01(b) shall be deemed rescinded.

(e)      In connection with any Optional Termination, only an amount equal to the Mortgage Loan Purchase Price less any Swap Optional Termination Payment shall be made available for distribution to the Regular Certificates. Any Estimated Swap Termination Payment deposited into the Distribution Account by Saxon or the Majority Class CE Certificateholder, as applicable, shall be withdrawn by the Securities Administrator from the Distribution Account on the related final Distribution Date and distributed as follows: (i) to the Supplemental Interest Trust for payment to the Swap Provider in accordance with Section 4.22, an amount equal to the Swap Optional Termination Amount calculated pursuant to the Swap Agreement, provided that in no event shall the amount distributed to the Swap Provider in respect of the Swap Optional Termination Amount exceed the Estimated Swap Termination Payment, and (ii) to Saxon or the

[TPW: NYLEGAL:691857.8] 17297-00533  11/15/2007 06:00 PM

CONFIDENTIAL

MSM_MSSTI_20071_0001657

Majority Class CE Certificateholder, as applicable, an amount equal to the excess, if any, of the Estimated Swap Termination Payment over the Swap Optional Termination Payment. The Swap Optional Termination Payment shall not be part of any REMIC and shall not be paid into any account which is part of any REMIC.

(f)     Upon receipt by a Custodian of notice from the Securities Administrator pursuant to Section 11.01(d) and the receipt by such Custodian of a Request for Release therefor, such Custodian shall promptly release to the Master Servicer, as applicable the Mortgage Files for the related Mortgage Loans and the Trustee shall execute and deliver any documents prepared and delivered to it which are necessary to transfer any REO Property.

Section 11.02  Final Distribution on the Certificates.

If on any Determination Date, (i) the Master Servicer determines that there are no Outstanding Mortgage Loans and no other funds or assets in the Trust Fund other than the funds in the Distribution Account, the Master Servicer shall direct the Securities Administrator to send a final distribution notice promptly to each Certificateholder or (ii) the Securities Administrator determines that a Class of Certificates shall be retired after a final distribution on such Class, the Securities Administrator shall notify the Certificateholders within five (5) Business Days after such Determination Date that the final distribution in retirement of such Class of Certificates is scheduled to be made on the immediately following Distribution Date. Any final distribution made pursuant to the immediately preceding sentence will be made only upon presentation and surrender of the Certificates at the Corporate Trust Office of the Securities Administrator. If Saxon or the Majority Class CE Certificateholder, as applicable, elects to terminate the Trust Fund pursuant to Section 11.01, at least 20 days prior to the date notice is to be mailed to the Certificateholders, Saxon or the Majority Class CE Certificateholder, as applicable, shall notify the Depositor, the Securities Administrator, the Swap Provider, the Yield Maintenance Agreement Provider and the Trustee of the date Saxon or the Majority Class CE Certificateholder, as applicable, intends to terminate the Trust Fund. Saxon or the Majority Class CE Certificateholder, as applicable, shall remit the Mortgage Loan Purchase Price to the Securities Administrator on the Business Day prior to the Distribution Date for such Optional Termination by Saxon or the Majority Class CE Certificateholder, as applicable,.

Notice of any termination of the Trust Fund, specifying the Distribution Date on which Certificateholders may surrender their Certificates for payment of the final distribution and cancellation, shall be given promptly by the Securities Administrator by letter to Certificateholders mailed not later than two Business Days after the Determination Date in the month of such final distribution. Any such notice shall specify (a) the Distribution Date upon which final distribution on the Certificates will be made upon presentation and surrender of Certificates at the office therein designated, (b) the amount of such final distribution, (c) the location of the office or agency at which such presentation and surrender must be made and (d) that the Record Date otherwise applicable to such Distribution Date is not applicable, distributions being made only upon presentation and surrender of the Certificates at the office therein specified. The Securities Administrator will give such notice to each Rating Agency at the time such notice is given to Certificateholders.

Upon such final deposit with respect to the Trust Fund and the receipt by a Custodian of a Request for Release therefor, such Custodian shall promptly release to the Master Servicer, as

165

CONFIDENTIAL

applicable the Mortgage Files for the related Mortgage Loans and the Trustee shall execute and deliver any documents prepared and delivered to it which are necessary to transfer any REO Property.

Upon presentation and surrender of the Certificates, the Securities Administrator shall distribute to Certificateholders of each Class the amounts allocable to such Certificates held in the Distribution Account in the order and priority set forth in Section 6.04 hereof on the final Distribution Date and in proportion to their respective Percentage Interests.

In the event that any affected Certificateholders shall not surrender Certificates for cancellation within six months after the date specified in the above mentioned written notice, the Securities Administrator shall give a second written notice to the remaining Certificateholders to surrender their Certificates for cancellation and receive the final distribution with respect thereto. If within six months after the second notice all the applicable Certificates shall not have been surrendered for cancellation, the Securities Administrator may take appropriate steps, or may appoint an agent to take appropriate steps, to contact the remaining Certificateholders concerning surrender of their Certificates, and the cost thereof shall be paid out of the funds and other assets that remain a part of the Trust Fund. If within one year after the second notice all Certificates shall not have been surrendered for cancellation, the Class R Certificateholders shall be entitled to all unclaimed funds and other assets of the Trust Fund that remain subject hereto.

Section 11.03  Additional Termination Requirements.

(a)     Upon exercise by Saxon or the Majority Class CE Certificateholder, as applicable, of its purchase option as provided in Section 11.01, the Trust Fund shall be terminated in accordance with the following additional requirements, unless the Trustee and the Securities Administrator have been supplied with an Opinion of Counsel addressed to the Trustee and the Securities Administrator at the expense of Saxon or the Majority Class CE Certificateholder, as applicable, to the effect that the failure of the Trust Fund to comply with the requirements of this Section 11.03 will not (i) result in the imposition of taxes on "prohibited transactions" of a REMIC, or (ii) cause a REMIC to fail to qualify as a REMIC at any time that any Certificates are outstanding:

(1)     The Majority Class CE Certificateholder or Saxon, as applicable, shall establish a 90-day liquidation period and notify the Securities Administrator thereof, and the Securities Administrator shall in turn specify the first day of such period in a statement attached to the tax return for each of REMIC I, REMIC II, REMIC III, REMIC IV, REMIC V and REMIC VI pursuant to Treasury Regulation Section 1.860F-1. The Majority Class CE Certificateholder or Saxon shall satisfy all the requirements of a qualified liquidation under Section 860F of the Code and any regulations thereunder, as evidenced by an Opinion of Counsel addressed to the Securities Administrator and the Trustee obtained at the expense of the Majority Class CE Certificateholder or Saxon, as applicable;

(2)     During such 90-day liquidation period, and at or prior to the time of making the final payment on the Certificates, the Securities Administrator on behalf of the Trustee, shall sell all of the assets of REMIC I for cash; and

[TPW: NYLEGAL:691857.8] 17297-00533  11/15/2007 06:00 PM

CONFIDENTIAL

MSM_MSSTI_20071_0001659

(3)     At the time of the making of the final payment on the Certificates, the Securities Administrator shall distribute or credit, or cause to be distributed or credited, to the Holders of the Residual Certificates, all cash on hand (other than cash retained to meet claims), and REMIC I shall terminate at that time.

