**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                  :
DEUTSCHE BANK NATIONAL TRUST                                      :
COMPANY, solely in its capacity as Trustee                        :
for the MORGAN STANLEY                                            :
STRUCTURED TRUST I 2007-1,                                        :
                                                                  :     No. 14 Civ. 3020 (LTS)
            Plaintiff,                                             :
                                                                  :
        - against -                                               :     ORAL ARGUMENT
MORGAN STANLEY MORTGAGE                                           :     REQUESTED
CAPITAL HOLDINGS LLC, as Successor-                              :
by-Merger to MORGAN STANLEY                                       :
MORTGAGE CAPITAL INC.,                                            :
                                                                  :
            Defendant.                                            :
                                                                  :
                                                                  :
                                                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
# MOTION FOR SUMMARY JUDGMENT


DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000

Attorneys for Defendant

## TABLE OF CONTENTS

· PAGE

PRELIMINARY STATEMENT ..................................................................................................1

BACKGROUND ........................................................................................................................3

    A.    The MSST Securitization.............................................................................3

    B.    The Governing Contract ..............................................................................4

    C.    Procedural History .......................................................................................6

    D.    Alleged Evidence of Breaches ....................................................................6

ARGUMENT.............................................................................................................................8

    I.    PLAINTIFF CANNOT AVOID THE "SOLE AND EXCLUSIVE
    REMEDY" PROVISION AND IS LIMITED TO REPURCHASE OF
    INDIVIDUAL LOANS .............................................................................9

        A.    The Sole Remedy Provision Is Inherently Loan-Specific, as This
        Court Has Recognized, and Must Be Enforced According to Its
        Plain Terms..................................................................................................9

        B.    The Sole Remedy Provision Is Not an Exculpatory Clause that
        Violates Public Policy................................................................................11

        C.    There Is No Evidence of the Type of Conduct Necessary to Void
        an Express Contractual Remedies Provision .............................................13

    II.    DEUTSCHE BANK HAS NOT SHOWN ACTUAL LOAN-BY-LOAN
    NOTICE OR DISCOVERY .....................................................................15

        A.    On Summary Judgment, Plaintiff Must Show Actual Loan-By-
        Loan Notice or Discovery of Material Breaches for Any Loan as to
        Which It Seeks Relief ................................................................................15

        B.    Deutsche Bank Has No Evidence of Actual Loan-by-Loan
        Discovery ...................................................................................................19

        C.    Deutsche Bank Chose Not to Rely Upon or Present Admissible
        Evidence of the Breaches Alleged in Its Complaint ..................................19

        D.    Deutsche Bank Cannot Pursue Notice-Based Claims for Breaches
        Not Identified in the Complaint .................................................................20

            1.    The New Claims Are Untimely and Do Not Relate Back ........... 20

            2.    Even if the New Claims Related Back, Deutsche Bank Failed to
            Satisfy the Notice Condition Precedent ......................................... 23

i

PAGE

III.   DEUTSCHE BANK ONLY OFFERS *CONCLUSORY* EXPERT
       OPINIONS THAT THE ALLEGED BREACHES "MATERIALLY AND
       ADVERSELY AFFECT THE VALUE OF THE INTERESTS OF
       CERTIFICATEHOLDERS," WHICH IS INSUFFICIENT...................................24

       A.   Mr. Hunter Only Provides A Conclusory Opinion on Materiality,
            Not an Analysis...........................................................................................26

       B.   Mr. Hunter's Conclusory Opinions Are Made as of the Wrong
            Date Under the Contract .............................................................................28

       C.   Dr. Kilpatrick Only Provides A Conclusory Opinion on
            Materiality, Not an Analysis......................................................................29

IV.    PLAINTIFF MISCONSTRUES THE MEANING OF VARIOUS
       REPRESENTATIONS AND WARRANTIES IN THE CONTRACT.................30

       A.   Deutsche Bank Misapplies Section 10(b)(5) of the MLPA ......................30

            1.   There Is No Evidence that Morgan Stanley Took Part in or Had
                 Knowledge of Any Alleged Breach of Section 10(b)(5) ..............30

            2.   Section 10(b)(5) Is Not a Guideline Compliance Representation  31

       B.   Deutsche Bank Misapplies the MLS Representation..................................33

            1.   The MLS Representation Does Not Serve as a "No Fraud"
                 Representation.............................................................................. 33

            2.   Allegedly Inaccurate DTI Ratios Do Not Breach the MLS
                 Representation.............................................................................. 36

       C.   Deutsche Bank Fails to Establish a Breach of Any Appraisal-
            Related Representation ...............................................................................36

            1.   Loan-to-Value Allegations Cannot Be Based on an AVM Value  36

            2.   Deutsche Bank Misapplies the Appraisal Representation ............ 37

V.     MORGAN STANLEY IS NOT RESPONSIBLE FOR
       REPRESENTATIONS AND WARRANTIES MADE BY
       ACCREDITED, FREMONT, OR WMC................................................................38

       A.   Deutsche Bank Released All Claims for Repurchase of Accredited
            Mortgage Loans ..........................................................................................38

       B.   Morgan Stanley Did Not Backstop Fremont and WMC Mortgage
            Loans............................................................................................................40

CONCLUSION......................................................................................................................40

**TABLE OF AUTHORITIES**

<u>CASES</u>

PAGE(S)

A.H.A. Gen. Constr., Inc. v. N.Y.C. Hous. Auth.,
    92 N.Y.2d 201 (1998) ............................................................................................ 13

Abacus Fed. Sav. Bank v. ADT Sec. Servs., Inc.,
    18 N.Y.3d 675 (2012) ...................................................................................... 11, 15

ACE Secs. Corp. v. DB Structured Prods., Inc.,
    25 N.Y.3d 581 (2015) ...................................................................................... 20, 23

ACE Secs. Corp. Home Equity Loan Trust, Series 2007-HE3 ex rel. HSBC Bank USA,
Nat. Ass'n v. DB Structured Prods., Inc.,
    5 F. Supp. 3d 543 (S.D.N.Y. 2014) ...................................................................... 12

Alitalia Linee Aeree Italiane, S.p.A. v. Airline Tariff Pub. Co.,
    580 F. Supp. 2d 285 (S.D.N.Y. 2008) ................................................................... 14

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986) ............................................................................................... 25

Ambac Assurance Corp. v. Countrywide Home Loans, Inc.,
    No. 651612/2010, 2015 WL 6471943 (Sup. Ct. N.Y. Cty.  Oct. 22, 2015) ........... 18

Assured Guar. Mun. Corp. v. Flagstar Bank,
    20 F. Supp. 2d 475 (S.D.N.Y. 2013) ..................................................................... 18

Atlantic Gypsum Co. v. Lloyds Int'l Corp.,
    753 F. Supp. 505 (S.D.N.Y. 1990) ....................................................................... 15

Beard v. Banks,
    548 U.S. 521 (2006) ................................................................................................ 9

Blackrock Allocation Target Shares: Series S Portfolio v. Bank of N.Y. Mellon,
    180 F. Supp. 3d 246 (S.D.N.Y. 2016) ................................................................... 17

Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC,
    No. Civ. 5140 (CS), 2012 WL 3201139 (Del. Ch. Aug. 7, 2012) ................................... *passim*

Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings, LLC,
    No. Civ. 5140 (VCS), 2010 WL 3258620 (Del. Ch. Aug. 19, 2010),
    rev'd on other grounds, 27 A.3d 531 (Del. 2011) .................................................. 35

Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce,
 Fenner & Smith Inc.,
  188 F.3d 31 (2d Cir. 1999) .................................................................................................... 39

Deutsche Alt-A Securities Mortg. Loan Trust, Series 2006-OA1 v. DB Structured
 Products, Inc.,
  958 F. Supp. 2d 488 (S.D.N.Y. 2013) ..................................................................................... 18

Eujoy Realty Corp. v. Van Wagner Commc'ns, LLC,
  22 N.Y.3d 413 (2013) ............................................................................................................ 10

Five Star Development Resort Communities LLC v. iStar RC Paradise Valley LLC,
  No. 09 Civ. 2085 (LTS), 2012 WL 4119561 (S.D.N.Y. Sept. 18, 2012) ......................... 10, 14

Fleming v. Verizon N.Y., Inc.,
  419 F. Supp. 2d 455 (S.D.N.Y. 2005) ..................................................................................... 20

Food Lion, Inc. v. S.L. Nusbaum Ins. Agency, Inc.,
  202 F.3d 223 (4th Cir. 2000) .................................................................................................. 39

Galli v. Metz,
  973 F.2d 145 (2d Cir. 1992) ....................................................................................... 32, 34, 35

Gary Friedrich Enters., LLC v. Marvel Characters, Inc.,
  716 F.3d 302 (2d Cir. 2013) .................................................................................................... 33

Goenaga v. March of Dimes Birth Defects Found.,
  51 F.3d 14 (2d Cir. 1995) .......................................................................................................... 9

Greater New York Health Care Facilities Assn. v. DeBuono,
  92 N.Y.2d 716 (1998) ............................................................................................................. 22

Gross v. Sweet,
  49 N.Y.2d 102 (1979) ............................................................................................................. 11

HarperCollins Publishers LLC v. Open Rd. Integrated Media, LLP,
  7 F.Supp.3d 363 (S.D.N.Y. 2014) ........................................................................................... 33

In re Soundview Elite Ltd.,
  543 B.R. 78 (Bankr. S.D.N.Y. 2016) ...................................................................................... 35

Indus. Risk Insurers v. Port Auth. of N.Y. & N.J.,
  387 F. Supp. 2d 299 (S.D.N.Y. 2005) ..................................................................................... 14

Int'l Klaffer Co., Inc. v. Continental Cas. Co.,
  869 F.2d 96 (2d Cir. 1989) ...................................................................................................... 33

Jungmann & Co., Inc. v. Atterbury Bros., Inc.,
    249 N.Y. 119 (1928) ................................................................................................ 24

Kalisch-Jarcho, Inc. v. City of New York,
    58 N.Y.2d 377 (1983) .......................................................................................... 11, 15

Major League Baseball Properties, Inc. v. Salvino, Inc.,
    542 F.3d 290 (2d Cir. 2008)................................................................................... 25

MASTR Adjustable Rate Mortgages Trust 2006-OA2 v. UBS Real Estate Sec. Inc.,
    No. 12 iv. 7322 (PKC), 2016 WL 1449751 (S.D.N.Y. Apr. 12, 2016) ................. 21

MASTR Adjustable Rate Mortgages Trust 2006-OA2 v. UBS Real Estate Sec. Inc.,
    No. 12 Civ. 7322 (PKC), 2015 WL 764665 (S.D.N.Y. Jan. 9, 2015) ............... 17, 28

MASTR Adjustable Rate Mortgages Trust 2006-OA2 v. UBS Real Estate Sec. Inc.,
    No. 12 Civ. 7322 (PKC), 2015 WL 797972 (S.D.N.Y. Feb. 25, 2015)................. 17

Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.,
    84 N.Y.2d 430 (1994) .......................................................................................... 14, 15

Morgan Stanley Mortg. Loan Trust 2006-13ARX v. Morgan Stanley Mortgage Capital
    Holdings, LLC,
    IAPL-2016-00240 (N.Y. fully briefed Mar. 10, 2017) ......................................... 15

Morgan Stanley Mortg. Loan Trust 2006-13ARX v. Morgan Stanley Mortgage Capital
    Holdings LLC,
    143 A.D.3d 1 (1st Dep't 2016) .............................................................................. 13

Net2Globe Int'l Inc. v. TimeWarner Telcommunc'ns of N.Y.,
    273 F. Supp. 2d 436 (S.D.N.Y. 2003)................................................................... 14

Nomura Home Equity Loan, Inc., Series 2006-FM2 v. Nomura Credit & Capital, Inc.,
    133 A.D.3d 96 (1st Dep't 2015) ........................................................................ 21, 22

Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.,
    86 N.Y.2d 685 (1995) ........................................................................................... 24

Porter v. Quarantillo,
    722 F.3d 94 (2d Cir. 2013).................................................................................... 20

Pretesting Co. v. Arbitron Co.,
    No. 93 Civ. 6031 (CBM), 1996 WL 480899 (S.D.N.Y. 1996),
    aff'd, 114 F.3d 1206 (Fed. Cir. 1997)................................................................... 25

