**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DEUTSCHE BANK NATIONAL TRUST
COMPANY, solely in its capacity as
Trustee for the MORGAN STANLEY
STRUCTURED TRUST I 2007-1,

                        Plaintiff,                    No. 14-CV-3020(LTS)(AJP)

        v.

MORGAN STANLEY MORTGAGE
CAPITAL HOLDINGS LLC, as
Successor-by-Merger to MORGAN
STANLEY MORTGAGE CAPITAL INC.,

                        Defendant.

**PLAINTIFF'S RESPONSE TO DEFENDANT'S LOCAL CIVIL RULE 56.1**
**STATEMENT OF UNDISPUTED MATERIAL FACTS AND**
**PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS**

Pursuant to Federal Rule of Civil Procedure 56(c) and Rule 56.1(b) of the Local Civil

Rules of the United States District Court for the Southern District of New York, plaintiff

Deutsche Bank National Trust Company, solely in its capacity as Trustee for Morgan Stanley

Structured I Trust 2007-1 (the "Trustee"), respectfully submits this response to defendant

Morgan Stanley Mortgage Capital Holdings LLC's ("Morgan Stanley") Local Rule 56.1

Statement of Undisputed Material Facts, and its own statement of additional material facts as to

which it contends that there exist genuine issues to be tried.  In addition, the Trustee incorporates

herein the evidentiary support set forth in the June 22, 2017 Declaration of Justin V. Shur and the

exhibits attached thereto.

**PLAINTIFF'S RESPONSE TO DEFENDANT'S LOCAL RULE 56.1
STATEMENT OF UNDISPUTED MATERIAL FACTS**

## I.     Structure of the Transaction

1.      Morgan Stanley Structured Trust I 2007-1 ("MSST 2007-1") is a residential mortgage-backed securitization ("RMBS") trust created pursuant to the Pooling and Servicing Agreement ("PSA") dated as of June 1, 2007, between Bear Stearns Asset Backed Securities I LLC ("BSABS") as Depositor, Wells Fargo Bank, National Association as Master Servicer and Securities Administrator, and Deutsche Bank National Trust Company ("Deutsche Bank") as Trustee.  (See Compl. ¶15 (Weinstein Decl. Ex. A); PSA (Weinstein Decl. Ex. B).)[1]

**Plaintiff's Response:**  Undisputed.

2.      Morgan Stanley Mortgage Capital Holdings LLC was the Sponsor for MSST 2007-1.  (See PSA § 1 at 50 (Weinstein Decl. Ex. B).)

**Plaintiff's Response:**  Undisputed.

3.      As Sponsor, Morgan Stanley acquired all of the loans ultimately included in MSST 2007-1.  (See Prospectus Supplement at S-50-51 (Weinstein Decl. Ex. C); Deposition Transcript of Steven Shapiro ("Shapiro Tr.") at 46:22-47:12 (Weinstein Decl. Ex. D).)

**Plaintiff's Response:**  Undisputed.

4.      Morgan Stanley sold the initial loan pool to EMC Mortgage Corporation ("EMC"), a wholly owned subsidiary of Bear, Stearns & Co., Inc. ("Bear Stearns"), pursuant to a Mortgage Loan Purchase and Warranties Agreement ("MLPWA") dated May 1, 2007. (MLPWA (Weinstein Decl. Ex. E).)

**Plaintiff's Response:**  Undisputed.

---

[1] "Weinstein Decl. Ex." refers to the exhibits to the May 8, 2017 Declaration of Brian S. Weinstein filed by Morgan Stanley.

5.      Morgan Stanley and EMC each sold certain mortgage loans to BSABS pursuant to the Mortgage Loan Purchase Agreement ("MLPA") among EMC as a Mortgage Loan Seller, Morgan Stanley as a Mortgage Loan Seller, and BSABS as Purchaser, dated as of July 6, 2007. (Compl. ¶ 13 (Weinstein Decl. Ex. A); MLPA (Weinstein Decl. Ex. F).)

**Plaintiff's Response:** Undisputed.

6.      BSABS as depositor then transferred all right, title and interest in those mortgage loans and assigned all its rights under the MLPA to the Trust in the PSA in exchange for the certificates. (PSA § 2.01 (Weinstein Decl. Ex. B).)

**Plaintiff's Response:** Undisputed.

7.      Bear Stearns, as underwriter, then offered the certificates to investors. (See Prospectus Supplement at S-1 (Weinstein Decl. Ex. C).)

**Plaintiff's Response:** Undisputed.

8.      As of the Closing Date, MSST 2007-1 consisted of 4,374 mortgage loans (the "Mortgage Loans"). (Prospectus Supplement at S-31 (Weinstein Decl. Ex. C).)

**Plaintiff's Response:** Undisputed.

9.      The "Closing Date" of MSST 2007-1 was July 6, 2007. (PSA § 1.01 (Weinstein Decl. Ex. B).) The "Cut-Off Date" of MSST 2007-1 was June 1, 2007. (Id.)

**Plaintiff's Response:** Undisputed.

## II.     Morgan Stanley's Role as Sponsor

10.     Francis N. Telesca is employed by Morgan Stanley as an Executive Director, and was designated as Morgan Stanley's corporate representative pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure ("FRCP 30(b)(6)") to provide deposition testimony as to certain topics. (Deposition Transcript of Francis N. Telesca as FRCP 30(b)(6) corporate

representative for defendant Morgan Stanley, Jan. 19, 2017 ("Telesca 30(b)(6) Tr.") at 6:12-7:23

(Weinstein Decl. Ex. G.)

**Plaintiff's Response:** Undisputed.

11.     During his deposition as FRCP 30(b)(6) corporate representative for defendant

Morgan Stanley taken on January 19, 2017, Mr. Telesca was asked the following questions and

gave the following answers:

> Q.     In connection with the securitization that's at issue in this case, the MSST transaction, Morgan Stanley served as the sponsor, right?
>
> A.     Yes.
>
> Q.     Okay.  What was Morgan Stanley's fee for serving as a sponsor?
>
> MR. WEINSTEIN:     Objection to scope.
>
> A.     I don't believe there is a fee associated with being a sponsor.
>
> Q.     How is Morgan Stanley compensated in connection with its role in this securitization?
>
> MR. WEINSTEIN:     Objection to scope.
>
> A.     Consistent with most securitizations, Morgan Stanley's economics ultimately came from the performance of the residual interest that they owned.  It is related to what is the purchase price play – paid for the mortgages and what is the ultimate economics that it received in connection with those mortgage loans.

(Telesca 30(b)(6) Tr. at 14:5-25 (Weinstein Decl. Ex. G).)

**Plaintiff's Response:**  Undisputed only insofar as Mr. Telesca was asked the cited

questions and gave the cited answers and defense counsel made the cited objections.

12.     Steven Shapiro was employed by Morgan Stanley as a managing director in the

global proprietary credit group (Shapiro Tr. at 13:8-14 (Weinstein Decl. Ex. D).)

**Plaintiff's Response:**  Undisputed.

13.     During his deposition taken on April 20, 2016, Mr. Shapiro was asked the following questions and gave the following answers:

> Q.     Just taking a step back, so the loans that ended up in the MSST trust, where did they come from?
>
> MR. SCHWARTZ:     Objection to the form.
>
> A.     We would have bought them from various subprime originators that we did business with.
>
> Q.     Morgan Stanley would have done that?  Bear Stearns?
>
> A.     That's correct.  Morgan Stanley.  This would have been loans that Morgan Stanley bought from subprime originators that we had in position and were looking to securitize.

(Shapiro Tr. at 46:22-47:12 (Weinstein Decl. Ex. D).)

**Plaintiff's Response:**   Undisputed only insofar as Mr. Shapiro was asked the cited questions and gave the cited answers and defense counsel made the cited objection.

14.     During his deposition taken on April 20, 2016, Mr. Shapiro was asked the following question and gave the following answer:

> Q.     So an exit in this context is referring to the fact that Morgan Stanley is purchasing these loans, holding them for two to three months, I believe you said earlier, and then getting them off their books and selling them or securitizing them?
>
> MR. SCHWARTZ:     Objection to the form.
>
> A.     Securitizing – there is a difference.  We are buying loans – the way I always looked at this business, we are buying loans and they are getting funded on Morgan Stanley's balance sheet, and then we are securitizing loans, so we are locking into term funding for, you know, whatever funds we are selling, but we're keeping the risk, we are holding the bottom residual and equity risk.
>
> So the securitization really is investment grade funding, but the risk, we have always viewed it as Morgan Stanley still holding the risk in the deals since we are holding the first loss equity in these deals.

(Shapiro Tr. at 96:25-97:25 (Weinstein Decl. Ex. D).)

**Plaintiff's Response:**   Undisputed only insofar as Mr. Shapiro was asked the cited questions and gave the cited answers and defense counsel made the cited objection.

15.     During his deposition taken on April 20, 2016, Mr. Shapiro was asked the following questions and gave the following answers:

> Q.     Mr. Shapiro, I know we discussed previously, but I just want to make sure I understand.
>
> For the deals or the deal like MSST where Morgan Stanley was not serving as an underwriter, how exactly did Morgan Stanley make money off of the MSST deal?
>
> A.     Sure, I mean, we would have made money off that deal just like every other deal which is through the performance of the residual that we would have owned.
>
> Q.     If you could flesh that out.
>
> A.     Sure, so if you – and – maybe it makes a little sense to give two minutes of background color and then get into this.
>
> Q.     OK.
>
> A.     When we first got into the business kind of back in call it 2000, '01, '02, the way it worked in the deals is you could basically buy loans and you could sell bonds to the marketplace, create a net interest margin security, sell that, and actually sell all of those components for more than you paid for the loans and then you would make some up-front profit and then you would own this equity essentially for free and that would be increased profit over time.
>
> The market evolved over time to where you couldn't do that anymore.  So in trades like MSST, and a lot of the trades that we did in this time period, you would buy loans for a certain dollar price, let's just say 102, and then you would issue bonds at like 96 cents on the dollar, which was your AAA through call it BBB bonds, and then you would have kind of a six-point sometimes more investment in the deal, and then over time, if your deals performed, that's how you would make money where the excess interest that you didn't need to pay the bonds or cover losses would go to that residual, and then three years into the deal, as long as certain performance triggers weren't hit, then you would receive

some of the over-collateralization back and prepayment penalties and excess.

So we would make our money through the performance of that equity that we owned in the deal.

(Shapiro Tr. at 146:9-148:10 (Weinstein Decl. Ex. D).)

**Plaintiff's Response:**   Undisputed only insofar as Mr. Shapiro was asked the cited questions and gave the cited answers.

16.    During his deposition taken on April 20, 2016, Mr. Shapiro was asked the following questions and gave the following answers:

Q.    In your mind at the time, what did it mean for your group to do well or for you to do well?

A.    Yeah, I always viewed it as our job was to – we ran the MSAC program.  So it was making sure our deals – we executed good deals in the marketplace, make sure that the deals performed according to how we thought they should perform, stay in touch with the market, what was going on with our shops or originators. So really just have a banking role focused on subprime whole loans and securitization.

Q.    What about the amount of money that the group was generating for the organization?

MR. SCHWARTZ:    Objection to the form.

A.    There was a lot of – there was a lot of different components, right.  So my role was always we weren't a trading role.  We were a banking role.

So our role, I always viewed our role was to make sure that the deals we are bringing to market and the deals that Morgan Stanley is going to be holding the equity risk in performed at or better than what our expectations were.

Q.    But the deals that you mentioned generated fees for the bank, yes?

A.    I mean, not really.  We were – the deals from '06 to '08, we were buying loans from originators and we were securitizing those loans.  So the bank is only going to make money if the deals perform.

So let's say we bought loans and they cost 102, right, 102 percent of par. When we did a securitization, we may get back 96 percent of par. So we have a basis in that portfolio of 6 points. We are only going to earn that over time. So if the deals don't perform, then you lose money. If the deals perform, then you can make money.

But there was no up-front fees or anything like that. I mean, there was fees that our group paid Morgan Stanley's broker/dealer and that was kind of an arrangement that Howie and the dealer had.

But to me, that's just kind of taking money out of one group into another. I don't really view that as real fees.

Q.     To be clear, when you say the deals performed, what do you mean?

A.     So we would buy – we would buy loans with a certain prepayment and loss expectation. So if they met – if they basically had losses that were at or lower than that, then that would be kind of outperforming our expectations. And if they were higher, that would be under-performing our expectations.

(Shapiro Tr. at 28:9-30:23 (Weinstein Decl. Ex. D).)

**Plaintiff's Response:**  Undisputed only insofar as Mr. Shapiro was asked the cited questions and gave the cited answers and defense counsel made the cited objection.

17.     Morgan Stanley acquired the Residual Interests (Class R Certificates) from Bear Stearns. (PSA § 1 at 22-23, 48 (defining "Residual Certificates," "Residual Interest," and various "Class R Certificates") (Weinstein Decl. Ex. B); Transferee Affidavit & Agreement (MSM_MSSTI_20071_0003187-MSM_MSSTI_20071_0003191) (Weinstein Decl. Ex. H).)

**Plaintiff's Response:**  Undisputed.

18.     Under the PSA, the Class R Certificates owned by Morgan Stanley only received distributions from any Excess Spread that remained after the Excess Spread had been distributed to all other classes of certificates. (PSA § 6.04 (Weinstein Decl. Ex. B).)

**Plaintiff's Response:**  Undisputed.

19.     Any Realized Losses on the mortgage loans in MSST 2007-1 were applied first to Excess Spread.  (PSA § 6.05(a) (Weinstein Decl. Ex. B).).

**Plaintiff's Response:**  Undisputed.

20.     In the event that loan defaults resulted in losses to the Trust, Morgan Stanley, as the owner of the Residual Interest, would suffer losses prior to losses being experienced by debt certificateholders.  (Telesca 30(b)(6) Tr. at 14:5-25 (Weinstein Decl. Ex. G); Shapiro Tr. at 96:25-97:25 (Weinstein Decl. Ex. D); PSA § 1 at 22-23, 48 (defining "Residual Certificates," "Residual Interest," and various "Class R Certificates"), §§ 6.04, 6.05 (Weinstein Decl. Ex. B).)

**Plaintiff's Response:**  Undisputed.

21.     There is no evidence that Morgan Stanley acted maliciously or for the purpose of harming the Trust.

**Plaintiff's Response:**  Disputed.   *See* ¶¶ 154-161, *infra* (citing Shur Decl. Ex. 1 (February 2016 $2.6 billion settlement between Morgan Stanley and the Department of Justice, covering this Trust)); Shur Decl. Ex. 2 (MSM_MSSTI_20071_0214862) (spreadsheet showing foreclosures); Shur Decl. Ex. 3 (Davis Dep. Tr.) at 317:14-318:2; Shur Decl. Ex. 4 (Davis Dep. Ex. 5) (Vice President of Valuation Due Diligence knew of appraiser fraud); Shur Decl. Exs. 5-10 (due diligence reports showing that many loans in the Trust had the highest risk rating); Shur Decl. Ex. 11 (Kaplan Dep. Tr.) at 306:5-24 (loans with first payment defaults "weren't supposed to be securitized"); Shur Decl. Ex. 12 (MSM_MSSTI_20071_0222237) (Morgan Stanley created this Trust as part of a "plan to empty the position"); Shur Decl. Ex. 13 (Drew Dep. Tr.) at 81:18-24, 213:2-8 (Morgan Stanley's director did not recall any procedures for handling repurchase requests that Morgan Stanley received); Weinstein Decl. Ex. G at 70:17-22, 114:2-115:22 (by 2012-2013, Morgan Stanley's repurchase manual removed procedures for a "Vertical Demand" –

*i.e.*, a "repurchase request or a breach notice that did not come from a third party but instead was internal"); Weinstein Decl. Ex. V ¶31 & Table 2-Rev (59.3% of loans in the Trust materially breach at least one representation and warranty according to the Trustee's experts).

22.     There is no evidence that Morgan Stanley breached a duty to the Trust or the Trustee outside of the alleged breaches of contract.

**Plaintiff's Response:**   Disputed.   *See* ¶¶154-161, *infra* (citing Shur Decl. Ex. 1 (February 2016 $2.6 billion settlement between Morgan Stanley and the Department of Justice, covering this Trust)); Shur Decl. Exs. 5-10 (due diligence reports showing Morgan Stanley's knowing conveyance of loans with the highest risk rating to the Trust); *see also* ¶145, *infra* (listing loans); Shur Decl. Ex. 12 (MSM_MSSTI_20071_0222237) (Morgan Stanley created this Trust as part of a "plan to empty the position"); Shur Decl. Ex. 13, at 81:18-24, 213:2-8 (Morgan Stanley's director of the repurchase group did not recall any procedures for repurchase requests to Morgan Stanley); Weinstein Decl. Ex. G at 70:17-22, 114:1-115:22 (removal of Vertical Demand procedures); Shur Decl. Ex. 14 (MSM_MSSTI_20071_0337564 and MSM_MSSTI_20071_0337573) (Aug. 13, 2007 email and attachment identifying seller-noticed claims for Accredited loans); Shur Decl. Ex. 15 (MSM_MSSTI_20071_0338159 and MSM_MSSTI_20071_0338160) (Oct. 9, 2007 email and attachment identifying seller-noticed claims for New Century loans).

## III.   The Governing Agreements

23.     Section 10 of the MLPA contains "Representations and Warranties of MSMCH Concerning the Mortgage Loans" made "as of the Closing Date or such other date as may be specified below."  (MLPA § 10 (Weinstein Decl. Ex. F).)

**Plaintiff's Response:**  Undisputed.

24.     Morgan Stanley made the representations and warranties in Section 10(a) "[w]ith respect to each Mortgage Loan."  (MLPA § 10(a) (Weinstein Decl. Ex. F).)