(b)     By their acceptance of the Certificates, the Holders thereof hereby authorize the adoption of a 90-day liquidation period and the adoption of a plan of complete liquidation for each of REMIC I, REMIC II, REMIC III, REMIC IV, REMIC V and REMIC VI, which authorization shall be binding upon all successor Certificateholders.

(c)     The Securities Administrator as agent for each REMIC hereby agrees to adopt and sign such a plan of complete liquidation meeting the requirements for a qualified liquidation under Section 860F of the Code and any regulations thereunder upon the written request of the Majority Class CE Certificateholder or Saxon, as applicable, and the receipt of the Opinion of Counsel referred to in Section 11.03(a)(1) and to take such other action in connection therewith as may be reasonably requested by the Majority Class CE Certificateholder or Saxon, as applicable.

167

CONFIDENTIAL

# ARTICLE XII

# MISCELLANEOUS PROVISIONS

Section 12.01  Amendment.

This Agreement may be amended from time to time by the parties hereto without the consent of any of the Certificateholders to cure any ambiguity, to correct or supplement any provisions herein (including to give effect to the expectations of investors), to comply with any changes in the Code, to revise any provisions to reflect the obligations of the parties to this Agreement as they relate to Regulation AB, to change the manner in which the Distribution Account maintained by the Securities Administrator is maintained or to make such other provisions with respect to matters or questions arising under this Agreement as shall not be inconsistent with any other provisions herein if such action shall not, as evidenced by an Opinion of Counsel addressed to the Trustee, adversely affect in any material respect the interests of any Certificateholder; provided that any such amendment shall be deemed not to adversely affect in any material respect the interests of the Certificateholders and no such Opinion of Counsel shall be required if the Person requesting such amendment obtains a letter from each Rating Agency stating that such amendment would not result in the downgrading or withdrawal of the respective ratings then assigned to the Certificates.

Notwithstanding the foregoing, without the consent of the Certificateholders, the parties hereto may at any time and from time to time amend this Agreement to modify, eliminate or add to any of its provisions to such extent as shall be necessary or appropriate to maintain the qualification of each of REMIC I, REMIC II, REMIC III, REMIC IV, REMIC V or REMIC VI, as a REMIC under the Code or to avoid or minimize the risk of the imposition of any tax on any of REMIC I, REMIC II, REMIC III, REMIC IV, REMIC V or REMIC VI pursuant to the Code that would be a claim against any of REMIC I, REMIC II, REMIC III, REMIC IV, REMIC V or REMIC VI at any time prior to the final redemption of the Certificates, provided that the Trustee and the Securities Administrator have been provided an Opinion of Counsel addressed to the Trustee and the Securities Administrator, which opinion shall be an expense of the party requesting such opinion but in any case shall not be an expense of the Trustee, the Securities Administrator or the Trust Fund, to the effect that such action is necessary or appropriate to maintain such qualification or to avoid or minimize the risk of the imposition of such a tax.

This Agreement may also be amended from time to time by the parties hereto with the consent of the Holders of each Class of Certificates affected thereby evidencing over 50% of the Voting Rights of such Class or Classes for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Agreement or of modifying in any manner the rights of the Holders of Certificates; provided that no such amendment shall (i) reduce in any manner the amount of, or delay the timing of, payments required to be distributed on any Certificate without the consent of the Holder of such Certificate, (ii) cause any of REMIC I, REMIC II, REMIC III, REMIC IV, REMIC V or REMIC VI to cease to qualify as a REMIC or (iii) reduce the aforesaid percentages of Certificates of each Class the Holders of which are required to consent to any such amendment without the consent of the Holders of all Certificates of such Class then outstanding.

[TPW: NYLEGAL:691857.8] 17297-00533  11/15/2007 06:00 PM

CONFIDENTIAL

MSM_MSSTI_20071_0001661

Notwithstanding any contrary provision of this Agreement, the Trustee shall not consent to any amendment to this Agreement unless it shall have first received an Opinion of Counsel addressed to the Trustee, which opinion shall be an expense of the party requesting such amendment but in any case shall not be an expense of the Trustee or the Securities Administrator, to the effect that such amendment will not (other than an amendment pursuant to clause (ii) of, and in accordance with, the preceding paragraph) cause the imposition of any tax on REMIC I, REMIC II, REMIC III, REMIC IV, REMIC V or REMIC VI or the Certificateholders or cause REMIC I, REMIC II, REMIC III, REMIC IV, REMIC V or REMIC VI to cease to qualify as a REMIC at any time that any Certificates are outstanding. Further, nothing in this Agreement shall require the Trustee to enter into an amendment without receiving an Opinion of Counsel, satisfactory to the Trustee (i) that such amendment is permitted and is not prohibited by this Agreement and (ii) that all requirements for amending this Agreement (including any consent of the applicable Certificateholders) have been complied with.

Promptly after the execution of any amendment to this Agreement requiring the consent of Certificateholders, the Trustee shall furnish written notification of the substance of such amendment to each Certificateholder, the Swap Provider and each Rating Agency.

It shall not be necessary for the consent of Certificateholders under this Section to approve the particular form of any proposed amendment, but it shall be sufficient if such consent shall approve the substance thereof. The manner of obtaining such consents and of evidencing the authorization of the execution thereof by Certificateholders shall be subject to such reasonable regulations as the Trustee may prescribe.

Notwithstanding any of the other provisions of this Section 12.01, none of the Depositor, the Master Servicer, the Securities Administrator or the Trustee shall enter into any amendment that could reasonably be expected to have a material adverse effect on the interests of the related Swap Provider (excluding, for the avoidance of doubt, any amendment to this Agreement that is entered into solely for the purpose of appointing a successor servicer, master servicer, securities administrator, trustee or other service provider) without the prior written consent of the related Swap Provider, which consent shall not be unreasonably withheld, conditioned or delayed.

Section 12.02   Recordation of Agreement; Counterparts.

To the extent permitted by applicable law, this Agreement is subject to recordation in all appropriate public offices for real property records in all of the counties or other comparable jurisdictions in which any or all of the Mortgaged Properties are situated, and in any other appropriate public recording office or elsewhere. The Master Servicer shall effect such recordation at the Trust's expense upon the request in writing of a Certificateholder, but only if such direction is accompanied by an Opinion of Counsel (provided at the expense of the Certificateholder requesting recordation) to the effect that such recordation would materially and beneficially affect the interests of the Certificateholders or is required by law.

For the purpose of facilitating the recordation of this Agreement as herein provided and for other purposes, this Agreement may be executed simultaneously in any number of counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument.

[TPW: NYLEGAL:691857.8] 17297-00533  11/15/2007 06:00 PM

CONFIDENTIAL

MSM_MSSTI_20071_0001662

Section 12.03  Governing Law.

**THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE SUBSTANTIVE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED IN THE STATE OF NEW YORK AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HERETO AND THE CERTIFICATEHOLDERS SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS WITHOUT REGARD TO THE CONFLICTS OF LAWS PRINCIPLES THEREOF (OTHER THAN SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAWS).**

Section 12.04  Intention of Parties.

It is the express intent of the parties hereto that the conveyance of the Mortgage Notes, Mortgages, assignments of Mortgages, title insurance policies and any modifications, extensions and/or assumption agreements and private mortgage insurance policies relating to the Mortgage Loans by the Sponsor and the Seller to the Depositor, and by the Depositor to the Trustee be, and be construed as, an absolute sale thereof to the Depositor or the Trustee, as applicable. It is, further, not the intention of the parties that such conveyance be deemed a pledge thereof by the Seller and the Sponsor to the Depositor, or by the Depositor to the Trustee. However, in the event that, notwithstanding the intent of the parties, such assets are held to be the property of the Seller, the Sponsor or the Depositor, as applicable, or if for any other reason the Mortgage Loan Purchase Agreement or this Agreement is held or deemed to create a security interest in such assets, then (i) the Mortgage Loan Purchase Agreement and this Agreement shall each be deemed to be a security agreement within the meaning of the Uniform Commercial Code of the State of New York and (ii) the conveyance provided for in the Mortgage Loan Purchase Agreement from the Sponsor and the Seller to the Depositor, and the conveyance provided for in this Agreement from the Depositor to the Trustee, shall be deemed to be an assignment and a grant by the Sponsor and the Seller or the Depositor, as applicable, for the benefit of the Certificateholders, of a security interest in all of the assets that constitute the Trust Fund, whether now owned or hereafter acquired.

The Depositor for the benefit of the Certificateholders shall, to the extent consistent with this Agreement, take such actions as may be necessary to ensure that, if this Agreement were deemed to create a security interest in the assets of the Trust Fund, such security interest would be deemed to be a perfected security interest of first priority under applicable law and shall be maintained as such throughout the term of the Agreement.

Section 12.05  Notices.

(a)     The Trustee shall use its best efforts to promptly provide notice to each Rating Agency with respect to each of the following of which a Responsible Officer of the Trustee has actual knowledge:

(i)     Any material change or amendment to this Agreement;

(ii)    The occurrence of any Event of Default that has not been cured;

170

CONFIDENTIAL

(iii)    The resignation or termination of the Master Servicer, the Securities Administrator or the Trustee and the appointment of any successor;

(iv)    The repurchase or substitution of Mortgage Loans pursuant to Sections 2.02, 2.03, 4.21 and 11.01; and

(v)    The final payment to Certificateholders.

(b)    All directions, demands and notices hereunder shall be in writing and shall be deemed to have been duly given when delivered at or mailed by registered mail, return receipt requested, postage prepaid, or by recognized overnight courier, or by facsimile transmission to a number provided by the appropriate party if receipt of such transmission is confirmed to (i) in the case of the Depositor, Bear Stearns Asset Backed Securities I LLC, 383 Madison Avenue, New York, New York 10179, Attention: Chief Counsel, and with respect to Regulation AB notifications to the Depositor at regabnotifications@bear.com; (ii) in the case of EMC, EMC Mortgage Corporation, EMC Mortgage Corporation, 2780 Lake Vista Drive, Lewisville, Texas 75067 (Facsimile: (214) 626-4714), attention: President or General Counsel or such other address as may be hereafter furnished to the other parties hereto by the Master Servicer in writing; (iii) in the case of the Trustee, at each Corporate Trust Office or such other address as the Trustee may hereafter furnish to the other parties hereto; (iv) in the case of the Master Servicer or the Securities Administrator, P. O. Box 98, Columbia, Maryland 21046 (or, for overnight deliveries, 9062 Old Annapolis Road, Columbia, Maryland 21045), Attention: MSSTI I 2007-1 or such other address as may be hereafter furnished to the other parties hereto by the Securities Administrator in writing, (v) in the case of the Swap Provider or the Yield Maintenance Agreement Provider, Bear Stearns Financial Products Inc., 383 Madison Avenue, 36th Floor, New York, New York 10179, Attention:  DPC Manager (vi) in the case of the Sponsor, Morgan Stanley Mortgage Capital Holdings LLC, 1633 Broadway, New York, New York 10019, and (vii) in the case of the Rating Agencies, (x) Moody's Investors Service, Inc., 99 Church Street, New York, New York 10007, Attention: Home Equity Monitoring and (y) Standard & Poor's, 55 Water Street, 41st Floor, New York, New York 10041, Attention: Mortgage Surveillance Group. Any notice delivered to the Seller, the Master Servicer, the Securities Administrator or the Trustee under this Agreement shall be effective only upon receipt. Any notice required or permitted to be mailed to a Certificateholder, unless otherwise provided herein, shall be given by first-class mail, postage prepaid, at the address of such Certificateholder as shown in the Certificate Register; any notice so mailed within the time prescribed in this Agreement shall be conclusively presumed to have been duly given, whether or not the Certificateholder receives such notice.

Section 12.06  Severability of Provisions.

If any one or more of the covenants, agreements, provisions or terms of this Agreement shall be for any reason whatsoever held invalid, then such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement or of the Certificates or the rights of the Holders thereof.

171

[TPW: NYLEGAL:691857.8] 17297-00533  11/15/2007 06:00 PM

Section 12.07  Assignment.

Notwithstanding anything to the contrary contained herein, except as provided pursuant to Section 8.07, this Agreement may not be assigned by the Master Servicer, the Seller or the Depositor.

Section 12.08  Limitation on Rights of Certificateholders.

The death or incapacity of any Certificateholder shall not operate to terminate this Agreement or the Trust Fund, nor entitle such Certificateholder's legal representative or heirs to claim an accounting or to take any action or commence any proceeding in any court for a petition or winding up of the Trust Fund, or otherwise affect the rights, obligations and liabilities of the parties hereto or any of them.

No Certificateholder shall have any right to vote (except as provided herein) or in any manner otherwise control the operation and management of the Trust Fund, or the obligations of the parties hereto, nor shall anything herein set forth or contained in the terms of the Certificates be construed so as to constitute the Certificateholders from time to time as partners or members of an association; nor shall any Certificateholder be under any liability to any third party by reason of any action taken by the parties to this Agreement pursuant to any provision hereof.

No Certificateholder shall have any right by virtue or by availing itself of any provisions of this Agreement to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Agreement, unless such Holder previously shall have given to the Trustee or the Securities Administrator, as appropriate, a written notice of an Event of Default and of the continuance thereof, as hereinbefore provided, the Holders of Certificates evidencing not less than 25% of the Voting Rights evidenced by the Certificates shall also have made written request to the Trustee or the Securities Administrator, as appropriate to institute such action, suit or proceeding in its own name as Trustee or the Securities Administrator, as appropriate, hereunder and shall have offered to the Trustee or the Securities Administrator, as appropriate, such reasonable indemnity as it may require against the costs, expenses, and liabilities to be incurred therein or thereby, and the Trustee or the Securities Administrator, as appropriate, for 60 days after its receipt of such notice, request and offer of indemnity shall have neglected or refused to institute any such action, suit or proceeding; it being understood and intended, and being expressly covenanted by each Certificateholder with every other Certificateholder and the Trustee, that no one or more Holders of Certificates shall have any right in any manner whatever by virtue or by availing itself or themselves of any provisions of this Agreement to affect, disturb or prejudice the rights of the Holders of any other of the Certificates, or to obtain or seek to obtain priority over or preference to any other such Holder or to enforce any right under this Agreement, except in the manner herein provided and for the common benefit of all Certificateholders. For the protection and enforcement of the provisions of this Section 12.08, each and every Certificateholder, the Trustee or the Securities Administrator shall be entitled to such relief as can be given either at law or in equity.