Reddington v. Staten Island Univ. Hosp.,
    511 F.3d 126 (2d Cir. 2007).................................................................................. 21

Ret. Bd. of the Policemen's Annuity & Benefit Fund of the City of Chi. v. Bank of N.Y.
    Mellon, 775 F.3d 154 (2d Cir. 2014) ....................................................................................... 8

Royal Park Investments SA/NV v. Bank of N.Y. Mellon,
    No. 14 Civ. 6502 (GHW), 2016 WL 899320 (S.D.N.Y. Mar. 2, 2016) ................................. 17

Royal Park Investments SA/NV v. HSBC Bank USA Nat'l Ass'n,
    No. 14 Civ. 8175 (LGS), 2017 WL 945099 (S.D.N.Y. Mar. 10, 2017) ................................. 18

Royal Park Investments SA/NV v. HSBC Bank USA, N.A.,
    109 F. Supp. 3d 587 (S.D.N.Y. 2015) ............................................................................. 18, 19

Shields v. Citytrust Bancorp, Inc.,
    25 F.3d 1124 (2d Cir. 1994) ................................................................................................. 15

Sommer v. Fed. Signal Corp.,
    79 N.Y.2d 540 (1992) .................................................................................................... 11, 15

South Road Assocs., LLC v. Int'l Bus. Machines Corp.,
    4 N.Y.3d 272 (2005) ............................................................................................................ 33

U.S. Bank Nat'l Ass'n v. GreenPoint Mortg. Funding, Inc.,
    147 A.D.3d 79 (1st Dep't 2016) ..................................................................... 18, 19, 23, 24

U.S. Bank, Nat'l Ass'n v. Citigroup Glob. Markets Realty Corp.,
    No. 13 Civ. 6989 (GBD), 2015 WL 1222075 (S.D.N.Y. Mar. 13, 2015) ............................. 17

U.S. Bank, Nat'l Ass'n v. UBS Real Estate Sec. Inc.,
    205 F. Supp. 3d 386 (S.D.N.Y. 2016) ........................................................................... passim

United States v. Spencer,
    700 F.3d 317 (8th Cir. 2012) .............................................................................................. 25

Varsity Transit, Inc. v. Bd. of Educ. of City of N.Y.,
    5 N.Y.3d 532 (2005) ............................................................................................................ 24

Wills v. Amerada Hess Corp.,
    379 F.3d 32 (2d Cir. 2003) .................................................................................................. 25

### STATUTES & RULES

Fed. R. Civ. P. 15(c)(1) ........................................................................................................... 20

Fed. R. Civ. P. 56(e) ................................................................................................................. 9

OTHER AUTHORITIES

5 Corbin, Corbin on Contracts § 1068 (1984) ........................................................... 15

23 Williston on Contracts § 61 (4th ed.) ................................................................... 39

Black's Law Dictionary (10th ed. 2014) ................................................................... 35

Restatement (Second) of Contracts § 195(1) ....................................................... 14, 15

Webster's Third New International Dictionary of the English Language Unabridged (3d
ed. 1993) ............................................................................................................... 35

Defendant Morgan Stanley Mortgage Capital Holdings LLC ("Morgan Stanley") respectfully submits this memorandum of law in support of its motion for summary judgment.

## PRELIMINARY STATEMENT

Plaintiff Deutsche Bank National Trust Company ("Deutsche Bank" or the "Trustee"), as trustee of the Morgan Stanley Structured Trust I 2007-1 ("MSST" or the "Trust"), has taken a number of shortcuts in prosecuting this litigation. These decisions, along with a number of fundamental problems with its claims, prevent Deutsche Bank from being able to survive summary judgment. Deutsche Bank's claims should be dismissed in their entirety, or at a minimum, dismissed in substantial part.

This case concerns a residential mortgage-backed securitization ("RMBS") trust consisting of 4,374 loans. Deutsche Bank claims that loans within the Trust breached representations and warranties ("R&Ws") concerning the quality of the loans. But rather than reviewing the vast majority of those loans, or even having its reunderwriting expert analyze the loans alleged to be in breach in Deutsche Bank's pre-suit demand letter and its complaint, Deutsche Bank hoped to be able to "extrapolate" a "breach rate" from a small sample of loans and apply it to the nearly 4,000 other loans in the Trust. When Deutsche Bank asked the Court to bless this approach, however, the Court made clear that this approach was inconsistent with the governing contract, which establishes a loan-by-loan protocol for identifying breaches and provides that the Trustee's "sole remedy" is to demand cure or repurchase, on a loan-by-loan basis, of the allegedly breaching loans. The Court concluded the Trustee could only avoid the sole remedy provision if it could establish that the provision was unenforceable as a matter of public policy—an issue the Court felt was premature to resolve at the pleadings stage. Deutsche Bank must live with the consequences of its decision to limit its proffered evidence to the

1

approximately 400 loans in its sample, and to gamble on being able to write the sole remedy provision out of the contract. On summary judgment, the issue of the enforceability of the sole remedy provision is now squarely presented, and Deutsche Bank has no valid legal basis for treating it as void. Accordingly, at the very most, even if its claims were not otherwise defective under the plain terms of the contract, Deutsche Bank could only proceed to trial on the 236 loans from its sample that it alleges were in breach. See Point I, infra.

But there are additional problems with Deutsche Bank's case that are fatal to its claims as to these loans as well. First, in order to seek repurchase of any loan, the plain language of the contract requires the Trustee to establish either that Morgan Stanley "discovered" a material breach in that loan, or that the Trustee met the condition precedent of providing "notice" of a material breach in such loan 90 days before filing suit—a standard that Deutsche Bank has admitted requires proof of *actual* knowledge of a *loan-specific* breach. Here, Deutsche Bank has no evidence that Morgan Stanley independently "discovered" the alleged breaches identified by its experts. In addition, Deutsche Bank has not established that it provided pre-suit "notice" of any of these alleged breaches more than 90 days before filing suit. While the Trustee provided notice of other alleged breaches, it strategically chose not to have its experts review those loans or to otherwise substantiate those allegations. Again, now Deutsche Bank must live with the consequences of that litigation decision. See Point II, infra.

Second, as to the 236 loans that Deutsche Bank has purported to submit evidence on, it took an additional shortcut that is fatal to its claims. The contract provides that in order to establish a valid repurchase claim, the Trustee must prove not only that the loan at issue breached an R&W, but that the breach "materially and adversely affects the value of the interests of the Certificateholders." While Deutsche Bank's experts purported to identify alleged

2

breaches, they did not separately explain or analyze why or how they concluded that any alleged breach in any given loan had such an effect on the Certificateholders—they simply stated the *conclusion* that the breaches had this effect. Such *conclusory* statements of opinion by experts are not enough to sustain plaintiff's burden on summary judgment. See Point III, infra.

In the event that Deutsche Bank's claims do survive, they must be limited in substantial part. The Trustee has misconstrued and misapplied the relevant R&Ws that comprise the bulk of its claims, in an effort to shoehorn alleged breaches into contractual provisions where they simply do not fit. See Point IV, infra. And even if the Trustee had properly construed the relevant R&Ws, it asserted breaches in loans originated by Accredited Home Lenders, Inc. ("Accredited"), Fremont Investment & Loan ("Fremont"), and WMC Mortgage Corp. ("WMC"), for which Morgan Stanley bears no liability. See Point V, infra.

## BACKGROUND

### A. The MSST Securitization

Morgan Stanley, as sponsor of the securitization, acquired all of the loans in the Trust from third-party originators and arranged for their securitization in the Trust. (R. 56.1 ¶¶ 2-3.)[1] Morgan Stanley did not earn any fees for its role in the securitization, nor did it make any profit upon the sale of the loans to the Trust. (Id. ¶¶ 10-16.) Rather, Morgan Stanley's opportunity to earn a profit arose from its equity interest in the Trust, which in turn was based on whether the deal performed according to expectations. If the loans failed to perform, Morgan Stanley would be the first to suffer losses, before the debt certificateholders. (See id. ¶¶ 10-20.)

Bear, Stearns & Co. Inc. ("Bear Stearns") was a third-party underwriter for MSST. (Id.

---

[1] "R. 56.1" refers to Morgan Stanley's Local Civil Rule 56.1 Statement of Undisputed Material Facts filed herewith and incorporates by reference all evidentiary support cited therein. "Ex." refers to the exhibits to the May 8, 2017 declaration of Brian S. Weinstein ("Weinstein Declaration") filed herewith.

¶ 7.) Morgan Stanley sold the initial loan pool to EMC Mortgage Corporation ("EMC"), a

subsidiary of Bear Stearns, pursuant to a Mortgage Loan Purchase and Warranties Agreement

dated May 1, 2007. (Id. ¶ 4.) Morgan Stanley and EMC then each transferred mortgage loans to

the depositor for the securitization pursuant to a Mortgage Loan Purchase Agreement dated July

6, 2007 (the "MLPA"). (Id. ¶ 5.) The depositor then assigned the final pool of 4,374 loans (the

"Mortgage Loans") to the Trust pursuant to a Pooling and Servicing Agreement dated June 1,

2007 (the "PSA," and collectively with the MLPA, the "governing contract").[2] (Id. ¶¶ 6, 8.) The

transaction closed on July 6, 2007. (Id. ¶ 9.)

### B. The Governing Contract

Morgan Stanley made various R&Ws concerning certain mortgage loans in Section 10 of

the MLPA. First, in Section 10(a), Morgan Stanley made certain limited representations "[w]ith

respect to each Mortgage Loan." (MLPA § 10(a) at 12.) Second, in Section 10(b), Morgan

Stanley made 24 additional R&Ws "[w]ith respect to the MSMCH Represented Mortgage

Loans." (Id. § 10(b) at 13.) The "MSMCH Represented Mortgage Loans" are defined as loans

originated by a list of specific originators that excludes Accredited, Fremont, and WMC. (Id. § 1

at 4.) "Accredited Mortgage Loans," "Fremont Mortgage Loans," and "WMC Mortgage Loans"

are each separately defined. (See id. § 1 at 2, 3, 6.)

Each of Accredited, Fremont, and WMC made R&Ws with respect to the loans they

originated directly to the Trust in, respectively, the Accredited Assignment & Recognition

Agreement (the "Accredited ARA"), a Bring Down Agreement between Morgan Stanley and

Fremont, and a Bring Down Agreement between EMC and WMC (the "Fremont and WMC

---

[2] A copy of the MLPA is attached as Exhibit F and a copy of the PSA is attached as Exhibit B to the
Weinstein Declaration.

Bring Down Agreements"). (R. 56.1 ¶¶ 39-42.) The Trustee could seek cure or repurchase for breach of these R&Ws directly from Accredited, Fremont, and WMC. (See id. ¶¶ 43-46.)

The MLPA sets forth a specific loan-by-loan protocol (the "Repurchase Protocol") that must be followed whenever a party believes that a representation or warranty has been breached:

> Upon discovery or receipt of notice by MSMCH or the Purchaser of a breach of any representation or warranty of MSMCH set forth in this Section 10 which materially and adversely affects the value of the interests of the Purchaser in any of the MSMCH Represented Mortgage Loans . . . the party discovering or receiving notice of such breach shall give prompt written notice to the others. In the case of any such breach . . . within 90 days from the date of discovery by MSMCH, or the date MSMCH is notified . . . of such breach . . . MSMCH will, (i) cure such breach in all material respects [or] (ii) purchase the affected Mortgage Loan at the applicable Purchase Price . . . .

(MLPA § 10 at 18.) The "Purchase Price," which makes the Trust whole with respect to any such breaching loan, is defined as "100% of the principal remaining unpaid on such Mortgage Loans as of the date of purchase (including if a foreclosure has already occurred, the principal balance of the related Mortgage Loan at the time the Mortgaged Property was acquired)" and "accrued and unpaid interest thereon at the applicable Mortgage Rate through and including the last day of the month of such purchase." (Id. § 1 at 5.) The MLPA expressly provides that cure or repurchase "shall constitute the Purchaser's, the Trustee's and the Certificateholder's *sole and exclusive remedy* under this Agreement or otherwise respecting a breach of representations or warranties hereunder." (Id. § 10 at 18 (emphasis added).)

Morgan Stanley also agreed that the same loan-by-loan Repurchase Protocol would apply to Accredited Mortgage Loans if Accredited did not resolve any valid claim with respect to such loans. (See id. § 10 at 18; see also PSA § 2.02(d) at 66.) Neither the MLPA nor the PSA contain any equivalent "backstop" provision for the Fremont and WMC Mortgage Loans.