**Plaintiff's Response:**  Undisputed.

25.     Section 10(a)(l) of the MLPA states the following:  "The information set forth in the Mortgage Loan Schedule relating to the Mortgage Loans is complete, true and correct as of the Cut-off Date."  (MLPA § 10(a)(l) (Weinstein Decl. Ex. F).)

**Plaintiff's Response:**  Undisputed.

26.     The MLPA defines the "Mortgage Loan Schedule" as:

> The schedule of Mortgage Loans setting forth the following information with respect to each Mortgage Loan: (1) the related Seller's Mortgage Loan identifying number; (2) [reserved]; (3) the city, state and zip code of the Mortgaged Property; (4) [reserved]; (5) the number and type of residential units constituting the Mortgaged Property (e.g. single family residence, a two- to four-family dwelling, condominium, planned unit development or cooperative); (6) the original months to maturity or the remaining months to maturity from the Cut-off Date, in any case based on the original amortization schedule and, if different, the maturity expressed in the same manner but based on the actual amortization schedule; (7) with respect to each First Lien Loan, the Loan-to-Value Ratio at origination, and with respect to each Second Lien Loan, the combined loan-to-value ratio (the "CLTV") at origination; (8) the Mortgage Rate and the Net Mortgage Rate as of the Cut-off Date; (9) the date on which the first Monthly Payment was due on the Mortgage Loan and, if such date is not consistent with the Due Date currently in effect, the Due Date; (10) the stated maturity date; (11) the amount of the Monthly Payment as of the Cut-off Date; (12) [reserved]; (13) the original principal amount of the Mortgage Loan; (14) the actual principal balance of the Mortgage Loan as of the close of business on the Cut-off Date, after deduction of payments of principal collected on or before the Cut-off Date; (15) with respect to Adjustable Rate Mortgage Loans, the Interest Rate Adjustment Date; (16) with respect to Adjustable Rate Mortgage Loans, the Gross Margin; (17) with respect to Adjustable Rate Mortgage Loans, the Periodic Rate Cap, if applicable, under the terms of the Mortgage Note; (18) [reserved]; (19) the type of Mortgage Loan (i.e., Fixed or Adjustable Rate Mortgage Loan, First or Second Lien Loan); (20)

a code indicating the purpose of the loan (i.e., purchase, rate/term refinance or cash-out refinance); (21) the Servicing Fee Rate; (22) the LPMI Fee, if applicable; (23) the Master Servicing Fee Rate; (24) the MIN with respect to each MOM Loan; (25) with respect to Adjustable Rate Mortgage Loans, the Maximum Mortgage Rate, if applicable; (26) with respect to Adjustable Rate Mortgage Loans, the Minimum Mortgage Rate, if applicable; (27) which Mortgage Loans adjust after an initial fixed-rate period of one, two, three, five, seven or ten years or any other period; (28) the Prepayment Charge, if any; (29) a code indicating whether the Mortgage Loan is has a balloon payment; (30) a code indicating whether the Mortgage Loan is an interest-only loan; (31) the interest-only term, if applicable; (32) the related Seller; and (33) the original amortization term. The Mortgage Loan Schedule is attached as Exhibit 2 hereto.

(MLPA § 1 (Weinstein Decl. Ex. F).)

**Plaintiff's Response:** Undisputed to the extent that Morgan Stanley has accurately quoted the MLPA. Disputed to the extent that Morgan Stanley suggests that the Mortgage Loan Schedule is limited to the attributes listed above. *Compare* Shur Decl. Ex. 16 (Grice Rpt.) ¶ 39 & n.14 (referring to MLS DBNTC_MSSTI_00010441 (Shur Decl. Ex. 29)) & ¶¶ 72-73 (evaluating DTI), *with* Weinstein Decl. Ex. BB ¶ 24 (referring to MLS MSM_MSSTI_20071_0003560 (Shur Decl. Ex. 30)).

27.   The PSA defines the "Mortgage Loan Schedule" as:

Mortgage Loan Schedule: The list of Mortgage Loans (as from time to time amended by the Sellers to reflect the deletion of Deleted Mortgage Loans and the addition of Replacement Mortgage Loans pursuant to the provisions of this Agreement) transferred to the Trustee as part of the Trust Fund and from time to time subject to this Agreement, the initial Mortgage Loan Schedule being attached hereto as Exhibit B, setting forth the following information with respect to each Mortgage Loan: (a) the related Seller's Mortgage Loan identifying number; (b) [reserved]; (c) the city, state and zip code of the Mortgaged Property; (d) [reserved]; (e) the number and type of residential units constituting the Mortgaged Property (e.g. single family residence, a two- to four-family dwelling, condominium, planned unit development or cooperative); (f) the original months to maturity or the remaining months to maturity from the Cut-off Date, in any case based on the

original amortization schedule and, if different, the maturity expressed in the same manner but based on the actual amortization schedule; (g) with respect to each first lien Mortgage Loan, the Loan-to-Value Ratio at origination, and with respect to each second lien Mortgage Loan, the CLTV at origination; (h) the Mortgage Rate and the Net Mortgage Rate as of the Cut-off Date; (i) the date on which the first Monthly Payment was due on the Mortgage Loan and, if such date is not consistent with the Due Date currently in effect, the Due Date; (j) the stated maturity date; (k) the amount of the Monthly Payment as of the Cut-off Date; (l) [reserved]; (m) the original principal amount of the Mortgage Loan; (n) the actual principal balance of the Mortgage Loan as of the close of business on the Cut-off Date, after deduction of payments of principal collected on or before the Cut-off Date; (o) with respect to Adjustable Rate Mortgage Loans, the Adjustment Date; (p) with respect to Adjustable Rate Mortgage Loans, the Gross Margin; (q) with respect to Adjustable Rate Mortgage Loans, the the Periodic Rate Cap, if applicable; under the terms of the Mortgage Note; (r) [reserved]; (s) the type of Mortgage Loan (i.e., fixed or Adjustable Rate Mortgage Loan, first or second lien Mortgage Loan); (t) a code indicating the purpose of the loan (i.e., purchase, rate/term refinance or cash-out refinance); (u) the Servicing Fee Rate; (v) the LPMI Fee, if applicable; (w) the Master Servicing Fee Rate; (x) the MIN with respect to each MOM Loan; (y) with respect to Adjustable Rate Mortgage Loans, the Maximum Mortgage Rate, if applicable; (z) with respect to Adjustable Rate Mortgage Loans, the Minimum Mortgage Rate, if applicable; (aa) which Mortgage Loans adjust after an initial fixed-rate period of one, two, three, five, seven or ten years or any other period; (aa) the Prepayment Charge, if any; (bb) a code indicating whether the Mortgage Loan is has a balloon payment; (cc) a code indicating whether the Mortgage Loan is an interest-only loan; (dd) the interest-only term, if applicable; (ee) the related Seller; and (ff) the original amortization term.

Such schedule also shall set forth for all of the Mortgage Loans, the total number of Mortgage Loans, the total of each of the amounts described under (k) and (n) above, the weighted average by principal balance as of the Cut-off Date of each of the rates described under (h) and (u) through (w) above, and the weighted average remaining term to maturity by unpaid principal balance as of the Cut-off Date.

(PSA § 1.01 (Weinstein Decl. Ex. B).)

**Plaintiff's Response:** Undisputed to the extent that Morgan Stanley has accurately quoted the PSA. Disputed to the extent that Morgan Stanley suggests that the Mortgage Loan Schedule is limited to the attributes listed above. *Compare* Shur Decl. Ex. 16 ¶39 & n.14 (referring to MLS DBNTC_MSSTI_00010441 (Shur Decl. Ex. 29)) & ¶¶72-73 (evaluating DTI), *with* Weinstein Decl. Ex. BB ¶24 (referring to MLS MSM_MSSTI_20071_0003560 (Shur Decl. Ex. 30)).

28. The PSA defines "Loan-to-Value Ratio" as: "The fraction, expressed as a percentage, the numerator of which is the original principal balance of the related Mortgage Loan and the denominator of which is the Appraised Value of the related Mortgaged Property." (PSA § 1.01 (Weinstein Decl. Ex. B).)

**Plaintiff's Response:** Undisputed.

29. The PSA defines "Appraised Value" as:

> With respect to any Mortgage Loan originated in connection with a refinancing, the appraised value of the Mortgaged Property based upon the appraisal made at the time of such refinancing or, with respect to any other Mortgage Loan, the lesser of (x) the appraised value of the Mortgaged Property based upon the appraisal made by a fee appraiser at the time of the origination of the related Mortgage Loan, and (y) the sales price of the Mortgaged Property at the time of such origination.

(PSA § 1.01 (Weinstein Decl. Ex. B).)

**Plaintiff's Response:** Undisputed.

30. Morgan Stanley made the representations and warranties in Section 10(b) "[w]ith respect to the MSMCH Represented Mortgage Loans (except as otherwise set forth in this subsection (b))." (MLPA § 10(b) (Weinstein Decl. Ex. F).)

**Plaintiff's Response:** Undisputed.

31.     The MLPA defines "MSMCH Represented Mortgage Loans" as:

> Any Mortgage Loan on the Mortgage Loan Schedule indicated as having been originated by Aames Capital Corporation, Aegis Mortgage Corporation, Decision One Mortgage Company, LLC, First NLC Financial Services, LLC, MILA, Inc., New Century Mortgage Corporation, Option One Mortgage Corporation or Wilmington Finance Inc.

(MLPA § 1 (Weinstein Decl. Ex. F).)

**Plaintiff's Response:**  Undisputed.

32.     Mortgage loans originated by Accredited Home Lenders, Inc. ("Accredited"), Fremont Investment & Loan ("Fremont"), and WMC Mortgage Corp. ("WMC") are not included in the definition of MSMCH Represented Mortgage Loans.  (See MLPA § 1 at 2, 3, 4, 6 (defining "MSMCH Represented·Mortgage Loans," "Accredited Mortgage Loans," "Fremont Mortgage Loans," and "WMC Mortgage Loans") (Weinstein Decl. Ex. F).)

**Plaintiff's Response:**  Undisputed.

33.     Section 10(b)(5) of the MLPA states the following:

> The Mortgage Note and the Mortgage and any other agreement executed and delivered by a Mortgagor in connection with a MSMCH Represented Mortgage Loan are genuine, and each is the legal valid and binding obligation of the maker thereof enforceable in accordance with its terms (including, without limitation, any provisions therein relating to Prepayment Penalties).  All parties to the Mortgage Note, the Mortgage and any other such related agreement had legal capacity to enter into the MSMCH Represented Mortgage Loan and to execute and deliver the Mortgage Note, the Mortgage and any such agreement, and the Mortgage Note, the Mortgage and any other such related agreement have been duly and properly executed by other such related parties.  No fraud, error, omission, misrepresentation, negligence or similar occurrence with respect to a MSMCH Represented Mortgage Loan has taken place on the part of MSMCH, or, to the knowledge of MSMCH, any other person, including without limitation, the Mortgagor, any appraiser, any builder or developer, or any other party involved in the origination of the MSMCH Represented Mortgage Loan;

(MLPA § 10(b)(5) (Weinstein Decl. Ex. F).)

**Plaintiff's Response:**  Undisputed.

34.    Section 10(b)(20) of the MLPA states the following:

> The Mortgage File contains an appraisal of the related Mortgaged Property signed prior to the approval of the MSMCH Represented Mortgage Loan application by a Qualified Appraiser, duly appointed by MSMCH, who had no interest, direct or indirect in the Mortgaged Property or in any loan made on the security thereof, and whose compensation is not affected by the approval or disapproval of the MSMCH Represented Mortgage Loan, and the appraisal and appraiser both satisfy the requirements of Fannie Mae or Freddie Mac and Title XI of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 and the regulations promulgated thereunder, all as in effect on the date the MSMCH Represented Mortgage Loan was originated;

(MLPA § 10(b)(20) (Weinstein Decl. Ex. F).)

**Plaintiff's Response:**  Undisputed.

35.    Section 10(b)(21) of the MLPA states the following:  "No MSMCH Represented

Mortgage Loan has an LTV greater than 100%."  (MLPA § 10(b)(21) (Weinstein Decl. Ex. F).)

**Plaintiff's Response:**  Undisputed.

36.    Section 10 of the MLPA states the following:

> Upon discovery or receipt of notice by MSMCH or the Purchaser of a breach of any representation or warranty of MSMCH set forth in this Section 10 which materially and adversely affects the value of the interests of the Purchaser in any of the MSMCH Represented Mortgage Loans delivered to the Purchaser pursuant to this Agreement, the party discovering or receiving notice of such breach shall give prompt written notice to the others.  In the case of any such breach of a representation or warranty set forth in this Section 10, within 90 days from the date of discovery by MSMCH, or the date MSMCH is notified by the party discovering or receiving notice of such breach (whichever occurs earlier), MSMCH will, (i) cure such breach in all material respects, (ii) purchase the affected Mortgage Loan at the applicable Purchase Price or (iii) if within two years of the Closing Date, substitute a qualifying Replacement Mortgage Loan in exchange for such MSMCH Represented Mortgage Loan.

(MLPA § 10 (Weinstein Decl. Ex. F).)

**Plaintiff's Response:** Undisputed.

37.  The MLPA defines "Purchase Price" as:

> With respect to any Mortgage Loan required to be purchased by EMC or MSMCH pursuant to the applicable provisions of this Agreement, an amount equal to the sum of (i) 100% of the principal remaining unpaid on such Mortgage Loan as of the date of purchase (including if a foreclosure has already occurred, the principal balance of the related Mortgage Loan at the time the Mortgaged Property was acquired), net of any Servicing Advances and Advances attributable to principal and payable to the purchaser of the Mortgage Loan if such purchaser is also the servicer of such Mortgage Loan, (ii) accrued and unpaid interest thereon at the applicable Mortgage Rate through and including the last day of the month of such purchase, net of any portion of the Servicing Fee and any Servicing Advances and Advances attributable to interest that is payable to the purchaser of the Mortgage Loan if such purchaser is also the servicer of such Mortgage Loan, plus (iii) any costs and damages (if any) incurred by the Purchaser in connection with any violation of such Mortgage Loan of any antipredatory lending laws.

(MLPA § 1 (Weinstein Decl. Ex. F).)

**Plaintiff's Response:** Undisputed.

38.  Section 10 of the MLPA states the following:

> The obligations of MSMCH to cure, purchase or substitute a qualifying Replacement Mortgage Loan shall constitute the Purchaser's, the Trustee's and the Certificateholder's sole and exclusive remedy under this Agreement or otherwise respecting a breach of representations or warranties hereunder with respect to the MSMCH Represented Mortgage Loans.

(MLPA § 10 (Weinstein Decl. Ex. F).)

**Plaintiff's Response:** Undisputed.

39.  Accredited made certain representations about the Accredited Mortgage Loans in

a separate Accredited Assignment and Recognition Agreement ("Accredited ARA").

(Accredited ARA (Weinstein Decl. Ex. I).)

**Plaintiff's Response:**  Undisputed.

40.    Section 10 of the MLPA states the following:

> With respect to any Accredited Mortgage Loan, reference is made to the Accredited Assignment, Assumption and Recognition Agreement attached hereto as Exhibit 8.  In the case of any such breach of a representation or warranty set forth in this Section 10 made by Accredited with respect to an Accredited Mortgage Loan, in the event Accredited fails to cure, substitute or repurchase an Accredited Mortgage Loan within the period specified in the Accredited Assignment, Assumption and Recognition Agreement, MSMCH will cure, substitute or repurchase such Accredited Mortgage Loan in accordance with the terms of the foregoing paragraph.

(MLPA § 10 (Weinstein Decl. Ex. F).)

**Plaintiff's Response:**   Undisputed to the extent that Morgan Stanley has accurately quoted the MLPA.  Disputed to the extent that Morgan Stanley suggests that this passage implies that Morgan Stanley did not also agree to repurchase Accredited Mortgage Loans.  *See* Dkt. 50 ¶ 33; *see also* Shur Decl. Ex. 17 (Defendant's Responses and Objections to Plaintiff's First Set of Requests for Admission) No. 3 ("[Morgan Stanley] admits that the Accredited Assignment and Recognition Agreement is a valid and enforceable contract."); Dkt. 47 (Memorandum Opinion and Order) at 7-9 (ruling that the "MLPA does not by any means unambiguously relieve [Morgan Stanley] of liability for Accredited's breaches" and Morgan Stanley "has an obligation to repurchase defective Accredited Loans").

41.    Fremont made certain representations about the Fremont Mortgage Loans in a Bring Down Agreement between Morgan Stanley and Fremont.   (Fremont Bring Down Agreement (Weinstein Decl. Ex. J).)

**Plaintiff's Response:**   Undisputed.  This fact is irrelevant and immaterial because no breach of the Fremont Bring Down Agreement is alleged and Fremont is not a party to this litigation.

42.     WMC made certain representations about the WMC Mortgage Loans in a Bring Down Agreement between EMC and WMC.  (WMC Bring Down Agreement (Weinstein Decl. Ex. K).)

**Plaintiff's Response:**  Undisputed.  This fact is irrelevant and immaterial because no breach of the WMC Bring Down Agreement is alleged and WMC is not a party to this litigation.

43.     Section 11 of the MLPA assigns the Accredited ARA and Fremont Bring Down Agreement to the Trustee.  (MLPA § 11 (Weinstein Decl. Ex. F).)

**Plaintiff's Response:**  Undisputed.  This fact is irrelevant and immaterial because no breach of the Fremont Bring Down Agreement is alleged.

44.     The PSA defines "Bring Down Agreements" to include the Accredited ARA and the Fremont and WMC Bring Down Agreements.  (PSA § 1 at 10 (Weinstein Decl. Ex. B).)

**Plaintiff's Response:**  Undisputed, except that the PSA refers to the Accredited ARA "dated as of the Closing Date," PSA § 1, at 10 (Weinstein Decl. Ex. B), and the Accredited ARA attached to the Weinstein Declaration as Exhibit I is dated July 3, 2007.  The Trustee refers the Court to the PSA and the other cited agreements as the best evidence of their contents.