Section 12.09  Inspection and Audit Rights.

The Master Servicer agrees that, on reasonable prior notice, it will permit any representative of the Depositor or the Trustee during the Master Servicer's normal business

172

CONFIDENTIAL

hours, to examine all the books of account, records, reports and other papers of the Master Servicer relating to the Mortgage Loans, to make copies and extracts therefrom, to cause such books to be audited by independent certified public accountants selected by the Depositor or the Trustee and to discuss its affairs, finances and accounts relating to such Mortgage Loans with its officers, employees and independent public accountants (and by this provision the Master Servicer hereby authorizes such accountants to discuss with such representative such affairs, finances and accounts), all at such reasonable times and as often as may be reasonably requested. Any out-of-pocket expense incident to the exercise by the Depositor or the Trustee of any right under this Section 12.09 shall be borne by the party requesting such inspection, subject to such party's right to reimbursement hereunder (in the case of the Trustee, pursuant to Section 10.05 hereof).

Section 12.10  Certificates Nonassessable and Fully Paid.

It is the intention of the Depositor that Certificateholders shall not be personally liable for obligations of the Trust Fund, that the interests in the Trust Fund represented by the Certificates shall be nonassessable for any reason whatsoever, and that the Certificates, upon due authentication thereof by the Securities Administrator pursuant to this Agreement, are and shall be deemed fully paid.

Section 12.11  Third Party Rights.

The Swap Provider shall be an express third-party beneficiary of this Agreement to the extent of its rights to receive any payments under this Agreement or any other rights of the Swap Provider stated in this Agreement, and shall have the right to enforce such rights under this Agreement as if it were a party hereto. The Swap Administrator shall be an express third-party beneficiary of this Agreement to the extent of its express rights to receive any payments under this Agreement or any other express rights of the Swap Administrator explicitly stated in this Agreement, and shall have the right to enforce such rights under this Agreement as if it were a party hereto.  Saxon shall be an express third-party beneficiary of this Agreement to the extent of its express rights under Section 11.01 to repurchase all of the Mortgage Loans (and REO Properties) remaining in the Trust Fund at the Mortgage Loan Purchase Price and shall have the right to enforce such rights under this Agreement as if it were a party hereto.

\*       \*       \*

[TPW: NYLEGAL:691857.8] 17297-00533  11/15/2007 06:00 PM

CONFIDENTIAL                                                                MSM_MSSTI_20071_0001666

IN WITNESS WHEREOF, the Depositor, the Master Servicer, the Securities Administrator and the Trustee have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year first above written.

BEAR STEARNS ASSET BACKED
SECURITIES I LLC,
as Depositor

By: _____
Name: Baron Silverstein
Title:   Vice President


WELLS FARGO BANK,
NATIONAL ASSOCIATION,
as Master Servicer and Securities Administrator

By: _____
Name:
Title:


DEUTSCHE BANK NATIONAL TRUST
COMPANY,
as Trustee

By: _____
Name:
Title:


By: _____
Name:
Title:

CONFIDENTIAL

IN WITNESS WHEREOF, the Depositor, the Master Servicer, the Securities Administrator and the Trustee have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year first above written.

BEAR STEARNS ASSET BACKED
SECURITIES I LLC,
as Depositor

By: _____
Name: Baron Silverstein
Title:   Vice President


WELLS FARGO BANK,
NATIONAL ASSOCIATION,
as Master Servicer and Securities Administrator

By: _____
Name:
Title:        Stacey M. Taylor
              Vice President


DEUTSCHE BANK NATIONAL TRUST
COMPANY,
as Trustee

By: _____
Name:
Title:


By: _____
Name:
Title:

MSM_MSSTI_20071_0001668

IN WITNESS WHEREOF, the Depositor, the Master Servicer, the Securities Administrator and the Trustee have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year first above written.

BEAR STEARNS ASSET BACKED
SECURITIES I LLC,
as Depositor

By: _____
Name: Baron Silverstein
Title:   Vice President

WELLS FARGO BANK,
NATIONAL ASSOCIATION,
as Master Servicer and Securities Administrator

By: _____
Name:
Title:

DEUTSCHE BANK NATIONAL TRUST
COMPANY,
as Trustee

By: _____
Name:       Karlene Benvenuto
Title:       Authorized Signer

By: _____
Name:       Radha Nilakantan
Title:       Authorized Signer

CONFIDENTIAL

STATE OF NEW YORK     )
                      ) ss.:
COUNTY OF NEW YORK  )

On this 6ᵗʰ day of July, 2007, before me, a notary public in and for said State, appeared Baron Silverstein, personally known to me on the basis of satisfactory evidence to be an authorized representative of Bear Stearns Asset Backed Securities I LLC, one of the companies that executed the within instrument, and also known to me to be the person who executed it on behalf of such limited liability company and acknowledged to me that such limited liability company executed the within instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

Notary Public

[Notarial Seal]

MICHELLE STERLING
Notary Public, State of New York
No. 02ST0068612
Qualified in Westchester County
Commission Expires November 19, 2009

STATE OF MARYLAND       )
                            ) ss.:
COUNTY OF HOWARD    )

On the 6th Day of July, 2007, before me, a notary public in and for said State, personally appeared Stacey M. Taylor, known to me to be a Vice President of Wells Fargo Bank, National Association, one of the national banking associations that executed the within instrument, and also known to me to be the person who executed it on behalf of said national banking association, and acknowledged to me that such national banking association executed the within instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

_____
Notary Public

GRAHAM M. OGLESBY
NOTARY PUBLIC
BALTIMORE CITY
MARYLAND
MY COMMISSION EXPIRES JANUARY 7 2009

MSM_MSSTI_20071_0001671

STATE OF CALIFORNIA    )
                           ) ss.:
COUNTY OF ORANGE     )

On this 6th day of July, 2007, before me, a notary public in and for said State, appeared Karlene Benvenuto , personally known to me on the basis of satisfactory evidence to be an authorized representative of Deutsche Bank National Trust Company, a national banking association, one of the parties that executed the within instrument, and also known to me to be the person who executed it on behalf of such corporation and acknowledged to me that such corporation executed the within instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

Notary Public

[Notarial Seal]

NADIA NGUYEN
Commission # 1535111
Notary Public - California
Orange County
My Comm. Expires Dec 16, 2008

STATE OF CALIFORNIA   )
                            ) ss.:
COUNTY OF ORANGE     )

On this 6th day of July, 2007, before me, a notary public in and for said State, appeared _Radha Nilakantan_ personally known to me on the basis of satisfactory evidence to be an authorized representative of Deutsche Bank National Trust Company, a national banking association, one of the parties that executed the within instrument  and also known to me to be the person who executed it on behalf of such corporation and acknowledged to me that such corporation executed the within instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

_____
Notary Public

[Notarial Seal]

NADIA NGUYEN
Commission # 1535111
Notary Public - California
Orange County
My Comm. Expires Dec 16, 2008

CONFIDENTIAL

EXHIBIT A-1

Form of Class A Certificates

SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES, THIS CERTIFICATE REPRESENTS A "REGULAR INTEREST" IN A "REAL ESTATE MORTGAGE INVESTMENT CONDUIT," AS THOSE TERMS ARE DEFINED, RESPECTIVELY, IN SECTIONS 860G AND 860D OF THE INTERNAL REVENUE CODE OF 1986 (THE "CODE").