C.  Procedural History

On April 2, 2013, two certificateholders sent a letter to Deutsche Bank identifying 1,620 purportedly breaching loans and directing Deutsche Bank to demand that Morgan Stanley repurchase the allegedly breaching loans in the Trust.  (R. 56.1 ¶ 59.)  On April 4, 2013, Deutsche Bank forwarded the letter to Morgan Stanley (the "Demand Letter").  (Id. ¶ 60.)

On April 3, 2013, the same certificateholders sent a second letter to Deutsche Bank, copying Accredited, identifying purported breaching Accredited loans in the Trust and directing Deutsche Bank to demand that Accredited repurchase the allegedly breaching loans.  (Id. ¶ 61.) On April 8, 2013, counsel for Accredited responded directly to the certificateholders, informing them that Deutsche Bank had already submitted a proof of claim in Accredited's bankruptcy and had received distributions on account of that claim.  (Id. ¶ 62.)

After Morgan Stanley responded to the Demand Letter within 90 days of receiving it, agreeing to repurchase 149 Mortgage Loans identified therein and disputing the remaining breach allegations on various grounds (id. ¶ 63), Deutsche Bank filed suit.  Morgan Stanley moved to dismiss the complaint, and the Court granted the motion in part and denied it in part. (See Apr. 3, 2015 Opinion & Order (Dkt. No. 47) ("MTD Op.").)

D.  Alleged Evidence of Breaches

During the course of discovery, Deutsche Bank served Morgan Stanley with expert reports from Robert W. Hunter, Dr. John A. Kilpatrick, Dr. Nelson R. Lipshutz, and Dr. Joseph Mason.  (Exs. U-Y, BB, EE.)  Rather than review the alleged breaches identified in the Demand Letter and the complaint, Deutsche Bank asked Mr. Hunter and Dr. Kilpatrick to examine a new

sample of 398[3] mortgage loans that were selected by Dr. Lipshutz.  (R. 56.1 ¶¶ 80, 106.)  Based

on Mr. Hunter's and Dr. Kilpatrick's loan-specific findings for these 398 loans, Dr. Lipshutz

then calculated a "breach rate" for the Trust as a whole and Dr. Mason utilized that purported

"breach rate" to estimate Trust-wide damages.  (See Exs. U-Y, BB, EE.)

      Dr. Kilpatrick reviewed the sample loans for appraisal-related issues.  First, he utilized an

automated valuation model ("AVM")—a type of software used to estimate property values

without conducting an actual appraisal—to estimate the values of the properties underlying the

sample loans, and then, using those estimates as the "value" for the loans, recalculated their loan-

to-value ratios ("LTVs") with those inputs.  (R. 56.1 ¶¶ 81-82.)  Using recalculated "LTVs"

based on his AVM values, Dr. Kilpatrick alleged that 241 loans breached R&Ws because they

had "incorrect LTVs" on the Mortgage Loan Schedule ("MLS") and that 74 loans breached

R&Ws because they had "LTVs" exceeding 100%.  (Id. ¶¶ 83, 85.)[4]  Dr. Kilpatrick also utilized

a so-called Credibility Assessment Model ("CAM") to determine whether 109 appraisal reports,

whose opinions of value exceeded his estimated AVM value by 15% or more, were "not

credible."  (Id. ¶¶ 88-90.)  Dr. Kilpatrick alleged that 96 appraisals were "not credible" according

to his CAM and offered the conclusory opinion, without elaboration, that all of these appraisals

materially and adversely affected the interests of the Certificateholders.  (Id. ¶¶ 90-92.)

      Incorporating Dr. Kilpatrick's LTV findings with his own reunderwriting results, Mr.

---

[3] Dr. Lipshutz initially drew a sample of 400 loans that had not yet paid in full.  After the sample was drawn, it was reduced to 398 because one loan paid in full and Mr. Hunter determined another could not be reunderwritten.  (Ex. U ¶¶ 13, 23.)

[4] Dr. Kilpatrick did not offer any opinion on the materiality of these alleged breaches.  Instead, Mr. Hunter, in his report, assumed that Dr. Kilpatrick's findings were accurate and opined that 102 of the alleged MLS violations were material, and that the alleged breaches for 26 of the loans with LTVs allegedly exceeding 100% were material, without explaining how he distinguished these loans from the others.  (R. 56.1 ¶¶ 83-86.)

Hunter opined that a total of 232 out of the 398 loans in the sample contained breaches of R&Ws that were material. (Id. ¶ 107.)[5]  Contrary to the requirements in the MLPA, he offered his opinion on materiality holistically at the loan level, rather than at the breach level. (Id. ¶¶ 109, 114.)  And while his reports and the attached appendices purported to detail these alleged breaches, they did not explain how Mr. Hunter came to the separate conclusion that, for any given loan, such alleged breaches materially and adversely affect the value of the interests of the Certificateholders. (Id. ¶¶ 108-114.)  The report simply stated the *conclusion* that the alleged breaches in those loans had this effect. (Id.)

Morgan Stanley submitted the expert report of Dr. Christopher M. James to rebut these conclusory materiality opinions. (Id. ¶¶ 119-122.)  Based on a statistical analysis of the loans, Dr. James concluded that the alleged breaches, even if true, did not have a statistically significant relationship to the loans' risk of default, and that therefore the alleged breaches did not materially and adversely affect the value of the interests of the Certificateholders. (Id.)

## ARGUMENT

Deutsche Bank bears "the burden of proving each disputed element of its claims by a preponderance of the evidence." U.S. Bank, Nat'l Ass'n v. UBS Real Estate Sec. Inc. ("MARM IV"), 205 F. Supp. 3d 386, 411 (S.D.N.Y. 2016).  Moreover, it "bear[s] this burden with respect to each alleged breach for each loan as to which [it] seek[s] relief." Id. (citing Ret. Bd. of the Policemen's Annuity & Benefit Fund of the City of Chi. v. Bank of N.Y. Mellon, 775 F.3d 154, 162 (2d Cir. 2014)).  "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an

---

[5] Mr. Hunter's report did not include four loans in which only Dr. Kilpatrick alleged material breaches. (Ex. V at 14 tbl.1-Rev.)  The factual disputes between Mr. Hunter, Dr. Kilpatrick, and defendant's experts as to the merits of those breach allegations are not at issue on this motion.

absence of evidence to support an essential element of the nonmoving party's claim." <u>Goenaga v. March of Dimes Birth Defects Found.</u>, 51 F.3d 14, 18 (2d Cir. 1995).  In turn, plaintiff must "set forth specific facts showing that there is a genuine issue for trial."  <u>Beard v. Banks</u>, 548 U.S. 521, 529 (2006) (quoting Fed. R. Civ. P. 56(e)); <u>see also Goenaga</u>, 51 F.3d at 18.

## I.   PLAINTIFF CANNOT AVOID THE "SOLE AND EXCLUSIVE REMEDY" PROVISION AND IS LIMITED TO REPURCHASE OF INDIVIDUAL LOANS

### A.   The Sole Remedy Provision Is Inherently Loan-Specific, as This Court Has Recognized, and Must Be Enforced According to Its Plain Terms

The MLPA expressly provides that the Trustee's "sole and exclusive remedy" respecting a breach of R&Ws is to seek cure, substitution or repurchase of the breaching loans.  (MLPA § 10 at 18.)  Under the MLPA's plain language, this remedy is *inherently* loan-specific.  The MLPA provides that the obligation to cure, substitute or repurchase a loan arises upon defendant's discovery or its receipt of notice of a material breach in that loan, following which defendant has 90 days to "cure *such breach*," substitute "*a qualifying Replacement Mortgage Loan* in exchange for *such . . . Mortgage Loan*,"[6] or repurchase "the *affected Mortgage Loan*." (<u>Id.</u> (emphasis supplied).)  Without knowing which loans have material breaches, and what those alleged breaches are, one cannot cure "such breach," substitute a replacement loan "in exchange for such . . . Mortgage Loan," or repurchase "the affected Mortgage Loan."  Indeed, for unidentified loans, one could not even calculate the Purchase Price at which to repurchase the loan, because "the principal [balance] remaining unpaid on *such Mortgage Loan*" or the "accrued and unpaid interest *thereon*" would vary on a loan-by-loan basis and would likewise be unknown.  (<u>Id.</u> § 1 at 5 (definition of "Purchase Price") (emphasis supplied).)

---

[6] The substitution remedy expired two years after the Closing Date of the Trust.  (MLPA § 10 at 18.)

It is a fundamental principle of New York law that parties' agreements will be enforced as written.  See, e.g., Eujoy Realty Corp. v. Van Wagner Commc'ns, LLC, 22 N.Y.3d 413, 424 (2013) ("Courts will give effect to the contract's language and the parties must live with the consequences of their agreement.").  Following that principle, the New York Court of Appeals has enforced provisions that limit, or even eliminate, a party's liability, unless the clause fits within a narrow public policy exception against clauses that insulate a party from liability for gross negligence or willful misconduct.  See Five Star Development Resort Communities LLC v. iStar RC Paradise Valley LLC, No. 09 Civ. 2085, 2012 WL 4119561, at *3-4 (S.D.N.Y. Sept. 18, 2012) (Swain, J.) ("[I]n a strictly commercial context, a provision limiting recovery is enforceable according to its terms unless the special relationship between the parties, a statute or public policy imposes liability. . . . [The parties] may later regret their assumption of the risks of non-performance in this manner, but the courts let them lie on the bed they made." (alterations in original) (citations omitted)); see also cases and authorities cited infra at pp. 14-15.

Consistent with the above, this Court observed in this case, after reviewing the parties' arguments concerning the Trustee's proposed use of sampling,[7] that "[t]he only apparent potential basis for a sampling approach [to proving liability] would be the line of New York authority that holds that gross negligence can trigger relief from a sole remedy provision." (May 15, 2015 Pretrial Conf. Tr. ("5/15/15 Tr.") at 3:16-20 (Dkt. No. 54).)  The Trustee itself has also admitted in other litigations that the Repurchase Protocol in RMBS contracts like this one is inherently loan-specific.  See pp. 16-17, infra.  Accordingly, even if the Trustee were otherwise

---

[7] See Amended Preliminary Pre-Trial Statement at 11-19 (Dkt. No. 51); see also Sept. 18, 2014 Letter from S. Molo (Dkt. No. 26-1); Sept. 18, 2014 Letter from B. Weinstein (Dkt. No. 27); Sept. 19, 2014 Pre-Trial Conf. Tr. at 14:15-21:10 (Dkt. No. 35).

able to assert valid claims with respect to the 236 loans for which it has purported to present

evidence of breaches in this case, its claims for trial would, at most, be limited to those loans.

The Trustee could only expand the set of loans at issue if the sole remedy provision were deemed

unenforceable, but such an argument is meritless. See Points I.B, I.C, infra.

B. The Sole Remedy Provision Is Not an Exculpatory Clause that Violates Public
   Policy

At the motion to dismiss phase, this Court deemed it premature to address the

enforceability of the sole remedy provision, stating that "[i]t is not necessary at this early

juncture to explore the circumstances, if any, under which the sole remedy might be held void in

relation to gross negligence." (MTD Op. at 14-15.) Nonetheless, this Court also observed that

this issue still should be resolved "at the earliest reasonably feasible stage" because it "will really

drive the question of whether individualized loan by loan proof is ultimately necessary [and] it

will also drive in large part the question of whether—and maybe drive entirely the question of

whether any relief other than put backs of individual loans is available in this case." (5/15/15 Tr.

at 3:20-4:3.) At summary judgment, now is the appropriate time to resolve this issue because

there is no support for Deutsche Bank's arguments that the sole remedy clause is unenforceable.

As explained and applied by the New York Court of Appeals, public policy provides a

limited exception to the enforceability of contractual limitations of liability if the provision is an

exculpatory clause that "insulate[s] [a party] from damages caused by grossly negligent conduct"

by "purporting to exonerate a party from liability [or] . . . limiting damages to a nominal sum."

Sommer v. Fed. Signal Corp., 79 N.Y.2d 540, 554 (1992); accord Abacus Fed. Sav. Bank v.