45.     Section 2.03(a) of the PSA states the following:

> Upon discovery by any of the parties hereto of a breach of a representation or warranty set forth in the Mortgage Loan Purchase Agreement or any Bring Down Agreement that materially and adversely affects the interests of the Certificateholders in any Mortgage Loan, the party discovering such breach shall give prompt written notice thereof to the other parties of this Agreement.

(PSA § 2.03(a) (Weinstein Decl. Ex. B).)

**Plaintiff's Response:**  Undisputed.

46.     Section 2.02(d) of the PSA states the following:

>   On behalf of the Trust, the Trustee shall enforce the obligation of the Sellers under the Mortgage Loan Purchase Agreement or the related Originator under the related Bring Down Agreement to repurchase, cure or substitute for any Mortgage Loan for which a breach of a representation or warranty made by such party exists and any other obligations of the related Seller or the related Originator under such agreements, including, without limitation, the obligation of the Sponsor to repurchase, cure, or substitute for any Mortgage Loan originated by Accredited in the event that Accredited fails to repurchase, cure or substitute for such Mortgage Loan.

(PSA § 2.02(d) (Weinstein Decl. Ex. B).)

**Plaintiff's Response:**  Undisputed.

47.     Exhibit B Section (v) of the Accredited ARA states the following:

>   <u>Conformance with Agency and Underwriting Guidelines</u>.  The Mortgage Loan was underwritten in accordance with the Underwriting Guidelines (a copy of which is attached to the Purchase Agreements as Exhibit G).  The Mortgage Note and Mortgage are on forms acceptable to Freddie Mac or Fannie Mae and the Seller has not made any representations to a Mortgagor that are inconsistent with the mortgage instruments used;

(Accredited ARA Ex. B § (v) (Weinstein Decl. Ex. I).)

**Plaintiff's Response:**  Undisputed to the extent that Morgan Stanley accurately quotes the Accredited ARA.  Disputed to the extent that Morgan Stanley suggests that the existence of this representation and warranty is relevant to the interpretation of MLPA § 10(b)(5).  *See* Shur Decl. Ex. 18 (Aronoff Rpt.) ¶ 70 (opinion of James H. Aronoff, who has more than 30 years of experience in the structured finance industry, focusing on RMBS in particular, and has participated at almost every level of the RMBS process and industry, that "RMBS investors frequently obtained overlapping representations and warranties," and "[i]t is not uncommon or surprising that the same underlying loan deficiency can violate both the 'no fraud, error, omission, misrepresentation or similar occurrence' representations and warranties and the MLS

20

Representations," and that he "know[s] from personal experience that it is not at all unusual for a single defect in a loan to violate multiple representations and warranties" (emphasis omitted)); *see* Shur Decl. Ex. 19 (Burnaman Dep. Tr.) at 332:17-333:14, 341:3-11 (admission by Morgan Stanley's expert, Phillip Burnaman, that § 10(b)(5) "covers negligence" by underwriters because it "cover[s] . . . any person . . . involved in the origination of the loan," and "[a]n underwriter . . . would be a party involved in the origination of the loan . . . with the knowledge of [Morgan Stanley]"); Weinstein Decl. Ex. EE ¶ 76 ("Based on my more than 40 years of experience in the banking and mortgage industry, it is my opinion that failure to comply with the underwriting guidelines constitutes, at a minimum, error, omission, misrepresentation, negligence, or other similar occurrence."); Weinstein Decl. Ex. BB ¶ 62 (127 loans violated § 10(b)(5) "including because the lender committed errors and/or acted negligently, such as by failing to comply with its own underwriting guidelines").

48.    Section 9.02(v) of the Second Amended and Restated Mortgage Loan Purchase and Warranties Agreement, dated as of November 1, 2006, between Morgan Stanley Mortgage Capital Inc. as Purchaser and Fremont Investment & Loan as Seller (the "Fremont 2d Am. MLPWA") states the following:

> <u>Conformance with Underwriting Guidelines</u>.  The Mortgage Loan was underwritten in accordance with the Underwriting Guidelines in effect at the time of origination (a copy of which is attached to the related Assignment and Conveyance as Exhibit B).  The Mortgage Note and Mortgage are on forms acceptable to Freddie Mac or Fannie Mae and no representations have been made to a Mortgagor that are inconsistent with the mortgage instruments used;

(Fremont 2d Am. MLPWA § 9.02(v) (Weinstein Decl. Ex. L).)

**Plaintiff's Response:**  Undisputed to the extent that Morgan Stanley accurately quotes the Fremont Second Amended MLPWA.  Disputed to the extent that Morgan Stanley suggests

that this provision is relevant to the interpretation of MLPA § 10(b)(5).  *See* Shur Decl. Ex. 18 ¶ 70.

49.     Section 9.02(v) of the Fifth Amended and Restated Mortgage Loan Purchase and Warranties Agreement, dated as of November 1, 2006, between Morgan Stanley Mortgage Capital Inc. as Purchaser and WMC Mortgage Corp. as Seller (the "WMC 5th Am. MLPWA") states the following:

> <u>Conformance with Agency and Underwriting Guidelines</u>.  The Mortgage Loan was underwritten in accordance with the Underwriting Guidelines, as may be amended from time to time by the Seller (a copy of which is attached to each related Assignment and Conveyance Agreement).  The Mortgage Note and Mortgage are on forms acceptable to prudent mortgage lenders in the secondary mortgage market and no representations have been made to a Mortgagor that are inconsistent with the mortgage instruments used;

(WMC 5th Am. MLPWA § 9.02(v) (Weinstein Decl. Ex. M).)

**Plaintiff's Response:**  Undisputed to the extent that Morgan Stanley accurately quotes the WMC Fifth Amended MLPWA.  Disputed to the extent that Morgan Stanley suggests that this provision is relevant to the interpretation of MLPA § 10(b)(5).  *See* Shur Decl. Ex. 18 ¶ 70.

50.     Section 9.02(v) of the Sixth Amended and Restated Mortgage Loan Purchase and Warranties Agreement, dated as of February 1, 2007, between Morgan Stanley Mortgage Capital Inc. as Purchaser and WMC Mortgage Corp. as Seller (the "WMC 6th Am. MLPWA") states the following:

> <u>Conformance with Agency and Underwriting Guidelines</u>.  The Mortgage Loan was underwritten in accordance with the Underwriting Guidelines, as may be amended from time to time by the Seller or GEMB (a copy of which is attached to each related Assignment and Conveyance Agreement).  The Mortgage Note and Mortgage are on forms acceptable to prudent mortgage lenders in the secondary mortgage market and no representations have been made to a Mortgagor that are inconsistent with the mortgage instruments used;

(WMC 6th Am. MLPWA § 9.02(v) (Weinstein Decl. Ex. N).)

**Plaintiff's Response:** Undisputed to the extent that Morgan Stanley accurately quotes the WMC Sixth Amended MLPWA. Disputed to the extent that Morgan Stanley suggests that this provision is relevant to the interpretation of MLPA § 10(b)(5). *See* Shur Decl. Ex. 18 ¶ 70.

51. Exhibit B Section (k) of the Accredited ARA states the following:

> Validity of Mortgage Documents. The Mortgage Note and the Mortgage and any other agreement executed and delivered by a Mortgagor in connection with a Mortgage Loan are genuine, and each is the legal, valid and binding obligation of the maker thereof enforceable in accordance with its terms (including, without limitation, any provisions therein relating to Prepayment Penalties). All parties to the Mortgage Note, the Mortgage and any other such related agreement had legal capacity to enter into the Mortgage Loan and to execute and deliver the Mortgage Note, the Mortgage and any such agreement, and the Mortgage Note, the Mortgage and any other such related agreement have been duly and properly executed by other such related parties. No fraud, error, omission, misrepresentation or similar occurrence with respect to the origination of a Mortgage Loan has taken place on the part of any Person, including, without limitation, the Mortgagor, any appraiser, any builder or developer, or any other party involved in the origination of the Mortgage Loan. The Seller has reviewed all of the documents constituting the Servicing File and has made such inquiries as it deems necessary to make and confirm the accuracy of the representations set forth herein;

(Accredited ARA Ex. B § (k) (Weinstein Decl. Ex. I).)

**Plaintiff's Response:** Undisputed.

52. Section 9.02(k) of the Fremont 2d Am. MLPWA states the following:

> Validity of Mortgage Documents. The Mortgage Note and the Mortgage and any other agreement executed and delivered by a Mortgagor in connection with a Mortgage Loan are genuine, and each is the legal, valid and binding obligation of the maker thereof enforceable in accordance with its terms (including, without limitation, any provisions therein relating to Prepayment Penalties). All parties to the Mortgage Note, the Mortgage and any other such related agreement had legal capacity to enter into the Mortgage Loan and to execute and deliver the Mortgage Note, the Mortgage and any such agreement, and the Mortgage Note, the

Mortgage and any other such related agreement have been duly and properly executed by other such related parties. The·documents, instruments and agreements submitted for loan underwriting were not falsified by the Seller or, to the best knowledge of the Seller, by the Mortgagor or the appraiser, at the time of the origination of the Mortgage Loan.   No fraud, error, omission, misrepresentation, negligence or similar occurrence with respect to a Mortgage Loan has taken place on the part of the Seller or, to the Seller's knowledge, any other Person, including without limitation, the Mortgagor, any appraiser, any builder or developer, or any other party involved in the origination of the Mortgage Loan or in the application for any insurance in relation to such Mortgage Loan, where (A) such fraud, error, omission, misrepresentation, negligence or similar occurrence misrepresented a mortgagor's ability to comply with the terms of the related Mortgage Loan or (B) had such fraud, error, omission, misrepresentation, negligence or similar occurrence been known, would have changed (x) the originator's decision to originate the Mortgage Loan or to originate the Mortgage Loan at the same interest rate, the same points and fees, and all other applicable origination terms relating to the Mortgage Loan, or (y) the Purchaser's decision to purchase the Mortgage Loan on the related Closing Date.   The Seller has reviewed all of the documents constituting the Servicing File and has made such inquiries as it deems necessary to make and confirm the accuracy of the representations set forth herein and neither the Seller nor any Affiliate has made any representations to a Mortgagor that are inconsistent with the mortgage instruments used;

(Fremont 2d Am. MLPWA § 9.02(k) (Weinstein Decl. Ex. L).)

**Plaintiff's Response:**  Undisputed.

53.   Section 9.02(k) of the WMC 5th Am. MLPWA states the following:

Validity of Mortgage Documents.   The Mortgage Note and the Mortgage and any other agreement executed and delivered by a Mortgagor in connection with a Mortgage Loan are genuine, and each is the legal, valid and binding obligation of the maker thereof enforceable in accordance with its terms (including, without limitation, any provisions therein relating to prepayment penalties), subject to bankruptcy, equitable principles and laws affecting creditor rights.   All parties to the Mortgage Note, the Mortgage and any other such related agreement had legal capacity to enter into the Mortgage Loan and to execute and deliver the Mortgage Note, the Mortgage and any such agreement, and the Mortgage Note, the Mortgage and any other such related agreement have been duly

and properly executed by other such related parties. No fraud, error, omission, misrepresentation, negligence or similar occurrence with respect to a Mortgage Loan has taken place on the part of the Seller in connection with the origination of the Mortgage Loan or in the application of any insurance in relation to such Mortgage Loan. Notwithstanding the foregoing, but without limiting the other representations and warranties set forth elsewhere in this Agreement, if any error, omission or negligence in the origination of such Mortgage Loan occurred despite Seller's conformance with its Underwriting Guidelines (as in effect at the time such Mortgage Loan was made), then there shall be a presumptive conclusion that there was no error, omission or negligence. No fraud, misrepresentation, or similar occurrence or, to Seller's knowledge, error, omission, or negligence with respect to a Mortgage Loan has taken place on the part of any Person (other than Seller), including without limitation, the Mortgagor, any appraiser, any builder or developer, or any other party involved in the origination of the Mortgage Loan or in the application for any insurance in relation to such Mortgage Loan. The Seller has reviewed all of the documents constituting the Servicing File and has made such inquiries as it deems necessary to make and confirm the accuracy of the representations set forth herein;

(WMC 5th Am. MLPWA § 9.02(k) (Weinstein Decl. Ex. M).)

**Plaintiff's Response:** Undisputed.

54.  Section 9.02(k) of the WMC 6th Am. MLPWA states the following:

Validity of Mortgage Documents. The Mortgage Note and the Mortgage and any other agreement executed and delivered by a Mortgagor in connection with a Mortgage Loan are genuine, and each is the legal, valid and binding obligation of the maker thereof enforceable in accordance with its terms (including, without limitation, any provisions therein relating to prepayment penalties), subject to bankruptcy, equitable principles and laws affecting creditor rights. All parties to the Mortgage Note, the Mortgage and any other such related agreement had legal capacity to enter into the Mortgage Loan and to execute and deliver the Mortgage Note, the Mortgage and any such agreement, and the Mortgage Note, the Mortgage and any other such related agreement have been duly and properly executed by other such related parties. No fraud, error, omission, misrepresentation, negligence or similar occurrence with respect to a Mortgage Loan has taken place on the part of the Seller in connection with the origination of the Mortgage Loan or in the application of any insurance in relation to

such Mortgage Loan.  Notwithstanding the foregoing, but without limiting the other representations and warranties set forth elsewhere in this Agreement, if any error, omission or negligence in the origination of such Mortgage Loan occurred despite Seller's conformance with the Underwriting Guidelines (as in effect at the time such Mortgage Loan was made), then there shall be a presumptive conclusion that there was no error, omission or negligence.  No fraud, misrepresentation, or similar occurrence or, to Seller's knowledge, error, omission, or negligence with respect to a Mortgage Loan has taken place on the part of any Person (other than Seller), including without limitation, the Mortgagor, any appraiser, any builder or developer, or any other party involved in the origination of the Mortgage Loan or in the application for any insurance in relation to such Mortgage Loan. The Seller has reviewed all of the documents constituting the Servicing File and has made such inquiries as it deems necessary to make and confirm the accuracy of the representations set forth herein;

(WMC 6th Am. MLPWA § 9.02(k) (Weinstein Decl. Ex. N).)

> **Plaintiff's Response:**  Undisputed.

## IV.   Deutsche Bank's Understanding of the Repurchase Protocol

55.   In <u>Royal Park Investments SA/NV v. Deutsche Bank National Trust Company</u>, No. 14-CV-4394 (S.D.N.Y.), Deutsche Bank submitted a memorandum of law in support of its motion to dismiss and stated the following:

> [T]he cure obligations of the Warrantors—to either repurchase the offending loan <u>at</u> <u>the</u> <u>purchase</u> <u>price</u> of the original loan or to substitute the offending loan with a "Qualifying Substitute Mortgage Loan," <u>i.e.</u>, a loan of the same price, outstanding balance, interest rate, quality, and risk, etc.—necessarily requires detailed information about the specific offending mortgage loan.

(Memorandum of Law in Support of the Motion to Dismiss of Defendant Deutsche Bank Nat'l Trust Co., as Trustee, at 29, <u>Royal Park Investments SA/NV v. Deutsche Bank National Trust Company</u>, No. 14-CV-4394-AJN (S.D.N.Y. Mar. 2, 2015) (Dkt. No. 55) (citations omitted) (emphasis in original) (Weinstein Decl. Ex. O).)

**Plaintiff's Response:**  Undisputed to the extent that Morgan Stanley accurately quotes that submission.  Disputed to the extent that Morgan Stanley suggests that this document, which was submitted by Deutsche Bank National Trust Co. as Trustee for other trusts in another case, governed by other contracts, is relevant to the Trustee's "understanding" of the securitization agreements in this case.  *See* Weinstein Decl. Ex. O at 20-22, 27-36 (addressing whether breaches should have been discovered by virtue of the trustee's limited role in the securitization); *see also id.* at 30 (citing authority for the proposition that an RMBS sponsor's discovery of breaches can be proven by evidence of (1) the sponsor's own due diligence; (2) forensic analysis revealing "'obvious and widespread breaches'"; and (3) identification of specific breaches in the trust at issue).

56.    In National Credit Union Administration Board v. Deutsche Bank National Trust Co., No. 14-cv-8919 (S.D.N.Y.), Deutsche Bank submitted a memorandum of law in support of its motion to dismiss and stated the following with respect to 97 governing agreements ("GAs") providing for repurchase of mortgage loans upon notice or discovery of a breach of a representation and warranty ("R&W"):  "Both the language and the structure of the GAs necessarily require that both the breach, and the knowledge of the breach, of an R&W be at the single mortgage loan level."  (Memorandum of Law in Support of the Motion to Dismiss of Defendant Deutsche Bank Nat'l Trust Co., as Trustee, at 27, Nat'l Credit Union Admin. Board v. Deutsche Bank Nat'l Trust Co., No. 14-cv-8919 (S.D.N.Y. May 1, 2015) (Dkt. No. 47) (emphasis in original) (Weinstein Decl. Ex. P).)

**Plaintiff's Response:**  Undisputed to the extent that Morgan Stanley accurately quotes that submission.  Disputed to the extent that Morgan Stanley suggests that this document, which was submitted by Deutsche Bank National Trust Co. as Trustee for other trusts in another case,

governed by other contracts, is relevant to the Trustee's "understanding" of the securitization

agreements in this case.  *See* Weinstein Decl. Ex. P at 20-21, 26-33 (addressing whether breaches

should have been discovered by virtue of the trustee's limited role in the securitization); *see also*

*id.* at 28-29 (citing authority for the proposition that an RMBS sponsor's discovery of breaches

can be proven by evidence of (1) the sponsor's own due diligence; (2) forensic analysis revealing

"'obvious and widespread breaches'"; and (3) identification of specific breaches in the trust at

issue).