THE CERTIFICATE PRINCIPAL BALANCE OF THIS CERTIFICATE WILL BE DECREASED BY THE PRINCIPAL PAYMENTS HEREON AND REALIZED LOSSES ALLOCABLE HERETO. ACCORDINGLY, FOLLOWING THE INITIAL ISSUANCE OF THE CERTIFICATES, THE CERTIFICATE PRINCIPAL BALANCE OF THIS CERTIFICATE WILL BE DIFFERENT FROM THE DENOMINATION SHOWN BELOW. ANYONE ACQUIRING THIS CERTIFICATE MAY ASCERTAIN ITS CERTIFICATE PRINCIPAL BALANCE BY INQUIRY OF THE SECURITIES ADMINISTRATOR NAMED HEREIN.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY TO THE DEPOSITOR OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY AND ANY PAYMENT IS MADE TO CEDE & CO., ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

PRIOR TO THE TERMINATION OF THE SUPPLEMENTAL INTEREST TRUST, ANY PERSON ACQUIRING A CERTIFICATE SHALL BE DEEMED TO HAVE MADE THE REPRESENTATIONS IN SECTION 7.02(B) OF THE POOLING AND SERVICING AGREEMENT.

CONFIDENTIAL                                                      MSM_MSSTI_20071_0001674

Certificate No. 1

Adjustable Rate

Class [A-1][A-2][A-3][A-4] Senior

Date of Pooling and Servicing Agreement
and Cut-off Date:
June 1, 2007

Aggregate Initial Certificate Principal
Balance of this Certificate as of the Cut-off
Date:
$[_____]

First Distribution Date:
July 25, 2007

Initial Certificate Principal Balance of this
Certificate as of the Cut-off Date:
$[_____]

Master Servicer and Securities Administrator:
Wells Fargo Bank, National Association

CUSIP: [_____]

Last Scheduled Distribution Date:
[_____, __]

## MORGAN STANLEY STRUCTURED TRUST I 2007-1
## ASSET-BACKED CERTIFICATE
## SERIES 2007-1

evidencing a fractional undivided interest in the distributions allocable to the
Class [A-1][A-2][A-3][A-4] Certificates with respect to a Trust Fund consisting
primarily of a pool of conventional, closed-end, first and second lien, subprime,
one- to four-family fixed and adjustable interest rate mortgage loans sold by
BEAR STEARNS ASSET BACKED SECURITIES I LLC.

This Certificate is payable solely from the assets of the Trust Fund, and does not
represent an obligation of or interest in Bear Stearns Asset Backed Securities I LLC, the Master
Servicer, the Securities Administrator or the Trustee referred to below or any of their affiliates or
any other person. Neither this Certificate nor the underlying Mortgage Loans are guaranteed or
insured by any governmental entity or by Bear Stearns Asset Backed Securities I LLC, the
Master Servicer, the Securities Administrator or the Trustee or any of their affiliates or any other
person. None of Bear Stearns Asset Backed Securities I LLC, the Master Servicer or any of their
affiliates will have any obligation with respect to any certificate or other obligation secured by or
payable from payments on the Certificates.

This certifies that Cede & Co. is the registered owner of the Percentage Interest
evidenced hereby in the beneficial ownership interest of Certificates of the same Class as this
Certificate in a trust (the "Trust Fund") generally consisting of conventional, closed-end, first

A-1-2

MSM_MSSTI_20071_0001675

and second lien, subprime, fixed and adjustable rate mortgage loans secured by one- to four-family residences (collectively, the "Mortgage Loans") sold by Bear Stearns Asset Backed Securities I LLC ("BSABS I"). The Mortgage Loans were sold by EMC Mortgage Corporation ("EMC") and Morgan Stanley Mortgage Capital Holdings LLC to BSABS I. Wells Fargo Bank, National Association will act as master servicer of the Mortgage Loans (in that capacity, the "Master Servicer," which term includes any successors thereto under the Agreement referred to below). The Trust Fund was created pursuant to the Pooling and Servicing Agreement, dated as of the Cut-off Date specified above (the "Agreement"), among BSABS I, as depositor (the "Depositor"), Wells Fargo Bank, National Association as Master Servicer and securities administrator (in such capacity, the "Securities Administrator"), and Deutsche Bank National Trust Company, as trustee (the "Trustee"), a summary of certain of the pertinent provisions of which is set forth hereafter. To the extent not defined herein, capitalized terms used herein shall have the meaning ascribed to them in the Agreement. This Certificate is issued under and is subject to the terms, provisions and conditions of the Agreement, to which Agreement the Holder of this Certificate by virtue of its acceptance hereof assents and by which such Holder is bound.

Interest on this Certificate will accrue from and including the immediately preceding Distribution Date (or with respect to the First Distribution Date, the Closing Date) to and including the day prior to the current Distribution Date on the Certificate Principal Balance hereof at a per annum rate equal to the Pass-Through Rate set forth above. The Securities Administrator will distribute on the 25th day of each month, or, if such 25th day is not a Business Day, the immediately following Business Day (each, a "Distribution Date"), commencing on the first Distribution Date specified above, to the Person in whose name this Certificate is registered at the close of business on the Business Day immediately preceding such Distribution Date so long as such Certificate remains in book-entry form (and otherwise, the close of business on the last Business Day of the month immediately preceding the month of such Distribution Date), an amount equal to the product of the Percentage Interest evidenced by this Certificate and the amount (of interest and principal, if any) required to be distributed to the Holders of Certificates of the same Class as this Certificate. The Assumed Final Distribution Date is the Distribution Date in the month following the latest scheduled maturity date of any Mortgage Loan.

Distributions on this Certificate will be made by the Securities Administrator by check mailed to the address of the Person entitled thereto as such name and address shall appear on the Certificate Register or, if such Person so requests by notifying the Securities Administrator in writing as specified in the Agreement, by wire transfer. Notwithstanding the above, the final distribution on this Certificate will be made after due notice by the Securities Administrator of the pendency of such distribution and only upon presentation and surrender of this Certificate at the office or agency appointed by the Securities Administrator for that purpose and designated in such notice. The initial Certificate Principal Balance of this Certificate is set forth above. The Certificate Principal Balance hereof will be reduced to the extent of distributions allocable to principal hereon and any Realized Losses allocable hereto.