ADT Sec. Servs., Inc., 18 N.Y.3d 675, 683 (2012); Kalisch-Jarcho, Inc. v. City of N.Y., 58

N.Y.2d 377, 384-85 (1983); Gross v. Sweet, 49 N.Y.2d 102, 106 (1979). The sole remedy

provision at issue here is nothing like the clauses subject to this narrow public policy exception.

11

Far from exonerating Morgan Stanley from liability or limiting liability to a nominal sum, the

provision requires Morgan Stanley to cure or repurchase any materially breaching loan, and

thereby "make the Trust whole." (MTD Op. at 2 (citing Compl. ¶¶ 27-28; MLPA § 10).)[8]

The Trustee therefore has not and cannot present any evidence of "damages" from which

Morgan Stanley is being "insulated."[9]  To the extent that the Trustee intends to argue, as others

have, that the sole remedy provision might deprive it of a remedy for foreclosed or liquidated

loans that can no longer be repurchased because they no longer exist, such an argument is a red

herring.  Morgan Stanley is *not* taking the position in this litigation that the Trustee is precluded

from recovering the Purchase Price for such loans, if the Trustee were otherwise able to assert a

valid claim with respect to those loans.[10]  In other words, for liquidated or foreclosed loans,

Morgan Stanley agrees in this case that if Deutsche Bank were able to assert a valid claim for

any loan, the Trust would be entitled to the same payment (the Purchase Price) whether or not

that loan could be returned to Morgan Stanley.  Accordingly, insofar as the sole remedy

provision does not insulate Morgan Stanley from any damages it allegedly caused to the Trust,

and instead allows the Trust to be "made whole" for any material breach it can prove, the public

---

[8] As noted above, the Purchase Price for the repurchase of any such loan is defined to include the full unpaid principal balance plus all unpaid interest, thereby making the Trust whole. (MLPA § 1 at 5.)

[9] The only type of "damages" proffered by Deutsche Bank's damages expert (see R. 56.1 ¶¶ 75-76) are current and projected future unpaid principal and interest on allegedly breaching loans—the very type of losses covered by payment of the "Purchase Price" for any loan shown to be in material breach. (MLPA § 1 at 5.)

[10] Unlike in some other RMBS contracts, the definition of "Purchase Price" here specifically provides that "if a foreclosure has already occurred," the Purchase Price shall be calculated using "the principal balance of the related Mortgage Loan at the time the Mortgaged Property was acquired" by the Trust. (MLPA § 1 at 5.) It therefore eliminates any possibility of the Trustee being unable to recover for foreclosed or liquidated loans. (See Compl. ¶ 42.) Moreover, numerous courts (including this Court) have concluded that damages equal to the repurchase price are available even if specific performance of the repurchase remedy is impossible. (See, e.g., MTD Op. at 14-15 (citing Ace Securities Corp. Home Equity Loan Trust, Series 2007-HE3 ex rel. HSBC Bank USA, Nat. Ass'n v. DB Structured Products ,Inc., 5 F. Supp. 3d 543, 554 (S.D.N.Y. 2014)).)

policy against enforcing exculpatory clauses does not apply.[11]

What the Trustee is really complaining about is not that it lacks a complete remedy for any claim it can prove, but rather that it must do the work of proving those claims on a loan-by-loan basis. But as this Court already recognized, that is what the governing contract requires. (5/15/15 Tr. at 3:16-20.) The gross negligence doctrine is not a basis for rewriting the parties' contract in order to relieve the plaintiff of the burden of satisfying contractual conditions precedent to recovery. See A.H.A. Gen. Constr., Inc. v. N.Y.C. Hous. Auth., 92 N.Y.2d 20, 30-31 (1998) ("conditions precedent to suit or recovery" are not "exculpatory clauses" that are voidable in instances of gross negligence, even if plaintiff's failure to satisfy those conditions prevent recovery). An agreement that establishes how the Trustee must prove its right to a remedy, and then provides full relief upon such a showing, does not violate public policy, and must be enforced according to its terms. A contrary holding would be a radical expansion of the limited exception to the enforceability of contracts established by the Court of Appeals.

### C. There Is No Evidence of the Type of Conduct Necessary to Void an Express Contractual Remedies Provision

Even putting aside that the sole remedy provision is not the type of provision that violates public policy—but rather, makes the Trust whole—Morgan Stanley would still be entitled to summary judgment because Deutsche Bank cannot meet the extremely high standard for proving

---

[11] The decision in Morgan Stanley Mortgage Loan Trust 2006-13ARX v. Morgan Stanley Mortgage Capital Holdings LLC ("13ARX"), 143 A.D.3d 1 (1st Dep't 2016), supports the conclusion that, under the circumstances presented here on summary judgment, the sole remedy provision cannot be deemed an unenforceable exculpatory clause. In that decision, the court held that a sole remedy provision could potentially be deemed analogous to an exculpatory clause if it proved "illusory"—i.e., if the Trustee were precluded from recovering for liquidated loans and therefore was effectively deprived of any remedy for those loans. Id. at 9. The court held that it was premature to determine whether the sole remedy clause had this effect on a motion to dismiss. Id. Here, it is clear that the sole remedy clause does not have that effect: the Purchase Price is available for liquidated or foreclosed loans, as well as performing loans, and Morgan Stanley is not arguing to the contrary. Far from being "illusory," the sole remedy provision makes the Trust whole if the Trustee can otherwise establish a valid claim.

gross negligence.  See Five Star Development Resort Communities LLC v. iStar RC Paradise

Valley LLC, No. 09 Civ. 2085, 2012 WL 4119561, at *5 (S.D.N.Y. Sept. 18, 2012) (Swain, J.)

("While issues of malice, willfulness and gross negligence often present questions of fact, courts

have sustained limitation of liability provisions in the context of a summary judgment motion

when the surrounding facts compel such a result." (quoting Net2Globe Int'l Inc. v. TimeWarner

Telecom of N.Y., 273 F. Supp. 2d 436, 450 (S.D.N.Y. 2003))).

        "[I]n a contract between sophisticated parties, not implicating public health or safety,

New York applies a more exacting standard of gross negligence than it would in other contexts."

Alitalia Linee Aeree Italiane, S.p.A. v. Airline Tariff Pub. Co., 580 F. Supp. 2d 285, 294

(S.D.N.Y. 2008).  A breach of contract—even an *intentional* one, much less a reckless one—

does not satisfy this standard, in the absence of malicious intent to use that breach to harm the

other party, or some other tortious breach of a separate legal duty.  See, e.g., Five Star, 2012 WL

4119561, at *4 ("Exculpation of intentional or reckless harm from *tort liability* is against public

policy, but the risk of economic harm stemming from deliberate non-performance that is

motivated by the economic self-interest of the breaching party is . . . the sort of risk assumed by

the commercial counterparty to an exculpatory clause." (emphasis added)); Indus. Risk Insurers

v. Port Auth. of N.Y. & N.J., 387 F. Supp. 2d 299, 307 (S.D.N.Y. 2005) ("The purpose, then, of

excepting claims of gross negligence from the rule permitting the release of claims for

negligence, is to ensure that parties will have legal recourse for injuries from particularly

malicious behavior.");  Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc., 84 N.Y.2d 430, 438

(1994) (requiring "conduct which is tortious in nature, i.e., wrongful conduct in which defendant

willfully intends to inflict harm on plaintiff at least in part through the means of breaching the

contract between the parties"); Restatement (Second) of Contracts § 195(1) ("[A] term

14

exempting a party from *tort liability* for harm caused intentionally or recklessly is unenforceable on grounds of public policy." (emphasis added)), <u>cited with approval in Metro. Life</u>, 84 N.Y.2d at 439; <u>Sommer</u>, 79 N.Y.2d at 554; <u>and Kalisch-Jarcho</u>, 58 N.Y.2d at 384-85; 5 Corbin, Corbin on Contracts § 1068, at 386 (1984) ("contractual exemption from liability for *tortious* conduct may be held against public policy"), <u>cited with approval in Metro. Life</u>, 84 N.Y.2d at 439.[12]

Deutsche Bank cannot satisfy this standard, because even if its claims of intentional or reckless breaches of contract had merit, it has no evidence that Morgan Stanley breached some independent duty to the Trustee, nor does it have evidence that Morgan Stanley breached the contract maliciously for the purpose of harming the Trustee or the Trust.  (R. 56.1 ¶¶ 21-22.)[13] Morgan Stanley is therefore entitled to summary judgment on plaintiff's gross negligence claim.

## II.   DEUTSCHE BANK HAS NOT SHOWN ACTUAL LOAN-BY-LOAN NOTICE OR DISCOVERY

### A.   <u>On Summary Judgment, Plaintiff Must Show Actual Loan-By-Loan Notice or Discovery of Material Breaches for Any Loan as to Which It Seeks Relief</u>

Under the governing contract, Morgan Stanley's obligation to cure or repurchase a

---

[12] To the extent that the <u>13ARX</u> court held that allegations of conduct similar to that alleged here could survive a motion to dismiss on the gross negligence issue, that decision is distinguishable because the court emphasized that the case was at the pleading stage.  143 A.D.3d at 8.  In any event, its holding on that issue is inconsistent with the authorities cited above, and Morgan Stanley respectfully submits that it was wrongly decided. It is now *sub judice* before the New York Court of Appeals.  <u>Morgan Stanley Mortg. Loan Trust 2006-13ARX v. Morgan Stanley Mortgage Capital Holdings, LLC</u>, IAPL-2016-00240 (N.Y. fully briefed Mar. 10, 2017).  In addition, in the event that the Trustee attempts to rely on <u>Abacus Federal Savings Bank v. ADT Security Services, Inc.</u>, 18 N.Y.3d 675 (2012), as did the <u>13ARX</u> trustee in its brief to the Court of Appeals, that case cannot properly be understood to have changed, *sub silentio*, the well-established standard for the gross negligence exception, as articulated in the long list of authorities cited above.  In light of space constraints, Morgan Stanley respectfully refers the Court to the parties' Court of Appeals' briefs for a fuller discussion of <u>Abacus</u>.  (See Exs. MM-OO.)

[13] Indeed, harming the Trust would be contrary to Morgan Stanley's own financial self-interest because it owned the most subordinated equity tranche of the Trust, and the only way for Morgan Stanley to profit from the transaction was if the loans performed well.  (R. 56.1 ¶¶ 11-20.)  Indeed, if the loans defaulted, Morgan Stanley would be the *first* to suffer losses than the Certificateholders.  (<u>Id.</u>)  Accordingly, even if Morgan Stanley breached R&Ws, no reasonable factfinder could conclude that it did so maliciously with the intent to harm the Trust. <u>See Shields v. Citytrust Bancorp, Inc.</u>, 25 F.3d 1124, 1130 (2d Cir. 1994) (courts must reject explanations that defy economic reason); <u>Atlantic Gypsum Co. v. Lloyds Int'l Corp.</u>, 753 F. Supp. 505, 514 (S.D.N.Y. 1990) ("Plaintiffs' view of the facts defies economic reason, and therefore does not yield a reasonable inference of fraudulent intent.").

materially breaching loan only arises after Morgan Stanley has discovered that breach on its own, or is notified of it by a third party. The MLPA provides that "within 90 days from the date of discovery by [Morgan Stanley], or the date [Morgan Stanley] is notified by the party discovering or receiving notice of such breach," Morgan Stanley is obligated to "cure such breach" or repurchase "the affected Mortgage Loan at the applicable purchase price." (MLPA § 10 at 18.) Under the plain language of the governing contract, this notice/discovery requirement is inherently loan-specific, and requires *actual* notice or discovery of material breaches in particular loans. Without notice or discovery of a material breach in a particular loan, one would not know how to "cure such breach" and one could not repurchase "the affected Mortgage Loan at the applicable purchase price." See Point I.A, supra. The plain terms of the contract require "notice" or "discovery" of "such breach" before the obligation to "cure such breach" or repurchase "the affected Mortgage Loan" arises. It does not speak of inquiry or constructive notice, nor does it impose any obligation to look for potential breaches.