     57.    In Phoenix Light SF Ltd. v. Deutsche Bank National Trust Co., No. 14-cv-10103

(S.D.N.Y.), Deutsche Bank submitted a memorandum of law in support of its motion to dismiss

the second amended complaint and stated the following:

> [W]here a governing agreement "contain[s] specific representations about particular sets of Mortgage Loans," a party has knowledge of a breach only if it has "actual, specific knowledge of the falsity of . . . particular statements." See FHFA v. HSBC N. Am. Holdings Inc., 33 F. Supp. 3d 455, 477-80 (S.D.N.Y. 2014).  "Actual knowledge of falsity means just that . . . .  Even suspicion of falsity, before it ripens into actual knowledge, will not suffice." Id. at 481; see also U.S. Bank N.A. v. Citigroup Glob. Mkts. Realty Corp., No. 13-cv-6989-GBD, 2014 WL 7714382 (S.D.N.Y. Nov. 14, 2014) ("speculative" allegations regarding knowledge of R&W breaches insufficient); Deutsche Zentral-Genossenchaftsbank AG v. HSBC N. Am. Holdings Inc., No. 12 Civ. 4025(AT), 2013 WL 6667601, at *13 (S.D.N.Y. Dec. 17, 2013) (allegations regarding poor performance of mortgage loans do "not speak to why the investments were performing poorly").

(Memorandum of Law in Support of Motion to Dismiss the Second Amended Complaint by

Defendant Deutsche Bank Nat'l Trust Co., as Trustee, at 22, Phoenix Light SF Ltd. v. Deutsche

Bank Nat'l Trust Co., No. 14-cv-10103-JGK (S.D.N.Y. Aug. 14, 2015) (Dkt. No. 36) (alterations

in original) (Weinstein Decl. Ex. Q).)

**Plaintiff's Response:** Undisputed to the extent that Morgan Stanley accurately quotes that submission. Disputed to the extent that Morgan Stanley suggests that this document, which was submitted by Deutsche Bank National Trust Co. as Trustee for other trusts in another case, governed by other contracts, is relevant to the Trustee's "understanding" of the securitization agreements in this case. *See* Weinstein Decl. Ex. Q at 21-23, 27-29 (addressing whether breaches should have been discovered by virtue of the trustee's limited role in the securitization).

58.    In IKB International, S.A. v. Deutsche Bank National Trust Co., No. 654439/2015 (Sup. Ct. N.Y. Cty.), Deutsche Bank submitted a memorandum of law in support of its motion to dismiss the complaint and stated the following:

> "[B]ecause the Agreements contain a *loan-specific* . . . remedy," Plaintiffs "cannot save [their] claim[s] by arguing that [Defendants were] *generally* aware of 'pervasive breaches' of R&Ws" or other contractual obligations.

(Defendants' Joint Memorandum of Law in Support of Motion to Dismiss at 10, IKB Int'l, S.A. v. Deutsche Bank Nat'l Trust Co., No. 654439/2015 (Sup. Ct. N.Y. Cty. Oct. 5, 2016) (Dkt. No. 26) (alterations in the original) (quoting U.S. Bank, N.A. v. Citigroup Glob. Mkts. Realty Corp., No. 13 Civ. 6989 (GBD), 2015 WL 1222075, at *3 (S.D.N.Y. Mar. 13, 2015)) (Weinstein Decl. Ex. R).)

**Plaintiff's Response:** Undisputed to the extent that Morgan Stanley accurately quotes that submission. Disputed to the extent that Morgan Stanley suggests that this document, which was submitted by Deutsche Bank National Trust Co. as Trustee for other trusts in another case governed by other contracts, is relevant to the Trustee's "understanding" of the securitization agreements in this case. *See* Weinstein Decl. Ex. R at 12-15, 24-25 (addressing whether breaches should have been discovered by virtue of the trustee's limited role in the securitization).

### V.      Repurchase Demands

59.      On April 2, 2013, two certificateholders in MSST 2007-1 sent a letter to Deutsche Bank identifying purported breaches by Morgan Stanley and demanding that Deutsche Bank seek repurchase from Morgan Stanley.  (Compl. Ex. 3 (Weinstein Decl. Ex. A); Letter from Melissa Rossiter to Morgan Stanley, Ex. A (Apr. 4, 2013) (Weinstein Decl. Ex. S).)

**Plaintiff's Response:**      Undisputed, with the exception of the argumentative characterization of the identified breaches as "purported breaches."  *See* Weinstein Decl. Ex. A; Weinstein Decl. Ex. S at MSM_MSSTI_20071_0348159 to MSM_MSSTI_20071_0348167 (advising of "material and adverse breaches of representations and warranties by Morgan Stanley" in 1,620 loans and stating that the "repurchase request reflect[ed] only current findings," that loan review was ongoing, and that the Trustee "reserv[ed] [the] right to give notice of additional breaches").

60.      On April 4, 2013, Deutsche Bank forwarded to Morgan Stanley a letter from two certificateholders in MSST 2007-1, which purported to provide notice of alleged breaches of representations and warranties with respect to approximately 1,620 Mortgage Loans (the "Demand Letter").  (See Compl. ¶47 & Ex. 3 (Weinstein Decl. Ex. A); Letter from Melissa Rossiter to Morgan Stanley (Apr. 4, 2013) (Weinstein Decl. Ex. S).)

**Plaintiff's Response:**      Undisputed, with the exception of the argumentative characterization of the letter as "purport[ing] to provide notice of alleged breaches."  Weinstein Decl. Ex. A; Weinstein Decl. Ex. S at MSM_MSSTI_20071_0348159 to MSM_MSSTI_20071_0348167 (providing notice of "material and adverse breaches of representations and warranties by Morgan Stanley" in 1,620 loans, demanding that Morgan Stanley "repurchase" all loans "in material breach of a representation or warranty," and stating

that the "repurchase request reflect[ed] only current findings," that loan review was ongoing, and that the Trustee "reserv[ed] [the] right to give notice of additional breaches").

61.     On April 3, 2013, two certificateholders in MSST 2007-1 sent a letter to Deutsche Bank, copying Accredited, identifying purported breaches by Accredited and demanding that Deutsche Bank seek repurchase from Accredited.  (Compl. Ex. 4 (Weinstein Decl. Ex. A).)

**Plaintiff's Response:**   Undisputed, with the exception of the argumentative characterization of the identified breaches as "purported breaches."  *See* Compl. Ex. 4 (Weinstein Decl. Ex. A) (identifying "material and adverse breaches of representations and warranties by Accredited").

62.     On April 8, 2013, counsel for Accredited sent a letter to the certificateholders, stating "[i]t may be worth noting that [the] Trustee receiving your letter did file proofs of claims in Accredited's bankruptcy case, and has received distributions on account of these claims." (Compl. Ex. 4 (Weinstein Decl. Ex. A).)

**Plaintiff's Response:**   Undisputed insofar as the April 8, 2013 letter contains that statement.

63.     Morgan Stanley responded to the Demand Letter within 90 days of receiving it, agreed to repurchase 149 Mortgage Loans identified therein, and disputed the remaining breach allegations on various grounds.   (Compl. ¶ 67 & Ex. 3 (Weinstein Decl. Ex. A); Letter from Steve Covington to Melissa Rossiter (July 3, 2013) (Weinstein Decl. Ex. T).)

**Plaintiff's Response:**   Undisputed subject to the clarification that Morgan Stanley refused to repurchase any other loans.  Dkt. 50 ¶ 47.

64.     Plaintiff's reunderwriting and appraisal experts have not expressed opinions on the loans identified in the Demand Letter.

**Plaintiff's Response:** Disputed. *See* Weinstein Decl. Exs. AA, BB, EE; Shur Decl. Ex. 20 (collectively, Hunter and Kilpatrick expert reports); *see also* Weinstein Decl. Ex. U ¶30 (Dr. Nelson R. Lipshutz's explanation that his sampling methodology in this case "provide[s] a sound and accepted statistical basis for assessing the extent of [Morgan Stanley's] deficiency or defect rate" that "can be scientifically validly extrapolated to the entire pool of loans to determine the deficiency or defect rate for the securitization").

65.   Prior to filing suit, Deutsche Bank did not identify for Morgan Stanley any particular loans in this Trust that it alleged to be in breach other than those identified in the Demand Letter.

**Plaintiff's Response:** Disputed. *See* Weinstein Decl. Ex. S at MSM_MSSTI_20071_ 0348160 (stating that the "repurchase request reflect[ed] only current findings," that loan review was ongoing, and that the Trustee "reserv[ed] [the] right to give notice of additional breaches").

66.   Deutsche Bank has not identified a single loan in the Trust that has not been repurchased as to which Morgan Stanley had actual knowledge that such loan contained a material breach of representations and warranties that Morgan Stanley discovered on its own.

**Plaintiff's Response:** Disputed. *See* MLPA § 10 (Weinstein Decl. Ex. F) (no "actual knowledge" requirement); Dkt. 50 ¶20; Shur Decl. Ex. 17 Nos. 8-9 (Morgan Stanley's admission that it performed due diligence on the loans); Weinstein Decl. Ex. BB ¶¶82-109, 114 (identifying breaches that would have been apparent during due diligence, including misrepresentations of income, employment, debt, and occupancy; failure to comply with underwriting guidelines or other principles of prudent underwriting; and defective appraisals); Shur Decl. Ex. 21 (MSM_MSSTI_20071_0266642) (revealing that 304 loans in MSST 2007-1 had "material credit and compliance problems," including "uncurable compliance violations" and "incomplete or

inaccurate documentation"); Shur Decl. Exs. 5-10 (due diligence documents from Morgan Stanley's vendor giving at least 86 of the loans in the Trust the highest risk rating available); Shur Decl. Ex. 22 (MSM_MSSTI_20071_0417700) (post-closing fraud review); Shur Decl. Ex. 3, at 181:15-25 (Morgan Stanley also identified "red flag[s]" in appraisals for loans in the Trust); *see also* Shur Decl. Ex. 23 (MSM_MSSTI_20071_0109529) (loan ███ 6895); Shur Decl. Ex. 24 (MSM_MSSTI_20071_0210247) (loans ███ 8983 and ███ 5888); Shur Decl. Ex. 25 (MSM_MSSTI_20071_0153984) (loans ███ 7794, ███ 9465, and ███ 5270); Shur Decl. Ex. 26 (MSM_MSSTI_20071_0210249) (loans ███ 5268 and ███ 7133); Shur Decl. Ex. 27 (MSM_MSSTI_20071_0169013) (loans ███ 7228, ███ 2611, ███ 5370, ███ 3388, ███ 0759, ███ 9964, and ███ 9776) (additional due diligence documents); *see also* ¶¶ 141-145, 161, *infra* (similar).

67.     Deutsche Bank and Morgan Stanley agreed to toll the statute of limitations from July 3, 2013 until April 25, 2014.  On April 28, 2014, the final day of the limitations period inclusive of the tolling period, Deutsche Bank filed the present suit.

**Plaintiff's Response:**  Undisputed.

## VI.     Deutsche Bank's Sampling Expert

68.     On August 22, 2016, Deutsche Bank served the expert report of its sampling expert, Dr. Nelson R. Lipshutz.  (Expert Report of Dr. Nelson R. Lipshutz ("Lipshutz Rpt.") (Weinstein Decl. Ex. U).)

**Plaintiff's Response:**   Undisputed except for the statement that Dr. Lipshutz is the Trustee's "sampling expert."  Dr. Lipshutz is the Trustee's statistics expert.  Weinstein Decl. Ex. U ¶¶2-4 (noting Dr. Lipshutz's more than 46 years' experience in carrying out economic,

financial, and statistical studies, including but not limited to statistical sampling in cases like this one).

69.    On January 25, 2017, Deutsche Bank served the expert rebuttal report of its sampling expert, Dr. Nelson R. Lipshutz.  (Expert Rebuttal Report of Dr. Nelson R. Lipshutz ("Lipshutz Rebuttal Rpt.") (Weinstein Decl. Ex. V).)

**Plaintiff's Response:**  Undisputed except for the statement that Dr. Lipshutz is the Trustee's "sampling expert."  Dr. Lipshutz is the Trustee's statistics expert.  Weinstein Decl. Ex. U ¶¶2-4.

70.    Based on Mr. Hunter's and Dr. Kilpatrick's loan-specific findings for 398 loans in the sample selected by Dr. Lipshutz, Dr. Lipshutz calculated a "breach rate" for the Trust as a whole.  (Lipshutz Rebuttal Rpt. ¶31 (Weinstein Decl. Ex. V).)

**Plaintiff's Response:**  Undisputed with the clarification that the 400 loans that were originally included in the sample were randomly selected by Dr. Lipshutz.  Weinstein Decl. Ex. U ¶¶4, 8, 13; *see also id.* ¶23 (explaining that one of the loans in the original sample paid in full shortly after the sample was drawn and another loan had insufficient data to permit re-underwriting).

71.    During his deposition taken on March 15, 2017, Dr. Lipshutz was asked the following questions and gave the following answers:

> Q.     Is it fair to say that it is – that you are unable to say for any specific loan that is not part of your sample whether it breaches any representations?
>
> MS. PARTHUM:     Objection.
>
> A.     All that a sample is supposed to do, intended to do, can do, is provide information on the overall average properties of the population.  It cannot give information on an individual loan – this is well-known – and I would not dispute it because it's true.

You can't get information on an individual loan from a sample except for the loans within the sample. Okay. On those you've got information. But the rest of it, you can't pull another unsampled loan out of the pile and say, given the statistical analysis, this is what it is.

You can say at best, well, if there's a lot of breaching loans, the odds are better than not that it is breaching, but you can't identify those results to an individual loan. That's true.

Q.    So if I show you a specific loan that is not part of the sample, you're unable to say whether there is a breach in this loan or what specific breach, if any, there is in this loan; correct?

MS. PARTHUM:    Objection.

A.    Not based on the results of the sample.

(Deposition Transcript of Dr. Nelson R. Lipshutz ("Lipshutz Tr.") at 70:3-71:7 (Weinstein Decl. Ex. W).)

**Plaintiff's Response:**   Undisputed only insofar as Dr. Lipshutz was asked the cited questions and gave the cited answers and counsel for the Trustee made the cited objections.

## VII.   Deutsche Bank's Economic Damages Expert

72.    On August 22, 2016, Deutsche Bank served the expert report of Dr. Joseph R. Mason. (Expert Report of Dr. Joseph R. Mason ("Mason Rpt.") (Weinstein Decl. Ex. X).)

**Plaintiff's Response:**  Undisputed.

73.    On January 25, 2017, Deutsche Bank served the expert rebuttal report of Dr. Joseph R. Mason. (Expert Rebuttal Report of Dr. Joseph R. Mason ("Mason Rebuttal Rpt.") (Weinstein Decl. Ex. Y).)

**Plaintiff's Response:**  Undisputed.

74.    Dr. Mason calculates "damages" based on: (i) Realized Loss, as defined in the PSA, for inactive loans plus "interest on the Realized Loss amount from the date at which the loss is recognized to the Valuation Date," (ii) "Realized Loss on active loans that are specifically

related to reductions in loan principal balance," and (iii) "estimate[d] probable losses to the end of the loans' expected lives . . . discounted to net present value from the date upon which Realized Loss is estimated to the Valuation Date."   (Mason Rpt. ¶¶39-51 (Weinstein Decl. Ex. X).)

**Plaintiff's Response:**  Undisputed that this is one means by which Dr. Mason calculated damages.  Disputed to the extent that it implies this is the only damages calculation that Dr. Mason used.  Weinstein Decl. Ex. X ¶¶35-52 & p. 18 (Tables); Weinstein Decl. Ex. Y ¶¶124-125 & Table 5 (calculating damages of approximately $231-$305 million).  The Trustee adds that Dr. Mason determined that as of June 2016, $236.2 million of the Trust's $333.5 million in realized losses were attributable to liquidated loans.  Weinstein Decl. Ex. X ¶45.

75.    Dr. Mason estimated damages as "the effects of repurchasing the portion of material and adverse breach ('Breach') loans that have resulted in a loss to the Trust":

> While repurchase is not contingent upon loss, I use Realized Loss to assess damages because it reflects the beneficial monetary effect of repurchase upon the Trust, net of the relevant recoveries on the subject loans.   The Pooling and Servicing Agreement defines Realized Loss as:
>
>> With respect to each Mortgage Loan as to which a Final Recovery Determination has been made, an amount (not less than zero) equal to (i) the unpaid principal balance of such Mortgage Loan as of the commencement of the calendar month in which the Final Recovery Determination was made, plus (ii) accrued interest from the Due Date as to which interest was last paid by the Mortgagor though the end of the calendar month in which such Final Recovery Determination was made, calculated in the case of each calendar month during such period (A) at an annual rate equal to the annual rate at which interest was then accruing on such Mortgage Loan and (B) on a principal amount equal to the Stated Principal Balance of such Mortgage Loan as of the close of business on the Distribution Date during such calendar month, minus (iii) the proceeds, if any, received in respect of such Mortgage Loan during the calendar month in which such Final Recovery

Determination was made, net of amounts that are payable therefrom to the related Servicer pursuant to the related Servicing Agreement.  In addition, to the extent the related Servicer receives Subsequent Recoveries with respect to any Mortgage Loan, the amount of the Realized Loss with respect to that Mortgage Loan will be reduced to the extent such recoveries are distributed to any Class of Certificates o[r] applied to increase Excess Spread on any Distribution Date.

Since Realized Loss is net of "amounts payable therefrom to the related Servicer," there is no need to estimate servicing fees and costs associated with each loan liquidation.

Realized Loss also includes accrued and unpaid interest on the loan through the month in which the loss is recognized, in assessing interest on unpaid principal balances "from the Due Date as to which interest was last paid by the Mortgagor through the end of the calendar month in which such Final Recovery Determination was made."  Pursuant to the Purchase Price definition, therefore, I need only compute interest on the Realized Loss amount from the date at which the loss is recognized to the Valuation Date.