This Certificate is one of a duly authorized issue of Certificates designated as set forth on the face hereof (the "Certificates"). The Certificates, in the aggregate, evidence the entire beneficial ownership interest in the Trust Fund formed pursuant to the Agreement.

A-1-3

The Certificateholder, by its acceptance of this Certificate, agrees that it will look solely to the Trust Fund for payment hereunder and that neither the Trustee nor the Securities Administrator is liable to the Certificateholders for any amount payable under this Certificate or the Agreement or, except as expressly provided in the Agreement, subject to any liability under the Agreement.

This Certificate does not purport to summarize the Agreement and reference is made to the Agreement for the interests, rights and limitations of rights, benefits, obligations and duties evidenced hereby, and the rights, duties and immunities of the Securities Administrator and the Trustee.

The Agreement permits, with certain exceptions therein provided, the amendment thereof and the modification of the rights and obligations of the Depositor and the rights of the Certificateholders under the Agreement from time to time by the parties thereto with the consent of the Holders of Certificates, evidencing over 50% of the Voting Rights of the Certificates, or with the consent of the Holders of each Class of Certificates affected thereby evidencing over 50% of the Voting Rights of such Class or Classes, as applicable. Any such consent by the Holder of this Certificate shall be conclusive and binding on such Holder and upon all future Holders of this Certificate and of any Certificate issued upon the transfer hereof or in lieu hereof whether or not notation of such consent is made upon this Certificate. The Agreement also permits the amendment thereof, in certain limited circumstances, without the consent of the Holders of any of the Certificates.

As provided in the Agreement and subject to certain limitations therein set forth, the transfer of this Certificate is registrable with the Securities Administrator upon surrender of this Certificate for registration of transfer at the offices or agencies maintained by the Securities Administrator for such purposes, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Securities Administrator duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Certificates in authorized denominations representing a like aggregate Percentage Interest will be issued to the designated transferee.

Prior to the termination of the Supplemental Interest Trust, any transferee of this Certificate shall be deemed to make the representations in Section 7.02(b) of the Agreement.

The Certificates are issuable only as registered Certificates without coupons in the Classes and denominations specified in the Agreement. As provided in the Agreement and subject to certain limitations therein set forth, this Certificate is exchangeable for one or more new Certificates evidencing the same Class and in the same aggregate Percentage Interest, as requested by the Holder surrendering the same.

No service charge will be made to the Certificateholders for any such registration of transfer, but the Securities Administrator may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith. The Depositor, the Master Servicer, the Securities Administrator, the Trustee and any agent of any of them may treat the Person in whose name this Certificate is registered as the owner hereof for all purposes,

A-1-4

and none of the Depositor, the Master Servicer, the Securities Administrator, the Trustee or any such agent shall be affected by notice to the contrary.

The obligations created by the Agreement and the Trust Fund created thereby (other than the obligations to make payments to Certificateholders with respect to the termination of the Agreement) shall terminate upon the earlier of (i) the later of (A) the maturity or other liquidation (or Advance with respect thereto) of the last Mortgage Loan remaining in the Trust Fund and disposition of all property acquired upon foreclosure or deed in lieu of foreclosure of any Mortgage Loan and (B) the remittance of all funds due under the Agreement, or (ii) the optional repurchase by the party named in the Agreement of all the Mortgage Loans and other assets of the Trust Fund in accordance with the terms of the Agreement. Such optional repurchase may be made only on or after the first Distribution Date on which the aggregate Stated Principal Balance of the Mortgage Loans is less than or equal to a certain percentage of the aggregate Stated Principal Balance of the Mortgage Loans as of the Cut-off Date as set forth in the Agreement. The exercise of such right will effect the early retirement of the Certificates. In no event, however, will the Trust created by the Agreement continue beyond the earlier of (i) the expiration of 21 years after the death of certain persons identified in the Agreement and (ii) the Latest Possible Maturity Date (as defined in the Agreement).

Unless this Certificate has been countersigned by an authorized signatory of the Securities Administrator by manual signature, this Certificate shall not be entitled to any benefit under the Agreement, or be valid for any purpose.

A-1-5

IN WITNESS WHEREOF, the Trustee has caused this Certificate to be duly executed.

Dated: _____, _____

WELLS FARGO BANK, NATIONAL ASSOCIATION,
as Securities Administrator


By: _____
                    Authorized Signatory

## CERTIFICATE OF AUTHENTICATION

This is one of the Class [A-1][A-2][A-3][A-4] Certificates referred to in the within-mentioned Agreement.

WELLS FARGO BANK, NATIONAL ASSOCIATION
as Securities Administrator


By: _____
                    Authorized Signatory

A-1-6

## ASSIGNMENT

FOR VALUE RECEIVED, the undersigned hereby sell(s), assign(s) and transfer(s) unto _____ (Please print or typewrite name and address including postal zip code of assignee) a Percentage Interest evidenced by the within Asset-Backed Certificate and hereby authorizes the transfer of registration of such interest to assignee on the Certificate Register of the Trust Fund.

I (We) further direct the Certificate Registrar to issue a new Certificate of a like denomination and Class, to the above named assignee and deliver such Certificate to the following address:

_____

_____ .

_____

Dated: _____

_____
Signature by or on behalf of assignor

_____
Signature Guaranteed

### DISTRIBUTION INSTRUCTIONS

The assignee should include the following for purposes of distribution:

Distributions shall be made, by wire transfer or otherwise, in immediately available funds to _____

for the account of _____
account number _____ or, if mailed by check, to

Applicable statements should be mailed to _____

_____

This information is provided by _____
assignee named above, or _____
its agent.

A-1-7

EXHIBIT A-2

Form of Class M Certificates

THIS CERTIFICATE IS SUBORDINATED IN RIGHT OF PAYMENT TO THE SENIOR CERTIFICATES [,] [AND] [CLASS M-1 CERTIFICATES] [,] [AND] [CLASS M-2 CERTIFICATES] [,] [AND] [CLASS M-3 CERTIFICATES] [,] [AND] [CLASS M-4 CERTIFICATES] [,] [AND] [CLASS M-5 CERTIFICATES] [AND] [CLASS M-6 CERTIFICATES] AS DESCRIBED IN THE AGREEMENT (AS DEFINED BELOW).

SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES, THIS CERTIFICATE REPRESENTS A "REGULAR INTEREST" IN A "REAL ESTATE MORTGAGE INVESTMENT CONDUIT," AS THOSE TERMS ARE DEFINED, RESPECTIVELY, IN SECTIONS 860G AND 860D OF THE INTERNAL REVENUE CODE OF 1986 (THE "CODE").