Consistent with what the plain language of the contract requires, Deutsche Bank has admitted in other litigations that the notice/discovery requirements in RMBS contracts like this one are inherently loan-specific, and require actual notice/discovery rather than inquiry or constructive notice/discovery. (See R. 56.1 ¶ 56 ("Both the language and the structure of the [governing agreements] necessarily require that *both* the breach, *and* the *knowledge* of the breach, of an R&W be at the single mortgage loan level." (emphasis in original)); R. 56.1 ¶ 55 ("[T]he cure obligations of the Warrantors . . . necessarily requires detailed information about the specific offending mortgage loan."); R. 56.1 ¶ 57 ("Actual knowledge of falsity means just that . . . . Even suspicion of falsity, before it ripens into actual knowledge, will not suffice."); R. 56.1 ¶ 58 ("Because the Agreements contain a loan-specific remedy, Plaintiffs cannot save their

16

claims by arguing that Defendants were generally aware of 'pervasive breaches' of R&Ws or other contractual obligations.").)

Numerous courts have agreed with Deutsche Bank's position and held that similar repurchase provisions require actual knowledge of loan-specific breaches of R&Ws. See, e.g., Blackrock Allocation Target Shares: Series S Portfolio v. Bank of N.Y. Mellon, 180 F. Supp. 3d 246, 258-59 (S.D.N.Y. 2016) (noting that trustee was correct that discovery required actual knowledge); Royal Park Investments SA/NV v. Bank of N.Y. Mellon, No. 14 Civ. 6502 (GHW), 2016 WL 899320, at *4 (S.D.N.Y. Mar. 2, 2016) (same); MASTR Adjustable Rate Mortgs. Trust 2006-OA2 v. UBS Real Estate Sec. Inc. ("MARM I"), No. 12 Civ. 7322 (PKC), 2015 WL 764665, at *11 (S.D.N.Y. Jan. 9, 2015) ("[T]he repurchase remedy negotiated by the parties is loan specific, i.e., an obligation to 'purchase such Mortgage Loan.' . . . [T]he repurchase mechanism established by the parties is targeted to a specific loan, and not to a group or category of loans."); MASTR Adjustable Rate Mortgs. Trust 2006-OA2 v. UBS Real Estate Sec. Inc. ("MARM II"), No. 12 Civ. 7322 (PKC), 2015 WL 797972, at *4 (S.D.N.Y. Feb. 25, 2015) ("The parties could have, but did not, bargain for an inquiry notice standard. The parties could have, but did not, bargain for an obligation that if the aggregate number of loans in breach exceeded a certain threshold, a duty to reexamine all loans would be triggered.  Instead, the specified remedies are the 'sole remedies.'"); U.S. Bank, Nat'l Ass'n v. Citigroup Glob. Markets Realty Corp., No. 13 Civ. 6989 (GBD), 2015 WL 1222075, at *3 (S.D.N.Y. Mar. 13, 2015) ("the Agreements contain a loan-specific cure or repurchase remedy"); see also Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC, No. 5140-CS, 2012 WL 3201139, at *19 (Del. Ch. Aug. 7, 2012) (Strine, Ch.) ("The Master Agreement specifically regulates how Central Mortgage is to provide Morgan Stanley with notice of a breach of a representation or warranty,

17

and it requires that Central Mortgage do so in a loan-specific way. . . . Furthermore, the Master

Agreement contemplates a loan-specific cure . . . .").[14]

At the pleading stage, this Court declined to dismiss claims relating to loans not

identified in plaintiff's Demand Letter or complaint (MTD Op. at 5-7), but more is required to

survive summary judgment. There is a critical difference between the "notice" required for

purposes of notice pleading at the motion to dismiss stage, and the "notice" required under the

terms of the contract, which requires *actual* and *loan-specific* notice or discovery. See, e.g.,

Royal Park Investments SA/NV v. HSBC Bank USA, Nat'l Ass'n, 109 F. Supp. 3d 587, 603

(S.D.N.Y. 2015) ("If, after discovery, plaintiffs cannot prove that [defendant] had actual

knowledge regarding the loans at issue here, [defendant] may move for summary judgment.");

Ambac Assurance Corp. v. Countrywide Home Loans, Inc., No. 651612/2010, 2015 WL

6471943, at *5 (Sup. Ct. N.Y. Cty. Oct. 22, 2015) (rejecting the argument, on summary

judgment, that "loan-by-loan notice is not required," and distinguishing cases decided on

motions to dismiss that allowed claims to proceed on loans for which breaches had not

specifically been identified); U.S. Bank Nat'l Ass'n v. GreenPoint Mortg. Funding, Inc., 147

_____

[14] Judge Rakoff held in Assured Guaranty Municipal Corp. v. Flagstar Bank, FSB, 920 F. Supp. 2d 475, 512-13 (S.D.N.Y. 2013), that inquiry or constructive notice is sufficient, but did not explain how that comports with the plain terms of the contract. Deutsche Alt-A Securities Mortgage Loan Trust, Series 2006-OA1 v. DB Structured Products, Inc., 958 F. Supp. 2d 488 (S.D.N.Y. 2013), cited Judge Rakoff's holding, but without discussing or analyzing it. See Deutsche Alt-A, 958 F. Supp. 2d at 497 n.3. As with this case, the Deutsche Alt-A court had an independent basis for allowing claims regarding unidentified loans to proceed past the motion to dismiss—namely, the plaintiff pled in the alternative that defendant independently discovered breaches, and plaintiff was granted the opportunity to seek evidence of the same. See id. at 494; MTD Op. at 7.

As reflected by the other cases cited herein, various courts have more recently rejected the conclusion reached in Assured v. Flagstar, based on the plain language of the contracts. See cases cited at pp. 17-18; see also Royal Park Investments SA/NV v. HSBC Bank USA Nat'l Ass'n, No. 14 Civ. 8175, 2017 WL 945099, at *6 n.2 (S.D.N.Y. Mar. 10, 2017) ("To the extent Judge Rakoff found that inquiry notice of pervasive breaches was adequate to trigger Flagstar's obligations this Court declines to impose an inquiry notice standard."). Morgan Stanley respectfully submits that this set of cases reached the correct conclusion; the Trustee has likewise admitted in other litigations that notice/discovery must be *actual* notice/discovery, and must be loan-specific. See pp. 16-17, supra.

A.D.3d 79, 88 (1st Dep't 2016) ("[A] pleading notice and a breach notice are not natural substitutes for one another.").

In short, on summary judgment, Deutsche Bank must show actual loan-by-loan notice or discovery of material breaches for any loan as to which it seeks relief. As set forth below, Deutsche Bank has adduced no evidence that Morgan Stanley discovered material breaches on its own in any loan, and likewise cannot establish a valid notice-based claim as to any loan.

### B. Deutsche Bank Has No Evidence of Actual Loan-by-Loan Discovery

For any loan as to which Deutsche Bank seeks to recover on the basis of "discovery" of breaches by Morgan Stanley, Deutsche Bank must present loan-by-loan evidence that Morgan Stanley actually discovered a material breach in such loan. See Point II.A, supra; see also MARM IV, 205 F. Supp. 3d 386, 476 (S.D.N.Y. 2016) (holding that it is impossible to "determine whether the Trusts have proved that UBS received notice or otherwise discovered that a loan was in breach *unless the loan is identified*") (emphasis added); Royal Park, 109 F. Supp. 3d at 601 (holding that R&W claims must be proved "loan-by-loan" at summary judgment). Deutsche Bank has adduced no such evidence. (R. 56.1 ¶ 66.) Accordingly, all discovery-based claims should be dismissed.

### C. Deutsche Bank Chose Not to Rely Upon or Present Admissible Evidence of the Breaches Alleged in Its Complaint

Deutsche Bank made the strategic decision not to attempt to prove the breaches that were alleged in its pre-suit Demand Letter and complaint, but instead to have its reunderwriting expert review a different set of 398 loans. Those are the only loans addressed in plaintiff's expert reports, (Exs. AA-BB, EE), and are the only alleged breaches that feed into the damages calculations by Deutsche Bank's damages expert, (Exs. U-V, X-Y). As a result, Deutsche Bank has presented no admissible evidence substantiating the alleged breaches in its Demand Letter,

19

and claims relating to those loans therefore must be dismissed.  See MARM IV, 205 F. Supp. 3d at 412 (holding that expert testimony has been required in RMBS putback cases to show a "breach of warranty, injury and causation"); Porter v. Quarantillo, 722 F.3d 94, 97 (2d Cir. 2013) (holding that it was proper to exclude inadmissible hearsay on a motion for summary judgment).

    D.   Deutsche Bank Cannot Pursue Notice-Based Claims for Breaches Not Identified in the Complaint

Deutsche Bank's claims relating to alleged breaches of R&Ws that it first purported to identify in expert discovery in this case ("new claims") must be dismissed because they are untimely and because Deutsche Bank failed to provide the contractually required pre-suit notice.

    1.   The New Claims Are Untimely and Do Not Relate Back

The new claims were asserted well after expiration of the six-year statute of limitations period, which began to run at the closing of the transaction.  See ACE Secs. Corp. v. DB Structured Prods., Inc., 25 N.Y.3d 581, 599 (2015).[15]  Federal Rule of Civil Procedure 15 would only permit the new claims to relate back to the filing of the original complaint if they arose out of the same "conduct, transaction, or occurrence set out" in the complaint or if "the law that provides the applicable statute of limitations allows relation back." Fed. R. Civ. P. 15(c)(1)(A-B).  Because New York applies a nearly identical relation-back standard as the Federal Rules, "courts have not focused on any distinction [between CPLR 203(f) and Fed. R. Civ. P. 15(c)(1)(B)]." Fleming v. Verizon N.Y., Inc., 419 F. Supp. 2d 455, 467 n.5 (S.D.N.Y. 2005).

Because of the inherently loan-specific nature of the breach allegations and the corresponding remedies, see Point I.A, supra, every claim that a loan materially breaches R&Ws

---

[15] The transaction closed on July 6, 2007.  The parties agreed to toll the statute of limitations from July 3, 2013 until April 25, 2014.  (R. 56.1 ¶ 67.)  Deutsche Bank filed suit on April 28, 2014, the final day of the limitations period, taking into account the tolling agreement.

is effectively its own claim for breach of contract. Even though the loans are included in the same securitization, none of the facts relating to the securitization are relevant to proving a breach of R&Ws in any given loan. The facts of each loan are different, the alleged breaches must be proven on a loan-by-loan basis, and the relief must be provided on a loan-by-loan basis. Consistent with the plain language of the contract, the relevant conduct for relation-back purposes should be at the loan level. If it were otherwise, a plaintiff could preserve claims as to thousands of loans in a securitization, for years past the end of the limitations period, simply by asserting a breach in a single loan. That would be inconsistent with the way the governing contract is designed and with the principles of relation back.

Courts have reached conflicting conclusions on whether notice-based claims of alleged breaches that are first identified by RMBS trustees during litigation can relate back to the date of the original complaint. Compare Cent. Mortg., 2012 WL 3201139, at *18 (in light of loan-specific nature of the alleged breaches under the contracts, claims for loans not identified in complaint cannot relate back),[16] with Nomura Home Equity Loan, Inc., Series 2006-FM2 Inc. v. Nomura Credit & Capital, Inc., 133 A.D. 3d 96, 108 (1st Dep't 2015) (permitting relation back) and MASTR Adjustable Rate Mortgs. Trust 2006-OA2 v. UBS Real Estate Sec. Inc. ("MARM III"), No. 12 Civ. 7322 (PKC), 2016 WL 1449751, at *4 (S.D.N.Y. Apr. 12, 2016) (following Nomura).[17]

---

[16] Delaware's Rule 15 is modeled after the federal rule and guided by federal interpretations of Fed. R. Civ. P. 15. Cent. Mortg., 2012 WL 3201139, at *18 n.151 ("Delaware Courts have often looked to the application in federal court of the analogous Rule 15 of the Federal Rules of Civil Procedure.")

[17] Nomura is not binding on this Court with respect to New York law. See Reddington v. Staten Island Univ. Hosp., 511 F.3d 126, 133 (2d Cir. 2007) ("Decisions of New York's intermediate appellate courts are helpful indicators of how the Court of Appeals would decide, but we are not strictly bound by decisions of the Appellate Division." (internal quotation marks omitted)).

Morgan Stanley respectfully submits that Chancellor Strine's detailed decision in Central Mortgage is the correct analysis of this issue. Because of the inherently loan-specific nature of the claims under the governing contract (which are substantively the same as those here),

> each alleged breach of contract due to a breach of representation made by Morgan Stanley as to each individual loan constitutes a separate transaction or occurrence, regardless of the fact that the loans might have been part of the same loan pool. This is because a separate independent violation of the same contract provision does not 'arise' out of the same conduct, transaction or occurrence as did the first, unrelated violation. The breaches alleged with respect to the New Loans in the Amended Complaint are entirely separate instances of breach from those alleged in the Original Complaint, because they are based on different loans and distinct instances of misrepresentation.