(Mason Rpt. ¶¶39-41 (Weinstein Decl. Ex. X) (footnotes and citations omitted).)

**Plaintiff's Response:**  Undisputed to the extent that Morgan Stanley accurately quotes Dr. Mason's Report.  Disputed to the extent that Morgan Stanley suggests that this is the only damages calculation Dr. Mason performed.  Weinstein Decl. Ex. X ¶¶35-52 & p. 18 (Tables). The Trustee adds that Dr. Mason determined that as of June 2016, $236.2 million of the Trust's $333.5 million in realized losses were attributable to liquidated loans.  *Id.* ¶45.

76.    Dr. Mason stated in his report:

I use the dollar proportion of Breach loans relative to the dollar amount of all loan balances from the sample of loans implemented by Dr. Lipshutz and Mr. Hunter (the "Breach Ratio") to estimate the amount of Realized Losses that would have been avoided by certificateholders had MSMCH honored its repurchase obligations.

(Mason Rpt. ¶48 (Weinstein Decl. Ex. X).)

**Plaintiff's Response:**  Undisputed.

77.     During his deposition taken on March 27, 2017, Dr. Mason was asked the following question and gave the following answer:

> Q.     And, again, the loans that prepaid didn't cause damages because they paid off in full?
>
> A.     That's right.

(Deposition Transcript of Dr. Joseph R. Mason ("Mason Tr.") at 147:22-25 (Weinstein Decl. Ex. Z).)

**Plaintiff's Response:**  Undisputed only insofar as Dr. Mason was asked the cited question and gave the cited answer.

78.     During his deposition taken on March 27, 2017, Dr. Mason was asked the following question and gave the following answer:

> Q.     With respect to Mr. Hunter's findings of breaches, are you offering an opinion on whether any of those breaches is material?
>
> MR. WEINER:        Same objection.
>
> A.     No.

(Mason Tr. at 114:20-24 (Weinstein Decl. Ex. Z).)

**Plaintiff's Response:**  Undisputed only insofar as Dr. Mason was asked the cited question and gave the cited answer and counsel for the Trustee made the cited objection.

## VIII.  Deutsche Bank's Appraisal Expert

79.     On August 22, 2016, Deutsche Bank served the expert report of Dr. John A. Kilpatrick.   (Expert Report of Dr. John A. Kilpatrick ("Kilpatrick Rpt.") (Weinstein Decl. Ex. AA).)

**Plaintiff's Response:**  Undisputed.  The Trustee adds that, on January 25, 2017, the Trustee served the rebuttal expert report of Dr. John A. Kilpatrick.  Shur Decl. Ex. 20.

80.     For his analysis, Dr. Kilpatrick reviewed the sample of loans selected by

Dr. Nelson R. Lipshutz.  (Kilpatrick Rpt. at 3 (Weinstein Decl. Ex. AA).)

**Plaintiff's Response:**  Undisputed.

81.     Dr. Kilpatrick stated the following in his report:

> In reaching the opinions and findings set forth in this report, I used
> the Greenfield Automated Valuation Model ("GAVM") to help me
> value the properties collateralizing the Loans (the "Properties").
> The GAVM is an automated valuation model ("AVM") that uses
> mathematical modeling to value comparable properties . . . .
>
> The GAVM provides "retrospective" values for each Property,
> meaning that each Valuation was calculated as of the date of that
> Property's original appraisal.

(Kilpatrick Rpt. at 5-6 (Weinstein Decl. Ex. AA) (footnotes and citations omitted).)

**Plaintiff's Response:**  Undisputed to the extent that Morgan Stanley accurately quotes

Dr. Kilpatrick's report.  Disputed to the extent that Morgan Stanley suggests that this is the only

purpose for which Dr. Kilpatrick ran his GAVM.  *See* Weinstein Decl. Ex. AA at 1, 3-7

(explaining that Dr. Kilpatrick ran his proprietary GAVM to determine whether the appraisals

used to generate LTV values for the mortgage loans were "accurate," which allowed him to

identify inaccurately reported LTVs).

82.     Dr. Kilpatrick stated that he "used the Valuations provided by the GAVM to

recalculate LTV and CLTV ratios for the Loans at the time of origination" as follows:

> I took the principal balance of the mortgage loan (*i.e.*, the loan
> amount) at origination (the "Original Balance") as the numerator in
> the LTV ratio, which for second lien loans included the balance of
> the principal for first and second lien mortgages.   For the
> denominator, I took the lesser of the Greenfield AVM market
> value or the original appraised value or the sale price of the
> mortgaged property.   For those loans originated for a mortgage
> refinance, I took as the denominator the lesser of the Greenfield
> AVM market value or the original appraised value.  For CLTV, I
> took the balance of all loans collateralized by the underlying
> property (regardless of lien position) at origination as the

> numerator.   The denominator for CLTV was determined in a manner identical to LTV, as described above.

(Kilpatrick Rpt. at 31 (Weinstein Decl. Ex. AA).)

     **Plaintiff's Response:**  Undisputed.

83.    Dr. Kilpatrick stated in his report that "241 Loans breached the representations and warranties that the information about the Loans in the Mortgage Loan Schedule was complete, true and correct" because he "determined that the Mortgage Loan Schedule contained inaccurate LTV ratios for 241 Loans in breach [of] those representations and warranties," but did not opine on whether these alleged breaches materially and adversely affected the interests of the Certificateholders.  (Kilpatrick Rpt. at 4 (Weinstein Decl. Ex. AA).)

     **Plaintiff's Response:**  Undisputed that Dr. Kilpatrick stated in his report that "241 Loans breached the representations and warranties that the information about the Loans in the Mortgage Loan Schedule was complete, true and correct" because he "determined that the Mortgage Loan Schedule contained inaccurate LTV ratios for 241 Loans in breach [of] those representations and warranties."  Weinstein Decl. Ex. AA at 4.  Disputed to the extent that Morgan Stanley suggests that the Trustee did not offer analysis regarding whether the breaches materially and adversely affected the interests of the Certificateholders.  Weinstein Decl. Ex. BB ¶ 2(b) & n.5; *see also id.* ¶ 114 (Mr. Hunter's materiality analysis for those loans).

84.    Deutsche Bank's expert Robert W. Hunter stated in his report that "[o]f the breaches identified by Dr. Kilpatrick, . . . 102 loans breached the representation and warranty that '[t]he information set forth in the Mortgage Loan Schedule' is 'complete, true and accurate' in a manner that materially and adversely affected the value of the interests of the Purchaser," without separately describing what analysis he conducted that caused him to conclude that each of these alleged breaches "materially and adversely affected the value of the interests of the

Purchaser."   (Expert Report of Robert W. Hunter ("Hunter Rpt.") ¶114 (Weinstein Decl. Ex. BB).)

**Plaintiff's Response:**   Undisputed that Mr. Hunter stated in his report that "[o]f the breaches identified by Dr. Kilpatrick, . . . 102 loans breached the representation and warranty that '[t]he information set forth in the Mortgage Loan Schedule' is 'complete, true and accurate' in a manner that materially and adversely affected the value of the interests of the Purchaser." Weinstein Decl. Ex. BB ¶114.   Disputed that Mr. Hunter did not separately describe what analysis he conducted that caused him to draw that conclusion.   *See id.* ¶¶74, 113 (explaining that Mr. Hunter assessed the materiality of breaches by evaluating whether the "breaches . . . materially increase the risk of loss on a loan," and that his "determinations as to whether these breaches [identified by Dr. Kilpatrick] materially and adversely affected the value of the interests of the Purchaser are based upon [Dr. Kilpatrick's] 40 years of experience in financial services, banking and mortgage lending, as detailed in Section III [of his report]").

85.   Dr. Kilpatrick stated in his report that "74 Loans had an LTV greater than 100% at origination, in breach of the representations and warranties that no Mortgage Loan had an LTV greater than 100% at origination," but did not opine on whether these alleged breaches materially and adversely affected the interests of the Certificateholders.   (Kilpatrick Rpt. at 4-5 (Weinstein Decl. Ex. AA).)

**Plaintiff's Response:**   Undisputed that Dr. Kilpatrick stated in his report that "74 Loans had an LTV greater than 100% at origination, in breach of the representations and warranties that no Mortgage Loan had an LTV greater than 100% at origination."   Weinstein Decl. Ex. AA at 4-5.   Disputed to the extent that Morgan Stanley suggests that the Trustee did not offer additional materiality analysis.   *See* Weinstein Decl. Ex. AA at 8, 33-34 (Dr. Kilpatrick's explanation that

"investors look to LTV to determine the credit risk of the underlying collateral," and "[l]oans with LTV or CLTV ratios over 100%, for example, have a much greater risk of default and of higher loss in the event of a default because the property does not fully collateralize the loan," and, for those reasons, appraisals that are "inflated 15% or more" are "not credible" and "materially undermine[ ] the purchaser's rights by denying an accurate valuation to determine the credit risk of the underlying collateral . . . therefore expos[ing] the investor to an unanticipated risk of loss"); Weinstein Decl. Ex. BB ¶2(f) & n.9; *see also id.* ¶114 (Mr. Hunter's opinion on the materiality of these breaches).

86.     Mr. Hunter stated in his report that "[o]f the breaches identified by Dr. Kilpatrick, . . . 26 loans breached the representation and warranty that no mortgage loan had an LTV greater than 100% in a manner that materially and adversely affected the value of the interests of the Purchaser," without separately describing what analysis he conducted that caused him to conclude that each of these alleged breaches "materially and adversely affected the value of the interests of the Purchaser."  (Hunter Rpt. ¶114 (Weinstein Decl. Ex. BB).)

**Plaintiff's Response:**  Undisputed that Mr. Hunter stated in his report that that "[o]f the breaches identified by Dr. Kilpatrick, . . . 26 loans breached the representation and warranty that no mortgage loan had an LTV greater than 100% in a manner that materially and adversely affected the value of the interests of the Purchaser."  Weinstein Decl. Ex. BB ¶114.  Disputed that Mr. Hunter did not separately describe what analysis he conducted that caused him to draw that conclusion.  *See id.* ¶¶74, 76, 113 (assessing the materiality of breaches by evaluating whether the "breaches . . . materially increase the risk of loss on a loan," explaining that "loans with characteristics such as . . . high CLTV [*i.e.*, combined loan-to-value ratios] are by their nature risky loans" and that "[b]ecause exceptions to guidelines increase risk, exceptions

permitted for already risky loans" can "materially increase the credit risk of the loan," and stating that his "determinations as to whether these breaches [identified by Dr. Kilpatrick] materially and adversely affected the value of the interests of the Purchaser are based upon [Dr. Kilpatrick's] 40 years of experience in financial services, banking and mortgage lending, as detailed in Section III [of his report]").

87.     Dr. Kilpatrick stated in his report that he "next determined the Inflated Appraisals, *i.e.*, the subset of the Loans that had an appraised value that was 15% or more above the Valuation provided by the GAVM."  (Kilpatrick Rpt. at 6 (Weinstein Decl. Ex. AA) (footnote omitted).)

**Plaintiff's Response:**   Undisputed.   The Trustee adds that Dr. Kilpatrick stated immediately after the quoted passage that he "calculated that Properties with 109 Loans had an appraisal value that was at least 15% greater than the GAVM Valuation."   Weinstein Decl. Ex. AA at 6.

88.     Dr. Kilpatrick stated in his report that he "evaluated the Inflated Appraisals using the Credibility Assessment Model ('CAM'), an appraisal review methodology that [he] designed using [his] decades of experience as an appraiser, including [his] work consulting on and testifying in RMBS cases.  CAM uses 22 inquiries to determine whether the Inflated Appraisals comport with USPAP and other applicable appraisal standards."   (Kilpatrick Rpt. at 6-7 (Weinstein Decl. Ex. AA) (footnote omitted).)

**Plaintiff's Response:**  Undisputed.  The Trustee adds that Dr. Kilpatrick stated immediately after the quoted passage that "[t]he 22 questions provide a consistent methodology with which to review the appraisals."   Weinstein Decl. Ex. AA at 7; *see also id.* at 3-4 (Dr. Kilpatrick

used the CAM to "determine[] whether [the] appraisals were 'credible,' as that term is defined by the [USPAP]," and thus whether they "conform[ed] to the industry appraisal standards.").

89.     Dr. Kilpatrick's CAM methodology incorporates the appraisal guidelines of both Fannie Mae and Freddie Mac.  (Kilpatrick Rpt. at 16-17, 33-37 (Weinstein Decl. Ex. AA).)

**Plaintiff's Response:**  Undisputed to the extent that the CAM methodology incorporates the appraisal guidelines of both Fannie Mae and Freddie Mac.  Disputed to the extent that Morgan Stanley suggests that the CAM methodology identifies breaches of only Fannie Mae or Freddie Mac appraisal guidelines rather than both of them.  *See* Weinstein Decl. Ex. AA at 4 n.11 ("The industry standards required by the MLPA (including Fannie Mae and Freddie Mac requirements and Title XI of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989), incorporate USPAP by reference.").

90.     Based on his CAM findings, Dr. Kilpatrick concluded that 96 loans "were not supported by credible appraisals and therefore failed to conform to industry standards as represented and warranted by Morgan Stanley."  (Kilpatrick Rpt. at 5 (Weinstein Decl. Ex. AA).)

**Plaintiff's Response:**  Undisputed.

91.     Dr. Kilpatrick stated that "[b]ased on [his] experience, training, and expertise, [he] concluded that a non-credible appraisal materially and adversely affects the value of the interests of the certificateholders in those Loans because, among other things, it indicates the loans are not secured by reliable valuations" and "therefore expose the investor to an unanticipated risk of loss," without separately describing what analysis he conducted that caused him to conclude that each of the allegedly "non-credible appraisals" that he identified in this case "materially and adversely affects the value of the interests of the certificateholders" in the affected mortgage loan.  (Kilpatrick Rpt. at 5, 33-34 (Weinstein Decl. Ex. AA).)

**Plaintiff's Response:**   Undisputed that Dr. Kilpatrick stated that "[b]ased on [his] experience, training, and expertise, [he] concluded that a non-credible appraisal materially and adversely affects the value of the interests of the certificateholders in those Loans because, among other things, it indicates the loans are not secured by reliable valuations" and "therefore expose the investor to an unanticipated risk of loss."   Weinstein Decl. Ex. AA at 5, 33-34. Disputed that Dr. Kilpatrick did not describe what analysis he conducted that caused him to conclude that each of the "non-credible appraisals" that he identified in this case "materially and adversely affects the value of the interests of the certificateholders" in the affected mortgage loan.  *See id.* at 8, 33-34 (explaining that "investors look to LTV to determine the credit risk of the underlying collateral," because loans with LTVs "over 100%, for example, have a much greater risk of default and of higher loss in the event of a default because the property does not fully collateralize the loan" and that when Dr. Kilpatrick found that an appraisal was "inflated 15% or more," he came to the conclusion that the appraisals used to calculate LTV "were not credible" and that the breach "materially undermines the purchaser's rights by denying an accurate valuation to determine the credit risk of the underlying collateral" and by "expos[ing] the investor to an unanticipated risk of loss"); *see also id.* at 92 ("[T]he 96 Inflated Appraisals' lack of credibility adversely affects the certificateholders' interests in the Loans because [his] findings show those loans are not secured by reliable valuations.  The 96 non-credible Inflated Appraisals expose the certificateholders to an unanticipated risk of loss from the disparity between Loan amounts and the underlying property Valuations.").

92.    Dr. Kilpatrick did "not express[] an opinion" about the accuracy of the original appraised values and had "not given [] any thought" to whether the appraisals he alleged were not credible would have materially and adversely affected the interests of the Certificateholders

if the original appraisal's opinion of value was nevertheless accurate.  (Deposition Transcript of

Dr. John Kilpatrick ("Kilpatrick Tr.") at 166:16-167:10 ("Q.  So you believe the 490,000 was

inaccurate?  A.  I believe that 272554 is the accurate value.  And based on that, I conduct a

credibility assessment on the 490, but I'm not expressing an opinion, per se, about the 490.");

201:19-202:2 ("Q.  If you had an appraisal that you deemed non-credible as a result of your

CAM analysis but it was only inflated by 1 percent, would you view that non-credible appraisal

as materially and adversely affecting the value of the interests of the certificate holders?  MR.

ELLIS:  Objection.  A.  I've not given that any thought.") (Weinstein Decl. Ex. CC).)

    **Plaintiff's Response:**  Undisputed only insofar as Dr. Kilpatrick was asked the cited

questions and gave the cited answers and counsel for the Trustee made the cited objection.

Disputed that Dr. Kilpatrick offered no opinion on the accuracy of the original appraised values.

*See* Weinstein Decl. Ex. AA at 4-5 ("[B]ased on [his] analysis of the appraisals, [Dr. Kilpatrick]

determined that the Mortgage Loan Schedule contained inaccurate LTV ratios for 241 Loans in

breach [of] those representations and warranties" because the original appraised value did not

accurately report the property value used to calculate LTV, and that "109 Loans had appraisals

that were inflated by 15% or greater.").

    93.    During his deposition taken on April 21, 2017, Dr. Kilpatrick was asked the

following questions and gave the following answers:

        Q.    The court reporter has handed you what's been marked as
        Exhibit 4 to your deposition which is part of the backup that we
        received from your initial report.  Do you recognize this
        document?

        A.    Yes.

        Q.    And does it look to be – strike that.

              What – what is this document?

A.      This is a synopsis of my findings in the appraisal review.

Q.      Okay.  And for this property, if I'm understanding the form correctly, you determined that the GAVM value was $272,554?

A.      Yes.

Q.      By the way, did you include cents in your AVM model or did you just round up or down?

A.      You know, I can't recall if it's part of the output.  I think for purposes of these we may have truncated or rounded off the cents, but I suspect that cents is baked into the output.