THE CERTIFICATE PRINCIPAL BALANCE OF THIS CERTIFICATE WILL BE DECREASED BY THE PRINCIPAL PAYMENTS HEREON AND REALIZED LOSSES ALLOCABLE HERETO.  ACCORDINGLY, FOLLOWING THE INITIAL ISSUANCE OF THE CERTIFICATES, THE CERTIFICATE PRINCIPAL BALANCE OF THIS CERTIFICATE WILL BE DIFFERENT FROM THE DENOMINATION SHOWN BELOW. ANYONE ACQUIRING THIS CERTIFICATE MAY ASCERTAIN ITS CERTIFICATE PRINCIPAL BALANCE BY INQUIRY OF THE SECURITIES ADMINISTRATOR NAMED HEREIN.

EACH HOLDER OF A CERTIFICATE OR BENEFICIAL OWNERSHIP SHALL BE DEEMED TO HAVE MADE THE REPRESENTATIONS SET FORTH IN SECTION 7.02(B) OF THE POOLING AND SERVICING AGREEMENT.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY TO THE DEPOSITOR OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY AND ANY PAYMENT IS MADE TO CEDE & CO., ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

A-2-1

MSM_MSSTI_20071_0001681

Certificate No.1

Class [M-1][M-2][M-3][M-4][M-5][M-6]
Subordinate

Date of Pooling and Servicing Agreement
and Cut-off Date:
June 1, 2007

First Distribution Date:
July 25 2007

Master Servicer and Securities Administrator:
Wells Fargo Bank, National Association

Last Scheduled Distribution Date:
[_____]

Adjustable Rate

Aggregate    Initial    Certificate    Principal
Balance of this Certificate as of the Cut-off
Date:
$[_____]

Initial Certificate Principal Balance of this
Certificate as of the Cut-off Date:
$[_____]

CUSIP: [_____]

## MORGAN STANLEY STRUCTURED TRUST I 2007-1
## ASSET-BACKED CERTIFICATE
### SERIES 2007-1

evidencing a fractional undivided interest in the distributions allocable to the
Class [M-1][M-2][M-3][M-4][M-5][M-6] Certificates with respect to a Trust
Fund consisting primarily of a pool of conventional, closed-end, first and second
lien, subprime, one- to four-family fixed and adjustable interest rate mortgage
loans sold by BEAR STEARNS ASSET BACKED SECURITIES I LLC.

This Certificate is payable solely from the assets of the Trust Fund, and does not
represent an obligation of or interest in Bear Stearns Asset Backed Securities I LLC, the Master
Servicer, the Securities Administrator or the Trustee referred to below or any of their affiliates or
any other person. Neither this Certificate nor the underlying Mortgage Loans are guaranteed or
insured by any governmental entity or by Bear Stearns Asset Backed Securities I LLC, the
Master Servicer, the Securities Administrator or the Trustee or any of their affiliates or any other
person. None of Bear Stearns Asset Backed Securities I LLC, the Master Servicer or any of their
affiliates will have any obligation with respect to any certificate or other obligation secured by or
payable from payments on the Certificates.

This certifies that Cede & Co. is the registered owner of the Percentage Interest
evidenced hereby in the beneficial ownership interest of Certificates of the same Class as this

A-2-2

Certificate in a trust (the "Trust Fund") generally consisting of conventional, closed-end, first and second lien, subprime, fixed and adjustable rate mortgage loans secured by one- to four-family residences (collectively, the "Mortgage Loans") sold by Bear Stearns Asset Backed Securities I LLC ("BSABS I"). The Mortgage Loans were sold by EMC Mortgage Corporation ("EMC") and Morgan Stanley Mortgage Capital Holdings LLC to BSABS I. Wells Fargo Bank, National Association will act as master servicer of the Mortgage Loans (in that capacity, the "Master Servicer," which term includes any successors thereto under the Agreement referred to below). The Trust Fund was created pursuant to the Pooling and Servicing Agreement, dated as of the Cut-off Date specified above (the "Agreement"), among BSABS I, as depositor (the "Depositor"), Wells Fargo Bank, National Association as Master Servicer and securities administrator (in such capacity, the "Securities Administrator"), and Deutsche Bank National Trust Company, as trustee (the "Trustee"), a summary of certain of the pertinent provisions of which is set forth hereafter. To the extent not defined herein, capitalized terms used herein shall have the meaning ascribed to them in the Agreement. This Certificate is issued under and is subject to the terms, provisions and conditions of the Agreement, to which Agreement the Holder of this Certificate by virtue of its acceptance hereof assents and by which such Holder is bound.

Interest on this Certificate will accrue from and including the immediately preceding Distribution Date (or with respect to the First Distribution Date, the Closing Date) to and including the day prior to the current Distribution Date on the Certificate Principal Balance hereof at a per annum rate equal to the Pass-Through Rate set forth above. The Securities Administrator will distribute on the 25th day of each month, or, if such 25th day is not a Business Day, the immediately following Business Day (each, a "Distribution Date"), commencing on the first Distribution Date specified above, to the Person in whose name this Certificate is registered at the close of business on the Business Day immediately preceding such Distribution Date so long as such Certificate remains in book-entry form (and otherwise, the close of business on the last Business Day of the month immediately preceding the month of such Distribution Date), an amount equal to the product of the Percentage Interest evidenced by this Certificate and the amount (of interest and principal, if any) required to be distributed to the Holders of Certificates of the same Class as this Certificate. The Assumed Final Distribution Date is the Distribution Date in the month following the latest scheduled maturity date of any Mortgage Loan.

Distributions on this Certificate will be made by the Securities Administrator by check mailed to the address of the Person entitled thereto as such name and address shall appear on the Certificate Register or, if such Person so requests by notifying the Securities Administrator in writing as specified in the Agreement, by wire transfer. Notwithstanding the above, the final distribution on this Certificate will be made after due notice by the Securities Administrator of the pendency of such distribution and only upon presentation and surrender of this Certificate at the office or agency appointed by the Securities Administrator for that purpose and designated in such notice. The initial Certificate Principal Balance of this Certificate is set forth above. The Certificate Principal Balance hereof will be reduced to the extent of distributions allocable to principal hereon and any Realized Losses allocable hereto.

A-2-3

This Certificate is one of a duly authorized issue of Certificates designated as set forth on the face hereof (the "Certificates"). The Certificates, in the aggregate, evidence the entire beneficial ownership interest in the Trust Fund formed pursuant to the Agreement.

The Certificateholder, by its acceptance of this Certificate, agrees that it will look solely to the Trust Fund for payment hereunder and that neither the Trustee nor the Securities Administrator is liable to the Certificateholders for any amount payable under this Certificate or the Agreement or, except as expressly provided in the Agreement, subject to any liability under the Agreement.

This Certificate does not purport to summarize the Agreement and reference is made to the Agreement for the interests, rights and limitations of rights, benefits, obligations and duties evidenced hereby, and the rights, duties and immunities of the Securities Administrator and the Trustee.

The Agreement permits, with certain exceptions therein provided, the amendment thereof and the modification of the rights and obligations of the Depositor and the rights of the Certificateholders under the Agreement from time to time by the parties thereto with the consent of the Holders of Certificates, evidencing over 50% of the Voting Rights of the Certificates, or with the consent of the Holders of each Class of Certificates affected thereby evidencing over 50% of the Voting Rights of such Class or Classes, as applicable. Any such consent by the Holder of this Certificate shall be conclusive and binding on such Holder and upon all future Holders of this Certificate and of any Certificate issued upon the transfer hereof or in lieu hereof whether or not notation of such consent is made upon this Certificate. The Agreement also permits the amendment thereof, in certain limited circumstances, without the consent of the Holders of any of the Certificates.