Cent. Mortg., 2012 WL 3201139, at *18. In short, "evaluating the accuracy of Morgan Stanley's representations as to Loan A is an independent inquiry from that evaluation as to Loan B." Id.

The First Department's conclusion in Nomura that it was sufficient to plead that the plaintiff "might uncover additional defective loans for which claims would be made" is not persuasive authority to the contrary. 133 A.D. 3d at 108. To begin, it is inconsistent with the only New York Court of Appeals case to address this issue, which found relation back inapplicable to "claims of injury [] based on different, not identical transactions," noting that the claims were subject to "an individualized reimbursement rate" that varied from claim to claim. Greater N.Y. Health Care Facilities Ass'n v. DeBuono, 91 N.Y.2d 716, 721 (1998). Deutsche Bank's repurchase claims are similarly subject to "an individualized" Purchase Price, and the "injury claimed"—namely, the specific breaches—also vary loan to loan.

Additionally, as Chancellor Strine explained:

> relation back does not provide [plaintiff] with a license to advance an allegation that it *might* plead more claims along with an allegation as to the general basis for why it thinks that there may be more claims, and then allow the plaintiff to sit back knowing that it has indefinitely stalled the running of the limitations period.

Cent. Mortg., 2012 WL 3201139, at *20.  To allow a claim as to Loan A to preserve an untimely

claim as to Loan B "would end run this clear contractual loan-by-loan requirement and [the]

statute of limitations."  Id. at *3.  Such a conclusion would also run afoul of the specific principle

that breach of contract claims accrue when the breach occurred, regardless of when the plaintiff

discovered the injury.  Id.; ACE, 25 N.Y.3d at 594 ("New York does not apply the 'discovery'

rule to statutes of limitations in contract actions.").

Under the appropriate treatment of relation back, particularly in light of the loan-specific

nature of the governing contract, Deutsche Bank's new claims should be dismissed as untimely.

> ### 2. Even if the New Claims Related Back, Deutsche Bank Failed to Satisfy the Notice Condition Precedent

Even if the new claims did relate back, plaintiff's claim as to those loans would be

untimely for an additional reason.  As the First Department held in GreenPoint, relying on the

New York Court of Appeals' seminal ACE decision, for breach claims based on "notice" by the

Trustee, rather than on the defendant's own "discovery," a claim cannot be brought before the

Trustee has *both* provided notice and allowed the specified cure period (here, 90 days) to pass.

GreenPoint, 147 A.D.3d at 86-87 (citing ACE, 25 N.Y.3d at 599).  Under the language of the

governing contract and the Court of Appeals' reasoning in ACE, providing such notice and

allowing the cure period to pass is a "contracted-for condition precedent" which must be satisfied

*before* suit is filed.  Id. at 86-88.  Accordingly, notices of alleged breaches that are provided after

litigation commences "cannot 'relate back' because the inherent nature of a condition precedent

to bringing suit is that it actually precedes the action."  Id. at 87.  But even if Deutsche Bank's

"notice" of alleged breaches through its expert reports could relate back to the date of the

Trustee's complaint, claims with respect to such loans would still be untimely.  As the

GreenPoint court held:

> Even were we persuaded that the belated breach notices in this case could relate back, the earliest date would be when the summons with notice was served. That date would still not suffice because, contractually, defendant must be afforded a [90]–day period within which to cure before an action for breach of contract may be commenced. Plaintiff's argument would simply eviscerate the condition precedent of serving a breach notice, as required by the contract, and defendant's right to effect a pre-action cure.

Id.

Finally, plaintiff's expert reports cannot satisfy the condition precedent for the additional reason that they do not comply with the specified parameters in the governing contract. (MLPA §§ 10.24, 18; PSA §§ 2.03, 12.05.) These explicit provisions are not consistent with providing "notice" through service of an expert report in ongoing litigation. This is fatal to Deutsche Bank's claims because it "is barred from recovery here by failure to give notice *according to the terms of the contract*." Jungmann & Co., Inc. v. Atterbury Bros., Inc., 249 N.Y. 119, 122 (1928) (notice provided by letter and not "by cable" insufficient) (emphasis supplied); see also Varsity Transit, Inc. v. Bd. of Educ. of City of N.Y., 5 N.Y.3d 532, 536 (2005) (claims accruing during litigation dismissed for failure to provide required notice, even though defendants were aware of the claims based on the ongoing litigation); Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co., 86 N.Y.2d 685, 693-94 (1995) (quoting Jungmann, 249 N.Y. at 122) (explaining that it is insufficient to argue that the "defendant had received notice . . . by other means and thus suffered no harm" because "the fact remains that the plaintiff was obligated under its contract to see that defendant obtained [notice] by [the means specified in the contract]").

For the reasons set forth above, Deutsche Bank's new claims should be dismissed.

## III.   DEUTSCHE BANK ONLY OFFERS *CONCLUSORY* EXPERT OPINIONS THAT THE ALLEGED BREACHES "MATERIALLY AND ADVERSELY AFFECT THE VALUE OF THE INTERESTS OF CERTIFICATEHOLDERS," WHICH IS INSUFFICIENT

Even if Deutsche Bank's new claims were timely, they would still suffer from a fatal

defect. Under the governing contract, Morgan Stanley is only obligated to repurchase loans

containing a breach that "materially and adversely affects the value of the interests of the

Certificateholders in any Mortgage Loan." (PSA § 2.03(a) at 68; MLPA § 10 at 18.) Because

the impact of alleged breaches on loan performance is outside the realm of knowledge of a lay

person, expert testimony is required on this question. See, e.g., Wills v. Amerada Hess Corp.,

379 F.3d 32, 46 (2d Cir. 2004) (requiring expert testimony "where . . . the nexus between the

injury and the alleged cause would not be obvious to the lay juror" and "where an injury has

multiple potential" causes); United States v. Spencer, 700 F.3d 317, 321-22 (8th Cir. 2012)

(discussing expert testimony about the "significance to the underwriter of various

misrepresentations on a loan application" and holding that "[m]ortgage underwriting standards

are beyond the experience of the typical juror"); R. 56.1 ¶ 115 ("Q. Do you think your opinion

about the materiality of the alleged breaches is more meaningful than a person who has no

experience in the mortgage industry? . . . THE WITNESS: Yes."). That expert testimony,

however, cannot be *conclusory* and must explain the analysis that forms the basis for those

opinions. See, e.g., Major League Baseball Properties, Inc. v. Salvino, Inc., 542 F.3d 290, 311

(2d Cir. 2008) (expert's "statement, which is entirely conclusory, [and] neither accompanied by

any evidentiary citation nor followed by any elaboration," did not create a genuine dispute of

fact); Pretesting Co. v. Arbitron Co., No. 93 Civ. 6031 (CBM), 1996 WL 480899, at *5

(S.D.N.Y. Aug. 23, 1996) (expert's "conclusory statements of non-obviousness does not amount

to 'significantly probative' evidence adequate to defeat summary judgment" because "[a] party

must offer more than conclusory statements from their experts" (quoting Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986))).

     Deutsche Bank's only affirmative evidence that its alleged breaches are material is the

conclusory *ipse dixit* of Mr. Hunter and Dr. Kilpatrick, without any explanation of how either made this determination. Their conclusory opinions are insufficient to carry Deutsche Bank's burden for this element of its claim on summary judgment.

      A.   Mr. Hunter Only Provides A Conclusory Opinion on Materiality, Not an Analysis

Mr. Hunter's reunderwriting reports purport to detail how 232 loans allegedly breached R&Ws,[18] but the issue of breach is separate from whether the alleged breaches in any loan "materially and adversely affect[] the value of the interests of the Certificateholders." (PSA § 2.03(a) at 68; MLPA § 10 at 18.) As to that element of Deutsche Bank's claim, Mr. Hunter does not offer any *analysis*, but simply the conclusory assertion that "those breaches of representations and warranties materially and adversely affected the value of the interests of the Purchaser." (R. 56.1 ¶¶ 84, 86, 108-15.) Mr. Hunter's reports never explain what his thought process was or how he reached that conclusion for any given breach or any given loan. At his deposition, Mr. Hunter admitted that he did not separately document his assessment of *materiality*, as distinguished from his findings of alleged *breaches*. (R. 56.1 ¶ 111 ("Q. There's nothing that separately describes how you, Mr. Hunter, assessed these different findings some of which you thought were material and some of which you thought might not be . . . ? A. . . . [Y]es, you're right. You know, I don't have a scratch sheet that, you know, I could produce, I don't have that."); id. ¶ 112 ("Q. And the thought process you went through, the various factors and how you came to determine that the findings were material as opposed to just the findings themselves, that's not separately written out in your report or appendices; correct? A. That's

---

[18] Mr. Hunter's detailed explanation of the alleged *breaches* is included in a voluminous appendix. Because the appendix contains significant confidential borrower information and because the document is difficult to review other than in its native Excel format, Morgan Stanley has not filed the appendix with its motion, but if the Court would like to review the appendix, Morgan Stanley can provide a copy in the format the Court prefers.

correct."); see also id. ¶ 113 (admitting that he "used the same process" in this case).)

To be clear, contrary to the characterization of Morgan Stanley's argument in Deutsche Bank's May 3, 2017 letter to the Court, the issue is not that Mr. Hunter has failed to indicate what "standard" he uses to assess materiality—i.e., "whether the breaches materially increase[d] the risk of loss on a loan" (Molo Ltr. at 3, May 3, 2007)—but rather, that Mr. Hunter does not provide any analysis or explanation as to how he concluded that this standard was met for any loan. Instead, he simply states the conclusion that it was. Similarly, and for that same reason, the issue is not one of measuring the *credibility* of Mr. Hunter's opinions against those of defendants' experts—which would raise an issue of fact—but rather one of determining whether Mr. Hunter's *conclusory* opinion creates a material dispute of fact at all.[19]

Mr. Hunter's conclusory materiality opinions are also fatally defective because his approach to determining materiality does not line up with the contractual language. In order to establish a claim for repurchase, the Trustee must identify a particular R&W breach whose effect was material. The MLPA provides that upon notice or discovery of "a breach of any representation or warranty . . . which materially and adversely affects the value of the interests of the Purchaser," Morgan Stanley must cure "such breach" or else repurchase the loan. In other words, the issue of materiality must be assessed at the R&W-level. Mr. Hunter, in contrast, does not make his materiality conclusions at the R&W-level, but rather does so "holistically," at the loan level. (R. 56.1 ¶¶ 109-14.) As he admitted in his deposition, for a loan with three alleged breaches of, respectively, three R&Ws, Mr. Hunter does not indicate whether he has concluded

---

[19] By contrast, in addition to offering its own reunderwriting expert who responded to Mr. Hunter's allegations, Morgan Stanley provided the expert report of Dr. James, who conducted a statistical analysis that concluded that Mr. Hunter's alleged breaches, even if accepted as true, did *not* have a material and adverse effect on the loans' risk of default. (R. 56.1 ¶¶ 119-22.)

that any of the three alleged breaches was material; rather, his conclusory assertion of materiality only conveys that, viewed holistically at the loan level, the cumulative effects were material. (Id. ¶ 114.) And contrary to what the contract requires, to the extent that Mr. Hunter did conclude that any of the three alleged breaches were material, he does not identify which one(s).

This fatal defect in Mr. Hunter's methodology is compounded by the fact that, if the factfinder were to conclude that any of his alleged breaches for a given loan lack merit, see, e.g., Point IV, infra, the factfinder is left with no guidance as to whether even Mr. Hunter considers his remaining allegations material. (R. 56.1 ¶ 114 ("Q. So it may be the case that one or more of those individual findings that were breach of an individual rep, if that were the only thing there, you might not find it material, correct? . . . THE WITNESS: That's possible. That's true.").) For this reason as well, Mr. Hunter's reports do not provide the factfinder with the tools necessary to assess his opinions on materiality, without Mr. Hunter providing an entirely new expert report.