Q.      And for this property you determined that the AVM value was accurate?

A.      Yes.

Q.      And this – for this property the contract price was $480,000?

A.      Yes.

Q.      And the appraised value was $490,000?

A.      Yes.

Q.      So sitting here today, what do you believe the accurate value was for this property as of December 29th, 2006?

A.      272554.

Q.      So you believe that 490,000 was inaccurate?

A.      I believe that 272554 is the accurate value.  And based on that, I conduct a credibility assessment on the 490, but I'm not expressing an opinion, per se, about the 490.  I'm simply saying that the 272554 is accurate and based on that I can then conduct a credibility assessment with respect to the original appraisal.

Q.      So it's your opinion, then, that $480,000 would be an inaccurate reflection of market value of this property on December 29th, 2006?

A.      Well, I didn't go that far.  My – my answer was that 272554 is accurate and I then used that as a gateway to conduct a credibility assessment; but I'm not, per se, expressing an opinion about the 490.

Q.     I'm asking you right now about the 480.  $480,000 is more than $200,000 greater than 272,554, correct?

A.     Yes.

Q.     So you'd agree with me that both of those figures can't be accurate market values for this property on this date, right?

A.     Well, it seems pedantically simple, but my opinion is – is – is expressed as to the accuracy of the 272554.  Now, with respect to the 480, I'm – I'm examining the credibility of the underlying appraisal and that's – that's the expression of my opinion.

(Kilpatrick Tr. at 165:4-167:23 (Weinstein Decl. Ex. CC).)

**Plaintiff's Response:**  Undisputed only insofar as Dr. Kilpatrick was asked the cited questions and gave the cited answers.

94.     During his deposition taken on April 21, 2017, Dr. Kilpatrick was asked the following questions and gave the following answers:

Q.     The court reporter has handed you what's been marked as Exhibit 6 to your deposition.  Do you recognize this document?

A.     Yes.

Q.     What is it?

A.     It's a synopsis of my CAM findings.

Q.     Okay.  And where it says "Questions with findings," there's nothing to the right and nothing underneath, right?

A.     Yes.

Q.     And what does that signify?

A.     That appears to indicate that we did not have any CAM findings.

Q.     Okay.  So this is an appraisal where you're not opining that it was not credible?

MR. ELLIS:   Objection.

Q.     Apologies for the double negative, I just want to be precise.

48

A.      Appears correct.

Q.      But you're also not affirmatively opining that this was credible?

A.      That's correct.

Q.      Okay.  And for this property you made a determination that the GAVM value was accurate, correct?

A.      Yes.

Q.      And for this property the GAVM value was $186,186?

A.      Yes.

Q.      And the appraised value was $330,000?

A.      Yes.

Q.      And sitting here today, what is your opinion about the value of this property on February 7th, 2007?

A.      It's $186,186.

Q.      No world in which it was actually $330,000?

MR. ELLIS:   Objection.

A.      My opinion is that it's 186186.

Q.      And any appraiser who appraised it at $330,000 just got it wrong?

MR. ELLIS:  Objection.

A       I'm limiting my opinion to the four corners of my report which are that 186186 is a[n] accurate measure of the value of this property.

Q.      But, again, you'd agree with me that 186186 and 330,000, they can't both be accurate measures, right?

A.      Well, I'm [silent] as to the – the 330.  I'm simply saying the 186186 is indeed an accurate measure.

(Kilpatrick Tr. at 179:10-181:16 (Weinstein Decl. Ex. CC).)

**Plaintiff's Response:**   Undisputed only insofar as Dr. Kilpatrick was asked the cited questions and gave the cited answers and counsel for the Trustee made the cited objections.

95.     During his deposition taken on April 21, 2017, Dr. Kilpatrick was asked the following questions and gave the following answers:

Q.     Is it your view that every non-credible appraisal materially and adversely affects the value of the interests of the purchaser?

MR. ELLIS:   Objection.

A.     Yes.

Q.     Okay.  What if the appraisal arrived at the same exact number that you believe represented the market value on the particular date in question?

MR. ELLIS:   Objection.

A.     I've not expressed an opinion about those.

Q.     Do you have an opinion sitting here today about whether, for an appraisal that you believe was not credible that reached the same value that the GAVM reached, about whether that appraisal materially and adversely affected the value of the interest of the purchaser?

A.     I don't have an opinion on that.

Q.     Okay.  If the mortgage loan schedule disclosed an LTV for a property of 80 and the correct LTV, in your opinion, was 80.1 would you view that to have materially and adversely affected the value of the interest of the purchaser?

MR. ELLIS:   Objection.

A.     I don't know.  I haven't given it a thought.

Q.     If the mortgage loan schedule disclosed an LTV for a property of 80 and the correct LTV, in your opinion, was 79.9, would you view that to have materially and adversely affected the value of the interest of the purchaser?

MR. ELLIS:   Objection.

A.      Again, I've not given it any thought leading into this deposition.

(Kilpatrick Tr. at 94:14-96:3 (Weinstein Decl. Ex. CC).)

**Plaintiff's Response:**  Undisputed only insofar as Dr. Kilpatrick was asked the cited questions and gave the cited answers and counsel for the Trustee made the cited objections.

96.      During his deposition taken on April 21, 2017, Dr. Kilpatrick was asked the following questions and gave the following answers:

Q.      Okay.   Let me try to conform my question to your counsel's objection.

Do you recall how many of the 96 non-credible appraisals that you reviewed were for purchase money mortgages?

A.      No.

Q.      If I told you 17 does that sound roughly correct?

A.      I don't have an opinion one way or the other.

Q.      Okay.   For those 96, you deem them non-credible as a result of your CAM analysis, correct?

A.      Yes.

Q.      Okay.   If – can you explain why it is your opinion that those 17 appraisals materially and adversely affected the value of the interests of the certificate holders within the meaning of Section 10B of the mortgage loan purchase agreement?

MR. ELLIS:   Objection.

A.      Implicit in your question is an assumption that those were arm's length transactions arrived at consistent with the definition of market value.   If in fact we're seeing their non-credible appraisals informing this transaction, which appraisals are supposed to do, and that there's a degree of inaccuracy associated with these purchase amounts in excess of 15 percent as developed through a highly accurate to USPAP-consistent appraisal model, then certainly that assumption is called into question.

Q.      Did you make a finding for any of the 96 loans – strike that.

51

Did you make a finding for any of the 17 loan subset of the 96 loan sample that were purchase money mortgages that the underlying sales transactions were not made at arm's length?

MR. ELLIS:   Objection.

A.       No.

(Kilpatrick Tr. at 97:24-99:17 (Weinstein Decl. Ex. CC).)

**Plaintiff's Response:**   Undisputed only insofar as Dr. Kilpatrick was asked the cited questions and gave the cited answers and counsel for the Trustee made the cited objections, with the exception that the second question asked was:  "Q.  If I told how 17 does that sound roughly correct?"  Weinstein Decl. Ex. CC at 98:6-7.

97.       During his deposition taken on April 21, 2017, Dr. Kilpatrick was asked the following questions and gave the following answers:

Q.       And what do you understand market value to mean?

A.       There's a stylized definition which I have contained in my report.

Q.       And what is that definition?

A.       May I turn to my report and read it.

Q.       Sure, of course?

A.       I'm in Exhibit 2, and I'm on page 98 in Exhibit 2, and I'm in Section D which says "Type and definition of value."  And I'll read "The type of value is market value.  For this analysis, I've applied the following definition of market value, which is promulgated for federally insured lending and is often referred to as the federal definition:

"Market value means the most probable price which property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably and assuming the price is not affected by undue stimulus.  Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

"Buyer and seller are typically motivated, both parties are well-informed or well-advised and acting in what they consider their own best interests, a reasonable time is allowed for exposure in the open market, payment is made in terms of cash in U.S. Dollars or in terms of financial arrangements comparable thereto and the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale."

And I footnote 227 and provide the sources for that definition.

Q.      Do you have any reason to believe the sale of 4202 West Greenway Road in December of 2006 was not a sale that met the conditions that you just read from the federal definition?

A.      I have no opinion one way or the other on that.

Q.      Okay.  Does the fact that the property was in fact sold for $480,000 lead you to question whether the market value of this property was in fact more than $200,000 less at the same time?

A.      No.

Q.      Do you think that the person who bought it overpaid?

A.      I don't have an opinion on that.

Q.      Do you think the person who sold the property got a good deal?

A.      I don't have an opinion on that.

(Kilpatrick Tr. at 171:11-173:20 (Weinstein Decl. Ex. CC).)

**Plaintiff's Response:**  Undisputed only insofar as Dr. Kilpatrick was asked the cited questions and gave the cited answers.

98.      During his deposition taken in the present case on April 21, 2017, Dr. Kilpatrick was asked the following question and gave the following answer:

Q.      If you had an appraisal that you deemed non-credible as a result of your CAM analysis but it was only inflated by 1 percent, would you view that non-credible appraisal as materially and adversely affecting the value of the interests of the certificate holders?

> MR. ELLIS:   Objection.
>
> A.      I've not given that any thought.   The – that's outside the scope of – of the testimony I've offered here.

(Kilpatrick Tr. at 201:19-202:4 (Weinstein Decl. Ex. CC).)

**Plaintiff's Response:**   Undisputed only insofar as Dr. Kilpatrick was asked the cited question and gave the cited answer and counsel for the Trustee made the cited objection.

99.      Dr. Kilpatrick stated in his report that "the appraisers of the Properties were required to conform to the requirements of Fannie Mae and Freddie Mac."  (Kilpatrick Rpt. at 16 (Weinstein Decl. Ex. AA).)

**Plaintiff's Response:**  Undisputed.

100.      Dr. Kilpatrick stated in his report that the "Fannie Mae and Freddie Mac standards apply by virtue of USPAP's Supplemental Standards Rule, with additional guidance provided by the Statement on Appraisal Standards No. 10 (SMT-10)."   (Kilpatrick Rpt. at 17 (Weinstein Decl. Ex. AA).)

**Plaintiff's Response:**  Undisputed.

101.      Dr. Kilpatrick stated in his report that:

> The industry standards required by the MLPA (including Fannie Mae and Freddie Mac requirements and Title XI of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989), incorporate USPAP by reference.

(Kilpatrick Rpt. at 4 n.11 (Weinstein Decl. Ex. AA).)

**Plaintiff's Response:**  Undisputed.

102.      During his deposition taken in the present case on April 21, 2017, Dr. Kilpatrick was asked the following questions and gave the following answers:

> Q.      Was the CAM designed to detect USPAP compliance?

A.     The CAM was designed to detect certain categories of USPAP noncompliance.

Q.     And was it broader than just USPAP noncompliance?  Did it incorporate other standards as well?

MR. ELLIS:   Objection.

A.     It only incorporates standards which are either (a), referenced by USPAP in the Supplemental Standards Rule or (b) referenced in the MLPA.

Q.     And is there any way for me to disaggregate those two to determine which CAM questions were designed to identify USPAP noncompliance versus noncompliance with the supplemental standards?

MR. ELLIS:   Objection.

A.     I don't believe so.

(Kilpatrick Tr. at 203:7-25 (Weinstein Decl. Ex. CC).)

**Plaintiff's Response:**  Undisputed only insofar as Dr. Kilpatrick was asked the cited questions and gave the cited answers and counsel for the Trustee made the cited objections.

103.   The cost approach and income approach on Fannie Mae/Freddie Mac Uniform Residential Appraisal Report are "not required by Fannie Mae."   (Kilpatrick App'x 9 at 3 (Weinstein Decl. Ex. DD).)

**Plaintiff's Response:**  Undisputed only insofar as the quoted statement appears on page 3 of Exhibit DD of the Weinstein Declaration.

## IX.     Deutsche Bank's Reunderwriting Expert

104.   On August 22, 2016, Deutsche Bank served the expert report of its reunderwriting expert, Robert W. Hunter.  (Hunter Rpt. (Weinstein Decl. Ex. BB).)

**Plaintiff's Response:**  Undisputed.

105.    On January 25, 2017, Deutsche Bank served the expert rebuttal report of its reunderwriting expert, Robert W. Hunter.  (Hunter Rebuttal Rpt. (Weinstein Decl. Ex. EE).)

**Plaintiff's Response:**  Undisputed.

106.    For his analysis, Mr. Hunter reviewed 398 loans from the Trust that were chosen by another of Deutsche Bank's experts, Dr. Nelson Lipshutz.  (Hunter Rpt. ¶2 (Weinstein Decl. Ex. BB).)

**Plaintiff's Response:**  Undisputed with the clarification that the 398 loans that were included in the sample were randomly selected by Dr. Lipshutz.  Weinstein Decl. Ex. BB ¶2 n.3; Weinstein Decl. Ex. U ¶¶4, 8, 13.

107.   Mr. Hunter incorporated Dr. Kilpatrick's LTV findings with his own reunderwriting findings (Hunter Rpt. ¶¶2 & nn.5 & 9, 110-14 (Weinstein Decl. Ex. BB); Hunter Rebuttal Rpt. ¶ 82 & n.60 (Weinstein Decl. Ex. EE)), and stated in his rebuttal report that "232 of the 398 mortgage loans in the MSSTI 2007-1 sample that [he] re-underwrote breached the representations and warranties that MSMCH made about them in a manner that materially and adversely affected the value of the interests of the Purchaser."   (Hunter Rebuttal Rpt. ¶3 (Weinstein Decl. Ex. EE).)

**Plaintiff's Response:**  Undisputed with the clarification that instead of "incorporat[ing] Dr. Kilpatrick's LTV findings," Mr. Hunter stated that he was "asked to assume the breaches of the [MLS and LTV] representations and warranties identified by Dr. Kilpatrick and to opine on whether those breaches materially and adversely affected the value of the interests of the Purchaser."   Weinstein Decl. Ex. BB ¶113; *see also* Weinstein Decl. Ex. EE ¶82 ("I was instructed to assume that Dr. Kilpatrick identified defects correctly based on his training, background, and experience.  I then opined on the materiality of the defects identified . . . .").

108.    Mr. Hunter stated in his report that "those breaches of representations and warranties materially and adversely affected the value of the interests of the Purchaser."  (Hunter Rebuttal Rpt. ¶¶ 3, 93 (Weinstein Decl. Ex. EE); Hunter Rpt. ¶¶ 2, 62 (Weinstein Decl. Ex. BB).)

**Plaintiff's Response:**    Undisputed, subject to the clarification that Mr. Hunter determined that each and every breaching loan he identified breaches the applicable representations and warranties in a way that "materially and adversely affected the value of the interests of the Purchaser."  Weinstein Decl. Ex. EE ¶¶ 3, 93; Weinstein Decl. Ex. BB ¶¶ 2, 62; *see also* Shur Decl. Ex. 16 ¶ 18 (Morgan Stanley's reunderwriting expert's admission that he was unable to rebut many of the breaches Mr. Hunter identified and he classified those breaches as "Unresolved").

109.    Mr. Hunter stated that he "made this determination on a loan-level basis using a holistic approach, evaluating the overall credit profile of the loan."  (Hunter Rpt. ¶ 75 (Weinstein Decl. Ex. BB).)

**Plaintiff's Response:**  Undisputed.  *See* Weinstein Decl. Ex. BB ¶¶ 74-75 (analyzing "whether the breaches materially increased the credit risk of the loan," and opining that "[c]ertain breaches may not independently increase the credit risk of a loan, but may do so in combination with other factors"); *see also id.* ("[I]f a loan had breach findings for missing documentation, and based on the overall loan application [Mr. Hunter] determined that the missing documentation by itself did not increase the risk of default, then [he] determined that the breach did not materially and adversely affect the value of the interests of the Purchaser. However, if a loan had missing documentation accompanied by other findings such as a materially excessive DTI [*i.e.*, debt-to-income ratio], or materially non-compliant LTV or CLTV,

then [he] may determine that the breaches materially and adversely affected the value of the interests of the Purchaser.").

110.    Mr. Hunter admitted that "the thought process [he] went through, the various factors and how [he] came to determine that the findings were material as opposed to just the findings themselves, [i]s not separately written out in [his] report or appendices."  (Deposition Transcript of Robert W. Hunter in <u>Morgan Stanley Mortgage Loan Trust 2006-4SL and Mortgage Pass-Through Certificates, Series 2006-4SL v. Morgan Stanley Mortgage Capital Inc.,</u> No. 650579/2012 (Sup. Ct. N.Y. Cty.) and <u>Morgan Stanley Mortgage Loan Trust 2006-10SL and Mortgage Pass-Through Certificates, Series 2006-10SL v. Morgan Stanley Mortgage Capital Holdings LLC,</u> No. 652612/2012 (Sup. Ct. N.Y. Cty.) ("Hunter 2006-4SL and 2006-10SL Tr.") at 129:10-130:25 (Weinstein Decl. Ex. FF); MSST 2007-1 Deposition Transcript of Robert W. Hunter, April 25, 2017, ("Hunter Tr.") at 199:2-201:6 (admitting he "used the same process" here) (Weinstein Decl. Ex. GG).)

**Plaintiff's Response:**  Undisputed that Mr. Hunter gave that testimony in a different case, governed by different contracts.  Disputed that the cited testimony reflects Mr. Hunter's opinions or process in this case.  *See* Weinstein Decl. Ex. BB ¶74 (Mr. Hunter "determin[ed] whether the breaches materially increased the credit risk of the loan" or "materially increase[d] the risk of loss on a loan"); *id.* ¶¶74-79 (explaining why each category of breach is material); *id.* ¶77 (explaining that some categories of breaches "can independently increase the credit risk of a loan," and that "[m]isrepresentation of income, employment, debt, or occupancy," for example, "would be rated as materially increasing credit risk regardless of any other apparent compensating characteristics" because those types of misrepresentations "cast[ ] serious doubt on the borrower's capacity and willingness to repay the loan").