As provided in the Agreement and subject to certain limitations therein set forth, the transfer of this Certificate is registrable with the Securities Administrator upon surrender of this Certificate for registration of transfer at the offices or agencies maintained by the Securities Administrator for such purposes, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Securities Administrator duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one or more new Certificates in authorized denominations representing a like aggregate Percentage Interest will be issued to the designated transferee.

Each holder of a Certificate or beneficial ownership shall be deemed to have made the representations set forth in Section 7.02(b) of the Pooling and Servicing Agreement.

The Certificates are issuable only as registered Certificates without coupons in the Classes and denominations specified in the Agreement. As provided in the Agreement and subject to certain limitations therein set forth, this Certificate is exchangeable for one or more new Certificates evidencing the same Class and in the same aggregate Percentage Interest, as requested by the Holder surrendering the same.

A-2-4

MSM_MSSTI_20071_0001684

No service charge will be made to the Certificateholders for any such registration of transfer, but the Securities Administrator may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith. The Depositor, the Master Servicer, the Securities Administrator, the Trustee and any agent of any of them may treat the Person in whose name this Certificate is registered as the owner hereof for all purposes, and none of the Depositor, the Master Servicer, the Securities Administrator, the Trustee or any such agent shall be affected by notice to the contrary.

The obligations created by the Agreement and the Trust Fund created thereby (other than the obligations to make payments to Certificateholders with respect to the termination of the Agreement) shall terminate upon the earlier of (i) the later of (A) the maturity or other liquidation (or Advance with respect thereto) of the last Mortgage Loan remaining in the Trust Fund and disposition of all property acquired upon foreclosure or deed in lieu of foreclosure of any Mortgage Loan and (B) the remittance of all funds due under the Agreement, or (ii) the optional repurchase by the party named in the Agreement of all the Mortgage Loans and other assets of the Trust Fund in accordance with the terms of the Agreement. Such optional repurchase may be made only on or after the first Distribution Date on which the aggregate Stated Principal Balance of the Mortgage Loans is less than or equal to a certain percentage of the aggregate Stated Principal Balance of the Mortgage Loans as of the Cut-off Date as set forth in the Agreement. The exercise of such right will effect the early retirement of the Certificates. In no event, however, will the Trust created by the Agreement continue beyond the earlier of (i) the expiration of 21 years after the death of certain persons identified in the Agreement and (ii) the Latest Possible Maturity Date (as defined in the Agreement).

Unless this Certificate has been countersigned by an authorized signatory of the Securities Administrator by manual signature, this Certificate shall not be entitled to any benefit under the Agreement, or be valid for any purpose.

A-2-5

MSM_MSSTI_20071_0001685

IN WITNESS WHEREOF, the Trustee has caused this Certificate to be duly executed.

Dated: _____, _____

WELLS FARGO BANK, NATIONAL ASSOCIATION,
as Securities Administrator

By: _____
Authorized Signatory

## **CERTIFICATE OF AUTHENTICATION**

This is one of the Class [M-1][M-2][M-3][M-4][M-5][M-6] Certificates referred to in the within-mentioned Agreement.

WELLS FARGO BANK, NATIONAL ASSOCIATION
as Securities Administrator

By: _____
Authorized Signatory

A-2-6

## ASSIGNMENT

FOR VALUE RECEIVED, the undersigned hereby sell(s), assign(s) and transfer(s) unto _____ (Please print or typewrite name and address including postal zip code of assignee) a Percentage Interest evidenced by the within Asset-Backed Certificate and hereby authorizes the transfer of registration of such interest to assignee on the Certificate Register of the Trust Fund.

I (We) further direct the Certificate Registrar to issue a new Certificate of a like denomination and Class, to the above named assignee and deliver such Certificate to the following address:

Dated:

_____
Signature by or on behalf of assignor

_____
Signature Guaranteed

## DISTRIBUTION INSTRUCTIONS

The assignee should include the following for purposes of distribution:

Distributions shall be made, by wire transfer or otherwise, in immediately available funds to _____

_____
for the account of _____
account number _____ or, if mailed by check, to

_____
Applicable statements should be mailed to _____

_____

This information is provided by _____
assignee named above, or _____
its agent.

A-2-7

EXHIBIT A-3

Form of Class B Certificates

THIS CERTIFICATE IS SUBORDINATED IN RIGHT OF PAYMENT TO THE SENIOR CERTIFICATES AND THE CLASS M CERTIFICATES [,] [AND] [CLASS B-1 CERTIFICATES] [,] [AND] [CLASS B-2 CERTIFICATES] [,] [AND] [CLASS B-3 CERTIFICATES] AS DESCRIBED IN THE AGREEMENT (AS DEFINED BELOW).

SOLELY FOR U.S. FEDERAL INCOME TAX PURPOSES, THIS CERTIFICATE REPRESENTS A "REGULAR INTEREST" IN A "REAL ESTATE MORTGAGE INVESTMENT CONDUIT," AS THOSE TERMS ARE DEFINED, RESPECTIVELY, IN SECTIONS 860G AND 860D OF THE INTERNAL REVENUE CODE OF 1986 (THE "CODE").

THE CERTIFICATE PRINCIPAL BALANCE OF THIS CERTIFICATE WILL BE DECREASED BY THE PRINCIPAL PAYMENTS HEREON AND REALIZED LOSSES ALLOCABLE HERETO AS DESCRIBED IN THE AGREEMENT. ACCORDINGLY, FOLLOWING THE INITIAL ISSUANCE OF THE CERTIFICATES, THE CERTIFICATE PRINCIPAL BALANCE OF THIS CERTIFICATE WILL BE DIFFERENT FROM THE DENOMINATION SHOWN BELOW. ANYONE ACQUIRING THIS CERTIFICATE MAY ASCERTAIN ITS CERTIFICATE PRINCIPAL BALANCE BY INQUIRY OF THE SECURITIES ADMINISTRATOR NAMED HEREIN.

[For Class B-1, B-2 and B-3] UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY TO THE DEPOSITOR OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY AND ANY PAYMENT IS MADE TO CEDE & CO., ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

[For Class B-1, B-2 and B-3] EACH HOLDER OF A CERTIFICATE OR BENEFICIAL OWNERSHIP SHALL BE DEEMED TO HAVE MADE THE REPRESENTATIONS SET FORTH IN SECTION 7.02(B) OF THE AGREEMENT.

[For Class B-4] THIS CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER ANY STATE SECURITIES LAWS. THE HOLDER HEREOF, BY PURCHASING THIS CERTIFICATE, AGREES THAT THIS CERTIFICATE MAY BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY IN COMPLIANCE WITH THE ACT AND OTHER APPLICABLE LAWS AND ONLY (1)

MSM_MSSTI_20071_0001688