### B. Mr. Hunter's Conclusory Opinions Are Made as of the Wrong Date Under the Contract

In addition to being conclusory, Mr. Hunter's materiality opinions are also offered as of the wrong point in time. As the court held in MASTR Adjustable Rate Mortgs. Trust 2006-OA2 v. UBS Real Estate Secs. Inc. ("MARM I"), the terms of the contract provide that "the determination of whether the breach 'materially and adversely affect the interests of the Certificateholders' is assessed as of the cure-repurchase period." No. 12 Civ. 7322, 2015 WL 764665, at* 10 (S.D.N.Y. Jan. 9, 2015). This conclusion flows directly from the language of the Repurchase Protocol, which only applies to "a breach of any representation or warranty of MSMCH set forth in this Section 10 which materially and adversely *affects* the value of the interests of the Purchaser." (MLPA § 10 at 18 (emphasis added).) "The present-tense use of the word 'affects' expressly applies to the time when notice is given." MARM IV, 205 F. Supp. 3d

28

at 465. As a result, "the Trust[] must prove that the alleged breach had a material adverse effect

on Certificateholders' interests at the time that the repurchase obligation was triggered." Id.

Deutsche Bank has presented no such evidence of whether the alleged breaches were material at

that time, because Mr. Hunter only considered materiality as of the closing date of the loan. (R.

56.1 ¶¶ 117-18.)  The closing date of the loan—which necessarily preceded the closing date of

the transaction—could be a decade before the repurchase obligation was triggered, yet Mr.

Hunter offers no explanation of how (if at all) he considered the events in the intervening decade

and how they may have impacted whether the alleged breach was material.  Deutsche Bank is

therefore left with no evidence demonstrating that the alleged breaches identified by Mr. Hunter

materially and adversely affected the interests of the Certificateholders at the time when the

repurchase obligation was triggered.

### C. Dr. Kilpatrick Only Provides A Conclusory Opinion on Materiality, Not an Analysis

Dr. Kilpatrick separately purports to opine that 96 loans contain "not credible" appraisals

in violation of MLPA § 10(b)(21), and that those alleged breaches "materially and adversely

affect[] the value of the interests of the certificateholders in those Loans because, among other

things, it indicates the loans are not secured by reliable valuations" and "therefore expose the

investor to an unanticipated risk of loss." (R. 56.1 ¶¶ 90-91.)  Although Dr. Kilpatrick claims

that "*every* non credible appraisal materially and adversely affects the value of the interests of

the purchaser" (id. ¶ 95) (emphasis added), the MLPA nowhere provides that every breach of

MLPA § 10(b)(21) is *automatically* material.  Dr. Kilpatrick's report is insufficient to carry

plaintiff's burden on these loans because, like Mr. Hunter, he only states the *conclusion* that

these alleged breaches materially and adversely affect the value of the interests of the purchaser,

without explaining how or why he reached that conclusion for any loan.  (id. ¶ 91.)  As with Mr.

29

Hunter, the absence of such elaboration is not a mere technical failure, but goes to the essence of whether plaintiff has provided evidence that would allow it to satisfy one of the key elements of its claim.[20]

## IV.   PLAINTIFF MISCONSTRUES THE MEANING OF VARIOUS REPRESENTATIONS AND WARRANTIES IN THE CONTRACT

Nearly all of plaintiff's breach allegations are based on breaches of Section 10(b)(5) of the MLPA, Section 10(a)(1) (the "MLS Representation"), Section 10(b)(21) (the "LTV Representation"), and Section 10(b)(20) (the "Appraisal Representation").  Deutsche Bank misconstrues and misapplies these representations, with the result that all of its claims based on alleged breach of these representations should be dismissed.

### A.   Deutsche Bank Misapplies Section 10(b)(5) of the MLPA

#### 1.   There Is No Evidence that Morgan Stanley Took Part in or Had Knowledge of Any Alleged Breach of Section 10(b)(5)

Deutsche Bank alleges that 124 loans breach Section 10(b)(5) of the MLPA, but Deutsche Bank has not presented any evidence that links up to the relevant requirements— namely, that any "fraud, error, omission, misrepresentation, negligence or similar occurrence with respect to an MSMCH Represented Mortgage Loan *has taken place on the part of MSMCH, or, to the knowledge of MSMCH,* any other person . . . involved in the origination of the MSMCH Represented Mortgage Loan."  (MLPA § 10(b)(5) (emphasis added).)  Morgan Stanley did not originate any of the loans in the Trust, so any alleged fraud, error, omission,

---

[20] For example, 17 of the 96 loans were *purchase money mortgages with available sales prices to support the value of the property.*  Even if the underlying appraisals were conducted in a "non-credible" way, Dr. Kilpatrick could not explain how the appraisals for these particular loans "expose[d] the investor to an unanticipated risk of loss" when there was an arm's-length sales price to support the value of the property.  (R. 56.1 ¶¶ 91, 96 ("Q. . . . Did you make a finding for any of the 17 loan subset of the 96 loan sample that were purchase money mortgages that the underlying sales transactions were not made at arm's length? . . . A. No.").)  This same failure to describe his materiality analysis infects all of the loans on which Dr. Kilpatrick offered his conclusory opinion on materiality.

misrepresentation, negligence or similar occurrence in the origination of the loan could not have "taken place on the part of MSMCH." Id. In addition, plaintiff has adduced no evidence that Morgan Stanley had "knowledge" of any of the alleged breaches of Section 10(b)(5) by persons involved in the origination of the loans, effectively treating that requirement as if it did not exist. (See R. 56.1 ¶ 116 ("[Y]ou didn't take an additional step to determine what Morgan Stanley knew or didn't know, correct? . . . THE WITNESS: That's correct. We didn't.").) Morgan Stanley is thus entitled to dismissal of all claims based on this provision, which Deutsche Bank completely misapplied.

2.       Section 10(b)(5) Is Not a Guideline Compliance Representation

Insofar as most of the Trustee's alleged breaches of Section 10(b)(5) are based on allegations that the relevant loans did not comply with the originators' underwriting guidelines, those allegations fail for the additional reason that Section 10(b)(5) is not a representation that the loans comply with underwriting guidelines.

On its face, the provision makes no mention of underwriting guidelines, nor does it identify the set of guidelines with which Deutsche Bank believes the mortgage loans must comply. By contrast, the Accredited ARA and the Fremont and WMC Bring Down Agreements included express representations that their loans complied with guidelines, and identified the set of guidelines that applied. For example, the Accredited ARA represents that each "Mortgage Loan was underwritten in accordance with the Underwriting Guidelines (a copy of which is attached to the Purchase Agreements as Exhibit G)." (R. 56.1 ¶ 47.) Fremont and WMC made similar express representations that the loans complied with enumerated guidelines.[21]

---

[21] See R. 56.1 ¶ 48 ("The Mortgage Loan was underwritten in accordance with the Underwriting Guidelines in effect at the time of origination (a copy of which is attached to the related Assignment and Conveyance as Exhibit (....continued)

Significantly, the explicit guideline compliance representations in these agreements were *in addition* to separate representations that are nearly identical to the language in Section 10(b)(5) that Deutsche Bank is construing as a guideline compliance representation (i.e., "[n]o fraud, error, omission, misrepresentation, negligence or similar occurrence"). (See R. 56.1 ¶¶ 47-54.) Construing the "no fraud, error, omission, misrepresentation, negligence or similar occurrence" language as ensuring guideline compliance—by reading the word "error" or "negligence" in isolation, as the Trustee does, divorced from the contract as a whole—would render Accredited's, Fremont's and WMC's separate, more specific guideline compliance representations superfluous. See, e.g., Galli v. Metz, 973 F.2d 145, 149 (2d Cir. 1992) ("[A]n interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible.").

Deutsche Bank's argument also ignores the full context of Section 10(b)(5) itself. The first two sentences of that provision, like the identical representations in the Accredited ARA and in the Fremont and WMC Bring Down Agreements, are representations regarding the validity of the mortgage note and the legal capacity of the parties to enter the mortgage.[22] Section 10(b)(5), like the corresponding provisions in the Accredited, Fremont and WMC agreements, when read in its entirety, is plainly intended to protect against fraud in the procurement of the loan or other errors, omissions, misrepresentations, negligence or similar occurrences that would invalidate the

(continued....)

B)"); R. 56.1 ¶ 49 ("The Mortgage Loan was underwritten in accordance with the Underwriting Guidelines, as may be amended from time to time by the Seller (a copy of which is attached to each related Assignment and Conveyance Agreement)"); R. 56.1 ¶ 50 ("The Mortgage Loan was underwritten in accordance with the Underwriting Guidelines, as may be amended from time to time by the Seller or GEMB (a copy of which is attached to each related Assignment and Conveyance Agreement).").

[22] The title of this representation in the Accredited ARA and the Fremont and WMC Bring Down Agreements is "Validity of Mortgage Documents." (R. 56.1 ¶¶ 51-54.)

loan itself, and not to address compliance with underwriting guidelines.[23]  Notably, Section

10(b)(5) identifies four specific parties that could commit the enumerated acts:  Morgan Stanley,

"the Mortgagor" (i.e., the borrower), "any appraiser" and "any builder or developer."  (MLPA

§ 10(b)(5).)  None of these parties *applied underwriting guidelines*.  In sum, the Trustee's

strained attempt to transform Section 10(b)(5) into a guideline compliance representation fails to

properly read the relevant language in its contractual context.  The Trustee's alleged breaches of

Section 10(b)(5) that are based on alleged non-compliance with underwriting guidelines should

be dismissed.

> ### B.   Deutsche Bank Misapplies the MLS Representation
>
> #### 1.   The MLS Representation Does Not Serve as a "No Fraud" Representation

The MLS Representation provides, with respect to "each Mortgage Loan," that "the

information set forth in the Mortgage Loan Schedule relating to the Mortgage Loans is complete,

true and correct as of the Cut-off Date."  (MLPA § 10(a)(1).)  Deutsche Bank's claims are based

on an interpretation of the MLS Representation and its function within the contract that is

inconsistent with other provisions of the contract and the contract read as a whole.

Section 10(b)(5) of the MLPA already warrants against "fraud" by the borrowers or

others, but only to the extent that Morgan Stanley had "knowledge" of such fraud.  (See MLPA

§ 10(b)(5).)  However, Deutsche Bank effectively treats the MLS Representation as another "no

---

[23]  See Gary Friedrich Enters., LLC v. Marvel Characters, Inc., 716 F.3d 302, 313 (2d Cir. 2013) ("[W]e do
not consider particular phrases in isolation, but rather interpret them in light of the parties' intent as manifested by
the contract as a whole."); HarperCollins Publishers LLC v. Open Rd. Integrated Media, LLP, 7 F. Supp. 3d 363,
370 (S.D.N.Y. 2014) ("In determining the meaning of a contract, this Court will 'look to all corners of the document
rather than view sentences or clauses in isolation.'" (quoting Int'l Klaffer Co., Inc. v. Continental Cas. Co., 869 F.2d
96, 99 (2d Cir. 1989))); South Road Assocs., LLC v. Int'l Bus. Machines Corp., 4 N.Y.3d 272, 277 (2005) ("It is
also important to read the [contract] as a whole to ensure that excessive emphasis is not placed upon particular
words or phrases.").

fraud" representation, and one that would *not* require Morgan Stanley to have "knowledge" of the fraud. What Deutsche Bank argues is that if information in the loan file (for example, the borrower's intent to occupy the property) was misrepresented, *even if Morgan Stanley did not know about it*, and even if the information in the loan file was faithfully reflected on the MLS, the MLS Representation would nonetheless be breached because the underlying borrower fraud prevented the information in the loan file (and hence the MLS) from being "true" or "correct." The flaw in Deutsche Bank's reasoning is that it is reading words in a contract in isolation, without considering them in the context of the contract as a whole. See cases cited in note 23, supra. Deutsche Bank's interpretation makes no sense when one considers that borrower fraud is covered by Section 10(b)(5), for which Morgan Stanley would not be liable without "knowledge" of the fraud. Deutsche Bank's interpretation of the MLS Representation would not only render the separate "no fraud" representation superfluous, but would render Section 10(b)(5)'s "knowledge" requirement worthless and would eliminate the negotiated limitation on liability provided by that requirement. See, e.g., Galli, 973 F.2d at 149 (rejecting contract interpretations that render a clause "superfluous or meaningless. Rather, an interpretation that gives a reasonable and effective meaning to all terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect.").