111.    During his deposition taken on May 26, 2016 in <u>Morgan Stanley Mortg. Loan Trust 2006-14SL v. Morgan Stanley Mortg. Capital Holdings LLC</u>, No. 652763/2012 (Sup. Ct. N.Y. Cty.) ("<u>2006-14SL</u>"), Mr. Hunter was asked the following questions and gave the following answers:

> Q.    But the way that you actually made those different determinations for a given loan and assessed it holistically is not something that you documented separate and apart from just the lists of the findings themselves?
>
> MR. CYRULNIK:    Objection.
>
> A.    I based my findings – I base my rating – rankings on my materiality on the loan findings combined with my 40 years of experience of loan review, bank, you know, bank financing, mergers, et cetera, and that's how I grade my loans. I don't have a scale. And I don't have one a one, two, three. I guess I do have a one, two, three. Because materiality is – okay, that's a 3. That's a severely unsatisfactory loan. So. . .
>
> Q.    But there's nowhere in your report or appendices where you say for a given loan here are the various findings and here is the thought process I went through, you know, reviewing each of those findings and all of the other factors that I looked at in reviewing the loan as a whole, and here is why I determined that the loan was materially in breach, based on my 40 years of experience?
>
> MR. CYRULNIK:    Asked and answered.
>
> A.    Yeah, and again my answer is I do have that, and that's called the findings report. And so that's what the final grade was.
>
> Q.    Well, to be clear, sir, the findings report lists what the findings were, correct?
>
> A.    Right.
>
> Q.    There's nothing that separately describes how you, Mr. Hunter, assessed these different findings some of which you thought were material and some of which you thought might not be and all of the other things that you took into consideration for your holistic approach and actually explained what was going on in your mind when you came to your holistic determination, correct?

> MR. CYRULNIK:      Objection; asked and answered.
>
> A.      And that's the answer.  I look at the loan – yes, you're right.  You know, I don't have a scratch sheet that, you know, I could produce, I don't have that.  I have – I produced the findings, and my grading of materiality based on those findings on a loan-level basis.

(Deposition Transcript of Robert W. Hunter in <u>Morgan Stanley Mortg. Loan Trust 2006-14SL v. Morgan Stanley Mortg. Capital Holdings LLC</u>, No. 652763/2012 (Sup. Ct. N.Y. Cty.) ("Hunter 2006-14SL Tr.") at 208:3-211:19 and Hunter 2006-14SL Errata (Weinstein Decl. Ex. HH).)

**Plaintiff's Response:**  Undisputed that Mr. Hunter gave that testimony in a different case, governed by different contracts.  Disputed that the cited testimony reflects Mr. Hunter's opinions or process in this case.  *See* Weinstein Decl. Ex. BB ¶ 74 (Mr. Hunter "determin[ed] whether the breaches materially increased the credit risk of the loan" or "materially increase[d] the risk of loss on a loan"); *id.* ¶¶ 74-79 (explaining why each category of breach is material); *id.* ¶ 77 (explaining that some categories of breaches "can independently increase the credit risk of a loan," and that "[m]isrepresentation of income, employment, debt, or occupancy," for example, "would be rated as materially increasing credit risk regardless of any other apparent compensating characteristics" because those types of misrepresentations "cast[ ] serious doubt on the borrower's capacity and willingness to repay the loan").

112.    During his deposition taken on October 6, 2016 in <u>Morgan Stanley Mortgage Loan Trust 2006-4SL and Mortgage Pass-Through Certificates, Series 2006-4SL v. Morgan Stanley Mortgage Capital Inc.</u>, No. 650579/2012 (Sup. Ct. N.Y. Cty.) and <u>Morgan Stanley Mortgage Loan Trust 2006-10SL and Mortgage Pass-Through Certificates, Series 2006-10SL v. Morgan Stanley Mortgage Capital Holdings LLC</u>, No. 652612/2012 (Sup. Ct. N.Y. Cty.), Mr. Hunter was asked the following questions and gave the following answers:

Q.      Is – and your testimony, when I asked you in [2006-14SL] about how you determined whether loans were material and how it's reflected in your report and appendices, would that same testimony apply in this case?

A.      It was the same process.  We looked at the loan.  We – you know, I looked at all the findings in the loan, and I made a determination based on the loan and all the findings that went with that loan.

Q.      Okay.  And the findings are laid out finding by finding in the lengthy appendices that you submitted with your report; correct?

A.      Yes.

Q.      And what you testified in [2006-14SL] was that it's the findings themselves that would tell the reader how you determined that the breach was material, but you don't have a separate analysis where you describe the thought process that went on in your mind in determining whether or not the breaches were material; is that accurate?

A.      No.  Correct.

Q.      That's correct.

A.      We looked – I look at the loan.  I look at the findings.  And based on the circumstances of the loan and based on what the findings are, I determined materiality.

Q.      And the thought process you went through, the various factors and how you came to determine that the findings were material as opposed to just the findings themselves, that's not separately written out in your report or appendices; correct?

A.      That's correct.

(Hunter 2006-4SL and 2006-10SL Tr. at 129:10-130:25 (Weinstein Decl. Ex. FF).)

**Plaintiff's Response:**  Undisputed that Mr. Hunter gave that testimony in a different case, governed by different contracts.  Disputed that the cited testimony reflects Mr. Hunter's opinions or process in this case.  *See* Weinstein Decl. Ex. BB ¶ 74 (Mr. Hunter "determin[ed] whether the breaches materially increased the credit risk of the loan" or "materially increase[d]

the risk of loss on a loan"); *id.* ¶¶74-79 (explaining why each category of breach is material); *id.* ¶77 (explaining that some categories of breaches "can independently increase the credit risk of a loan," and that "[m]isrepresentation of income, employment, debt, or occupancy," for example, "would be rated as materially increasing credit risk regardless of any other apparent compensating characteristics" because those types of misrepresentations "cast[ ] serious doubt on the borrower's capacity and willingness to repay the loan").

113.     During his deposition taken in the present case on April 25, 2017, Mr. Hunter admitted that he "used the same process" as the one described in the prior testimony transcribed in Paragraphs 111 and 112, <u>supra</u>.  (Hunter Tr. at 199:2-201:6 (Weinstein Decl. Ex. GG).)

**Plaintiff's Response:**   Disputed that the reference to Mr. Hunter's testimony about reunderwriting he conducted in a different case, governed by different contracts, describes Mr. Hunter's opinions or process in the instant case.  *See* Weinstein Decl. Ex. BB ¶74 (Mr. Hunter "determin[ed] whether the breaches materially increased the credit risk of the loan" or "materially increase[d] the risk of loss on a loan"); *id.* ¶¶74-79 (explaining why each category of breach is material); *id.* ¶77 (explaining that some categories of breaches "can independently increase the credit risk of a loan," and that "[m]isrepresentation of income, employment, debt, or occupancy," for example, "would be rated as materially increasing credit risk regardless of any other apparent compensating characteristics" because those types of misrepresentations "cast[ ] serious doubt on the borrower's capacity and willingness to repay the loan").

114.     During his deposition taken in the present case on April 25, 2017, Mr. Hunter was asked the following questions and gave the following answers:

> Q.     So when you're talking about how you made your determination of materiality, you state that you made it "using a holistic approach, evaluating the overall credit profile of the loan.

Certain breaches may not independently increase the credit risk of a loan, but may do so in combination with other factors."

Do you see that?

A.      Yes, sir.

Q.      And so – and that's what you did in this case, right?  You determined materiality holistically on a loan-level basis, right?

A.      Yes, sir.

Q.      And so –

A.      And holistic is H-O-L-I-S-T-I-C.

Q.      Right.

THE WITNESS:  Only because sometimes you spell it wrong.  But okay.  H-O-L – okay.

BY MR. WEINSTEIN:

Q.      So to make this more concrete, sir – I want to make sure that we're on the same page – let's say for a given loan you have three breach findings, 1, 2, and 3, of representations (a), (b), and (c).  Right?  So breach 1 is an alleged breach of rep (a); breach 2 is an alleged breach of rep (b); and breach 3 is an alleged breach of rep (c), right?

A.      Yes, sir.

Q.      Each of those findings standing alone, 1, 2, and 3, might not necessarily be material in your view, right, because you're looking at the loan as a whole?

MR. WIEGAND:      Objection.

THE WITNESS:  Yeah, I'd have to see the loan, I mean, because -–

Q.      But in concept, that's the idea that you're expressing in paragraph 75, right?

A.      There may –

MR. WIEGAND:      Objection.

THE WITNESS:   So if a loan has three findings, each finding breaches a rep and warrant – we've mapped it to a specific rep, and the loan itself will – based on what the loan is, you know, I'll rate the loan material or not material.

BY MR. WEINSTEIN:

Q.      On a loan level?

A.      On a loan-level basis.  The entire loan.

Q.      So it may be the case that one or more of those individual findings of a breach of an individual rep, if that were the only thing there, you might not find it material, right?

MR. WIEGAND:      Objection.

THE WITNESS:      That's possible.  That's true.

BY MR. WEINSTEIN:

Q.      Okay.

A.      But you'd have to see the specific circumstances.

Q.  Right.  You'd have to look at a particular loan in order to – in order to know which of those, standing alone, in your view, would be a material breach and which would not?

A.      Yes, sir.

Q.      So if a loan is included in your loan-by-loan appendices that you submitted, that means you concluded that the breaches as a whole on a loan-level basis were material, right?

A.      Yes, sir.

Q.  Okay. Does it mean that one of either breach 1, 2, or 3 – that at least one of them would have had to have been material, standing alone, or just that the cumulative effect of all three was material in your view?

MR. WIEGAND:      Objection.

THE WITNESS:      Again, you'd have to see the specific circumstance.   You know, there are circumstances where, for instance, a 100 percent LTV loan is going to be treated differently than a 90 – than a 70 percent LTV loan.  So you have to see it within the circumstance of the entire loan.

BY MR. WEINSTEIN:

Q.  But there could be circumstances in which each of those three alleged breaches would be not material, standing alone, but in combination holistically at the loan level you've concluded that the loan as a whole was materially breached?

MR. WIEGAND:  Objection.

THE WITNESS:      It could be, but I'd have to see the loan.

(Hunter Tr. at 194:10-198:13 (Weinstein Decl. Ex. GG).)

**Plaintiff's Response:**  Undisputed only insofar as Mr. Hunter was asked the cited questions and gave the cited answers and counsel for the Trustee made the cited objections.

115.    During his deposition taken in the present case on April 25, 2017, Mr. Hunter was asked the following questions and gave the following answers:

Q.      And is experience as an expert in the mortgage industry something that's helpful – that you found helpful to you in determining whether or not breaches were material?

MR. WIEGAND:      Objection.

THE WITNESS:      Yes.

BY MR. WEINSTEIN:

Q.      Do you think your opinion about the materiality of the alleged breaches is more meaningful than a person who has no experience in the mortgage industry?

MR. WIEGAND:      Objection.

THE WITNESS:      Yes.

(Hunter Tr. at 202:7-19 (Weinstein Decl. Ex. GG).)

**Plaintiff's Response:**  Undisputed only insofar as Mr. Hunter was asked the cited questions and gave the cited answers and counsel for the Trustee made the cited objections.

116.    During his deposition taken in the present case on April 25, 2017, Mr. Hunter was asked the following questions and gave the following answers:

Q.     How did you apply this part of section 10(b)(5), the knowledge qualifier?

MR. WIEGAND:     Objection.

THE WITNESS:· That – we applied it saying that, okay, we – you know, someone didn't follow underwriting guidelines, someone was negligent, there was omissions, error, whatever, that this was information that they knew or could have known – or – you know, they knew or did know.

Q.     Well, which one?  Did you do anything to determine whether Morgan Stanley actually did know of any of the alleged breaches of underwriting guidelines?

MR. WIEGAND:     Objection.

THE WITNESS:     No, we didn't.

BY MR. WEINSTEIN:

Q.     Okay.  And did you do anything to determine whether Morgan Stanley did know of any kind of breach of section 10(b)(5) of the MLPA?

MR. WIEGAND:     Objection.

THE WITNESS:     Which section again, sir?  The same one?

BY MR. WEINSTEIN:

Q.     The same one.

A.     So the question, again, is what?

Q.     Did you do anything to determine whether Morgan Stanley did know of any kind of breach of section 10(b)(5) of the MLPA –

A.     No.

Q.     – as distinguished from –

MR. WIEGAND:     I'm sorry.  He hasn't –

BY MR. WEINSTEIN:

Q.     Let me ask again.  My earlier question was, did you do anything to determine whether Morgan Stanley was aware of any breach of underwriting guidelines, which you were applying to

66

section 10(b)(5)?  And my follow-up question was – and you said no.

My follow-up question was, did you do anything to determine if Morgan Stanley was aware of any breach other than of underwriting guidelines under section 10(b)(5)?

MR. WIEGAND:        Objection.

THE WITNESS:        Um –

BY MR. WEINSTEIN:

Q.      So for example, fraud.

MR. WIEGAND:        Further objection.

THE WITNESS:  Okay.  In the review of our loan files, we found information that the servicer had – you know, things. So there was, you know, fraud, misrepresentation, some of that stuff.  I mean, we found it.  I mean, how it – you know, it was known.  It was identified.  So, I mean, we found that.

BY MR. WEINSTEIN:

Q.      Right.  But you didn't take an additional step to determine what Morgan Stanley knew or didn't know, correct?

MR. WIEGAND:        Objection.

THE WITNESS:        That's correct.  We didn't.

(Hunter Tr. at 174:12-177:8 (Weinstein Decl. Ex. GG).)

**Plaintiff's Response:**  Undisputed only insofar as Mr. Hunter was asked the cited questions and gave the cited answers and counsel for the Trustee made the cited objections. Disputed to the extent Morgan Stanley suggests that there is no evidence that it had knowledge of those breaches.  *See* Dkt. 50 ¶20 (admitting that Morgan Stanley performed due diligence on loans in the Trust); Weinstein Decl. Ex. BB ¶¶82-109, 114 (misrepresentations of income, employment, debt, and occupancy; failure to comply with underwriting guidelines or principles

of prudent underwriting; and defective appraisals would have been apparent during due diligence).

117.     During his deposition taken on May 26, 2016 in <u>Morgan Stanley Mortg. Loan Trust 2006-14SL v. Morgan Stanley Mortg. Capital Holdings LLC</u>, No. 652763/2012 (Sup. Ct. N.Y. Cty.), Mr. Hunter was asked the following questions and gave the following answers:

> Q.     Okay.  Now in determining whether an alleged breach was material, or whether the loan as a whole was materially in breach, would it have mattered to you if after the loan was originated certain circumstances made the loan less risky; so, for example, the borrower amassed more savings or got a higher paying job or reduced his or her other debts?
>
> MR. CYRULNIK:     Objection.
>
> A.     No.
>
> Q.     And is that because the date as of which you determined whether there were alleged material breaches was the date that the loan was made?
>
> A.     The information that was – yes.
>
> Q.     Did you try to make that determination as of any later date?
>
> A.     No.

(Hunter 2006-14SL Tr. at 213:13-214:8 (Weinstein Decl. Ex. HH).)

**Plaintiff's Response:**  Undisputed that Mr. Hunter gave that testimony in a different case, governed by different contracts.  Disputed that the reference to Mr. Hunter's testimony about reunderwriting he conducted in a different case, governed by different contracts, describes Mr. Hunter's opinions or process in the instant case.  *See* Weinstein Decl. Ex. GG at 242:4-9 (Mr. Hunter determined that breaches were material on "the date of the loan," and that they "were continuing ongoing breaches as well," not "breaches that may have been cured or may have been resolved" by subsequent events.); *id.* at 242:4-244:18 (similar).

118.    During his deposition taken in the present case on April 25, 2017, Mr. Hunter admitted that he "use[d] the same methodology" as the one he described in the prior testimony transcribed in Paragraph 117, supra, and stated that "we made the determination based on the information at the date of the loan."  (Hunter Tr. at 241:3-10 (Weinstein Decl. Ex. GG).)

**Plaintiff's Response:**  Undisputed that Mr. Hunter gave that testimony in a different case, governed by different contracts.  Disputed that the reference to Mr. Hunter's testimony about reunderwriting he conducted in a different case, governed by different contracts, describes Mr. Hunter's opinions or process in the instant case.  *See* Weinstein Decl. Ex. GG at 242:4-9 (Mr. Hunter determined that breaches were material on "the date of the loan," and that they "were continuing ongoing breaches as well," not "breaches that may have been cured or may have been resolved" by subsequent events.); *id.* at 242:4-244:18 (similar).

## X.    Morgan Stanley's Materiality Expert

119.    On December 16, 2016, Morgan Stanley served the expert report of Christopher M. James, Ph.D.   (Expert Report of Christopher M. James ("James Rpt.") (Weinstein Decl. Ex. II).)

**Plaintiff's Response:**  Undisputed.

120.    Dr. James stated that, "after controlling for loan characteristics and economic factors, there is no statistically significant difference between the performance of the loans in the Trust with material breaches alleged by Plaintiff's experts and the performance of the loans in the Trust for which Plaintiff's experts have not alleged any material breaches."  (James Rpt. ¶ 16 (Weinstein Decl. Ex. II).)   Dr. James therefore "conclude[d] that the alleged breaches did not have a material adverse impact on the performance of the loans."  (Id.)

**Plaintiff's Response:**   Undisputed that Dr. James's report contains those assertions. Disputed that they are accurate and helpful to the Court.  Weinstein Decl. Ex. Y ¶9, ¶¶115-123 (opinion of Dr. Mason that Dr. James's regression analysis is "deeply flawed and unreliable" because, among other things, many of the "Comparable Deals" that Dr. James used in his analysis have been subject of allegations similar to those in this case, making them an unsuitable control group for comparing the sample reviewed in Mr. Hunter's report).