Viewed in the context of the contract as a whole, the more reasonable interpretation of the MLS Representation is that it warranted that the information in the loan file was completely, truthfully and correctly reflected on the MLS, without representing that there was no underlying fraud that might have caused the information in the loan file itself to have been misrepresented outside of Morgan Stanley's knowledge. Section 10(b)(5) covers any fraud that may have infected the information in the loan file, and it requires Morgan Stanley's "knowledge" to

establish a breach; the MLS Representation does the separate work of representing that the information in the loan file has been accurately reflected on the MLS. Unlike Deutsche Bank's interpretation, this interpretation does not render other provisions "superfluous and meaningless," and "gives a reasonable and effective meaning to all terms." Galli, 973 F.2d at 149. The plain meaning of "[c]omplete" is "possessing all necessary parts, items, components, or elements," Webster's Third New International Dictionary of the English Language Unabridged 465 (3d ed. 1993), and the plain meaning of "[t]rue and correct" is "[a]uthentic; accurate; unaltered," as in, "we have forwarded a true and correct copy of the expert's report," Black's Law Dictionary (10th ed. 2014); see also In re Soundview Elite Ltd., 543 B.R. 78, 101 (Bankr. S.D.N.Y. 2016) ("'true and correct' . . . effectively means 'unaltered'"). Read in conjunction, "complete, true and correct" means no more than that the MLS accurately transcribes the data reflected in the loan files, as supplied by the originators to Morgan Stanley. See Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings, LLC, No. 5140-VCS, 2010 WL 3258620, at *9 n.75 (Del. Ch. Aug. 19, 2010) ("[The] argument that [the loan seller] was representing that all of the underlying [loan data] in all loan files was accurate seems strained. The more plausible reading of the contract is that [the seller] was simply representing that it accurately compiled the loan data."), rev'd on other grounds, 27 A.3d 531 (Del. 2011).[24]

In sum, any MLS Representation claim that is not based on a failure to accurately reflect

---

[24] Morgan Stanley respectfully submits that the construction of the MLS Representation in MARM IV as an "unqualified warranty," 205 F. Supp. 3d 386, 427 (S.D.N.Y. 2016), was mistaken for the reasons set forth above. But in all events, such a conclusion would plainly be inconsistent with the parties' intent here. While the relevant contract in MARM IV did not have a "no fraud" representation, here there was not only a separate "no fraud" representation that would be rendered superfluous by the Trustee's interpretation, but the "no fraud" provision has a knowledge qualifier that would be rendered meaningless by the Trustee's interpretation. That interpretation is even more untenable here because it effectively incorporates a "no fraud" standard with respect to loans as to which Morgan Stanley's "no fraud" representation did not even apply (i.e., Fremont and WMC loans, see Point V, infra).

the information in the loan file must be dismissed.

2.    Allegedly Inaccurate DTI Ratios Do Not Breach the MLS Representation

In addition to the argument in the preceding section, Morgan Stanley is entitled to partial

summary judgment for alleged breaches of the MLS Representation based on allegedly incorrect

debt-to-income ratios ("DTIs"). "Mortgage Loan Schedule," as used in the MLS Representation,

is a defined term setting forth an exclusive list of information to be included on the MLS. (See

PSA § 1 at 33-34 (defining fields in "Mortgage Loan Schedule"); MLPA § 1 at 3-4 (same).) DTI

is not among them. Moreover, the definition includes no catch-all provision that would make

any additional information that may be included on the MLS subject to the MLS Representation.

Plaintiff's MLS Representation claims based on allegedly incorrect DTIs should be dismissed.

C.    Deutsche Bank Fails to Establish a Breach of Any Appraisal-Related
Representation

1.    Loan-to-Value Allegations Cannot Be Based on an AVM Value

Deutsche Bank alleges that 241 loans have an incorrect LTV on the MLS, in violation of

the MLS Representation, and that 74 loans have an LTV in excess of 100%, in violation of the

LTV Representation.[25] Because the basis for all of these allegations is nothing other than

recalculating the "LTV" using Dr. Kilpatrick's AVM results as the "value" (i.e., the LTV

denominator), these claims have no merit. "Loan-to-Value Ratio" is a defined term under the

governing contract, and it is defined as "[t]he fraction, expressed as a percentage, the numerator

of which is the original principal balance of the related Mortgage Loan and the denominator of

which is the *Appraised Value* of the related Mortgaged Property." (PSA § 1.01 (emphasis

added).) The "Appraised Value," in turn, is defined as:

---

[25] "No MSMCH Represented Mortgage Loan has an LTV greater than 100%." (MLPA § 10(b)(21).)

> With respect to any Mortgage Loan originated in connection with a refinancing, the appraised value of the Mortgaged Property based upon the appraisal made at the time of such refinancing or, with respect to any other Mortgage Loan, the lesser of (x) the appraised value of the Mortgaged Property based upon the appraisal made by a fee appraiser at the time of the origination of the related Mortgage Loan, and (y) the sales price of the Mortgaged Property at the time of such origination.

(PSA § 1.01.) An AVM value is neither "the appraised value" nor "the sales price." (PSA § 1.01.) Accordingly, none of Dr. Kilpatrick's recalculated LTVs actually demonstrate a breach of either the MLS Representation or the LTV Representation. Indeed, the Court in MARM IV agreed that, under materially similar contract language, "AVM Data Is Not A Substitute for An Appraisal," and held that "rely[ing] entirely on [plaintiff's expert's] AVM recalculations" is insufficient to prove a breach of either the MLS Representation or the LTV Representation in that case. MARM IV, 205 F. Supp. 3d at 434-37, 460, 486; see also id. at 460 (rejecting plaintiffs' expert's "method for recalculating LTV ratios [using AVM values] as inconsistent with the PSAs' prescribed approach to determining LTV ratio").

## 2.     Deutsche Bank Misapplies the Appraisal Representation

Finally, plaintiff alleges that 96 loans contain appraisals that breach the Appraisal Representation because, according to Dr. Kilpatrick, they are "not credible." Dr. Kilpatrick's analysis, however, fails to establish a breach of the Appraisal Representation, which requires that "the appraisal and appraiser both satisfy the requirements of Fannie Mae or Freddie Mac" and the Uniform Standards of Professional Appraisal Practice ("USPAP"). (MLPA § 10(b)(20).) To assess compliance with the Appraisal Representation, Dr. Kilpatrick first identifies appraisals whose opinions of value exceed his AVM value by 15% or more (which he characterizes as "inflated"). (R. 56.1 ¶ 87.) Next, he analyzes those appraisal reports using his CAM, which consists of a series of questions incorporating requirements of USPAP and *both* Fannie Mae's

37

*and* Freddie Mac's guidelines. (See R. 56.1 ¶ 99 ("[T]he appraisers of the Properties were required to conform to the requirements of Fannie Mae *and* Freddie Mac." (emphasis added)); R. 56.1 ¶ 101 ("industry standards required by the MLPA (including Fannie Mae *and* Freddie Mac)" (emphasis added)).) As a result, Dr. Kilpatrick alleges a breach if his model determines that the appraisal does not meet the requirements of *all three* guidelines. But by its plain terms, the Appraisal Representation only requires compliance with USPAP and "the requirements of Fannie Mae *or* Freddie Mac," MLPA § 10(b)(20) (emphasis added), which do not necessarily overlap, see, e.g., R. 56.1 ¶ 103 (cost approach and income approach listed on Fannie Mae and Freddie Mac's joint Uniform Residential Appraisal Report form were "not required by Fannie Mae"). Because Dr. Kilpatrick admitted that there is no way to distinguish which CAM questions identify compliance with which set of standards, see R. 56.1 ¶ 103, it is impossible to determine whether a loan complies with Freddie Mac's standards but not Fannie Mae's, or vice versa. Dr. Kilpatrick's analysis therefore fails to establish any breaches of the Appraisal Representation.

## V.   MORGAN STANLEY IS NOT RESPONSIBLE FOR REPRESENTATIONS AND WARRANTIES MADE BY ACCREDITED, FREMONT, OR WMC

A. Deutsche Bank Released All Claims for Repurchase of Accredited Mortgage Loans

Morgan Stanley no longer has any obligation to backstop any alleged breach of Accredited's representations and warranties because Deutsche Bank voluntarily settled and released those claims. On October 6, 2009, Deutsche Bank filed a proof of claim in Accredited's bankruptcy, in its capacity as trustee for certain specified trusts and "any other trusts of which it is trustee and which hold mortgage loans originated or sold by any Debtor"—a definition that indisputably includes MSST. (R. 56.1 ¶¶ 123-24.) Deutsche Bank alleged that "Debtors have breached certain of these Representations and Warranties" in the corresponding governing

38

contracts and "the Trusts have or will have claims for breach of such obligations." (R. 56.1

¶ 125.) After Accredited objected to the proof of claim (R. 56.1 ¶ 126), Deutsche Bank and

Accredited entered a stipulation fixing an allowed amount for Deutsche Bank's proof of claim

(the "DB Claim") in which Deutsche Bank agreed to "fully and forever release[], surrender[],

give[] up and discharge[] the Debtors [Accredited] . . . (collectively, the "Released Parties") from

any and all claims, actions, causes of action, rights, debts, costs, charges, losses, demands and

damages of whatsoever nature or kind in law or equity, *whether now known or hereinafter*

*known, that DB ever had, may have had or may have against the Released Parties* solely with

respect to the DB Claim." (R. 56.1 ¶ 127 (emphasis supplied).)

        Deutsche Bank thus released any repurchase claims that it had against Accredited,

thereby extinguishing Morgan Stanley's backstop obligations as well. "The general rule in New

York is that a creditor's release of a principal debtor operates to discharge parties, such as

guarantors, who are only secondarily liable on a debt." Compagnie Financiere de CIC et de

L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc., 188 F.3d 31, 34 (2d Cir.

1999). Because Morgan Stanley only agreed to cure or repurchase Accredited Mortgage Loans

"in the event Accredited fails to" do so (MLPA § 10 at 18), and because Deutsche Bank

voluntarily released any repurchase claims against Accredited, Deutsche Bank no longer has any

valid claims that Morgan Stanley can backstop. See Food Lion, Inc. v. S.L. Nusbaum Ins.

Agency, Inc., 202 F.3d 223, 226-28 (4th Cir. 2000) (holding that creditor's voluntary settlement

of contract claims with bankrupt debtor also operated as release of the guarantor because the debt

"was not discharged [by the bankruptcy court]; rather, it was settled by an agreed order in the

bankruptcy court"); 23 Williston on Contracts § 61:8 (4th ed.) (under the Bankruptcy Code "a

voluntary compromise of a claim against a bankrupt [entity]" results in the release of a surety).

B.  Morgan Stanley Did Not Backstop Fremont and WMC Mortgage Loans

Morgan Stanley is also entitled to summary judgment on all claims based on alleged

breaches in the Fremont and WMC Mortgage Loans.  Fremont and WMC made their own R&Ws

directly to the Trust in the Bring Down Agreements and the Trustee had the authority to directly

enforce those agreements.  (See PSA § 2.02(d) at 66; id. § 1.01 at 10-11.)  The parties did not

include any backstop provision for Fremont's and WMC's representations.  Thus, Morgan

Stanley has no liability to cure, substitute or repurchase any Fremont or WMC loan that breaches

their respective R&Ws.  And because they are not included in the definition of "MSMCH

Represented Mortgage Loans" (R 56.1 ¶ 31), Fremont and WMC Mortgage Loans cannot breach

the R&Ws made by Morgan Stanley in Section 10(b) of the MLPA.  (See MLPA § 10(b).)[26]

## CONCLUSION

For the reasons stated above, defendant respectfully requests that this Court dismiss this

action in its entirety with prejudice.

---

[26] Deutsche Bank alleges that Fremont and WMC Mortgage Loans breached the MLS Representation contained in Section 10(a) of the MLPA, but it misapplies that representation.  See Point IV.B supra.

Dated:    New York, New York          DAVIS POLK & WARDWELL LLP
          May 8, 2017

                                      By:  _____
                                            Brian S. Weinstein
                                            Matthew Cormack
                                            Craig T. Cagney

                                      450 Lexington Avenue
                                      New York, New York 10017
                                      (212) 450-4000
                                      brian.weinstein@davispolk.com
                                      matthew.cormack@davispolk.com
                                      craig.cagney@davispolk.com

                                      Attorneys for Defendant

41