121.   In his expert report, Dr. James stated the following:

> I then estimated a hazard model to determine if the loans in the sample with alleged material breaches performed differently than the loans in the sample for which Plaintiff's experts have not alleged any material breaches.  A hazard model is a statistical model that measures the incremental impact on the probability that a loan will default (the hazard rate) based on a set of explanatory variables.   The explanatory variables that I use in this model include loan and borrower characteristics—specifically, FICO score, original CLTV ratio, original loan balance, and indicator variables to designate whether the loan purpose was for purchase, whether the underlying property was owner occupied, whether the loan was originated under a full documentation program, whether the underlying property was a single family residence, whether the loan had a prepayment penalty, and whether the loan was an ARM—as well as three economic variables: percentage change in the local HPI, percentage change in ·unemployment, and percentage change in personal income.  I also include an indicator variable, as an additional explanatory variable to the ones listed above, that distinguishes loans with alleged material breaches from those without alleged material breaches.  This model specification is relatively parsimonious, that is, it uses as few variables as necessary to explain the observed data, and the variables included are consistent with those used to predict default rates by other researchers and are similar to the variables I have used in my prior academic publications to explain default rates.

(James Rpt. ¶36 (Weinstein Decl. Ex. II) (footnotes and citations omitted).)

**Plaintiff's Response:**   Undisputed that Dr. James made that statement.  Disputed that it is accurate and helpful to the Court.  Weinstein Decl. Ex. Y at 33 & ¶¶71-83 (opinion of Dr. Mason that "Dr. James's selection of the first 30-day delinquencies as a proxy for a default and

loss is not accepted as a valid measure because it misclassifies many 'live' loans as 'dead' ''); *id.* ¶ 71 ("Dr. James's criteria are not an accepted industry classification precisely because they 'overstate[] the true number of loans that will eventually default and be foreclosed," and "[w]hile Dr. James notes that 'there are other acceptable methods of calculating default rates,' . . . Dr. James provides no evidence that his model is robust compared to those other methods" (footnote omitted)); *id.* ¶¶ 72-88 (similar); *id.* ¶ 89 (explaining that that Dr. James's model uses different variables than those used in the model of Dr. Christopher Palmer, on whose work Dr. James bases his model and that, as a result, "Dr. James's model cannot be considered to be grounded in existing academic research"); *id.* ¶¶ 90-96 (similar); *id.* ¶ 97 (concluding that Dr. James's model is "untested" and "deeply flawed").

122.    In his expert report, Dr. James stated the following:

> The results of my analysis are depicted in **Exhibit 6**. If the disclosed loan characteristics and economic factors used as control variables in my hazard model did not fully account for the risk of the underlying loans (e.g., due to inaccuracies in the disclosed loan characteristics or other undisclosed factors that led to material breaches) then I would expect the analysis to show that loans with alleged material breaches significantly *underperformed* the loans without alleged material breaches. In other words, if the alleged material breaches caused incrementally worse performance, I would expect the loans with alleged material breaches to default at a higher rate than the loans without alleged material breaches, after controlling for relevant risk characteristics, and thus I would expect the hazard ratio for the "alleged material breach" indicator to be statistically significant and above one.

> However, as **Exhibit 6** shows, the hazard ratio on loans with alleged material breaches is not statistically significant, indicating that loans with alleged material breaches did not perform significantly differently than loans without alleged material breaches. Based on this result, I conclude that the alleged breaches of representations and warranties did not have a material adverse impact on the performance of the loans in the Trust.

(James Rpt. ¶¶ 38-39 (Weinstein Decl. Ex. II) (emphasis in original).)

**Plaintiff's Response:**  Undisputed that Dr. James made that statement.  Disputed that it is accurate and helpful to the Court.  Weinstein Decl. Ex. Y ¶¶68, 99 (opinion of Dr. Mason that Dr. James's econometric model in Exhibit 6, which is based on an unpublished working paper, "selectively reports results for only a single regression coefficient of that model," and that "[t]he main problem with Dr. James's model begins to become apparent when one realizes that the model only finds important effects for his macroeconomic covariates with his flawed 'first' 30-day delinquency measure of default, which mischaracterizes the timing of macroeconomic variables and therefore their relationship to default and loss"); *id.* ¶¶101-102 & Table 3 ("One would expect that if Dr. James's model is worthwhile, his results will not only hold up, but also improve, using measures of distress that are more highly correlated with loss," but "Dr. James's results *deteriorate*, rather than improve, with measures of default more closely related to loss."); *id.* ¶104 (concluding that "Dr. James's opinion that defaults were caused by macroeconomic factors rather than the breaches identified by Mr. Hunter, therefore, does not hold up because he only finds a role for such macroeconomic factors in a flawed model that mis-times the relationship between such factors and his measure of economic distress, the first time a loan becomes 30 days delinquent regardless of whether the loan went to liquidation or loss").

## XI.   Release of Repurchase Claims Against Accredited

123.    On October 6, 2009, Deutsche Bank filed Proof of Claim No. 817 in Accredited's bankruptcy (the "DB Claim"), in its capacity as trustee for certain specified trusts and "any other trusts of which it is trustee and which hold mortgage loans originated or sold by any Debtor." (Deutsche Bank Proof of Claim No. 817, ¶¶1, 7-8, In re Accredited Home Lenders Holding Co., No. 09-11516 (Bankr. D. Del. Oct. 6, 2009) (Weinstein Decl. Ex. JJ).)

**Plaintiff's Response:**  Undisputed that the release contains that statement.  Disputed that the release applies to claims against Morgan Stanley.  *See* Weinstein Decl. Ex. LL at Ex. 1 ¶3 (discharging claims only against "the Debtors" – *i.e.*, Accredited and other specifically "Released Parties").

124.    Deutsche Bank is the trustee for MSST 2007-1, which includes mortgage loans originated by Accredited.  (Prospectus Supplement at S-4-5 (Weinstein Decl. Ex. C); MLPA § 1 at 2 (defining "Accredited Mortgage Loans") (Weinstein Decl. Ex. F).)

**Plaintiff's Response:**  Undisputed.

125.    The DB Claim stated that "Debtors have breached certain of these Representations and Warranties" in the corresponding governing agreements for the trusts described in the DB Claim and "the Trusts have or will have claims for breach of such obligations." (Deutsche Bank Proof of Claim No. 817, ¶¶ 1, 7-8, In re Accredited Home Lenders Holding Co., No. 09-11516 (Bankr. D. Del. Oct. 6, 2009) (Weinstein Decl. Ex. JJ).)

**Plaintiff's Response:**  Undisputed.

126.    Accredited objected to the DB Claim.  (In re Accredited Home Lenders Holding Co., No. 09-11516, Dkt. No. 1567 (Bankr. D. Del. May 21, 2010) (Weinstein Decl. Ex. KK).)

**Plaintiff's Response:**  Undisputed.

127.    Deutsche Bank and Accredited entered a stipulation that stated:

> Except as set forth herein, DB, solely in its capacity as Trustee for each of the applicable trusts, fully and forever releases, surrenders, gives up and discharges the Debtors [Accredited] . . . (collectively, the "Released Parties") from any and all claim, actions, causes of action, rights, debts, costs, charges, losses, demands and damages of whatsoever nature or kind in law or equity, *whether now known or hereinafter known, that DB ever had, may have had or may have against the Released Parties* solely with respect to the DB Claim, including, but not limited to any and all claims for actual, punitive and/or statutory damages asserted or which could have

been asserted against the Released Parties solely with respect to the DB Claim. DB, in its capacity as Trustee for each of the applicable Trusts, further *covenants not to sue or authorize a suit against the Released Parties* in connection with any of the foregoing released claims, actions, causes of action, rights, debts, costs, charges, losses, demands and damages relating to the DB Claim.

(Order Approving Stipulation Ex. 1 ¶¶2-3 (emphasis supplied), <u>In re Accredited Home Lenders Holding Co.</u>, No. 09-11516, Dkt. No. 3103 (Bankr. D. Del. Nov. 27, 2012) (Weinstein Decl. Ex. LL).)

**Plaintiff's Response:** Undisputed.

128.    The Bankruptcy Court approved the stipulation on November 27, 2012, retaining exclusive jurisdiction "to interpret, implement and enforce the provisions of this Order and the Stipulation." (Order Approving Stipulation at 2, <u>In re Accredited Home Lenders Holding Co.</u>, No. 09-11516, Dkt. No. 3103 (Bankr. D. Del. Nov. 27, 2012) (Weinstein Decl. Ex. LL).)

**Plaintiff's Response:** Undisputed.

## PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS AS TO WHICH IT CONTENDS THAT THERE EXIST GENUINE ISSUES TO BE TRIED

In addition to the genuine issues of fact noted above, the Trustee respectfully submits that genuine issues of fact remain to be tried as set out below.

## I.    THE MSST 2007-1 SECURITIZATION

129.    Closing on July 6, 2007, this securitization was one of the last three residential mortgage-backed securitizations Morgan Stanley sponsored before the market collapsed. Shur Decl. Ex. 28 (Telesca Dep. Tr.) at 338:7-339:11.

130.    At the time that Morgan Stanley decided to create the Trust, it knew that foreclosures were dramatically increasing. Shur Decl. Ex. 2 (MSM_MSSTI_20071_0214862).

131.    The Senior Vice President of Morgan Stanley's valuation group remarked that there was an "amazing" number of "appraisers . . . doing fraud."  Shur Decl. Ex. 3, at 317:14-318:2; Shur Decl. Ex. 4.

132.    During its corporate deposition, Morgan Stanley testified that the Trust was "an unusual transaction."  Weinstein Decl. Ex. G at 34:8-35:14.

133.    The MSST 2007-1 transaction was a "single deal" that was not part of a "shelf" of similar deals.  Shur Decl. Ex. 28, at 273:5-22.

134.    MSST 2007-1 contains loans from 11 different originators, instead of the usual "two or three."  Weinstein Decl. Ex. D at 49:14-50:16.

135.    On June 30, 2007, Frank Telesca (the Executive Director of Morgan Stanley's Global Proprietary Credit Group or "GPCG") sent an email to Steven Shapiro (the Vice President of GPCG) and others with the subject "pool cuts if we do MSSTI."  In that email, Telesca wrote that "we plan to empty the position."  Shur Decl. Ex. 12.

136.    At his deposition on April 13, 2016, Telesca explained that he understood "empty[ing] the position" to mean "securitiz[ing] the full amount of the loan position," specifically including "subprime loan[s]."  Shur Decl. Ex. 28, at 339:14-340:19.

137.    Morgan Stanley conducted due diligence in connection with loans underlying the Trust.  Dkt. 50 ¶ 20; Shur Decl. Ex. 17 Nos. 8-9.

138.    Morgan Stanley had originally planned to securitize 3,996 loans in the Trust, but it had to repurchase 364 of them from Bear Stearns due to breaches.  Shur Decl. Ex. 28, at 348:22-350:3.

139.    Due diligence of loans from Aegis Subprime, one of the originators for loans securitized in MSST 2007-1, revealed that 304 loans had "material credit and compliance

problems," including "uncurable compliance violations" and "incomplete or inaccurate documentation."   Shur Decl. Ex. 21; *see* MLPA §1 (Weinstein Decl. Ex. F) (listing Aegis Mortgage Corporation as an originator of loans in the Trust).

140.   Morgan Stanley also identified "red flag[s]" in appraisals for loans in the Trust. Shur Decl. Ex. 3, at 181:15-25.

141.   By 2008, Morgan Stanley confirmed that there was fraud in the origination of the loans through its post-closing fraud reviews.  *See* Shur Decl. Ex. 22.

142.   During pre-securitization due diligence, Morgan Stanley's due diligence vendor gave at least 86 of the loans in the Trust the highest risk rating available.  Shur Decl. Exs. 5-10.

143.   For one loan, the vendor determined that a locker room attendant who claimed to make $66,216 per year had stated an unreasonable income.  Shur Decl. Ex. 9 (loan ████4846). For another loan that required documentation of the borrower's income, the vendor pointed out that the required documentation (a paystub and W2) was missing, but Morgan Stanley deemed those documents "not pertinent."  Shur Decl. Ex. 6 (loan ████1988).

144.   Morgan Stanley sold both of those loans to the Trust.   Shur Decl. Ex. 29 (DBNTC_MSSTI_00010442); Shur Decl. Ex. 30 (MSM_MSSTI_20071_0003560).

145.   Morgan Stanley's internal database showed that many loans sold to the Trust had first payment defaults.   Shur Decl. Ex. 23 (loan ████6895); Shur Decl. Ex. 24 (loans ████8983 and ████5888); Shur Decl. Ex. 25 (loans ████7794, ████9465, and ████5270); Shur Decl. Ex. 26 (loans ████5268 and ████7133); Shur Decl. Ex. 27 (loans ████7228, ████2611, ████5370, ████3388, ████0759, ████9964, and ████9776); *see* Shur Decl. Ex. 30 (MSM_MSSTI_20071_0003560) (Mortgage Loan Schedule).

146.    A former Morgan Stanley employee testified that loans with first payment defaults "weren't supposed to be securitized."  Shur Decl. Ex. 11, at 306:5-24.

147.    Securitizing defaulted loans was common practice at Morgan Stanley.  *See* Shur Decl. Ex. 31 (MSM_MSSTI_20071_0162789) (exploring ways of securitizing delinquent loans).  It described this practice as "fill[ing] [the] 1% gap."   Shur Decl. Ex. 12 (MSM_MSSTI_20071_0222237).

148.    One of Morgan Stanley's own due diligence employees alerted Frank Telesca and Steven Shapiro, key executives on Morgan Stanley's finance desk, that he had "delved a little deeper" and discovered "how easy it is to buy loans we know nothing about," because "the data is so sloppy and/or incomplete I couldn't clean it up after hours and hours."  Shur Decl. Exs. 32, 33 (MSM_MSSTI_20071_0292378 and MSM_MSSTI_20071_0134872).  "It isn't 'just a couple of typos' or 'mistakes,' " he stated: "The more we dig, the more we find."  Shur Decl. Ex. 33 (MSM_MSSTI_20071_0134872).

149.    Morgan Stanley told that employee to stop investigating those issues.  Shur Decl. Ex. 32 (MSM_MSSTI_20071_0292378).

150.    After closing, Morgan Stanley actively pursued repurchase demands to originators to recoup money for itself.  *See* Shur Decl. Exs. 14-15.

151.    Although Morgan Stanley's repurchase group tripled in size after the securitization closed, the group focused almost exclusively on repurchase claims Morgan Stanley asserted against originators.  Shur Decl. Ex. 13, at 70:2-16, 81:18-24.

152.    The repurchase group's former Director did not recall any procedures for handling repurchase demands that Morgan Stanley received.  Shur Decl. Ex. 13, at 213:2-8.

153.    Although Morgan Stanley's repurchase manual once contained procedures for a "Vertical Demand" – *i.e.*, a "repurchase request or a breach notice that did not come from a third party but instead was internal," Weinstein Decl. Ex. G at 70:17-22 – Morgan Stanley removed those procedures between 2012 and 2013.  *Id.* at 114:2-115:22; *see* Weinstein Decl. Ex. S.

## II.    THE DOJ SETTLEMENT COVERING MSST 2007-1

154.    In February 2016, Morgan Stanley "acknowledge[d]" unlawful conduct pertaining to this Trust, among others, in the Statement of Facts accompanying a $2.6 billion settlement with the Department of Justice that covers this Trust.  Shur Decl. Ex. 1, at 1-3 & Annex 2, at 5 (listing this Trust).

155.    Morgan Stanley acknowledged that it was well aware of the "problematic lending practices of the subprime originators from which it purchased mortgage loans."  Shur Decl. Ex. 1 Annex 1, at 14.

156.    But Morgan Stanley still "clear[ed] dozens of loans for purchase after less than one minute of review per loan file."  Shur Decl. Ex. 1 Annex 1, at 10.

157.    Morgan Stanley acknowledged that it knew that "loans that did not comply with underwriting guidelines and lacked adequate compensating factors and/or had understated loan-to-value ratios were included in the RMBS sold."  Shur Decl. Ex. 1 Annex 1, at 1-2.

158.    Morgan Stanley acknowledged that its "finance team, which was responsible for purchasing and securitizing loan pools but not underwriting or due diligence, instituted a procedure whereby the finance team considered [purchasing] certain loans that Morgan Stanley's credit-and-compliance due diligence process had already recommended should not be purchased."  Shur Decl. Ex. 1 Annex 1, at 12.  Through that procedure, the finance team "decided which of the[] loans had 'acceptable risk.'"  *Id.* at 13.

159.    Morgan Stanley "ultimately purchased and securitized hundreds of loans through this process." Shur Decl. Ex. 1 Annex 1, at 13.

160.    As a result, as Morgan Stanley knew, many of the loans it securitized, including in this Trust, "did not conform to Morgan Stanley's representations."  Shur Decl. Ex. 1 Annex 1, at 13.

161.    Morgan Stanley's Vice President of Valuation, who was responsible for due diligence on the properties securing the loans Morgan Stanley securitized, including in MSST 2007-1, admonished an analyst for using the phrase "slightly higher risk tolerance" in writing because Morgan Stanley was "running under the radar and d[id] not want to document these types of things."  Shur Decl. Ex. 1 Annex 1, at 9.

### III.    THE *MSM 2006-13ARX* APPEAL

162.    On June 15, 2017 the parties in *Morgan Stanley Mortgage Loan Trust 2006-13ARX v. Morgan Stanley Mortgage Capital Holdings LLC*, No. APL-2016-00240, advised the Court of Appeals that "an agreement in principle to settle th[e] action ha[d] been reached," and "the parties intend to withdraw the appeal."  Shur Decl. Ex. 34.

June 22, 2017

Respectfully Submitted,

Steven F. Molo
Robert K. Kry
Justin V. Shur
Lauren M. Weinstein
MOLOLAMKEN LLP
430 Park Avenue
New York, New York  10022
(212) 607-8160 (telephone)
(212) 607-8161 (facsimile)

*Attorneys for Plaintiff Deutsche Bank*
*National Trust Company, as Trustee for the*
*Morgan Stanley Structured Trust 2007-1*